**COLE SCHOTZ P.C.**
1325 Avenue of the Americas
Suite 1900
New York, New York 10019
201-752-8000
*Attorneys for Plaintiffs, Tecspec LLC, Richard Rose*
*Robert Senia, and Ralph Schlenker*

| | |
|---|---|
| TECSPEC LLC, RICHARD ROSE, ROBERT SENIA, and RALPH SCHLENKER,<br><br>                    Plaintiffs,<br><br>        v.<br><br>MICHAEL DONNOLO, JOSHUA DONNOLO, JOHN MICHAEL LONG, BRAYA CONCEPTS LLC, BRAYA MACHINE COMPANY LLC, BRAYA SYSTEMS LLC, BRAYA VENTURES LLC, and ABC CORPORATIONS 1-10<br><br>                    Defendants. | UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK<br><br>CIVIL ACTION NO.<br><br>        <u>Civil Action</u><br><br>**VERIFIED COMPLAINT** |

Plaintiffs, Tecspec LLC ("Tecspec"), Richard Rose ("Mr. Rose"), Robert Senia ("Mr. Senia"), and Ralph Schlenker ("Mr. Schlenker" and together with Mr. Rose and Mr. Senia, the "Members" and the Members with Tecspec, the "Plaintiffs"), as and for their Verified Complaint against Defendants Michael Donnolo ("M. Donnolo"), Joshua Donnolo ("J. Donnolo" and together with M. Donnolo the "Donnolo Brothers"), John Michael Long ("Mr. Long," and together with the Donnolo Brothers, the "Individual Defendants"), Braya Machine Company LLC, Braya Systems LLC, Braya Concepts LLC, and Braya Ventures LLC (the "Braya Entities," and together with the Individual Defendants, the "Defendants"), hereby allege as follows:

## INTRODUCTION

1.      This is an action to enjoin M. Donnolo from violating his fiduciary duties owed to Tecspec, as well as his non-compete agreement, by operating the Braya Entities to Tecspec's

detriment.  Likewise, Plaintiffs seek to enjoin their (now former) employees, J. Donnolo and Mr. Long, from conspiring with M. Donnolo to undermine Tecspec by assisting him in operating the Braya Entities.

2.      Put plainly, M. Donnolo has spurned a once in a lifetime opportunity to start a successful business and obtain significant financial success. By way of brief background, in or around 2017, after working on a separate project together, M. Donnolo and Mr. Senia formed a concept for an HVAC manufacturing company focused on developing innovative HVAC units. While M. Donnolo possessed engineering expertise, he otherwise lacked the necessary background, industry experience, and working capital to fully realize this concept alone.

3.      Mr. Senia, however, who is a partner in one of the largest HVAC manufacturer representative firms in New York, had the necessary financial resources, business acumen, and industry knowledge necessary to bring Tecspec from an idea to a full-fledged entity.  Believing that Tecspec could revolutionize the HVAC industry, Mr. Senia recruited his partners Mr. Rose and Mr. Schlenker to join in this venture.

4.      The Plaintiffs began to invest significant time, money and resources in developing Tecspec's HVAC units, including retaining a former Rolls Royce chief jet engine engineer to develop certain integral components for its HVAC units. As a result, Tecspec developed proprietary manufacturing techniques and designs that offer a competitive advantage in installation cost, noise reduction, and efficiency.

5.      Ultimately, owing to the efforts, expertise, and capital of Plaintiffs, Tecspec developed invaluable manufacturing techniques and designs which make its HVAC units significantly cheaper to install, quieter, and more efficient than other competitors. Plaintiffs' efforts led to securing several multi-million-dollar contracts. The last and largest contract was for

the Two Penn Plaza building in Manhattan, a notable and rare achievement for a start-up company. Plaintiffs attribute this success to the Members' longstanding reputations in the industry and the quality of the HVAC unit they developed.

6.    Recognizing the importance of protecting Tecspec's confidential trade secrets, Plaintiffs implemented reasonable security measures, including storing design schematics on a password protected cloud-based server.

7.    At the early stages of the Two Penn Plaza job, Mr. Senia was injured in a life-threatening motor vehicle accident. Mr. Senia was out of work and recovering for approximately six months. With Mr. Senia absent, M. Donnolo was entrusted with overseeing production and plant management. But M. Donnolo saw an opportunity to extort the company. Fueled by greed and arrogance, M. Donnolo believed that he was solely responsible for developing Tecspec's HVAC units and demanded that he be made an 85% owner of the company. If the Members did not agree to his demands, M. Donnolo threatened to walk out (with J. Donnolo and Mr. Long) and not fulfill the Two Penn Plaza Building unit orders because the purchase order was given to SRS Enterprises, the Members' HVAC representative firm, directly from Turner Construction.

8.    The purchase order for the Two Penn Plaza Building was in the amount of $6.5 million dollars. At that time, M. Donnolo had possession of all the information and designs necessary to complete the Two Penn Plaza job, and if he left, Tecspec would have been unable to continue work on that project. This would certainly have put Tecspec in severe financial stress since it would have taken an unknown amount of time to rebuild the knowledge of the job, and SRS Enterprises would certainly be sued by Turner for breach of contract.

9.      The 85% request from M. Donnolo was rejected as it was deemed unacceptable by the other Members as it undermined their contributions and investments which amounted to millions of dollars, thousands of hours of labor, and trade secret development.

10.     Not only did M. Donnolo walk out, but he told other Tecspec employees to not show up at work. Most of those employees were hired by M. Donnolo and worked for him in another business. All of Tecspec's employees stayed home but one. After a week, Mr. Senia offered a $10,000 bonus to anyone that would return to work, and all did after a week. Three weeks later, after tense negotiations, the Members agreed to provide M. Donnolo with a $400,000 salary, which was a 100% increase, and M. Donnolo returned to work. Approximately three months later he promised never to speak to the Members again. He kept his promise.

11.     Ultimately, despite being provided a large yearly salary, M. Donnolo refused to accept that absent the Members' efforts, Tecspec would be nothing but an idea, and rather than adhere to his fiduciary duties as a member, and work towards further building Tecspec, he decided he would try and run it out of business. M. Donnolo allegedly continued to work on the Two Penn Plaza job to maintain an appearance of loyalty, only to recruit Tecspec employees (including J. Donnolo and Mr. Long) to join him in a new company, the Braya Entities, to start directly competing with Tecspec by manufacturing its HVAC units in a separate facility.

12.     Plaintiffs, however, observed a decline in progress at Two Penn Plaza and irregular attendance by M. Donnolo and J. Donnolo to the point of not showing up to work at all. Likewise, Mr. Long would disappear for days at a time as reported by David Lopez, one of the assembly line workers.

13.     Confused as to why the Individual Defendants were not handling their responsibilities, Plaintiffs investigated. Those efforts paid dividends, and Plaintiffs caught M. Donnolo red-handed.

14.     Last week, after becoming aware that M. Donnolo had leased a facility in Staten Island, Mr. Senia and Mr. Rose entered the premises and discovered thousands of dollars of stolen Tecspec equipment. Notwithstanding that M. Donnolo, with the assistance of J. Donnolo and Mr. Long, literally robbed Tecspec blind, Mr. Senia and Mr. Rose observed that the Individual Defendants were producing Tecspec's HVAC units using Tecspec's confidential designs and manufacturing processes without consent. That fact is indisputable, as Plaintiffs have photographic evidence of M. Donnolo's unlawful conduct.

15.     As if stealing and transporting Tecspec's equipment and inventory over state lines (in trucks owned by Tecspec) was not bad enough, Plaintiffs also discovered that the Braya Entities have bid on two jobs in Manhattan that Tecspec had already bid on. For one of those projects, Tecspec was awarded a contract, and has already provided multiple floors of units. The Braya Entities have also been awarded a contract for a number of HVAC units on that same project, and the exact number is not known at this time. The Individual Defendants were in the process of building these units when Mr. Rose and Mr. Senia entered the Braya Entities' facility. All were working for the Braya Entities during normal working hours while being paid by Tecspec.

16.     M. Donnolo also created a contingency plan and implemented measures to restrict the Members' access to Tecspec's operations in case he was caught. Specifically, M. Donnolo, in addition to J. Donnolo and Mr. Long, retain exclusive control over passwords for critical company assets, including: (i) design and schematic databases; (ii) servers, software, and other electronic data; (iii) company websites; (iv) facility surveillance systems; (v) business email accounts; (vi)

manufacturing equipment controls; and (vii) facility temperature control systems. As a result of these actions, Tecspec has been unable to continue necessary work at the Two Penn Plaza job site and other jobs, potentially leading to missed contractual deadlines. Indeed, the Individual Defendants' conduct has shut down operations at Tecspec, and it will not be able to reopen until it receives this vital information.

17.    M. Donnolo's conduct is unjust, outrageous, and cannot be permitted to continue. M. Donnolo's conduct is a blatant breach of trust and misuse of his position within Tecspec to access confidential trade secrets. M. Donnolo recruited Mr. Long and J. Donnolo to operate the Braya Entities in direct competition with Tecspec, using Tecspec's trade secrets to gain a market advantage and to cut out his business partners, all while collecting salaries, and using and stealing company machines, parts, property, and trade secrets.

18.    A temporary restraining order and preliminary injunction is necessary to protect Plaintiffs as they prosecute their various claims against the Individual Defendants and the Braya Entities. Critically, should Defendants be permitted to continue on their course of action absent this relief, Tecspec faces a bitter reality. That is, Defendants push forward and ultimately run Tecspec out of business. Justice cannot countenance this abhorrent conduct.

## <u>THE PARTIES</u>

19.    Plaintiff Tecspec LLC is a New York State limited liability company with its principal place of business located at 150 St. Charles Street, Newark, NJ 07105.

20.    Richard Rose is an individual residing in the State of New Jersey and is a 25% member of Tecspec.

21.    Robert Senia is an individual residing in the State of New Jersey and is a 25% member of Tecspec.

22.     Ralph Schlenker is an individual residing in the State of New York and is a 25% member of Tecspec.

23.     Michael Donnolo is an individual residing in the State of New York, New York County, and is a 25% member of Tecspec. Michael Donnolo is also an owner of the Braya Entities.

24.     Braya Systems LLC is a New York State limited liability company with its principal place of business located at 2589 Richmond Terrace, Staten Island, NY 10303.

25.     Braya Machine Company LLC is a New York State limited liability company with its principal place of business located at 2589 Richmond Terrace, Staten Island, NY 10303.

26.     Braya Concepts LLC is a New York State limited liability company with its principal place of business located at 2589 Richmond Terrace, Staten Island, NY 10303.

27.     Braya Ventures LLC is a New York LLC with its principal place of business located at 2589 Richmond Terrace, Staten Island, NY 10303.

28.     Joshua Donnolo is an individual residing in the State of New York, New York County, who is an employee of the Braya Entities. Joshua Donnolo is also a former employee of Tecspec.

29.     John Michael Long is an individual residing in the State of New York, New York County, who is an employee of the Braya Entities. John Michael Long is a former employee of Tecspec.

30.     ABC Corporations 1-10 are fictitious entities/companies whose actual names are unknown to the Plaintiffs after having conducted a reasonable search with due diligence. Defendants ABC Corporations 1-10 represent additional potential entities established, operated by, or managed by Defendants and using Plaintiffs' trade secrets and/or confidential information.

## **JURISDICTION AND VENUE**

31.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 1338(a), and 1367 as Plaintiffs' claims for misappropriation of trade secrets arise under the laws of the United States, and under 18 U.S.C. § 1836(c) which provides that district courts have original jurisdiction over any civil action brought under 18 U.S.C. § 1836 ("DTSA"). This Court has supplemental jurisdiction over Plaintiffs' remaining claims pursuant to 28 U.S.C. § 1367, because those claims form part of the same case or controversy with the claims for which this Court has original jurisdiction.

32.     Venue is proper in this federal judicial district pursuant to 28 U.S.C. § 1391(a), (b)(2), and/or 1400(a) because a substantial part of the events or omissions giving rise to the causes of action in this case occurred in this judicial district.

33.     This Court has personal jurisdiction over Defendants for the following reasons: the Braya Entities are incorporated in the State of New York with principal places of business located in Staten Island. Likewise, the Individual Defendants are employed by the Braya Entities and conducted business in the State of New York. Therefore, this Court has personal jurisdiction over Defendants in this action for, among other reasons, those set forth in the preceding paragraphs and because, *inter alia*: (i) Defendants transact, or have transacted during the relevant time period, business in this state; (ii) Defendants derive, or have derived during the relevant time period, substantial revenue from services rendered in this state; and (iii) certain of the Defendants' actions at issue in this case occurred in this district.

## FACTUAL ALLEGATIONS

### The Formation of Tecspec and Development of its HVAC Unit

34.     In or around 2017, Mr. Senia developed a relationship with M. Donnolo after working together on a separate project. While working on that project, M. Donnolo and Mr. Senia

discussed the possibility of starting a new entity centered on developing more efficient HVAC units for large-scale residential and commercial properties.

35.    Given that mutual interest, M. Donnolo and Mr. Senia met in Mr. Senia's garage and conceptualized an HVAC unit (and built a cursory prototype) that would be more cost-effective to install and operate with greater efficiency compared to existing market offerings. After meeting with M. Donnolo, Mr. Senia saw that Tecspec, and its hypothesized product, could revolutionize the HVAC industry.

36.    While M. Donnolo possessed the conceptual framework, he lacked resources. To that end, M. Donnolo was only an engineer, he did not have the financial backing, relevant industry knowledge, knowledge of industry-specific contacts, or general business acumen necessary to start and operate a new enterprise.

37.    Mr. Senia, however, is a veteran in the HVAC industry who founded a successful HVAC business. If there was anyone who had the necessary industry knowledge and financial flexibility to get Tecspec off the ground, it was Mr. Senia.

38.    Mr. Senia recognized the potential for Tecspec and realized that its proposed product would significantly impact the HVAC industry. Accordingly, given his prior success in forming a thriving business, Mr. Senia agreed to partner with M. Donnolo in this venture. Thereafter, Tecspec was formed in February 2017, with non-party Christina Senia listed as the sole owner.

39.    Mr. Senia promptly identified that Tecspec required additional expertise and financial backing beyond what himself and M. Donnolo possessed to develop a functioning product and to transform Tecspec from a concept and into a viable competitor in the New York City HVAC market.

40.     To address this challenge, Mr. Senia reached out to his partners Mr. Rose and Mr. Schlenker to ascertain their interest in joining Tecspec and assisting in the development of its product.

41.     Similar to Mr. Senia's reaction, Mr. Rose and Mr. Schlenker were impressed by Tecspec's concept and consented to join the venture.

42.     By way of a January 1, 2018 First Amendment to Operating Agreement (the "Operating Agreement"), Ms. Senia transferred her 75% Membership Interest to Mr. Senia, Mr. Rose, and Mr. Schlenker. Likewise, M. Donnolo became a 25% member of Tecspec, however, unlike the Members, M. Donnolo did not, and has not, provided any financial contributions to the company in exchange for his membership interest.

43.     Following the establishment of the team, the Members immediately commenced operations. They began by investing the necessary capital to initiate the design process for Tecspec's HVAC unit. The Members' involvement extended beyond financial contributions, as they dedicated significant time and effort to developing schematics and conducting component testing.

44.     The Members also sought out top-tier engineering talent, including the recruitment of a former Rolls Royce jet engineer, to assist them in developing a proprietary nozzle design aimed at producing a quieter and more efficient HVAC unit. This endeavor required a substantial investment of $500,000 and thousands of man hours.

45.     Tecspec's confidential nozzle design represents a significant technological advancement. These nozzles are constructed from machined aluminum, threaded for easy replacement, and anodized coated. This design offers superior efficiency and durability compared to traditional nozzles used in conventional HVAC units.

46.    The Members also spent tens of thousands of dollars testing and developing an original silencer which would further ensure that Tecspec's HVAC units were quieter than any competitors.

47.    The Members also innovated in the area of unit construction, opting for extruded aluminum siding instead of sheet metal. This design choice was intended to improve durability, aesthetic quality, and noise reduction. The use of extruded aluminum also allows for increased rigidity and the ability to form more complex shapes from single pieces.

48.    This design approach represents a departure from industry norms, as traditional HVAC units typically utilize sheet metal construction, which is comparatively less durable and more prone to damage requiring costly repairs.

49.    The Members also developed a confidential manufacturing process aimed at reducing installation costs. This process involves using a CNC machine to pre-cut specific extrusions into the aluminum, allowing for a plug-and-place installation method at the desired location, reducing the need for multiple bolts and rivets.

50.    Moreover, the Members developed the Tecspec SOV Valve, which is the only microprocessor required to control the unit, as opposed to other HVAC units which require a motorized vale and an additional controller (at increased costs). Mr. Kevin Kerr was hired as a consultant to develop the software for the valve with a royalty agreement.

51.    After several years of development, Tecspec had created proprietary designs and manufacturing processes for its HVAC units. These innovations were intended to significantly reduce labor time and costs while improving performance, durability, and quality.

52.    The Plaintiffs recognized the potential value of Tecspec's HVAC units, realizing they had developed a product that was revolutionary within the industry.

**Tecspec Opens for Business**

53.    With a preeminent product in hand, Plaintiffs needed to get Tecspec's operations up and running.

54.    Plaintiffs started by leasing a small-scale facility in Long Island City, New York. Plaintiffs grew out of the facility relatively quickly and moved to a large 25,000 square foot facility in Newark, New Jersey that could store a large amount of inventory, in addition to providing enough space for manufacturing the HVAC units.

55.    As explained above the Members placed M. Donnolo in charge of running the facility because a life-threatening injury Mr. Senia sustained. In this regard, M. Donnolo was responsible for, amongst other things, hiring employees, retaining contractors for jobsites, overseeing jobsites to ensure proper installation of HVAC units, and overseeing the quality control of components Tecspec manufactures.

56.    With that control, M. Donnolo hired his brother, J. Donnolo as an engineer and Mr. Long as manufacturing engineer, who was responsible for machine programing, project scheduling, and purchasing.

57.    The success was immediate, as Tecspec landed several multi-million-dollar jobs, including a 6.5-million-dollar project at Two Penn Plaza in Manhattan, which was overseen by M. Donnolo

58.    Plaintiffs realized the significance of landing a job of this magnitude as a new company and attributed that achievement to the design of its HVAC unit. Indeed, Plaintiffs realized that Tecspec's product was incomparable, and that for Tecspec to succeed in the future, they would have to ensure that its designs and manufacturing processes were kept confidential.

59.     To maintain that confidentiality, Plaintiffs stored TecSpec's schematics in a secured cloud-based system which can only be accessed by a limited number of employees with proper authorization and passwords.

60.     Similarly, Plaintiffs ensure that only certain individuals have access to the CNC machines that create Tecspec's components. Those machines create designs that are stored on their internal server.

61.     Tecspec also limited access to its Newark facility to employees only. Likewise, because all of Tecspec's manufacturing is done in-house, no third-party, or non-employee, would have access to its designs and manufacturing processes.

62.     Finally, all of Tecspec's employees who have access to these secured systems are informed by Plaintiffs of the proper protection of this confidential information.

63.     With Tecspec's designs and manufacturing processes secured, and a substantial job landed, the Plaintiffs began to see the fruits of their labor. Indeed, it appeared that Tecspec had unlimited potential, and would quickly become the premier HVAC manufacturer in New York City. M. Donnolo, however, had other plans.

**M. Donnolo Concocts His Scheme To Turn on Tecspec in Violation of His Fiduciary Duties and Non-Compete Agreement**

64.     Around this time, M. Donnolo apparently believed that he no longer needed the Members' assistance and desired to take over Tecspec for himself. In fact, M. Donnolo approached the Members and demanded that he be made an 85% member of Tecspec or otherwise he would walk out.

65.     That request was denied by the Members. Understanding, however, that M. Donnolo was an important piece to Tecspec's future success, the Members agreed and provided

M. Donnolo with a $400,000 yearly salary, a 100% increase. Several weeks later M. Donnolo also raised Mr. Long and J. Donnolo's salaries by 100% to $200,000 per year without conferring with the other Members.

66.     That exorbitant salary was still not enough to satiate M. Donnolo's greed. In his mind, Tecspec was his and his alone. If he could not have complete control of Tecspec, he would run it out of business.  And so, M. Donnolo, set in motion his grand conspiracy.

**M. Donnolo Forms the Braya Entities and Recruits J. Donnolo and Mr. Long**

67.     Understanding that he could not orchestrate a hostile takeover of Tecspec, M. Donnolo decided his best option was to open a competing business, in direct contradiction of his non-compete agreement and fiduciary duties.

68.     In connection with his plan to spurn his fiduciary duties and non-compete agreement, M. Donnolo recruited his brother, J. Donnolo and Mr. Long, who were both employees of Tecspec and had access to the confidential trade secrets necessary to replicate Tecspec's HVAC unit. Notably, both J. Donnolo and Mr. Long, as employees, owe Tech Spec a separate duty to not undermine the company. In addition, both J. Donnolo and Mr. Long were aware that M. Donnolo was an owner of Tecspec and that he owed fiduciary duties to the company and the Members.

69.     With J. Donnolo and Mr. Long on board, the Individual Defendants inconspicuously formed the Braya Entities in 2023.

70.     Eager not to tip the Members off to their plan, the Individual Defendants took exhaustive efforts to conceal their newly formed companies.

71.     The Individual Defendants selected a facility in Staten Island, New York for their base of operations, *i.e.*, in a separate state from where Tecspec's warehouse is located. Moreover, a Google search indicates that the Braya Entities do not have any notable online presence.

**The Defendants Steal Thousands of Dollars Worth of Tecspec Equipment, Inventory, Engineering Drawings, and Know-How For the Benefit of the Braya Entities**

72.    With a facility secured, the Individual Defendants began phase two of their scheme: rob Tecspec of the equipment necessary to start manufacturing HVAC units for the Braya Entities.

73.    This cannot be understated. The Individual Defendants have stolen thousands of dollars' worth of equipment, inventory, and engineering know how from Tecspec, as Plaintiffs just discovered, in blatant violation of their various duties. This is indisputable. After discovering that the Braya Entities were operating in Staten Island, Mr. Senia and Mr. Rose entered the premises and obtained photographic evidence of some of the items stolen from Tecspec's Newark warehouse, including but not limited to:

    (a)    Sound Machines



    (b)    Laptops



(c)    Printers



(d)    Label Printers



(e)    Insulation



74.    Plaintiffs were only at the premises for a brief time, but surely if they had stayed longer, more stolen equipment and inventory would have been uncovered.

75.    Moreover, it was apparent that Defendants have already begun to use Tecspec's confidential trade secrets, as Mr. Senia and Mr. Rose saw that Defendants were using and manufacturing Tecspec's confidential silencer.

76.    There can now be no doubt that the Defendants fully intend to use Tecspec's confidential information, and a preliminary injunction is immediately necessary to prevent any further use.

77.    In addition, Plaintiffs have discovered that the Individual Defendants have been manufacturing Tecspec component parts at its Newark facility, only to take them to the Braya Entities' Staten Island facility.

78.    For example, it appears that Mr. Long manufactured, on Tecspec's dime, 9,000 HVAC nozzles for the Braya Entities' benefit, as the nozzles are missing from Tecspec with no other conceivable explanation.

79.    These documented acts of theft fly in the face of the duties of care and loyalty M. Donnolo owes to Tecspec, in addition to the duties owed to the company by J. Donnolo and Mr. Long as employees.

80.    Further, as if the Individual Defendants actions could not be more outrageous, they are working in the Braya Entities' facility while wearing Tecspec branded clothing.



**<u>The Defendants Are Purposefully Usurping Tecspec's Business Opportunities</u>**

81.    Upon discovery of the Braya Entities' facility and the Defendants' possession of Tecspec's equipment and confidential trade snecrets, Plaintiffs immediately reached out to industry insiders to figure out if the Braya Entities have been actively working jobsites.

82.    To Plaintiffs' dismay, they discovered that Defendants have already bid for two substantial jobs in Manhattan, specifically the: (i) 730 Third Avenue Teachers' Insurance Building Project (which Tecspec has already received a contract on); and (ii) the 200 Park Avenue Building.

83.    That conduct is in direct violation of M. Donnolo's non-compete agreement. Specifically, the Tecspec Operating Agreement contains a non-compete provision which prohibits M. Donnolo from competing with Tecspec in counties where Tecspec has done business while he is a Member of Tecspec and for a period of four (4) years thereafter. As explained above, Tecspec is currently working on the Two Penn Plaza Building job, in Manhattan, in addition to the 1211 6th Avenue Building and 110 East 59th Street Building.

84.    Worse yet, as noted above, Tecspec already received a contract on the 730 Third Avenue Teachers' Insurance Building project, and already delivered 223 HVAC units.

85.    The 703 Teachers' Insurance building and 200 Park Avenue building are substantial opportunities for Tecspec, and the Defendants should not be permitted to obtain that work off the back of Plaintiffs.

**The Individual Defendants Have the Ability Shut Down Tecspec**

86.    The Individual Defendants, while employed by Tecspec, were also privy to certain information that could allow them to shut down Tecspec.

87.    For example, the Individual Defendants maintain the passwords to Tecspec's website, email, cloud-based storage (which contains the confidential designs and blueprints for Tecspec's trade secrets), CNC machines, facility cameras, and other electronically operated machinery. At any moment, the Individual Defendants could delete critical information that may not only be relevant to this matter, but necessary for Tecspec to continue operations. In fact, the Individual Defendants could actually delete all of Tecspec's schematics for its trade secrets from

its password protected cloud-based server. If that occurs, that information could be lost forever. Moreover, by holding these passwords hostage, the Individual Defendants are preventing Plaintiffs from using Tecspec's own machinery.

88.    In addition, the Individual Defendants have the passwords to Tecspec's facility's smart climate control. With that access, the Individual Defendants could freeze Plaintiffs' factory at any time.

89.    Further, the Individual Defendants have access to Tecspec's vendor list and can order products on behalf of the company without the Plaintiffs' approval. With that in hand, the Individual Defendants could leave Tecspec on the hook for thousands of dollars' worth of unnecessary materials.

90.    The aforementioned information is just a brief overview of the material that the Individual Defendants are in possession of, and which Plaintiffs need to continue operating Tecspec, and therefore, the Defendants must be compelled to produce that information.

**Conclusion**

91.    The damages caused by the Defendants have strongly impacted Tecspec's business. Based on an analysis and calculations of business lost and equipment stolen, Plaintiffs believe the damages are more than a million dollars.

92.    Plaintiffs therefore file this complaint seeking a temporary restraining order, preliminary injunction, and costs. Significantly, the Tecspec Operating Agreement provides that in the event a Member fails to perform in accordance with the Operating Agreement – including the Non-Compete Agreement – that there will be "no adequate remedy at law" and the remaining Members "shall be entitled to such equitable and injunctive relief as may be available to restrain a

violation or threatened violation of" the Operating Agreement or to specifically enforce the Operating Agreement.

## FIRST COUNT
### (Breach of Fiduciary Duty – Against Michael Donnolo

93.　　Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if stated fully herein.

94.　　At all relevant times, Michael Donnolo was and is a member of Tecspec with fiduciary obligations to Tecspec, including, inter alia, the highest obligation of loyalty, candor, good faith, due care, and to avoid self-dealing and conflicts of interest, to Tecspec and Mr. Senia, Mr. Rose, and Mr. Schlenker.

95.　　Based on information uncovered to date, Michael Donnolo breached his fiduciary duties to Tecspec and Mr. Senia, Mr. Rose, and Mr. Schlenker by, among other things:

(a)　　Divesting Tecspec of various business opportunities;

(b)　　Misappropriating Tecspec's designs and manufacturing processes for its HVAC unit; and

(c)　　Holding Tecspec hostage by withholding critical passwords.

96.　　As a direct and proximate result of the foregoing breaches of fiduciary duties, and those others alleged above, Michael Donnolo is liable to Plaintiffs.

## SECOND COUNT
### (Breach of the Implied Covenant of Good Faith and Fair Dealing Against Michael Donnolo)

97.　　Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if stated fully herein.

98.　　Under New York law, all contracts imply a covenant of good faith and fair dealing in the course of performance.

99.    Specifically, the covenant of good faith and fair dealing is violated when a party to a contract violates an implied contract to the effect that they would prevent the other party from benefiting from the fruits of the contract.

100.    As detailed above, Plaintiffs have diligently executed all of their duties and obligations pursuant to the express terms of the Non-Compete Agreement.

101.    In return for Plaintiffs' performance of said duties and obligations, Michael Donnolo is prohibited from directly competing with Tecspec.

102.    Michael Donnolo acted in bad faith by placing his own interests, specifically, operating the Braya Entities to the detriment of Tecspec, misappropriating Tecspec's confidential HVAC unit designs and manufacturing processes, and stealing thousands of dollars' worth of equipment for the Braya Entities benefit, over his contractual duties to Plaintiffs.

103.    Due to Michael Donnolo's conduct, Plaintiffs continue to suffer financial damages.

104.    As such, Michael Donnolo violated the Covenant of Good Faith and Fair Dealing resulting in damages to Plaintiffs.

**THIRD COUNT**
**(Misappropriation of Trade Secrets Pursuant to 18 U.S.C. 1836 Against Michael Donnolo, Joshua Donnolo, John Michael Long and the Braya Entities)**

105.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if stated fully herein.

106.    As set forth above, Tecspec owns various trade secrets within the meaning of the Defend Trade Secrets Act ("DTSA"), § 18 U.S.C. 1836. This includes, without limitation, Tecspec's designs and manufacturing processes for its HVAC unit.

107.    Tecspec developed these trade secrets over many years through an extensive investment of labor, skill, money and/or knowledge gained from experiences within its markets.

108.    Tecspec's trade secrets derive independent economic value, both actual and potential, from not being generally known to the public or to others who can obtain economic value from their disclosure or use. Further, Tecspec's trade secrets are not readily ascertainable through proper means by others who can obtain economic value from their disclosure or use.

109.    Tecspec's trade secrets give it a competitive advantage over other companies within its markets who do not have access to its trade secret information. Further, Tecspec's trade secrets are valuable and crucial to its business functions and its competitive position in the industry.

110.    Tecspec protects the confidentiality of its trade secrets through reasonable efforts to maintain their secrecy including, without limitation, internal policies and security systems.

111.    The Individual Defendants wrongfully acquired Tecspec's trade secrets, including but not limited to the designs of Tecspec's HVAC units by using improper means to acquire their knowledge. The Individual Defendants' misappropriation has been achieved through breaches of their respective duties owed to Tecspec and M. Donnolo's Non-Compete Agreement. These actions constitute misappropriation within the meaning of the DTSA.

112.    The Individual Defendants misappropriated and wrongfully used Tecspec's trade secrets without Tecspec's knowledge or consent to bolster the Braya Entities' ability to compete within Tecspec's market, in violation of the Individual Defendants' respective duties and contractual obligations owed to Tecspec.

113.    The trade secrets that the Individual Defendants have misappropriated are invaluable to Tecspec and have allowed them to materially harm Tecspec's business.

114.    The Individual Defendants have used Tecspec's trade secrets to give the Braya Entities a competitive advantage over Tecspec.

115.    The misappropriation of Tecspec's trade secrets by the Individual Defendants has been willful and malicious.

116.    The Individual Defendants have caused and will continue to cause damage to Tecspec and, unless restrained, will further damage Tecspec.

117.    Tecspec has suffered irreparable damages as a result of the misappropriation. Injunctive relief is necessary to prevent irreparable harm and further disclosure or use of Tecspec's trade secrets.

**FOURTH COUNT**
(**Misappropriation of Trade Secrets Under New York Common Law Against Michael Donnolo, Joshua Donnolo, John Michael Long and the Braya Entities**)

118.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if stated fully herein.

119.    As set forth above, Tecspec owns various trade secrets under New York Law. This includes, without limitation, Tecspec's designs and manufacturing processes for its HVAC unit.

120.    The Individual Defendants and the Braya Entities possess trade secrets of Tecspec, including but not limited to Tecspec's designs and manufacturing processes for its HVAC unit.

121.    The Individual Defendants misappropriated those trade secrets in breach of their respective duties owed to Tecspec, in addition to their contractual obligations.

122.    Additionally, the Individual Defendants wrongfully acquired Tecspec's trade secrets, *i.e.*, the designs and manufacturing processes for its HVAC unit, by abusing their relationship with Tecspec and using improper means to acquire their knowledge. These actions constitute misappropriation under New York law.

123.    The Individual Defendants misappropriated and wrongfully used Tecspec's trade secrets without Tecspec's knowledge or consent in violation of their respective duties and contractual obligations owed to Tecspec. The trade secrets that the Individual Defendants have

misappropriated are invaluable to Tecspec and have allowed the Individual Defendants to materially harm Tecspec's business.

124.    The Individual Defendants have gained a competitive advantage for the Braya Entities through the misuse of Tecspec's trade secrets.

125.    The misappropriation of Tecspec's trade secrets by the Individual Defendants has been willful and malicious.

126.    The Individual Defendants' actions have caused and will continue to cause damage to Tecspec and, unless restrained, will further damage Tecspec.

127.    Tecspec has suffered irreparable harm as a result of the misappropriation. Injunctive relief is necessary to prevent irreparable harm and further disclosure or use of Tecspec's trade secrets.

## FIFTH COUNT
### (Corporate Waste/Mismanagement/Self-Dealing Against Michael Donnolo)

128.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if stated fully herein.

129.    By virtue of the acts and conduct alleged herein, Michael Donnolo has committed corporate waste, mismanagement, and self-dealing.

130.    Michael Donnolo has acted willfully, wantonly, and with reckless disregard for the interests of Tecspec and the rights and interests of its owners, including Mr. Rose, Mr. Schlenker, and Mr. Senia.

131.    Michael Donnolo has improperly used Tecspec's trade secrets, including but not limited to the designs and manufacturing processes for its HVAC unit, for his own personal gain by way of using that information to the benefit of the Braya Entities. M. Donnolo has also stolen thousands of dollars' worth of equipment from Tecspec for his own personal gain.

132.    The inept and unlawful conduct and self-dealing by Michael Donnolo has caused waste, and likely will continue to cause waste, of Tecspec's funds and opportunities, as well as substantial damages to Tecspec.

133.    As a direct and proximate cause of Michael Donnolo's waste, Tecspec has suffered, and will continue to suffer, substantial monetary damages.

## SIXTH COUNT
### (Breach of Contract Against Michael Donnolo)

134.     Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if stated fully herein.

135.    Michael Donnolo entered into a valid and enforceable Non-Compete Agreement governed by the State of New York in connection with his member status with Tecspec LLC.

136.    The Non-Compete Agreement is and was supported by due consideration, as Michael Donnolo received the benefits of being a member of Tecspec, including but not limited to, Tecspec distributions.

137.    The Non-Compete Agreement is reasonable in duration and geographic scope.

138.    Pursuant to the Non-Compete Agreement, Michael Donnolo averred that he would not "directly or indirectly, individually or in conjunction with any person or persons, firm, partnership, corporation . . . in any other manner whatsoever, carry on or be engaged in, or connected with any business which competes, in whole or in part, with [Tecspec LLC], which is located in any county in which [Tecspec LLC] is doing or has done business."

139.    In direct breach of the Non-Compete Agreement, M. Donnolo formed the Braya Entities, which directly compete with Tecspec. Indeed, M. Donnolo is currently competing with Tecspec, through the Braya Entities, by bidding on the: (i) 730 Third Avenue Teachers' Insurance Building job; and (ii) 200 Park Avenue Job.

140.    In addition, to facilitate that competition, the Braya Entities are currently using confidential trade secrets, including the designs and manufacturing processes for Tecspec's HVAC units, which Michael Donnolo misappropriated from Tecspec.

141.    All of these acts occurred while Michael Donnolo was a member of Tecspec.

142.    All of these acts occurred in a territory in which Tecspec operates, specifically Manhattan, New York.

143.    As a result of Michael Donnolo's breach, Tecspec has been deprived of the benefit of its bargain with Michael Donnolo and has sustained damages, including, but not limited to, damage to customer relationships, business expectations, and lost profits and market share.

144.    Tecspec has performed all of its conditions, covenants, and promises under the Non-Compete Agreement.

145.    Tecspec is entitled to a temporary restraining order and preliminary injunction from this Court, and costs associated with them, under the express terms of the Non-Compete Agreement.

146.    Tecspec will suffer irreparable harm if this Court does not enter an injunction because Tecspec will continue losing customers and be put at a competitive disadvantage by way of Michael Donnolo operating the Braya Entities.

147.    As a direct and proximate result of Michael Donnolo's repeated, willful, and ongoing breaches of the Non-Compete Agreement through the Braya Entities, Tecspec has been, and will be further injured.

## SEVENTH COUNT
### (Breach of the Faithless Servant Doctrine Against Michael Donnolo, Joshua Donnolo, and John Michael Long)

148.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if stated fully herein.

149.    At all relevant times to this action, the Individual Defendants were employees of Tecspec.

150.    As employees of Tecspec, the Individual Defendants received compensation exceeding $1,166,666.66 for the period in question.

151.    The Individual Defendants were at all times bound to exercise the utmost faith, loyalty, and fidelity in the performance of duties owed to Tecspec as employees of the company.

152.    The Individual Defendants knowingly and repeatedly breached their duties of good faith, loyalty, and fidelity as employees of Tecspec through their conduct set forth in detail above.

153.    The Individual Defendants misconduct and unfaithfulness substantially violated their obligations as employees of Tecspec, such that their wrongdoing permeated their services in the most material and substantial parts.

### EIGHTH COUNT
**(Unjust Enrichment Against Michael Donnolo, Joshua Donnolo, John Michael  Long and the Braya Entities)**

154.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if stated fully herein.

155.    The Individual Defendants have founded and operated the Braya Entities and use them to directly compete with Tecspec.

156.    There is no enforceable contract between Tecspec and the Braya Entities.

157.    However, the Braya Entities, and all profits derived therefrom, and distributed to the Individual Defendants, are creations of a willful, prolific, and extensive scheme which included the misappropriation of trade secrets.

158.    It is against equity and good conscience to allow the Braya Entities, founded and operated by the Individual Defendants in complete violation of the Individual Defendants' duties

and contractual obligations owed to Tecspec, to continue generating a profit off of Tecspec's trade secrets.

159.     The Individual Defendants and the Braya Entities have therefore been unjustly enriched by way of the misappropriation of Tecspec's trade secrets and profiting off their use, without compensating Tecspec for same.

### NINTH COUNT
### (Conversion Against Michael Donnolo, Joshua Donnolo, and John Michael Long)

160.     Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if stated fully herein.

161.     The Individual Defendants misappropriated trade secrets and equipment for the benefit of the Braya Entities, which was unauthorized and clearly not intended to benefit Tecspec, but rather, the Individual Defendants and the Braya Entities.

162.     The Individual Defendants have acted willfully, wantonly, and recklessly with respect to Tecspec's interests.

163.     As a direct and proximate result of the Individual Defendants' wrongful conversion of trade secrets and equipment, Tecspec has been damaged, and continues to be damaged.

### TENTH COUNT
### (Tortious Interference with Prospective Business Relationships Against Michael Donnolo, Joshua Donnolo, and John Michael Long)

164.     Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if stated fully herein.

165.     Tecspec had, and continues to have, contracts with and a reasonable expectation of prospective contractual relationships with various job opportunities, including but not limited to: (i) the 730 Third Avenue Teachers' Insurance Building job (which Tecspec has already provided 223 HVAC units for at approximately $800,000); and (ii) the 200 Park Avenue job.

166.    The Individual Defendants were aware of Tecspec's existing and potential relationships with such businesses.

167.    The Individual Defendants have intentionally interfered (and continue to interfere) with those relationships by misappropriating Tecspec's trade secrets and using that information to poach customers from Tecspec.

168.    The Individual Defendants have used, and continue to use, illegal, dishonest, unfair and/or improper means to interfere with Tecspec's business relationships.

169.    But for the Individual Defendants' interference and improper conduct, Tecspec would have retained its business relationships.

170.    The Individual Defendants' actions constitute tortious interference with prospective business relations under the laws of the State of New York.

## ELEVENTH COUNT
### (Unfair Competition – Against Defendants)

171.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if stated fully herein.

172.    As set forth more fully above, Defendants have misappropriated the trade secrets and equipment of Tecspec to gain an unfair advantage in the industry.

173.    Defendant M. Donnolo additionally breached his Non-Compete Agreement and violated the fiduciary duties he owed to Tecspec.

174.    Defendants intentionally used Tecspec's trade secrets and equipment to undercut and sabotage Tecspec's position in the HVAC industry.

175.    Defendants undertook these actions in an intentionally deceitful way and in bad-faith, as evidenced by the blatant theft of Tecspec's equipment and trade secrets.

176.    Defendants' actions have allowed them to directly and unfairly compete with Tecspec.

177.    As a result of Defendants' conduct, Plaintiffs have suffered and will continue to suffer damages in an amount to be proven at trial.

## TWELFTH COUNT
### (Aiding and Abetting Breach of Fiduciary Duty – Against J. Donnolo and Mr. Long)

178.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if stated fully herein.

179.    Michael Donnolo has breached his fiduciary duties owed to Tecspec and Mr. Senia, Mr. Rose, and Mr. Schlenker by, among other things:

(a)    Divesting Tecspec of various business opportunities;

(b)    Misappropriating Tecspec's designs and manufacturing processes for its HVAC unit; and

(c)    Holding Tecspec hostage by withholding critical passwords

180.    J. Donnolo and Mr. Long have substantially assisted M. Donnolo in violating his fiduciary duties by operating the Braya Entities, misappropriating Tecspec's designs and manufacturing processes for its HVAC unit, and holding Tecspec hostage by withholding critical passwords.

181.    J. Donnolo and Mr. Long were aware that M. Donnolo was a member of Tecspec, and therefore knew, or should have known, that assisting M. Donnolo in the aforementioned conduct would constitute a breach of his fiduciary duties.

182.    As a result of Defendants' conduct, Plaintiffs have suffered and will continue to suffer damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

1.      On the First Cause of Action, against Michael Donnolo, compensatory, consequential, incidental damages, disgorgement of all compensation paid, and pre- and post-judgment interest, an award of attorneys' fees incurred in connection with this litigation, and such other relief as may be permitted under applicable law and which this Court deems just and equitable under the circumstances.

2.      On the Second Cause of Action, against Michael Donnolo, compensatory, consequential, and incidental damages, pre- and post-judgment interest, an award of attorneys' fees incurred in connection with this litigation, and such other relief as may be permitted under applicable law and which this Court deems just and equitable under the circumstances.

3.      On the Third Cause of Action, against Michael Donnolo, Joshua Donnolo, John Michael Long, Braya Systems LLC, Braya Machine Company LLC, Braya Concepts LLC, and Braya Ventures LLC, a temporary restraining order and preliminary injunction to enforce the Non-Compete Agreement, and enjoin any further competition with Tecspec and use of Tecspec trade secrets, precluding M. Donnolo, J. Donnolo, and Mr. Long from operating the Braya Entities, requiring M. Donnolo, J. Donnolo, and Mr. Long to return all stolen property and return all property necessary to operate Tecspec, requiring M. Donnolo, J. Donnolo, and Mr. Long to return all designs in their possession for any component of Tecspec's HVAC units, in addition to compensatory, consequential, and incidental damages, pre- and post-judgment interest, an award of attorneys' fees incurred in connection with this litigation, and such other relief as may be permitted under applicable law and which this Court deems just and equitable under the circumstances.

4.      On the Fourth Cause of Action, against Michael Donnolo, Joshua Donnolo, John Michael Long, Braya Systems LLC, Braya Machine Company LLC, Braya Concepts LLC, and

Braya Ventures LLC, a temporary restraining order and preliminary injunction to enforce the Non-Compete Agreement, and enjoin any further competition with Tecspec and use of Tecspec trade secrets, precluding M. Donnolo, J. Donnolo, and Mr. Long from operating the Braya Entities, requiring M. Donnolo, J. Donnolo, and Mr. Long to return all stolen property and return all property necessary to operate Tecspec, requiring M. Donnolo, J. Donnolo, and Mr. Long to return all designs in their possession for any component of Tecspec's HVAC units, in addition to compensatory, consequential, and incidental damages, pre- and post-judgment interest, an award of attorneys' fees incurred in connection with this litigation, and such other relief as may be permitted under applicable law and which this Court deems just and equitable under the circumstances.

5.    On the Fifth Cause of Action, against Michael Donnolo, compensatory, consequential, and incidental damages, pre- and post-judgment interest, an award of attorneys' fees incurred in connection with this litigation, and such other relief as may be permitted under applicable law and which this Court deems just and equitable under the circumstances.

6.    On the Sixth Cause of Action, against Michael Donnolo, a temporary restraining order and preliminary injunction to enforce the Non-Compete Agreement, enjoining any further competition with Tecspec and use of Tecspec trade secrets, precluding M. Donnolo from operating the Braya Entities, requiring M. Donnolo to return all stolen property and return all property necessary to operate Tecspec, requiring M. Donnolo to return all designs in his possession for any component of Tecspec's HVAC units, and requiring M. Donnolo to finish the job at Two Penn Plaza on behalf of Tecspec, in addition to compensatory, consequential, and incidental damages, pre- and post-judgment interest, an award of attorneys' fees incurred in connection with this

litigation, and such other relief as may be permitted under applicable law and which this Court deems just and equitable under the circumstances.

7.      On the Seventh Cause of Action, against Michael Donnolo, Joshua Donnolo, and John Michael Long, compensatory, consequential, and incidental damages, pre- and post-judgment interest, an award of attorneys' fees incurred in connection with this litigation, and such other relief as may be permitted under applicable law and which this Court deems just and equitable under the circumstances.

8.      On the Eighth Cause of Action, against Michael Donnolo, Joshua Donnolo, John Michael Long, Braya Systems LLC, Braya Machine Company LLC, Braya Concepts LLC, and Braya Ventures LLC, compensatory, consequential, and incidental damages, pre- and post-judgment interest, an award of attorneys' fees incurred in connection with this litigation, and such other relief as may be permitted under applicable law and which this Court deems just and equitable under the circumstances.

9.      On the Ninth Cause of Action, against Michael Donnolo, Joshua Donnolo, and John Michael Long, compensatory, consequential, and incidental damages, pre- and post-judgment interest, an award of attorneys' fees incurred in connection with this litigation, and such other relief as may be permitted under applicable law and which this Court deems just and equitable under the circumstances.

10.     On the Tenth Cause of Action, against Michael Donnolo, Joshua Donnolo, and John Michael Long, compensatory, consequential, and incidental damages, pre- and post-judgment interest, an award of attorneys' fees incurred in connection with this litigation, and such other relief as may be permitted under applicable law and which this Court deems just and equitable under the circumstances.

11.     On the Eleventh Cause of Action, against Michael Donnolo, Joshua Donnolo, John Michael Long, Braya Systems LLC, Braya Machine Company LLC, Braya Concepts LLC, and Braya Ventures LLC, compensatory, consequential, and incidental damages, pre- and post-judgment interest, an award of attorneys' fees incurred in connection with this litigation, and such other relief as may be permitted under applicable law and which this Court deems just and equitable under the circumstances.

12.     On the Twelfth Cause of Action, against Joshua Donnolo and John Michael Long, compensatory, consequential, and incidental damages, pre- and post-judgment interest, an award of attorneys' fees incurred in connection with this litigation, and such other relief as may be permitted under applicable law and which this Court deems just and equitable under the circumstances.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all matters so triable.

Respectfully submitted,

By: */s/ Jason R. Melzer*
**COLE SCHOTZ P.C.**
Jason R. Melzer
jmelzer@coleschotz.com
212-752-8000
1325 Avenue of the Americas
Suite 1900
New York, New York 10019
*Attorneys for Plaintiffs, Tecspec LLC, Richard Rose, Robert Senia, and Ralph Schlenker*

Dated: 10/24/2024

## **VERIFICATION**

RALPH SCHLENKER pursuant to Title 28, United State Code, Section 1746, hereby declares under penalty of perjury that he has read the foregoing Verified Complaint and knows the contents thereof to be true to the best of his knowledge, information, and belief.

_____
RALPH SCHLENKER

DATED:  October 24, 2024

## VERIFICATION

RICHARD ROSE pursuant to Title 28, United State Code, Section 1746, hereby declares under penalty of perjury that he has read the foregoing Verified Complaint and knows the contents thereof to be true to the best of his knowledge, information, and belief.

RICHARD ROSE

DATED: October 24, 2024

68430/0001-48688012v1

## <u>VERIFICATION</u>

ROBERT SENIA, pursuant to Title 28, United State Code, Section 1746, hereby declares under penalty of perjury that he has read the foregoing Verified Complaint and knows the contents thereof to be true to the best of his knowledge, information, and belief.

_____
ROBERT SENIA

DATED:  October 24, 2024