**ROSENBERG & ESTIS, P.C.**
     Matthew S Blum, Esq. – MBlum@RosenbergEstis.com
     Jay H. Min, Esq. – Jmin@RosenbergEstis.com
     733 Third Avenue, Flr 14
     New York, New York 10017
*Attorneys For Braya Concepts LLC,*
*Braya Machine Company LLC,*
*Braya Systems LLC, Braya Ventures*
*LLC, Michael Donnolo, John*
*Michael Long, And Joshua Donnolo*

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TECSPEC LLC, RICHARD ROSE, ROBERT SENIA, and RALPH SCHLENKER,<br><br>                                     Plaintiffs,<br><br>      -against-<br><br>MICHAEL DONNOLO, JOSHUA DONNOLO, JOHN MICHAEL LONG, BRAYA CONCEPTS LLC, BRAYA MACHINE COMPANY LLC, BRAYA SYSTEMS LLC, BRAYA VENTURES LLC, and ABC CORPORATIONS 1-10<br><br>                                    Defendants, | Case No. 24-cv-08077 |
| BRAYA CONCEPTS LLC, BRAYA MACHINE COMPANY LLC, BRAYA SYSTEMS LLC, BRAYA VENTURES LLC, JOHN MICHAEL LONG, JOSHUA DONNOLO, and MICHAEL DONNOLO, individually and derivatively on behalf of Tecspec LLC<br><br>                Third-Party Plaintiffs,<br><br>      -against-<br><br>RALPH SCHLENKER, ROBERT SENIA, RICHARD ROSE, SRS ENTERPRISES INC., SRS ENTERPRISES NJ LLC, HVAC SERVICE ASSOCIATES INC., and SRS RESEARCH LLC,<br><br>              Third-Party Defendants,<br><br>      -against-<br><br>TECSPEC LLC<br><br>              Nominal Third-Defendant | **THIRD-PARTY COMPLAINT** |

Third-Party Plaintiffs Braya Concepts LLC, Braya Machine Company LLC, Braya Systems LLC, Braya Ventures LLC (collectively, "Braya"), Michael Donnolo individually and derivatively on behalf of Tecspec LLC, John Michael Long, and Joshua Donnolo (collectively, "Third-Party Plaintiffs" or "TPPS"), by and through their attorneys, allege as follows:

### NATURE OF THE ACTION

1.      Third-Party Plaintiffs file this third-party action arising from Third-Party Defendants' ("TPDS") fraudulent scheme, carried out in connection with TPDS' commission of a scheme cognizable under the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. §§ 1961-1968 ("RICO"), TPDS corrupting Tecspec LLC and SRS (each defined hereunder) in pursuit of TPDS' intention to launder money.

### PARTIES

2.      Braya Concepts LLC is a limited liability company organized under the laws of New York, owned by Michael Donnolo, located in Richmond County New York.

3.      Braya Machine Company LLC is a limited liability company organized under the laws of New York, owned by Michael Donnolo, located in Richmond County New York.

4.      Braya Systems LLC is a limited liability company organized under the laws of New York, owned by Michael Donnolo, located in Richmond County New York.

5.      Braya Ventures LLC is a limited liability company organized under the laws of New York, owned by Michael Donnolo, located in Richmond County New York.

6.      Michael Donnolo is an individual residing in New York, New York, and owner of the Braya entities.

7.      John Michael Long is an individual residing in New York, New York, and was an employee of Tecspec LLC.

8.      Joshua Donnolo is an individual residing in New York, New York, and was an employee of Tecspec LLC.

9.      Upon information and belief, Ralph Schlenker is a resident of New York, who maintains ownership and control over Tecspec LLC, and SRS.

10.     Upon information and belief, Robert Senia is a resident of New Jersey, who maintains ownership and control over Tecspec LLC, and SRS.

11.     Upon information and belief, Richard Rose is a resident of New Jersey, who maintains ownership and control over Tecspec LLC, and SRS. (Rose, Senia, and Schlenker, collectively, "Individual TPDS").

12.     Upon information and belief, SRS Enterprises Inc. is a New Jersey corporation owned and operated by the Individual TPDs, and which is located in Middletown, New Jersey.

13.     Upon information and belief, SRS Enterprises NJ LLC is a New Jersey corporation owned and operated by the Individual TPDs, and which is located in Middletown, New Jersey.

14.     Upon information and belief,  HVAC Service Associates, Inc. is a New Jersey corporation owned and operated by the Individual TPDs, and which is located in Middletown, New Jersey.

15.     Upon information and belief, SRS Research LLC is a New York corporation owned and operated by the Individual TPDs, and which is located in New York, New York. (SRS Enterprises Inc., SRS Enterprises NJ LLC,   HVAC Service Associates, Inc., and SRS Research LLC, collectively, "SRS").

16.     Tecspec LLC ("Tecspec") is a limited liability company organized under the laws of the State of New York, with its place of business in Newark, New Jersey.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as it arises under federal law, specifically the Defend Trade Secrets Act (18 U.S.C. § 1836 et seq.) and RICO statutes (18 U.S.C. §§ 1961-1968).

18.     The Court has supplemental jurisdiction under 28 U.S.C. § 1367 for the state law

claims that are part of the same case or controversy as the federal claims.

19.     Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part

of the events or omissions giving rise to the claims occurred in this district, and Third-Party

Defendants reside in or conduct business within this jurisdiction.

## STATEMENT OF FACTS

**A.     Tecspec LLC.**

20.     Tecspec, LLC was formed over seven years ago, specifically around February 24,

2017, under the laws of the State of New York, as a limited liability company focused on the

development and innovation of heating, ventilation, and air conditioning (HVAC) technologies.

Robert Senia, without disclosing to Richard Rose or Ralph Schlenker, set up Tecspec with his

daughter Christina Senia as a surrogate owner to gain advantage on WBE contracts.

21.     Since its inception, Michael Donnolo has been an owner and manager of Tecspec,

utilizing his extensive experience in both technical and design aspects of HVAC systems to

influence the direction and success of the company.

22.     Through his engineering expertise, Michael Donnolo has developed numerous

key products and innovative processes that have established Tecspec's standing in the HVAC

marketplace.

23.     Tecspec's Operating Agreement, executed on October 6, 2017, outlines the

governance and operational structure of Tecspec. Initially, Tecspec was comprised of two

members: Christina Senia, who held a 75% ownership interest, and Michael Donnolo, holding a

25% ownership interest.

24.     The Operating Agreement explicitly includes provisions that permit Tecspec

members to engage in other business interests without the obligation to prioritize Tecspec's

operations. For instance, the Operating Agreement states that members are not required to

manage Tecspec solely and that neither Tecspec nor any member has rights to the income or profits from these other ventures unless otherwise noted.

25.     Importantly, Section 25 of the Operating Agreement includes a non-compete clause indicating that members will not engage in any competing business within counties where Tecspec operates, but it also recognizes that members may pursue independent business ventures [provided the business is not located in any county in which Tecspec has operated] ("Non-Compete").

26.     On January 1, 2018, under pressure from Robert Senia because Richard Rose and Ralph Schlenker found out about Tecspec and that Robert Senia was using SRS funds to operate Tecspec without their knowledge, Christina Senia, assigned her 75% interest in Tecspec to three individuals: Robert Senia, Richard Rose, and Ralph Schlenker, each receiving an equal 25% share. This change was formalized but did not alter the original Operating Agreement's critical provisions.

27.     Since the formation of Tecspec, Michael Donnolo remains the only member with significant technical background and expertise in HVAC.

28.     The Third-Party Defendants, Ralph Schlenker, Robert Senia, and Richard Rose ("Individual TPDs") collectively operate entities under SRS Enterprises Inc., SRS Enterprises NJ LLC, HVAC Service Associates, Inc., and SRS Research LLC, separate from but competing with Tecspec, ultimately leveraging Tecspec resources for Individual TPDs profit.

29.     Third-Party Defendants have engaged in business activities that not only directly compete with Tecspec in violation of the Non-Compete, but have used SRS to divert and misappropriate millions of dollars from Tecspec and Michael Donnolo.

30.     Tecspec's business centered on research, development, and manufacturing for HVAC-related technology ("HVAC Units"), included, among other things:

   i.     HVAC induction units. An HVAC induction unit is a device used in commercial and industrial spaces to distribute air efficiently. It leverages a central air handling unit to supply conditioned primary air through ductwork, which passes through narrow nozzles in the unit, creating low pressure that induces room air into the unit. This secondary air mixes with the primary air, facilitating

temperature regulation before being discharged back into the room. The unit's coils can be connected to chilled or hot water systems for further temperature adjustments. For Tecspec, these induction units took 3,000-4,000 hours to develop through the efforts of Michael Donnolo, John Michael Long, and Joshua Donnolo (collectively, "Individual TPPs").

    ii.    <u>Machined-metal grilles</u>, which attached to an HVAC encasing. Such grilles took up to 2,000 research and development hours for Tecspec to develop. These materials were researched at the direction of Robert Senia, who only sold 2 such orders before no longer promoting the manufacture of such materials.

    iii.    <u>Heating and cooling pump skids</u>, which are trailer-sized packaged equipment which combine specialty heating and cooling components and appurtenances. These HVAC Units took 200 hours to engineer and, once plans were developed, Robert Senia absconded with the plans and gave the manufacturing plans to another company to produce.

    iv.    <u>Personal air diffusers</u>, which are ceiling versions of an HVAC air vent, which were researched and developed at the direction of Robert Senia. The personal air diffuser took up to 750 research and development hours for Tecspec to develop.  However, once the design & plans for manufacturing were developed by Tecspec, Robert Senia took the plans and gave the plans to SRS Research LLC, which then gave the plans to Numa as a buy-in for 33% of the Numa business – an HVAC manufacturer.

    v.    <u>Packaged pump systems</u>, which are smaller versions of heating and cooling pump skids, which took approximately 500 research and development hours for Tecspec to create, which Robert Senia also gave away to a different company once developed.

    vi.    <u>Extruded grilles</u>, which are a different type of metal grating that is situated in an induction housing, which took 3,000 research and development hours, which Robert Senia also gave to a different company after Tecspec developed the designs and plans for manufacturing.

    vii.    <u>Fan coils,</u> which is a completely different type of HVAC system, taking more than 3,000 research and development hours, that the Third-Party Defendants made available to other companies and that Tecspec thereafter never manufactured.

    (collectively, HVAC Units)

**B.**    **The Third-Party Defendants' Fraudulent Scheme of "Price Manipulation" (as part of the RICO Scheme, defined hereunder).**

    31.    The Individual TPDs, Ralph Schlenker, Robert Senia, and Richard Rose, devised a scheme to manipulate pricing for Tecspec products, effectively diverting money away from Tecspec and to themselves.

32.     Under this scheme, Ralph Schlenker, Robert Senia, and Richard Rose unilaterally controlled the pricing structure of Tecspec's products by computing Tecspec product pricing by way of the ultimate price paid by the customer less profits Ralph Schlenker, Robert Senia, and Richard Rose, desired to keep for themselves. Ralph Schlenker, Robert Senia, and Richard Rose did not price Tecspec products based on any criteria other than what the customer was willing to pay. This computed price would correlate to the customer's price less a profit margin for SRS.

33.     For instance, in transactions involving Tecspec induction units, the Third-Party Defendants would set a sale price (hypothetically $1,000.00 per unit) that did not reflect Tecspec's production costs, which were significantly higher (e.g., $2,500.00 per unit).

34.     Once Third-Party Defendants secured a price from the customer, Third-Party Defendants would then compute the price Tecspec would charge SRS for the HVAC Units. Third-Party Defendants would build in a 30% buffer for SRS profit, and then charge the remaining amount as the "purchase price" between SRS and Tecspec. For example:

Hypothetical sale 1:

> Third-Party Defendants, holding themselves out as owners of SRS, establish a purchase price with a customer for $1,000 per Tecspec induction unit. Third-Party Defendants compute a 30% profit for SRS, at $300 per unit, resulting in Third-Party Defendants having "Tecspec sell to SRS" induction units for that project at $700.

Contemporaneous hypothetical sale 2:

> Third-Party Defendants, holding themselves out as owners of SRS, establish a purchase price with a customer for $800 per Tecspec induction unit. Third-Party Defendants compute a 30% profit for SRS, at $240 per unit, resulting in Third-Party Defendants having "Tecspec sell to SRS" induction units for that project at $560.

35.    Despite the fact that the Tecspec induction units cost $2,500 to Tecspec to produce, Third-Party Defendants, through SRS, always make a profit on every sale, and sell the Tecspec HVAC Units at prices without correlation to the actual cost of production. In fact, Tecspec never had a set price for selling induction units to SRS because of the scheme in which Third-Party Defendants engaged.

36.    This manipulation effectively ensured that SRS could competitively sell Tecspec products to end-users at a price that appeared advantageous but was still reflective of significant profits to the Third-Party Defendants, while Tecspec never recovered from the cost of producing the units Third-Party Defendants would sell.

37.    This cyclical pricing strategy allowed the Third-Party Defendants to consistently profit from each HVAC Unit sold under the SRS name, ultimately depriving Tecspec of its rightful earnings and exacerbating its ongoing financial losses.

38.    Through this misrepresentation and manipulation of the market, the Third-Party Defendants not only affected the profitability of Tecspec but also severely compromised its operational sustainability by creating unprofitability for Tecspec.

39.    The actions of the Third-Party Defendants amounted to a systematic diversion of corporate opportunities and resources from Tecspec to SRS, effectively constituting a breach of fiduciary duty and resulting in significant financial harm to Tecspec.

40.    Through the foregoing scheme, Third-Party Defendants have engaged in approximately $15 million in Tecspec sales to themselves, which translates to an extraordinary amount of funds that the Third-Party Defendants and SRS has kept for themselves, money which belongs to Tecspec and Michael Donnolo.

**C.    The Third-Party Defendants broke into the Braya facility and stole proprietary information from the Braya facility.**

41.    On October 17, 2024, at approximately 12:34 PM, Richard Rose dropped off Robert Senia near the entrance of the Braya facility located at 2589 Richmond Terrace, Staten Island, New York ("Premises") with the apparent intent to "case the property."

42.     Shortly thereafter, at 12:45 PM, a Chevy Colorado (New York license plate number KPU5916) entered the Premises, carrying Senia and an unidentified individual.

43.     At the same time, Richard Rose walked onto the property, followed by two other individuals.

44.     Once on-site, Senia began taking pictures of everything.

45.     At approximately 12:47 PM, Michael Donnolo encountered Senia, Rose, and the unidentified third person while in his Smart Car.

46.     Michael Donnolo instructed them to leave the Premises, as captured in video footage.

47.     In response, Senia defiantly stated, "I'm not doing that."

48.     Following this confrontation, Michael Donnolo called 911 at around 12:47 PM and waited at the front of the Premises for officers to respond.

49.     Concurrently, at approximately 12:47 PM, Senia, Rose, and the unidentified individual opened a previously closed door at the back of the Braya Premises, thereby trespassing onto the Premises.

50.     While inside, Senia and Rose systematically took pictures of equipment, machinery, and other non-public information within the facility, actions documented in video footage.

51.     Around the same time, Joshua Donnolo also called 911 to report the ongoing incident at the Braya facility.

52.     Despite being told multiple times to leave the Premises, the Third-Party Defendants continued to trespass inside the Braya facility, capturing images without consent. Cellphone camera footage from Joshua Donnolo and John Michael Long during this period is preserved.

53.     The first officers arrived on the scene at 1:03 PM, as referenced in video footage.

54.     After the officers arrived, Senia, Rose, and the unidentified third person exited the Premises.

55.     Ultimately, Senia, Rose, and the third person left the property at 1:14 PM, concluding the unauthorized entry and actions within the Braya facility, taking with them photographs of Braya operations and proprietary information that they had provided to Tecspec employees, agents, and vendors.

**D.      Racketeer Influenced and Corrupt Organizations Act (RICO); 18 U.S.C. §§ 1961-1968**

> **i.   Purpose and Structure of Third-Party Defendants' RICO enterprise**

56.     Third-Party Plaintiffs allege that Third-Party Defendants Ralph Schlenker, Robert Senia, and Richard Rose have engaged in an association-in-fact enterprise within the meaning of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968.

57.     This enterprise comprises RICO persons Ralph Schlenker, Robert Senia, and Richard Rose whom have associated in an association-in-fact enterprise (the "AIFE"), whom have collaborated in a coordinated effort to execute a fraudulent scheme that corrupts Tecspec and SRS by way of manipulating pricing for Tecspec HVAC products in order secure customers for the ultimate purpose of laundering money.

58.     "Money Laundering" "is the criminal practice of processing ill-gotten gains, or 'dirty' money, through a series of transactions; in this way the funds are 'cleaned' so that they appear to be proceeds from legal activities."[1]

59.     Robert Senia, Ralph Schlenker, and Richard Rose, each RICO persons, comprise the AIFE as defined under applicable RICO statutes, engaging in an illegal and fraudulent scheme to launder money through their corruption of SRS and Tecspec, distributing to themselves 'clean' cash after acquiring monies through fraud and other false pretenses, obfuscating the source of such funds to, among other things, thwart recovery of ill-gotten funds and to evade taxes.

---

[1] Federal Financial Institutions Examination Council, *Bank Secrecy Act – Anti-Money Laundering Examination Manual,"* 2006, p. 7. Black's Law Dictionary, 8thed., defines the term as "[t]he act of transferring illegally obtained money through legitimate people or accounts so that its original source cannot be traced."

60.     Robert Senia, Ralph Schlenker, and Richard Rose, each, actively participate and control the AIFE.

61.     Robert Senia serves as the leader of the AIFE. Senia is the primary decision maker, orchestrating the efforts of the others, Rose and Schlenker.

62.     Richard Rose engages in deal negotiations with customers, negotiating sale of HVAC Units which serves as the foundation for the AIFE to operate.

63.     Ralph Schlenker engages in sales under the auspice of acting as a "sales engineer," pitching purchase opportunities and bringing in potential customers for the various entities which the AIFE corrupts, namely SRS and Tecspec.

64.     Separate and apart of their acquisition of potential customers, each of Senia, Schlenker, and Rose participate in gross financial misappropriation, fraud, bank fraud, mail and wire fraud, and commercial bribery, all with the collective purpose of taking in money from wherever funds may be acquired, deliberately obfuscating the source of such funds, and thereafter misappropriating such funds under the pretext of issuing distributions to themselves despite the funds not belonging to any of the AIFE members ("RICO Scheme").

65.     Through this RICO Scheme, each of the RICO persons have engaged in a pattern of racketeering activity that encompasses fraud, tax evasion, and threats of violence and intimidation, all of which are illegal and constitute predicate acts under 18 U.S.C. § 1961.

### ii.   The AIFE's Corruption of Tecspec and SRS

66.     One objective of the AIFE was to siphon profits away from Tecspec and isolate losses so that none of the AIFE would incur reductions of funds that the AIFE would otherwise collect, irrespective of such reductions being valid and necessary business expenses. *See* Price Manipulation scheme, above.

67.     The Price Manipulation Scheme was designed to maximize funds flowing to the AIFE, at the severe and fatal detriment to Tecspec. By executing this RICO Scheme, the AIFE aimed to enrich each of the RICO persons at the direct expense of Tecspec, undermining its

operational stability and financial integrity. This organization was not a mere coincidence; rather, it involved a deliberate and systematic approach to financial misconduct.

68.    Under this RICO Scheme, the Third-Party Defendants established a pricing structure that allowed them to create misleading profitability projections that were not reflective of Tecspec's or SRS's true financial health. They engaged in the Price Manipulation scheme to ensure SRS always secured a profit margin, thereby depriving Tecspec of vital revenue needed for its operations.

69.    However, the AIFE then manufactured and provided "cooked books" to Bank of America for the purposes of securing lines of credit and/or other financing. Each of the RICO persons participated in manufacturing of the false-appearing financial records, which each of Senia, Schlenker, and Rose conferred and decided to submit for the purposes of securing financing based on false-appearing financial documents.

70.    Once loan proceeds were issued, those proceeds were immediately recharacterized and reflected in further "cooked books" as profits, not loan proceeds, which the AIFE then used to secure additional financing, falsely representing to Bank of America that the liabilities reflected in Third-Party Defendants' cash balances were actually assets.

71.    After recharacterizing the loan proceeds, Rose, Senia, and Schlenker then misappropriated the loan proceeds; after obfuscating the source of such funds for passing the funds through various companies, contracts, and other mechanisms to hide the identification of such funds being "loan proceeds," they diverted such loan proceeds to themselves as their 'share' of profits. In fact, they were not profits, but proceeds of collateralized debentures to which none of the RICO persons were entitled to (mis)appropriate. Specific examples are below.

### iii.    18 U.S.C. § 1961; Predicate Acts

72.    The Individual TPDS' unlawful activities included a series of predicate acts of racketeering under the RICO statute. Specifically, each Individual TPD engaged in tax fraud by

illegally omitting profits obtained through the manipulation of Tecspec's sales, which affected both federal and state tax liabilities.

73.     Additionally, each Individual TPD committed bank fraud by presenting false information to secure financing based on these inflated profitability claims, thereby misleading banks and investors about the financial stability of Tecspec and SRS.

74.     Moreover, Senia, Rose, and Schlenker utilized intimidation tactics or supported intimidation to suppress dissent and maintain control over Tecspec.  Key stakeholders were frequently threatened, including Michael Donnolo, John Michael Long, and Joshua Donnolo, with extreme violence, including explicit threats of death and physical harm, such as threats to bash their heads in or shoot them with a firearm owned by Robert Senia. Several examples are on video and already of record with the Court.

75.     These threats were designed not only to intimidate but also to ensure that no challenges to the AIFE's illegal activities would arise, further consolidating their power over Tecspec and creating a culture of fear and control.

76.     The illegal activities engaged in by the Third-Party Defendants demonstrate continuity, as their actions constituted ongoing and systemic efforts to defraud Tecspec and maintain a firm grip over its operations. This systematic approach further underscores their collective intent to profit unlawfully at the expense of the business.

77.     The actions of the Third-Party Defendants have significantly impacted interstate commerce by undermining Tecspec's ability to compete effectively in the market. Their fraudulent scheme has led to substantial financial harm to Tecspec and its stakeholders, ultimately destabilizing a company that relies on integrity and trust in its operations.

78.     The predicate acts described above are intricately connected to the ultimate purpose of the Third-Party Defendants, which is to siphon profits away from Tecspec and redirect them to themselves through SRS. Each act not only facilitated the AIFE's RICO Scheme but also played a pivotal role in creating an environment in which the Third-Party Defendants could manipulate financial outcomes to their advantage.

79.    The mail fraud and wire fraud perpetrated by the Third-Party Defendants, in violation of 18 U.S.C. § 1341, 1343, involved the transmission of misleading documents and false reports to investors and banks. This activity was essential for fabricating an image of fiscal health at Tecspec, allowing the Third-Party Defendants to secure crucial investments and financing necessary for their operations. By projecting an inflated perception of profitability, the Third-Party Defendants were able to enhance their cash flow, which they then diverted to SRS, rather than allowing those funds to benefit Tecspec.

80.    For specific example:

In July 2020, Robert Senia and Richard Rose submitted a covenant report, upon information and belief, containing false statements which overstated profitability of SRS and Tecspec, including but not limited to false statements purporting to (over)performance in connection with on-going contracts, designed to have Bank of America rely on such false statements to induce Bank of America to continue to issue lines of credit to SRS and Tecspec. Upon information and belief, Robert Senia, Richard Rose, and Ralph Schlenker, all, spoke on the phone, communicated through text messages, and via email, about the approaches to submit false statements on the covenant report. The foregoing allegations are informed by an explanation by SRS Chief Operating Officer Ryan Rothstein: In a conversation in September 2020, Michael Donnolo inquired of Rothstein why SRS was lending money to Tecspec in lieu of passing along prepayments SRS received for inventory related to an SRS project for which Tecspec was producing HVAC Units. Senia, Rose, and Schlenker, all conferred and directed accounting to record the prepayments on unfulfilled orders as realized income, which could not legally be reported as realized income until qualifying events. Rothstein's explanation for this

false reporting was "the bank", which Michael Donnolo understood to mean that SRS would use its false-appearing profitability to secure loans from Bank of America, loan proceeds which Senia, Rose, and Schlenker would use to show as "payments on Tecspec contracts" to "prove" Tecspec progress payments and performance. In this regard, it is clear that Third-Party Defendants' RICO Scheme included borrowing money against revenues before expenses, and then reporting, both, loan proceeds *and* revenues as collective profits to secure even more financing by promoting the false financial health of Tecspec and SRS.

This was cyclic and appeared as a nested pyramid scheme, with the Third-Party Defendants reporting total funds as business profits when Third-Party Defendants were actually operating at a deep net loss.

Upon information and belief, Senia, Rose, and Schlenker, all, used regular mail, e-mail and telephone, making calls and sending emails between New York (where the Bank of America representative is located) and New Jersey (where the Third-Party Defendants are located), to transmit false reports, documents containing materially false statements concerning the financial stability of Tecspec and SRS, as well as discussions between the Third-Party Defendants about the RICO Scheme. This is believed to be true because of the regular commission of business in which each of Senia, Rose, and Schlenker, all done through phone, mail, and e-mail.

81.     As further example, Senia, Rose, and Schlenker, through the AIFE, each signed annual and/or biannual applications for continued lines of credit, each containing false statements concerning the financial health of Tecspec. Moreover, each of Senia, Rose, and Schlenker would submit to Bank of America quarterly covenant reports, which were required to

apprise Bank of America of the profitability and performance of Tecspec and SRS on open
contracts. In each of these covenant reports, each of which would be reviewed, authorized,
and/or expressly signed by Senia, Rose, and Schlenker, presented false reports on purported
contracts with Tecspec. For example, Senia, Rose, and Schlenker would authorize and/or certify
that loan proceeds in the bank were actually profits from Tecspec's performance on fulfilled
contracts, which was actually false but submitted to Bank of America to prove compliance with
performance benchmarks. At least eight of these reports were submitted to Bank of America , all
resulting in continued lines of credit and abilities to continue over-leveraging Tecspec. Critically,
at no time did Tecspec end up in possession of such loan proceeds despite Senia, Rose, and
Schlenker pledging Tecspec's performance, assets, and contracts as collateral. Instead, Senia,
Rose, and Schlenker absconded with the loan proceeds and diverted same to themselves for their
own benefit, buying sports cars, paying for personal expenses, and treating proceeds of their
RICO Scheme as a mechanism to 'print money' for themselves.

82.     Using "cooked books" and the Price Manipulation scheme to secure further
financing, Senia, Rose, and Schlenker generated a continuous stream of loan proceeds which the
AIFE have, and continue to misappropriate through bank fraud.

83.     Similarly, Senia, Schlenker, and Rose, each committed wire fraud under 18 U.S.C.
§ 1343 for communicating false statements concerning Tecspec's financial health, and the source
of Tecspec's cash flows, which were designed to induce the issuance of loans and investments
collected by the Individual TPDS and used for the benefit of the TPDS.

84.     For example, upon information and belief, Senia, Rose, and Schlenker, each,
would communicate with representatives from Bank of America (in New York, from New
Jersey), over the phone and through the mails, concerning the covenant reports containing
materially false statements, such falsities Senia, Rose, and Schlenker would further explain and
support using additional lies to justify the original lies.

85.     The tax fraud engaged in by the Third-Party Defendants, violating 26 U.S.C. §
7201, allowed them to evade tax liabilities connected to the profits siphoned off to SRS. By

underreporting income derived from their manipulative practices, the Third-Party Defendants not only shielded their illicit gains from taxation but also facilitated the accumulation of wealth that they extracted from Tecspec's operations, exacerbating the company's financial struggles.

86.     The bank fraud committed under 18 U.S.C. § 1344 illustrates how the Third-Party Defendants' deceptive practices were routinely employed to secure loans based on inflated profitability claims. This ongoing fraud contributed to a cycle of borrowing with no intention of sharing the proceeds with Tecspec, as the funds obtained through deceptive financial practices were funneled into SRS, further distancing Tecspec from essential revenue and resources.

87.     For one of many examples:  On or about January 13, 2022, Upon information and belief, Senia, Schlenker, and Rose directed Kevin Finley, Controller for SRS, to inaccurately reflect inventory thereby increasing Tecspec's profit on documents provided to Bank of America for the renewal of a line of credit which, upon information and belief, contained false statements specifically to induce Bank of America to continue issuing a line of credit. Upon information and belief, Rose, Senia, and Schlenker caused to be submitted financial documents which falsely reported the health of SRS and Tecspec to induce Bank of America to continue lending. This is believed to be true based on the explanation by Kevin Finley that he would not accurately reflect the inventory Tecspec had on hand as of December 31, 2021.  Finley explained that they intended not to show another year of Tecspec losses to Bank of America.  The foregoing false statements were communicated through telephone and e-mail, and were materially relied upon by Bank of America to continue issuance of a line of credit, uses and advances against which inured solely to the AIFE, not Tecspec.

88.     The threats and intimidation tactics employed by the Third-Party Defendants, in violation of 18 U.S.C. § 1951, were intended to suppress any dissent and maintain an unquestioned environment around their activities. By instilling fear among key stakeholders and employees, the Third-Party Defendants ensured that their scheme could operate without challenge, thereby protecting their ability to siphon profits without scrutiny. This atmosphere of control was crucial for their continued extraction of profits from Tecspec into their own pockets.

The examples are numerous, some of which are caught on video and are part of this Court's record in filed papers.

89.    Collectively, these acts demonstrate a coordinated effort to misappropriate funds and resources, ensuring that profits derived from Tecspec's operations were consistently redirected to SRS for the personal enrichment of the Third-Party Defendants, all to the detriment of Third-Party Plaintiffs.

90.    This ongoing pattern of racketeering is not merely a series of isolated fraudulent activities; it is a comprehensive scheme designed to siphon off financial resources, hide the source of funds acquired through false and other pretenses, and then divert those funds to the AIFE.

91.    As a result of the foregoing, Plaintiff Tecspec respectfully requests that the Court find that an association-in-fact enterprise exists under RICO. The Third-Party Defendants have engaged in continuous and unlawful racketeering activities that have caused significant harm to the Plaintiff.

92.    Consequently, Plaintiff seeks appropriate relief, including treble damages, attorney's fees, and any other relief the Court deems just and proper, to remedy the extensive harm caused by the Third-Party Defendants' unlawful actions.

//

//

//

//

//

//

//

//

**CAUSES OF ACTION**

**<u>Count I</u>**

**Violation of 18 U.S.C. § 1836 (Defend Trade Secrets Act)**
**for Stealing Braya Trade Secrets**

93.    Third-Party Plaintiffs repeat and reallege all of the pleadings set forth above as if set forth fully hereunder.

94.    Under the meaning given by the Defend Trade Secrets Act and New York law, Braya has undertaken extraordinary efforts and expense to develop certain designs and other intellectual property relating to Braya's competitive advantage that, together, comprise Braya's trade secrets ("Trade Secrets").

95.    Braya's Trade Secrets were protected in a facility accessible only to Michael Donnolo and specific authorized employees, agents, or vendors. No other individual from the public was permitted to enter the Braya facility without authorization. The Premises is gated, with locking doors and security cameras.

96.    These measures are necessary because, once in the Braya facility (Premises), Braya's Trade Secrets are being used in the course of operating its business, which requires such Trade Secrets to be viewable from authorized visitors into the Premises. For e.g., the materials Braya uses cannot be 'concealed' as they are being used in the course of Braya's production of materials.

97.    Knowing the foregoing, the Third-Party Defendants broke into the Braya Premises with the express purpose and intent of ascertaining Braya's Trade Secrets.

98.    Not only were Third-Party Defendants' actions improper, but they were also illegal and punishable under New York Penal Law.

99.    Third-Party Defendants have disseminated such Trade Secrets to their employees, agents, and vendors specifically to inform Third-Party Defendants of Braya's technological advancements, forming its competitive advantage.

100.    The foregoing was acquired without consent of any of the Third-Party Plaintiffs. Moreover, Third-Party Plaintiffs called the police to thwart Third-Party Defendants from continuing their illegal trespass onto the Premises.

101.    Upon information and belief, Third-Party Defendants intend to use Braya's Trade Secrets for their own competitive advantage.

102.    Upon information and belief, if no such advantage can be obtained through stealing Braya's Trade Secrets, Defendants will use and disseminate Braya's Trade Secrets solely to eliminate Braya's competitive advantage despite Defendants' ability to wield Braya's technological advances for themselves.

103.    Consequently, Third-Party Defendants have violated 18 U.S.C. § 1836, damaging Third-Party Plaintiffs in an amount to be determined at trial but in no amount less than $5 million.

## Count II

### Violations of the Racketeer Influenced and Corrupt Organizations Act
### 18 U.S.C. §§ 1962(a), 1962(b), 1962(c), and 1962(d)

104.    Third-Party Plaintiffs repeat and reallege all of the pleadings set forth above as if set forth fully hereunder.

105.    Senia, Rose, and Schlenker comprise an association-in-fact enterprise as defined under RICO statute (the AIFE).

106.    Senia, Rose, and Schlenker have associated in such a manner for thirty years, having engaged in fraudulent conduct for at least the last seven years.

107.    Senia, Rose, and Schlenker usurped control and corrupted Tecspec and SRS, which the AIFE used to launder money.

108.    Senia, Rose, and Schlenker are each RICO persons, each committing felonious predicate acts, acting together, for the benefit of the AIFE and to the detriment of Michael Donnolo and Tecspec.

109.    Senia, Rose, and Schlenker committed crimes in connection with perpetrating the AIFE:

    a.   Mail Fraud**:** In violation of 18 U.S.C. § 1341, the Third-Party Defendants transmitted fabricated financial documents, misleading communications, and false statements through the mail. These documents contained inflated profitability reports and false sales projections, which were used to secure

investments under false pretenses, enabling the Third-Party Defendants to enhance cash flow directed to SRS rather than benefiting Tecspec.

b.  Wire Fraud: In violation of 18 U.S.C. § 1343, the Third-Party Defendants employed electronic communications to transmit false financial data about Tecspec's financial condition. This manipulation facilitated the ongoing deception needed to attract additional investment and business, which were then diverted away from Tecspec, further enriching the Third-Party Defendants and supporting their fraudulent activities.

c.  Tax Fraud: In violation of 26 U.S.C. § 7201, the Third-Party Defendants willfully omitted significant portions of income generated from the manipulation of Tecspec's sales. This recurring fraudulent underreporting allowed them to evade tax liabilities and retain profits that should have benefited Tecspec, contributing to its financial decline.

d.  Bank Fraud: In violation of 18 U.S.C. § 1344, the Third-Party Defendants presented false information to banks to secure loans based on fabricated claims of Tecspec's profitability. This fraudulent activity occurred repeatedly over the past five years, diverting financial resources intended for Tecspec to SRS without any intention of sharing the benefits.

e.  Commercial Bribing in the Second Degree: New York Penal Law § 180.00 and 18 U.S.C. § 1961 et seq., Senia and Rose engaged in a pattern of racketeering activity through acts of commercial bribery that affected interstate commerce. Specifically, bribes and kickbacks were paid to decisionmakers in businesses in order to induce said businesses to buy Tecspec products at prices set by Rose, Schlenker, and Senia. However, since Senia, Rose, and Schlenker control the "price" at which Tecspec sells products, Senia, Rose, and Schlenker unilaterally reduced the prices per unit to create a 'surplus' for themselves and as a commercial bribe for the decisionmaker in the business, which they paid to promote further business deals. These actions satisfy the criteria of racketeering activity as defined under 18 U.S.C. § 1961(1), and their conduct constitutes a violation of federal RICO statutes, 18 U.S.C. § 1962(c), necessitating compensation for the resulting damages.

f.  Threats and Intimidation: In violation of 18 U.S.C. § 1951, the Third-Party Defendants directed explicit threats of physical violence toward key stakeholders, including Michael Donnolo, John Michael Long, and Joshua Donnolo, to maintain control over the company and suppress dissent against their unlawful actions.

110.  Senia, Rose, and Schlenker each communicated about, authorized the use of, and caused to submit financial documents to Bank of America and other financial institutions containing materially false representations by deliberately mischaracterizing the nature of reported funds, the status of Tecspec contracts, and the disposition of Tecspec liabilities. Such

statements were materially false, submitted to Bank of America and other financial institutions for the express purpose of inducing same to loan money.

111.    Senia, Rose, and Schlenker knew the statements to be false at the time they were submitted, and repeated those false statements in quarterly covenant reports for years.

112.    The result was the issuance of loan proceeds to Tecspec, which Senia, Rose, and Schlenker illegally diverted to themselves through transferring funds by and between Tecspec and SRS.

113.    Once the loan proceeds were acquired through Senia, Rose, and Schlenker committing bank fraud, Senia, Rose, and Schlenker then committed an additional fraud in order to justify transfer of funds to SRS from Tecspec. For example, Senia, Rose, and Schlenker would create invoices for expenses that were never incurred and then "reimburse" themselves through payments from Tecspec to SRS. Further, upon information and belief, Senia, Rose, and Schlenker created fake invoices for payment of products that Tecspec never had, owned, and/or had no reason to purchase, and which were never purchased, but which Senia, Rose, and Schlenker used to justify paying to themselves purported expenses based on fake invoices. The foregoing is believed to be true based on the accountant for SRS and Tecspec inquiring of Michael Donnolo about invoiced items submitted by Senia, Schlenker, and Rose for items and expenses that were never borne by Tecspec.

114.    And once the money was paid to SRS, upon information and belief, Senia, Schlenker, and Rose would distribute those funds to themselves.

115.    As pleaded supra, Senia, Schlenker, and Rose committed bank fraud, mail fraud, and wire fraud, with regularity and over the course of the last 7 years.

116.    Moreover, Senia and Rose engaged in illegal commercial bribes, including kickbacks to company employees of businesses in which Senia attempted to do business, which resulted in Senia and Rose 'skimming' from Tecspec sales and that ultimately resulted in the business with which Tecspec contracted to go bankrupt.

117.    Moreover, Senia, Rose, and Schlenker controlled the books of, both, Tecspec and SRS, engaging in the Price Manipulation scheme that resulted in paying SRS and themselves approximately $15 million dollars at the expense of Tecspec. Each of Senia, Rose, and Schlenker participated in the Price Manipulation scheme, which allowed the AIFE to give the appearance of generating Tecspec contracts, giving the AIFE additional grounds to seek more and more financing.

118.    Despite these 'Tecspec contracts' being secured through Senia, Rose, and Schlenker's Price Manipulation scheme, each concealed the fact that the Tecspec contracts were for the sale of Tecspec products at a fraction of the cost that it took Tecspec to create such products, putting Tecspec deeper and deeper into debt with every purchase order.

119.    And with each of the foregoing purchase orders, the AIFE would buffer "profits" to SRS, which ultimately were paid to the Individual TPDS, leaving Tecspec with a contract to fulfill at a deep deficit to Tecspec, which the Individual TPDS would then use to secure additional financing from Bank of America and other financial institutions.

120.    The foregoing is a continued, open-ended scheme, each of the activities related to the purpose of generating funds under any means necessary, which are recharacterized and then diverted to SRS, ultimately then paid to the AIFE members as 'clean' cash or reimbursement for expenses.

121.    The foregoing conduct was acted upon knowingly by each of the RICO persons, participating in the collective scheme to generate money, launder that money, and then misappropriate that money for themselves.

122.    Each RICO person's activities were knowingly in furtherance of the common RICO Scheme, in which Senia, Rose, and Schlenker, each, knowingly agreed to participate.

123.    Each RICO person engaged in their own predicate acts, dozens of such acts conducted over a single year and which extended over the course of the last 7 years -- acts pleaded with specificity above.

124.    Further as pleaded the RICO persons Senia, Rose, and Schlenker are distinct from the AIFE, each acting in furtherance of the RICO Scheme for a common and collective purpose.

125.    Each of Senia, Rose, and Schlenker, had their respective roles, participated, and controlled aspects of the AIFE, allowing and promoting the AIFE to operate, with each materially benefiting from the AIFE through the misappropriation of funds that ultimately were paid to each AIFE member.

126.    As a result of the foregoing, Tecspec and Michael Donnolo were injured as a direct result of the RICO Scheme in an amount indicated by at least $15 million dollars' worth of Tecspec products "sold" to SRS in connection with the Price Manipulation scheme as part of the RICO Scheme.

127.    Moreover, Tecspec has been and continues to be damaged from pledging Tecspec as collateral on lines of credit and loans, proceeds from which Tecspec must repay but which were diverted to the AIFE.

128.    Each of the RICO persons' predicate acts impact interstate commerce, as the activities concerning the predicate acts occurred by transmitting fraudulent documents and information between New York and New Jersey. Further, funds acquired in New York, including through bank fraud committed at a New York Bank of America branch, were  diverted to the AIFE, each member located in New Jersey.

129.    Lastly, as a result of the RICO Scheme, Tecspec is no longer a viable business and, instead, serves as a special purpose vehicle to house the AIFE's cost of engaging in their RICO Scheme, Tecspec completely unable to recover any semblance of profitability as a result of the AIFE's activities.

130.    By the foregoing, Rose, Senia, Schlenker, and SRS are liable to Tecspec and Michael Donnolo for damages arising from the violations of 18 U.S.C. §§ 1962(a)-(d).

## **Count III**

### **Violation of Tecspec LLC's Non-Compete Agreement**
### **As against the Third-Party Defendants**

131.    Third-Party Plaintiffs repeat and reallege all of the pleadings set forth above as if set forth fully hereunder.

132.    The Operating Agreement of Tecspec includes an enforceable non-compete provision that restricts competition of Tecspec Members in having interests in businesses located in counties where Tecspec has operated.

133.    Third-Party Defendants have maintained ownership interests in SRS, SRS Enterprises Inc., SRS Enterprises NJ LLC, and HVAC Service Associates, Inc. located in Middletown, New Jersey and SRS Research LLC located in New York, New York. Tecspec has done business in both of those locations, which the Non-Compete strictly prohibits.

134.    Third-Party Defendants have knowingly engaged in business activities that compete with Tecspec.

135.    For example, opportunities for selling HVAC Units may be filled by SRS through a completely different and other manufacturer, that not being Tecspec, which actively competes with Tecspec's ability to compete with leads generated through SRS.

136.    Tecspec sells HVAC Units and SRS sells HVAC Units.

137.    SRS does not always 'acquire' its HVAC Units from Tecspec. In such circumstances, SRS would be competing with Tecspec.

138.    Where the Third-Party Defendants hold ownership interest in the SRS entities, they have violated the Non-Compete.

139.    For violating the Non-Compete, the Third-Party Defendants are liable to Tecspec and Michael Donnolo to the extent SRS conducted business that resulted in sales of HVAC Units that did not come from Tecspec.

140.    Consequently, the Third-Party Defendants are liable for an amount to be determined at trial.

**Count IV**

**Declaratory Judgment**
**By Michael Donnolo as Against SRS**

141.    Third-Party Plaintiffs reincorporate by reference all preceding allegations as if fully set forth herein.

142.    Third-Party Plaintiffs assert that SRS Enterprises Inc. is an alter ego of Tecspec, LLC, as both entities are owned and controlled by the same individuals—Ralph Schlenker, Robert Senia, and Richard Rose—who utilize SRS as a conduit to divert business opportunities and profits that rightfully belong to Tecspec.

143.    Upon information and belief, the Third-Party Defendants conduct business for the sale of HVAC Units by holding themselves out as owners and operators of SRS while conducting business on behalf of Tecspec and, further, hold themselves out as owners and operators of Tecspec while conducting business on behalf of SRS.

144.    There exists a unity of interest and ownership between SRS Enterprises Inc. and Tecspec, LLC, as both companies operate with overlapping management and have engaged in mutual business transactions that blur the lines of their separate identities through Third-Party Defendants' activities.

145.    The Third-Party Defendants have used SRS Enterprises to circumvent the restrictions and obligations placed upon them as members of Tecspec, including fiduciary duties which the Third-Party Defendants breached and the misuse of Tecspec's resources for Third-Party Defendants' benefit.

146.    The intermingling of assets and operations between the two entities demonstrates that the separate personalities of SRS Enterprises Inc. and Tecspec LLC are not maintained, as SRS has utilized Tecspec's resources and diverted key business opportunities to benefit itself.

147.    The actions of the Third-Party Defendants in operating SRS Enterprises Inc. as an alter ego of Tecspec, LLC have resulted in inequitable consequences, including the misappropriation of funds, erosion of Tecspec's market position, and inability to receive rightful returns on its investments.

148.    The foregoing constitutes a justiciable controversy for which Third-Party Plaintiffs have no other adequate remedy at law.

149.    Therefore, a declaration from this Court is necessary to confirm that SRS
Enterprises Inc. is the alter ego of Tecspec, LLC, and to prevent the Third-Party Defendants from
continuing to evade their obligations to Tecspec through the misuse of the corporate form.

150.    Plaintiff Michael Donnolo seeks judgment in his favor, finding that Tecspec and
SRS are alter egos, and that Mr. Donnolo's 25% ownership extends to a 25% ownership in SRS.

## Count V

### Battery
### By the Individual TPPS as Against Defendants Senia

151.    Third-Party Plaintiffs reincorporate by reference all preceding allegations as if
fully set forth herein.

152.    Third-Party Defendant Robert Senia made specific verbal threats against the
personal safety of Third-Party Plaintiffs Michael Donnolo, Joshua Donnolo, and John Michael
Long.

153.    Specifically, those threats were to cause injury and/or to murder the Individual
Third-Party Plaintiffs using blunt force to the skull and/or shooting the Third-Party Plaintiffs in
the head using a firearm owned and kept by Robert Senia.

154.    These threats created a reasonable apprehension of imminent harmful or offensive
contact, resulting in psychological distress and fear for the safety of the Third-Party Plaintiffs.

155.    This conduct constitutes battery, as it involved intentional acts leading to harmful
and offensive contact, whether perceived or actual.

156.    By the foregoing, Senia and Rose are liable to the Individual TPPS in an amount
to be determined at trial.

## Count VI

**Misappropriation of Tecspec LLC Opportunities**
**By Tecspec LLC as against Third-Party Defendants**

157.    Third-Party Plaintiffs reincorporate by reference all preceding allegations as if fully set forth herein.

158.    Over the last seven years, Tecspec has operated a manufacturing business designed to supply HVAC Units, among other things.

159.    The Third-Party Defendants, purportedly holding themselves out on behalf of Tecspec as owners of Tecspec, secured purchases of Tecspec products by way of SRS.

160.    When securing purchasers of HVAC Units via SRS, Third-Party Defendants did not each time use Tecspec despite holding themselves out as being affiliated, owning, and/or operating Tecspec.

161.    Upon information and belief, SRS conducted business using other HVAC Units that could have been purchased through Tecspec but, instead, were purchased through a different manufacturer.

162.    Moreover, in securing a purchaser, the Third-Party Defendants could have secured said purchaser of Tecspec products directly with Tecspec, but instead, chose to only funnel such purchases through SRS so that Third-Party Defendants could disproportionately profit from Tecspec business.

163.    As a direct result, Tecspec suffered significant financial losses, including the loss of contracts and diminished market presence.


**<u>Count VII</u>**

**Tortious Interference with Braya Business Activities**
**By TPPS against TPDS**

164.    Third-Party Plaintiffs reincorporate by reference all preceding allegations as if fully set forth herein.

165.    Braya had established business relationships within the HVAC industry.

166.     Third-Party Defendants were aware of these relationships and intentionally interfered by attempting to sabotage those relationships.

167.     By the foregoing, TPDS are liable to Braya for tortious interference with Braya's business opportunities in an amount to be determined at trial.

## Count VIII

### Breach of Good Faith and Fair Dealing
### By Michael Donnolo against the Individual TPDS

168.     Third-Party Plaintiffs reincorporate by reference all preceding allegations as if fully set forth herein.

169.     The Operating Agreement between Tecspec and its members outlines specific duties and obligations, including restrictions on competitive conduct.

170.     The Individual TPDS and Michael Donnolo agreed to the provisions therein, making it a binding contract.

171.     That Operating Agreement contained an implied covenant of good faith and fair dealing.

172.     The Individual TPDS breached that implied covenant of good faith and fair dealing by way of engaging in fraud and committing the RICO Scheme and Price Manipulation scheme.

173.     As a result of these breaches, Michael Donnolo was damaged, which damages are proximately caused by the Individual TPDS' breaches.

174.     By the foregoing, the Individual TPDS are liable to Michael Donnolo in an amount to be determined at trial.

## Count IX

### Trespass
### By Braya as against the Individual TPDS

175.    Third-Party Plaintiffs reincorporate by reference all preceding allegations as if fully set forth herein.

176.    Senia,  Rose, and an unknown third person unlawfully entered the Braya facility without consent, intending to misappropriate proprietary technology and information.

177.    Their entry was intentional, as they were fully aware they had no right to access the premises. In fact, Senia and Rose were directed not to enter, to immediately leave the premises, and when they refused, the police were called.

178.    As a result of this trespass, Third-Party Plaintiffs suffered damages, including loss of proprietary information and operational disruption.

179.    By the foregoing, Senia and Rose are liable to Braya in an amount to be determined at trial.

### Count X

**Failure to Pay Wages**
**By the Individual TPPS against Tecspec LLC**

180.    Third-Party Plaintiffs reincorporate by reference all preceding allegations as if fully set forth herein.

181.    Michael Donnolo, John Michael Long, and Joshua Donnolo were all employed by Tecspec, providing services critical to the company's operations.

182.    Despite their performances of work, Third-Party Defendants failed to compensate them appropriately for their labor, violating both state and federal labor laws.

183.    This failure to pay wages has resulted in economic harm and loss for each of these Third-Party Plaintiffs.

184.    As a result, the Individual TPPS were damaged in an amount which compensation was withheld, plus interest, penalties, and related costs.

**INJUNCTION**

185.    TPPS allege an on-going breach of the Non-Compete, by the TPDS and, specifically, SRS.

186.    Senia, Rose, and Schlenker continue to corrupt and pervert the business of Tecspec for the benefit of SRS, using SRS to compete and subsume corporate opportunities for Tecspec in direct violation of the Operating Agreement containing a covenant not-to-compete.

187.    Plainly, SRS is located and does business in Middletown, New Jersey and Manhattan, New York, both locations in which Tecspec has done business.

188.    Tecspec lacks an adequate remedy at law to prevent SRS from misappropriating business opportunities from Tecspec.

189.    Tecspec, Michael Donnolo, and Braya are entitled to an injunction as against SRS, and the Individual TPDS, for unlawful competition, the AIFE's RICO Scheme, and misappropriation of Braya technology.

**PRAYER FOR RELIEF**

**WHEREFORE**, Third-Party Plaintiffs respectfully request that this Court enter judgment in their favor and against Third-Party Defendants as follows:

a)    An injunction permanently prohibiting Third-Party Defendants from using or disclosing Third-Party Plaintiffs' proprietary information, trade secrets, and further trespassing upon Third-Party Plaintiffs' premises.

b)    An order enjoining Third-Party Defendants from unlawfully competing with Third-Party Plaintiffs using wrongfully obtained information and taking actions that undermine the business relationships of Braya and Tecspec.

c)    An award of actual damages for lost profits, lost opportunities, and compensation for unpaid wages.

d) An award of punitive damages due to the willful and malicious nature of Third-Party Defendants' conduct.

e) A declaration from this Court establishing the proprietary nature of the misappropriated information as belonging to Braya and Tecspec, along with an order directing SRS to cease any further use or profit from such information.

f) An order requiring Third-Party Defendants to return all proprietary materials and documents belonging to Third-Party Plaintiffs.

g) An award of Third-Party Plaintiffs' attorney's fees, costs, and expenses incurred in connection with this action.

h) Treble damages, punitive damages, and compensatory damages for Third-Party Defendants' various breaches of 18 U.S.C. §§ 1961-1968, which includes attorneys' fees, costs, and expenses,

i) Such other and further relief as this Court may deem just and proper.

Dated: New York, New York
   December 18, 2024

         **ROSENBERG & ESTIS, P.C.**
         *Attorneys for Third-Party Plaintiffs*

         Matthew S. Blum, Esq.
         733 Third Avenue
         New York, New York 10017
         (212) 551-8409
         MBlum@RosenbergEstis.com