**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------

TECSPEC LLC, RICHARD ROSE, ROBERT
SENIA, and RALPH SCHLENKER,

                Plaintiffs,

    -against-

MICHAEL DONNOLO, JOSHUA DONNOLO,
JOHN MICHAEL LONG, BRAYA CONCEPTS
LLC, BRAYA MACHINE COMPANY LLC,
BRAYA SYSTEMS LLC, BRAYA VENTURES
LLC, and ABC CORPORATIONS 1-10,

                Defendants.

------------------------------------------------------------------

Case No. 1:24-cv-08077-JHR

---

**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

---

**COLE SCHOTZ P.C.**
*Attorneys for Plaintiffs*
Jason R. Melzer
Arielle H. Wasserman
JMelzer@coleschotz.com
1325 Avenue of the Americas
19th Floor
New York, New York 10019
(212) 752-8000

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................ i

FINDINGS OF FACT ........................................................................................................ 1

CONCLUSIONS OF LAW ................................................................................................ 15

    I.    Plaintiffs are Entitled to a Preliminary Injunction ............................................ 15

        A.    The Record Evidence Demonstrates that Plaintiffs Have
and Will Continue to Suffer Irreparable Harm Absent a
Preliminary Injunction .......................................................................... 15

        B.    Plaintiffs Have Established a Likelihood of Success on
the Merits ................................................................................................ 17

               i.    Plaintiffs Have Established a Likelihood of Success on Their
Claim That M. Donnolo Breached His Fiduciary Duty of
Loyalty Owed to Tecspec LLC .................................................. 17

               ii.    Plaintiffs Have Established a Likelihood of Success on Their
Claim that M. Donnolo Breached the Tecspec LLC Non-
Compete Agreement ................................................................... 19

               iii.    Plaintiffs Have Established a Likelihood of Success on Their
Claim that M. Donnolo Has Breached the Covenant of Good
Faith and Fair Dealing ................................................................ 23

               iv.    Plaintiffs Have Established a Likelihood of Success on Their
Claim that Defendants Misappropriated Tecspec LLC's
Trade Secrets Pursuant to 18 U.S.C. 1836 and New York
Common Law .............................................................................. 24

               v.    Plaintiffs Have Established a Likelihood of Success on Their
Claim that M. Donnolo has Committed Corporate Waste and
Mismanagement .......................................................................... 27

               vi.    Plaintiffs Have Established a Likelihood of Success on Their
Claim that M. Donnolo, J. Donnolo, and Mr. Long Have
Breached the Faithless Servant Doctrine ................................... 28

               vii.    Plaintiffs Have Established a Likelihood of Success on Their
Claim that Defendants Have Been Unjustly Enriched ............... 29

viii.    **Plaintiffs Have Established a Likelihood of Success on Their Claim that M. Donnolo, J. Donnolo, and Mr. Long Have Converted Tecspec LLC's Trade Secrets**................................. 29

ix.    **Plaintiffs Have Established a Likelihood of Success on Their Claims Against Defendants for Tortious Interference and Unlawful Competition**........................................................ 30

x.    **Plaintiffs Have Established a Likelihood of Success on Their Claim for Aiding and Abetting Breach of Fiduciary Duty**.... 31

C.    **Plaintiffs Have Established that the Balance of Hardships Weighs Strongly in Their Favor and an Injunction Favors the Public Interest** ................................................... 32

**CONCLUSION** ........................................................................................... 33

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ackerman v. Pilipiak*,
   457 B.R. 191 (E.D.N.Y. 2011) ..........................................................................23

*Ad Lighting Inc. v. Clean.io, Inc.*,
   2020 WL 4570047 (S.D.N.Y. Aug. 7, 2020) ....................................................32

*Agency Solutions Com, LLC v. TriZetto Grp., Inc.*,
   819 F. Supp. 2d 1001 (E.D. Cal. 2011)............................................................31

*Ashland Inc. v. Morgan Stnaley & Co.*,
   652 F.3d 333 (2d Cir. 2011)...............................................................................35

*Ayco Co., L.P., v. Frisch*,
   795 F. Supp. 2d 193 (N.D.N.Y. 2011) ..............................................................22

*Carvel Corp. v. Noonan*,
   250 F.3d 6 (2d Cir. 2003)...................................................................................36

*DAR & Assocs., Inc. v. Uniforce Servs., Inc.*,
   37 F. Supp. 2d 192 (E.D.N.Y. 1999) ................................................................26

*Digital Camera Int'l, Ltd. v. Antebi*,
   2017 WL 2992719 (E.D.N.Y. July 14, 2017).....................................................23

*Eichenblatt v. Kugel*,
   2018 WL 3202079 (E.D.N.Y. May 15, 2018) ....................................................33

*Espire Ads LLC v. TAPP Influencers Corp.*,
   655 F. Supp. 3d 223 (S.D.N.Y. 2023)...............................................................31

*FMC Corp v. Taiwan Tainan Giant Indus. Co. Ltd.*,
   730 F.2d 61 (2d Cir. 1984).................................................................................22

*Friends of Wickers Creek Archeological Site, Inc. v. Landing on the Water at*
   *Dobbs Ferry Homeowners Association, Inc.*,
   156 N.Y.S.3d 227 (N.Y. App. Div. 2021) ..........................................................25

*Highfill, Inc. v. Bruce & Iris, Inc.*,
   50 A.D.3d 742 (2nd Dep't 2008) .......................................................................29

*Iacovacci v. Brevet Holdings, LLC*,
   437 F. Supp. 3d 367 (S.D.N.Y. 2020)...............................................................30

*IDG USA, LLC v. Schupp*,
    416 F. App'x 86 (2d Cir. 2011) ...........................................................................21

*Inflight Newspapers, Inc. v. Magazines In-Flight, LLC*,
    990 F. Supp. 119 (E.D.N.Y. 1997) ...............................................................22, 26

*Insight Data Corp. v. First Bank Sys., Inc.*,
    1998 WL 146689 (S.D.N.Y. Mar. 25, 1998) ..........................................22, 26, 29

*Int'l Bus. Machines Corp. v. De Freitas Lima*,
    2020 WL 5261336 (S.D.N.Y. Sept. 3, 2020)...................................................26, 27

*Islam v. Cuomo*,
    475 F. Supp. 3d 144 (E.D.N.Y. 2020) ..................................................................21

*Lader v. Delgado*,
    941 F. Supp. 2d 267 (E.D.N.Y. 2013) ..................................................................36

*Magtoles v. United Staffing Registry, Inc.*,
    665 F. Supp. 3d 326 (E.D.N.Y. 2023) ..................................................................27

*Mende v. Milestone Tech, Inc.*,
    269 F. Supp. 2d 246 (S.D.N.Y. 2003).....................................................................28

*Miller v. Levi & Korinsky, LLP*,
    2021 WL 535599 (S.D.N.Y. Feb. 12, 2021) .........................................................34

*Nat'l Elevator Cab & Door Corp. v. H&B, Inc.*,
    282 Fed. Appx. 885 (2d Cir. 2008)................................................................21, 26

*New York State Trawlers Ass'n v. Jorling*,
    764 F. Supp. 24 (E.D.N.Y. 1991) .........................................................................23

*NRT New York, LLC v. Harding*,
    16 N.Y.S.3d 255 (N.Y. App. Div. 2015) ...............................................................25

*Oliver Wyman, Inc. v. Eilson*,
    282 F. Supp. 3d 684 (S.D.N.Y. 2017)....................................................................27

*Patrick v. Allen*,
    355 F. Supp. 2d 704 (S.D.N.Y. 2005).....................................................................33

*Pauwels v. Deloitte LLP*,
    83 F.4th 171 (2d Cir. 2023) ..................................................................................37

*Phansalkar v. Andersen Weinroth & Co., L.P.*,
    344 F.3d 184 (2d Cir. 2003)..................................................................................34

iv

*Pokoik v. Pokoik*,
   115 A.D.3d 428 (1st Dep't 2014) ........................................................................23

*Poller v. BioScrip, Inc.*,
   974 F. Supp. 2d 204 (S.D.N.Y. 2013).................................................................26

*PPG Indus. Inc. v. Jiangsu Tie Mao Glass Co. Ltd*,
   47 F.4th 156 (3d Cir. 2022) ...............................................................................31

*Rennaker Co. Consulting, Inc. v. TLM Grp., LLC*,
   2017 WL 2240235 (S.D.N.Y. Mar. 29, 2017) ...................................................23

*Scienton Techs., Inc. v. Computer Assocs. Int'l, Inc.*,
   2008 WL 11447906 (E.D.N.Y. Mar. 24, 2008)..................................................29

*Speedry Chem. Prod., Inc. v. Carter's Ink Co.*,
   306 F.2d 328 (2d Cir. 1962)...............................................................................37

*St. John's Univ., New York v. Bolton*,
   757 F. Supp. 2d 144 (E.D.N.Y. 2010) ...............................................................35

*Thyroff v. Nationwide Mut. Ins. Co.*,
   460 F.3d 400 (2d Cir. 2006)...............................................................................35

*Trionic Assocs., Inc. v. Harris Corp.*,
   27 F. Supp. 2d 175 (E.D.N.Y. 1998) .................................................................25

*Wechsler v. Bowman*,
   34 N.E.2d 322 (N.Y. 1941).................................................................................37

*Woods v. Bos. Sci. Corp.*,
   2006 WL 4495530 (S.D.N.Y. Nov. 1, 2006)......................................................29

**Statutes**

18 U.S.C. 1836.........................................................................................................30,31

New York Limited Liability Company Act Section 417(a)(1)....................................24

## FINDINGS OF FACT

### The Formation of Tecspec LLC

1.    In or around 2017, M. Donnolo and Mr. Senia[1] met and began to discuss the possibility of starting a new entity centered on developing more efficient HVAC units for large-scale residential and commercial properties. *See* Verified Complaint, ¶ 34. Mr. Senia brought Mr. Rose and Mr. Schlenker ("collectively the "Members"), his partners in a different business venture, onboard to join in on the venture between himself and M. Donnolo. *See* Verified Complaint, ¶¶ 40-41.

2.    M. Donnolo's background was in engineering, and he provided the technical know-how, while the Members provided the financial resources and business connections. *See* Verified Complaint, ¶¶ 36-41.

3.    The success was immediate, as Tecspec LLC landed several multi-million-dollar jobs, including a 6.5-million-dollar project at Two Penn Plaza in Manhattan, which was overseen by M. Donnolo. *See* Verified Complaint, ¶ 57.

4.    On or about January 1, 2018, Mr. Senia, Mr. Rose, Mr. Schlenker and M. Donnolo all became 25% members of Tecspec LLC.  *See* ECF 26-5 (Tecspec Operating Agreement).

5.    M. Donnolo was appointed as a Manager of Tecspec LLC pursuant to the Tecspec Operating Agreement. *Id.*

6.    Section 25.1 of the Tecspec Operating Agreement states as follows:

> …each Member covenants and agrees that while he is a Member of the Company, and for a four (4) year period after the Member transfers his entire Interest in the Company, he will not directly or indirectly, individually or in conjunction with any person or persons, firm, partnership, corporation … or in any other manner whatsoever,

---

[1] Unless stated otherwise, all defined terms have the same meaning as they do in the Verified Complaint filed on October 24, 2024 ("Verified Complaint") (ECF 1).

> **carry on** or be engaged in, or connected with or interested in **any business** which competes, in whole or in part, with [Tecspec], which is located in any county in which [Tecspec] is doing or **has done business**.
>
> *See* ECF 26-5 at Section 25.1 (emphasis added).

7.      Section 25.1 (the "Non-Compete Agreement") provides that every member of Tecspec LLC, including M. Donnolo, cannot perform any jobs or work on any projects in counties where Tecspec is performing any jobs or working on any projects for a span of four years after which they are no longer a member. *Id.*

8.      M. Donnolo is still currently a member of Tecspec LLC and is thus currently restrained by Section 25.1. *Id.*; *See* also Verified Complaint, ¶ 94.

9.      Additionally, as members of Tecspec, Mr. Senia, Mr. Rose, Mr. Schlenker and M. Donnolo owe Tecspec LLC fiduciary duties of good faith, loyalty, and care. *Id.*

**M. Donnolo Walks Out on Tecspec and Later Returns**

10.     As Tecspec was coming into its own, Mr. Senia suffered a life-threatening motor vehicle accidence, forcing Mr. Senia out of work for six months. Verified Complaint, ¶ 7. Due to Mr. Senia's absence, M. Donnolo was entrusted with overseeing production and plant management. *Id.*

11.     M. Donnolo, however, saw this as an opportunity to extort Tecspec LLC, and he demanded that he be made an 85% owner of the company. *Id.* If the Members did not agree to his demands, M. Donnolo threatened to walk out (with J. Donnolo and Mr. Long), and not fulfil the Two Penn Plaza Building unit orders (which was a substantial job for Tecspec LLC), and was worth $6.5 million dollars. *Id.* at ¶¶ 5, 7, 8.

12.     At that time, M. Donnolo had possession of all the information and designs necessary to complete the Two Penn Plaza job, and if he left, Tecspec LLC would have been unable to continue work on that project. *Id.* at ¶ 8.

13.     The 85% request from M. Donnolo, however, was rejected, as it was deemed unacceptable by the other Members as it undermined their contributions and investments which amounted to millions of dollars, thousands of hours of labor, and trade secret development. *Id.* at ¶ 9.

14.     Not only did M. Donnolo walk out, but he told other Tecspec LLC employees to not show up at work. *Id.* at ¶ 10. In fact, Mr. David Lopez, an employee of Tecspec LLC for five years, attested under penalty of perjury that: "approximately two and a half years ago, without any advance notice, defendant, [M. Donnolo] called me and instructed me not to report for work because 'it was not safe.'" Lopez Dec.,[2] ¶ 3.

15.     All of Tecspec LLC's employees stayed home but one, Mr. Lopez. Verified Complaint, ¶ 10; Lopez Dec., ¶ 5. After a week, Mr. Senia offered a $10,000 bonus to anyone that would return to work, and all did after a week. *Id.* Three weeks later, after tense negotiations, the Members agreed to provide M. Donnolo with a $400,000 salary, which was a 100% increase, and M. Donnolo returned to work. Verified Complaint, ¶ 10.

16.     Several weeks later M. Donnolo also raised Mr. Long and J. Donnolo's salaries by 100% to $200,000 per year without conferring with the other Members. *Id.* at ¶ 65.

**M. Donnolo's Responsibilities at Tecspec LLC**

17.     M. Donnolo was responsible for, amongst other things, hiring and firing employees, retaining contractors for jobsites, overseeing jobsites to ensure proper installation of HVAC units,

---

[2] "Lopez Dec." refers to the Declaration of David Lopez sworn to October 24, 2024 (ECF 12)

3

negotiating and setting the prices for HVAC units, and overseeing the quality control of components Tecspec LLC manufactures. *See* Verified Complaint, ¶ 55; December Senia Dec.[3], ¶¶ 8-14.

18.    In addition, M. Donnolo was responsible for setting the pricing for Tecspec LLC's HVAC units. *See* December Senia Dec. ¶ 8.

19.    For example, M. Donnolo unilaterally created proposals, pricing, and budgets for clients such as: (i) Fisher Brothers, for the purchase of 528 induction units for a total price of $1,056,000.00; and (ii) Goldman Copeland Associates PC (an engineering firm), for an estimate for a single floor induction unit replacement. *Id.* at Exs. A, B.

20.    M. Donnolo also set the pricing for Tecspec LLC's HVAC units for SRS Enterprises, Inc. ("SRS"), as Tecspec LLC's manufacturer's representative, as well. *Id.* at Ex. C.

21.    M. Donnolo set the prices for Tecspec LLC's HVAC units unilaterally, without any input from the Members or SRS. *Id.* at ¶ 12.

22.    M. Donnolo also unilaterally decided to hire his brother, J. Donnolo as an engineer and Mr. Long as manufacturing engineer, who was responsible for machine programing, project scheduling, and purchasing. *See* Verified Complaint, ¶ 56.

**M. Donnolo Breaches Section 25.1 of the Tecspec Operating Agreement and His Fiduciary Duties of Good Faith, Loyalty, and Care by Opening and Operating the Braya Entities**

23.    After failing to force the Members to make him an 85% owner of Tecspec LLC, M. Donnolo recruited his brother, J. Donnolo, and Mr. Long, who: (i) were both employees of Tecspec LLC; and (ii) had access to Tecspec LLC's R&D, to form the Braya Entities, a competing HVAC manufacturer, in 2023. *See* Verified Complaint, ¶ 68.

---

[3] "December Senia Dec." refers to the Declaration of Robert Senia sworn to December 6, 2024 (ECF 52).

24.    J. Donnolo and Mr. Long had full knowledge that M. Donnolo was a Member of Tecspec LLC and owed the company and Plaintiffs various fiduciary duties. *Id.*

25.    The Braya Entities are headquartered in Staten Island. *See* Verified Complaint, ¶ 71.

26.    At this time, M. Donnolo, Mr. Long, and J. Donnolo stopped showing up for work at Tecspec LLC. *See* Verified Complaint, ¶ 12; Lopez Dec. ¶¶ 7-8.

27.    The Braya Entities have directly interfered and competed with Tecspec LLC on two jobs: (i) the 730 Third Avenue Teachers' Insurance Building Project; and (ii) the 200 Park Avenue Building. *See* Anthes Dec.[4] ¶¶ 3-13.

28.    John Anthes, a principal of P&A Consulting Engineers, LLC, recommended that Tecspec LLC be selected as a manufacturer to provide replacement HVAC units at the 200 Park Avenue Building. *See* Anthes Dec. ¶ 5.

29.    In or around October of 2024, M. Donnolo and J. Donnolo installed Braya HVAC units at the 200 Park Avenue site. *See* Anthes Dec. ¶ 7.

30.    Tecspec LLC had provided HVAC units to 730 Third Avenue. *See* Anthes Dec. ¶ 12. Tecspec LLC had been selected as the manufacturer to provide replacement HVAC units at the building. *Id.*

31.    On or around November 2024, M. Donnolo was chosen to provide replacement Braya HVAC units to the building.  *See* Anthes Dec. ¶ 13.

32.    The 730 Teachers' Insurance building and 200 Park Avenue building are substantial business opportunities for Tecspec. *See* Verified Complaint, ¶ 85.

---

[4] "Anthes Dec." refers to the Declaration of John Anthes sworn to November 21, 2024 (ECF 50).

33.     By operating and working for the Braya Entities, competing HVAC manufacturing businesses (particularly one that is based on stolen Tecspec R&D[5], *see infra*), M. Donnolo has breached Section 25.1 of the Tecspec Operating Agreement. *See generally* Verified Complaint.

## SRS Does Not Compete with Tecspec LLC

34.     SRS is a manufacturer's representative, not a manufacturer. *See* December Senia Dec. ¶ 4. As a manufacturer's representative, SRS markets and sells a multitude of manufacturer's products. *Id.* at ¶ 5. SRS has represented manufacturers since it opened in 1994. *Id.* at ¶ 4.

35.     SRS does not unilaterally set the price for any of the manufacturer's products it sells. *Id.* at ¶ 7. Rather, SRS works directly with its partners to agree on a price that keeps the manufacturer's products competitive in the marketplace, while at the same time ensuring all parties involved earn a profit. *Id.*

36.     While SRS worked as Tecspec LLC's manufacturer's representative, M. Donnolo is the one who actively negotiated and set the prices for Tecspec LLC's HVAC units, not SRS. *Id.* at ¶ 12.

## Defendants Misappropriated Tecspec LLC's Trade Secrets

37.     The purpose of Tecspec LLC was to create an HVAC unit that would: (i) be more cost-effective to manufacture and install; and (ii) operate with greater efficiency compared to existing market offerings. *See* Verified Complaint ¶ 35.

38.     A traditional HVAC induction unit typically features what are referred to as "tall nozzles," which were originally developed in the 1950s. Sheard Dec., ¶ 6. The "tall nozzles" lead to high production costs, as the material needed to produce the nozzles is costly, and there are

---

[5] "Tecspec R&D" refers to the research and development performed on behalf of Tecspec LLC.

multiple "tall nozzles" in each unit. *Id.* at ¶ 5. Thus, developing more cost-efficient nozzles or otherwise increasing efficiency would be highly beneficial to HVAC manufacturers. *Id.*

39.    In order to create such an HVAC unit, the Members began investing in research and development, including but not limited to hiring Dr. Geoff Sheard, a former Rolls Royce Engineer. *See id.*, at ¶ 3; Verified Complaint, ¶ 44.

40.    The Members invested over $500,000.00 into Tecspec LLC's research and development, as well as thousands of man hours. *See* Verified Complaint, ¶ 44.

41.    During his tenure at Tecspec LLC, Dr. Sheard developed the "low-boy" nozzle concept, which achieved 90% of the induction unit performance of the tall nozzle while only using 20% of the material and requiring about 20% of the manufacturing time. Sheard Dec., ¶ 6. That nozzle was subsequently incorporated into Tecspec LLC's HVAC induction unit. *Id.*

42.    Dr. Sheard also performed research during his tenure at Tecspec LLC looking into the possibility of eliminating the use of high efficiency nozzles entirely. Sheard Dec., ¶ 9. Specifically, Dr. Sheard used technical software to conduct a 3D CFD analysis (three-dimensional hydraulic modeling) which incorporated a curved back-wall on the HVAC induction unit, *i.e.*, utilizing the Coanda effect (a phenomenon where a jet of air follows a nearby curved surface). *Id.* at ¶ 8. A copy of this analysis is below:



Figure 07:    This figure presents the results of a follow-up 3D CFD analysis with a curved back-wall (right). The design aimed to shift the low-pressure region away from the back-wall and toward the coil to improve airflow through the coil. However, the curved back-wall reduced performance as the Coanda effect resulted in nozzle jets adhered to it rather than dispersing outward.

[*Id.* at Ex. B.]

43.    Due to his research and experimentation, Dr. Sheard hypothesized that if properly harnessed, the Coanda effect could generate the same air flow produced by traditional nozzles, and therefore, eliminate the need for a highly efficient nozzle entirely. Sheard Dec., ¶ 9. Put another way, an HVAC manufacturer could rely on the effect of the Coanda wall (*i.e.*, a curved surface) to reduce an induction unit's reliance on costly, high efficiency nozzles. *Id.*

44.    Dr. Sheard continued to test and refine this theory during his time working for Tecspec LLC, including but not limited to conducting another 3D CFD analysis, wherein Dr. Sheard replaced the lowboy nozzles with a Coanda slit (a narrow opening designed to produce a jet of air which, due to the Coanda effect, follows the contours of a curved surface). *Id.* at ¶ 10.

That slit area was matched to the combined area of the low boy nozzles, to ensure equivalent

airflow. *Id.* A copy of this 3D CFD analysis is reproduced below:



Figure 10:    An initial 3D CFD analysis of a Coanda-effect induction unit was conducted, with the Coanda slit area matching the combined area of the standard nozzles. This early study evaluated different distances between the induction unit back wall and the coil to determine their impact on performance. The optimal configuration (option 3), shown in the bottom right, positioned the Coanda wall just 16.7 mm from the coil, effectively eliminating the space required for the back row of nozzles in the standard setup (top left).

[*Id.* at Ex. C.]

45.    In or around 2020, Tecspec LLC paused its research and development regarding

the Coanda effect because Tecspec LLC was under pressure to provide HVAC units to a certain

project, and Tecspec LLC chose to prioritize fulfilling its contractual obligations, with the intention to return to this research and development once Tecspec LLC had additional time and resources. Sheard Dec., ¶ 11.

46.    While paused, this foundational research for the development of an HVAC unit utilizing the Coanda effect was provided to Tecspec LLC. *Id*.

47.    Tecspec LLC kept its R&D confidential by (i) storing this research on a secured cloud-based system which can only be accessed by a limited number of employees with proper authorizations and passwords; (ii) limited access to its Newark facility to employees only; and (iii) informing Tecspec LLC employees who have access to secured systems of the proper protection of confidential information. *See* Verified Complaint, ¶¶ 59, 61-62.

48.    In conducting his review, Dr. Sheard reviewed the following images of the Braya Unit:











[*Id.* at Ex. D.]

49.    In reviewing these images, Dr. Sheard determined that Defendants leveraged confidential Tecspec R&D to gain critical insights that guided the design of their own induction unit for the Braya Entities. Sheard Dec., ¶ 12.

12

50. Specifically, the Braya Unit builds on the Tecspec R&D in the following ways:

- **<u>Coanda Back-Wall Integration</u>**: The Braya Entities employed the Coanda effect to manage airflow from the plenum, creating an attached flow along the back-wall. This approach replicated the flow behavior observed during Tecspec's research and development.

- **<u>Single Row of Plenum Holes</u>**: By using a single row of holes in the plenum and integrating the Coanda back-wall, the Braya Entities enabled airflow jets to attach to the back-wall, allowing it to be positioned closer to the coil. The single row of holes in the plenum creates a less efficient nozzle effect, and the Braya unit makes up for this reduced efficiency by relying on the Coanda wall effect. This is consistent with insights from Tecspec LLC's research and development.

- **<u>Convex-to-Concave Back-Wall Transition</u>**: The transition from a convex to a concave back-wall at a height similar to Tecspec LLC's early prototypes fitted with tall nozzles effectively maximized air entrainment. This design aligned with early Tecspec research and development.

  [Sheard Dec., ¶ 13.]

51. The Braya Entities' implementation of these concepts demonstrates a direct application of the insights and advancements developed during Tecspec LLC's R&D efforts. *Id.* at ¶ 14.

13

52.     The Coanda-effect-based induction unit technology integrated into the Braya Entities' design originated from the R&D programs Dr. Sheard initiated and executed for Tecspec. *Id.* at ¶ 16.

53.     Braya's unit relies on the effect of the Coanda wall – the very same effect that Dr. Sheard studied as part of the Tecspec R&D – to reduce the unit's reliance on high efficiency nozzles, which are costly to manufacture, and allows it to rely on the less efficient nozzle effect created by single row of holes in the plenum. *Id.* at ¶ 15.

54.     The Braya unit is the only Coanda-effect based HVAC Unit on the Market. December Senia Dec., ¶ 17.

55.     The Braya Unit is manufactured based **directly on the Tecspec R&D**. Sheard Dec., ¶ 14.   Defendants have failed to credibly dispute same.

**Defendants Have Failed to Provide the Passwords the Members Need to Operate Tecspec LLC**

56.     Upon the commencement of this action and M. Donnolo's exit from Tecspec LLC, M. Donnolo swore under the penalty of perjury that: "To the extent requested, I am willing to provide any required passwords to all Tecspec accounts in my possession to facilitate joint access with the caveat that no documents or things be erased to ensure such data and environment is preserved." ECF 26-1.

57.     Plaintiffs have made repeated requests to M. Donnolo for various passwords and access, including but not limited to: November 1, 2024, November 7, 2024, and November 8, 2024. ECF 35

58.     In spite of various demands since, and several meet and confers between Plaintiffs and Defendants, the information and passwords are still outstanding regarding: (i) the Tecspec

SolidWorks program; (ii) design drawings for all of Tecspec's products; (iii) certain programs for Tecspec's CNC machine; and (iv) location of network devices. ECF 69.

59.     Due to Defendants' malfeasance and refusal to provide Tecspec LLC with the information needed for it to become operational, Tecspec LLC is still non-operational at this time. *See* December Senia Dec., ¶ 2.

## CONCLUSIONS OF LAW

### I.    Plaintiffs are Entitled to a Preliminary Injunction

In the Second Circuit, a party seeking a preliminary injunction must show "(1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." *Islam v. Cuomo*, 475 F. Supp. 3d 144, 152 (E.D.N.Y. 2020) (quoting *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018)). Moreover, Plaintiffs are only required to establish that their probability of prevailing is "better than 50 percent" in connection with their request for injunctive relief. *Nat'l Elevator Cab & Door Corp. v. H&B, Inc.*, 282 Fed. Appx. 885, 888 (2d Cir. 2008). As will be explained below, and as demonstrated through the evidence proffered in connection with their motion, Plaintiffs have met the necessary standard requisite for the injunctive relief outlined in the proposed order filed contemporaneously herewith.

### A.    The Record Evidence Demonstrates that Plaintiffs Have and Will Continue to Suffer Irreparable Harm Absent a Preliminary Injunction

To establish irreparable harm, a plaintiff must demonstrate that: (i) an injury is likely absent that injunction; and (ii) that the injury cannot be adequately remedied with money damages. *IDG*

*USA, LLC v. Schupp*, 416 F. App'x 86, 88 (2d Cir. 2011). Plaintiffs established three independent bases evidencing that they have, and will continue to, suffer irreparable harm absent an injunction.

*First*, it is undisputed that Defendants misappropriated Tecspec LLC's trade secrets, *i.e.*, the research and development concerning the Coanda effect that Dr. Sheard provided to Tecspec. *See generally* Sheard Dec. That alone constitutes irreparable harm. To that end, in the Second Circuit, "irreparable harm is presumed where a trade secret has been misappropriated." *Inflight Newspapers, Inc. v. Magazines In-Flight, LLC*, 990 F. Supp. 119, 124 (E.D.N.Y. 1997); *see also FMC Corp v. Taiwan Tainan Giant Indus. Co. Ltd.*, 730 F.2d 61, 63 (2d Cir. 1984) ("A trade secret once lost is, of course, lost forever" and therefore, such a loss "cannot be measurable in money damages.").

*Second*, Plaintiffs have been irreparably harmed in connection with M. Donnolo's violation of his Non-Compete Agreement by operating the Braya Entities to Tecspec LLC's detriment. Indeed, in direct contravention of that agreement, M. Donnolo, as supported by the Declaration of Jonathan Anthes, has actively solicited potential and actual Tecspec LLC jobs, including the 730 Teacher's Insurance Building project and the 200 Park Avenue project. *See generally*, Anthes Dec. The poaching of Tecspec LLC's customer base (which Defendants do not credibly dispute), is irreparable harm. *See Ayco Co., L.P., v. Frisch*, 795 F. Supp. 2d 193, 205 (N.D.N.Y. 2011) ("Monetary damages are insufficient to compensate such loss, as it is very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come.")

*Third*, Plaintiffs have shown that absent court intervention, Defendants will not provide Plaintiffs with the necessary information required to operate Tecspec LLC, and therefore, quite literally, force Tecspec LLC to close its doors. *See* December Senia Dec., ¶ 2; ECF 69. In fact,

since the outset of this litigation, Tecspec LLC has been unable to operate its facility, and suffers substantial losses on a daily basis in light of Defendants' refusal to provide the information needed to get Tecspec LLC up and running. *Id.* This legitimate threat of closure is irreparable. *See New York State Trawlers Ass'n v. Jorling*, 764 F. Supp. 24, 26 (E.D.N.Y. 1991) ("Where a loss of profits is severe enough to drive a party out of business, this can be irreparable harm.").

### B.  Plaintiffs Have Established a Likelihood of Success on the Merits

As will be explained below, through their multiple submissions, including declarations from third-party witnesses, Plaintiffs have shown a likelihood of success the merits on their claims against Defendants. Indeed, it remains undisputed that: (i) Defendants misappropriated and are currently using Tecspec LLC's confidential trade secrets; and (ii) Defendants are actively competing against Tecspec LLC. *See generally* Sheard Dec. and Anthes Dec.

### i.    Plaintiffs Have Established a Likelihood of Success on Their Claim That M. Donnolo Breached His Fiduciary Duty of Loyalty Owed to Tecspec LLC

To succeed on a breach of fiduciary duty claim, a plaintiff must show that the defendant (1) owed a fiduciary duty, (2) breached that duty; and (3) caused harm as a result. *Ackerman v. Pilipiak*, 457 B.R. 191, 198 (E.D.N.Y. 2011); *Digital Camera Int'l, Ltd. v. Antebi*, 2017 WL 2992719, at *3 (E.D.N.Y. July 14, 2017). "Under New York law, LLC members owe one another, as well as the LLC, various fiduciary duties." *Rennaker Co. Consulting, Inc. v. TLM Grp., LLC*, 2017 WL 2240235, at *4 (S.D.N.Y. Mar. 29, 2017). "Among these duties are the duty of care, duty of loyalty, and the duty of disclosure." *Id.* "Under the duty of loyalty, a fiduciary must not engage in self-dealing, and he must avoid situations where his personal interest possibly conflicts with the interest of those owed a fiduciary duty." *Id.*; *see also Pokoik v. Pokoik*, 115 A.D.3d 428, 429 (1st Dep't 2014) (quoting *Birnbaum v. Birnbaum*, 73 N.Y.2d 461, 466 (1989) ("[I]t is

17

elemental that a fiduciary owes a duty of undivided and undiluted loyalty to those whose interests the fiduciary is to protect. This is a sensitive and inflexible rule of fidelity, barring not only blatant self-dealing, but also requiring avoidance of situations in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty."))

Further, New York law precludes the waiver of M. Donnolo's fiduciary duty of loyalty. Specifically, New York Limited Liability Company Act (the "Act") Section 417(a)(1) states as follows:

> Subject to the provisions of this chapter, the members of a limited liability company shall adopt a written operating agreement that contains any provisions not inconsistent with law or its articles of organization relating to (i) the business of the limited liability company, (ii) the conduct of its affairs and (iii) the rights, powers, preferences, limitations or responsibilities of its members, managers, employees or agents, as the case may be.
>
> **The operating agreement may set forth a provision eliminating or limiting the personal liability of managers to the limited liability company** or its members for damages for any breach of duty in such capacity, **provided that no such provision shall eliminate or limit**;
>
> **(1) the liability of any manager if a judgment or other final adjudication adverse to him or her establishes that his or her acts or omissions were in bad faith or involved intentional misconduct or a knowing violation of law or that he or she personally gained in fact a financial profit or other advantage to which he or she was not legally entitled** or that with respect to a distribution the subject of subdivision (a) of section five hundred eight of this chapter his or her acts were not performed in accordance with section four hundred nine of this article; or . . .
>
> [emphasis added]

In other words, the Act explicitly states that an LLC manager cannot limit his or her liability for: (i) acts or omissions in bad faith; (ii) intentional misconduct; or (iii) personal financial profit or advantage to which he or she is not legally entitled to, all of which fall under the fiduciary duty of loyalty and good faith.

Plaintiffs have established that M. Donnolo has violated his fiduciary duty of loyalty by: (i) refusing to turn over information necessary to operate Tecspec LLC; (ii) forming the Braya Entities, a competing HVAC company; (iii) misappropriating Tecspec LLC's trade secrets (see *infra*); and (iv) actively competing with Tecspec LLC in the marketplace while being a paid Member and Manager of same.

### ii.    Plaintiffs Have Established a Likelihood of Success on Their Claim that M. Donnolo Breached the Tecspec LLC Non-Compete Agreement

Under New York law, "[t]he essential elements of a breach of contract cause of action are the existence of a contract, the plaintiff's performance pursuant to the contract, the defendant's breach of his or her contractual obligations, and damages resulting from the breach." *Friends of Wickers Creek Archeological Site, Inc. v. Landing on the Water at Dobbs Ferry Homeowners Association, Inc.*, 156 N.Y.S.3d 227, 228 (N.Y. App. Div. 2021). "The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent." *NRT New York, LLC v. Harding*, 16 N.Y.S.3d 255, 257 (N.Y. App. Div. 2015). "[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Id.* at 258. "[W]hen interpreting a contract, the court should arrive at a construction which will give fair meaning to all of the language employed by the parties to reach a practical interpretation of the expressions of the parties so that their reasonable expectations will be realized." *Id.*

In New York, a non-compete agreement "will be enforced to the extent that it is reasonable in duration and area, necessary to protect the employer's legitimate interests, not harmful to the general public, and not unreasonably burdensome to the employee." *Trionic Assocs., Inc. v. Harris Corp.*, 27 F. Supp. 2d 175, 184 (E.D.N.Y. 1998). Against these applicable standards, Plaintiffs

have shown a likelihood of success with respect to their claim that M. Donnolo breached the Non-Compete Agreement, and that the Non-Compete Agreement is reasonable.

*First*, the Non-Compete Agreement is reasonable in duration, as it only restricts M. Donnolo from competing with Tecspec LLC for a period of four years. *See* ECF 26-5 at Section 25.1. Indeed, "New York Courts have held restrictions of up to five years to be reasonable depending on the circumstances." *Cardwell v. Thermo Fischer Sci.*, 2010 W L 3825711, at *7 (S.D.N.Y. Sept. 23, 2010); *see also Nat'l Elevator Cab & Door Corp.*, 282 F. App'x at 888 (affirming that a non-compete restriction operational for five years was reasonable).

*Second*, the Non-Compete Agreement is reasonably limited in area, as it only prohibits M. Donnolo from operating a competing company "located in any county in which [Tecspec LLC] is doing or has done business," *i.e.*, Manhattan. ECF 26-5 at Section 25.1; s*ee Int'l Bus. Machines Corp. v. De Freitas Lima*, 2020 WL 5261336, at *9 (S.D.N.Y. Sept. 3, 2020) (upholding a non-compete agreement that only precluded defendant from working "within a geographic area in which he had job responsibilities within the last twelve months of his employment"); *see also Poller v. BioScrip, Inc.*, 974 F. Supp. 2d 204, 221 (S.D.N.Y. 2013) (upholding a non-compete agreement which prohibited employee from working within "New York and Long Island"); *Inflight Newspapers, Inc.*, 990 F. Supp. at 135 (finding a non-compete agreement reasonable where it was geographically limited to "seven states and the District of Columbia"*); DAR & Assocs., Inc. v. Uniforce Servs., Inc.*, 37 F. Supp. 2d 192, 199 (E.D.N.Y. 1999) (finding a non-compete agreement covering a fifty mile radius to be reasonable).

*Third*, Plaintiffs have shown that the Non-Compete Agreement is necessary to protect Tecspec LLC's legitimate business interests. It is well established that "New York courts have recognized four legitimate interests that may be asserted to support a restrictive covenant: (1)

protection of trade secrets, (2) protection of confidential customer information, (3) protection of the employer's client base, and (4) protection against irreparable harm where the employee's services are unique or extraordinary." *Oliver Wyman, Inc. v. Eilson*, 282 F. Supp. 3d 684, 694 (S.D.N.Y. 2017). Here, the Non-Compete Agreement was intended to prevent M. Donnolo from divulging Tecspec LLC's confidential trade secrets, including but not limited to, the research and development provided by Dr. Sheard.  Likewise, the Non-Compete Agreement protects Tecspec LLC's client base by prohibiting M. Donnolo from competing in an area where Tecspec LLC operates, thereby, ensuring that M. Donnolo does not poach any actual or prospective customers. *See* ECF 26-5 at Section 25.1.

*Fourth,* the Non-Compete Agreement is not harmful to the general public, nor it is unreasonably burdensome to M. Donnolo. In this regard, the Non-Compete Agreement does not prohibit M. Donnolo from making a living. Indeed, M. Donnolo is permitted to work in any county where Tecspec LLC does not operate. To be sure, the Non-Compete Agreement is narrowly tailored enough to provide M. Donnolo with meaningful employment options. *Int'l Bus. Machines Corp.*, 2020 WL 5261336, at *9 (finding non-compete did not impose undue hardship because it did not create a complete ban on employment). Further, restricting an individual from operating an HVAC unit manufacturing company does not rise to the level of conduct that would be harmful to the general public. *But cf. Magtoles v. United Staffing Registry, Inc.*, 665 F. Supp. 3d 326, 348 (E.D.N.Y. 2023) (holding that it would be "harmful to the general public if dozens of licensed nurses and practitioners were prohibited from contributing their services to an industry as valuable and important as nursing").

*Fifth and finally*, Plaintiffs have established that M. Donnolo breached his Non-Compete Agreement by soliciting Tecspec LLC's actual and prospective customers. *See generally* Anthes

Dec. In this regard, as explained above, the Non-Compete Agreement provides, that for a period of four years after leaving Tecspec LLC as a Member, he would not:

> [D]irectly or indirectly, individually or in conjunction with any person or persons, firm, partnership, corporation . . . in any other manner whatsoever, carry on or be engaged in, or connected with any business which competes, in whole or in part, with [Tecspec LLC], which is located in any county in which [Tecspec LLC] is doing or has done business.

> [ECF 26-5 at Section 25.1.]

The plain language of the Non-Compete Agreement provides that M. Donnolo cannot perform any jobs or work on any projects in counties where Tecspec LLC is performing any jobs or working on any projects for a span of four years after M. Donnolo is no longer a member. "Business" does not mean a specific entity – it is referring to the action of doing business, *i.e.*, contracting with and/or performing a job on a project. This is clear from the language of the Non-Compete Agreement – one cannot "carry on" a business entity – rather, one carries on a job or project. Furthermore, the term "business" is used later on in the Non-Compete Agreement, where it states "any county in which [Tecspec LLC] is doing or has done business." It is clear that within the Non-Compete Agreement, the term "business" is referring to the act of doing business and/or a job and/or completing a project – not a business entity.

The plain meaning of "carry[ing] on" or "doing business" is consistent with the plain interpretation of the Non-Compete Agreement – namely, that regardless of where the competing business entity is located, M. Donnolo cannot "carry on business", *i.e.*, perform any jobs or work on any projects in counties were Tecspec LLC is "doing or has done business," *i.e.*, performing any jobs or working on any projects.

The language New York Courts use in determining long-arm jurisdiction is analogous and instructive here. It is axiomatic that under New York law, a foregoing corporation is subject to

general jurisdiction in New York if it is "doing business" in the state. *See Mende v. Milestone Tech, Inc.*, 269 F. Supp. 2d 246, 253 (S.D.N.Y. 2003). The language of "doing business" in New York mirrors the language in the Non-Compete Agreement, which prohibits Tecspec LLC members from "carry[ing] on business."

In determining whether a party is "doing business" in New York, "the corporation must be engaged in a regular and continuous course of conduct in the State." *See Highfill, Inc. v. Bruce & Iris, Inc.*, 50 A.D.3d 742, 743 (2nd Dep't 2008). In order to determine if the entity is engaging in "regular and continuous conduct," courts look at factors such as whether the subject business is soliciting business in New York, as well as the presence of employees in New York. *See Insight Data Corp. v. First Bank Sys., Inc.*, 1998 WL 146689 at *4 (S.D.N.Y. Mar. 25, 1998). Both of those facts are present here: (i) M. Donnolo, through the Braya Entities, is actively soliciting business in the county of New York, at job sites including but not limited to 730 Third Avenue and 200 Park Avenue; and (ii) M. Donnolo and other Braya Entity employees are regularly in the county of New York as part of their job duties for the Braya Entities. *See generally* Anthes Dec. Accordingly, Plaintiffs have shown a likelihood of success on their claim that M. Donnolo has breached the Non-Compete Agreement.

### iii.   Plaintiffs Have Established a Likelihood of Success on Their Claim that M. Donnolo Has Breached the Covenant of Good Faith and Fair Dealing

"Parties to a contract in New York have an implicit duty of good faith and fair dealing." *Scienton Techs., Inc. v. Computer Assocs. Int'l, Inc.*, 2008 WL 11447906, at *4 (E.D.N.Y. Mar. 24, 2008) (citing *Carvel Corp. v. Diversified Mgmt. Grp., Inc.*, 930 F.2d 228, 230 (2d Cir. 1991)); *see also Woods v. Bos. Sci. Corp.*, 2006 WL 4495530, at *13 (S.D.N.Y. Nov. 1, 2006) (explaining that New York law recognizes a covenant implicit in all contracts that requires both parties thereto

23

to refrain from taking any actions that prohibit the other party from receiving the bargained-for benefits of the contract). The record evidence shows that M. Donnolo has robbed Tecspec LLC of the protection it bargained for in the Non-Compete Agreement. To that end, the purpose of the Non-Compete Agreement was to preclude M. Donnolo from competing against Tecspec LLC. Implicit in that agreement was that M. Donnolo would not engage in actions that undermine Tecspec LLC. Nevertheless, as established through the record evidence, M. Donnolo has taken steps to directly compete, and otherwise force Tecspec LLC out of the market, by way of soliciting actual and prospective clients, in addition to hamstringing Tecspec LLC's business operations. *See generally* Anthes Dec.; ECF 69; December Senia Dec., ¶ 2. Therefore, Plaintiffs have established a likelihood of success on their claim that M. Donnolo has violated the implied covenant of good faith and fair dealing.

### iv.     Plaintiffs Have Established a Likelihood of Success on Their Claim that Defendants Misappropriated Tecspec LLC's Trade Secrets Pursuant to 18 U.S.C. 1836 and New York Common Law

To prevail on a misappropriation of trade secrets claim, a party must demonstrate that it possessed a trade secret that a defendant misappropriated. *Iacovacci v. Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 380 (S.D.N.Y. 2020) (noting the standards for misappropriation under the DTSA and New York law "are fundamentally the same" and therefore "courts have found that a [c]omplaint sufficiently plead[ing] a DTSA claim . . . also states a claim for misappropriation of trade secrets under New York law"). A "trade secret" is broadly defined to include "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes," provided that (i) the owner has "taken

24

reasonable measures to keep such information secret," and (ii) the information has "independent economic value." *Id.*

Further, Federal Courts have consistently held that "relying on [a] trade secret to assist or accelerate research or development . . . constitute[s] 'use' under the federal Defend Trade Secrets Act." *PPG Indus. Inc. v. Jiangsu Tie Mao Glass Co. Ltd*, 47 F.4th 156, 162 (3d Cir. 2022) (quoting *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 909 (3d Cir. 2021) (agreeing with the Fifth Circuit regarding same)); *Agency Solutions Com, LLC v. TriZetto Grp., Inc.*, 819 F. Supp. 2d 1001, 1028 (E.D. Cal. 2011) (quoting *JustMed, Inc. v. Byce*, 600 F.3d 1118 (9th Cir. 2010) ("Thus, marketing goods that embody the trade secret, employing the trade secret in manufacturing or production, relying on the trade secret to assist or accelerate research or development or soliciting customers through the use of information that is a trade secret all constitute 'use.'")

The Court in *PPG Industries* explained:

> The problem for [defendant] is that there is ample support for the conclusion that it did use the misappropriated trade secrets, so *Deltak* is wholly inapposite. [Defendant] just stripped [Plaintiff's] name and logo from drawings in the Proprietary Report and then asked [the] subcontractor to use those drawings and related specifications to manufacture 'the same molds' . . . . In other words, [defendant] was able to skip the R&D process completely and begin preparing for production without developing anything like the Opticor technology on its own. That amounts to use of the trade secrets.

> [*PPG Indus. Inc.*, 47 F.4th at 162.]

Here, the research and development conducted by Dr. Sheard constitutes a trade secret under the DTSA and New York Common law. *See id.* Moreover, Plaintiffs have gone to extraordinary measures to ensure the confidentiality of that trade secret by: (i) storing this research on a secured cloud-based system which can only be accessed by a limited number of employees with proper authorizations and passwords; (ii) limited access to its Newark facility to employees

only; and (iii) informing Tecspec LLC employees who have access to secured systems of the proper protection of confidential information. *See* Verified Complaint ¶¶ 59, 61-62; s*ee Espire Ads LLC v. TAPP Influencers Corp.*, 655 F. Supp. 3d 223, 251 (S.D.N.Y. 2023) (finding that the plaintiff took reasonable measures to guard the confidentiality of its trade secret where it "stor[ed] all pertinent code in a secure cloud-based server, utliz[ed] . . . computer and software passwords, and work[ed] in an office that has visitor control systems, locked door access, and overnight security personal"); *Ad Lighting Inc. v. Clean.io, Inc.*, 2020 WL 4570047, at *3 (S.D.N.Y. Aug. 7, 2020) (explaining that reasonable measures include "the use of confidentiality agreements, password-protection, sharing information with employees only on a need-to-know basis, emphasizing the need to keep the information confidential in an employee handbook, and frequently reminding employees of the need to maintain confidentiality")

Likewise, Tecspec LLC has derived an independent economic benefit from the research and development provided by Dr. Sheard. In this regard, as reflected in Dr. Sheard's declaration, his research and development is vital to creating a more efficient HVAC unit by implementing the Coanda effect. Sheard Dec., ¶ 9. Moreover, Tecspec LLC intended to turn to, and ultimately incorporate this research and development at a later date, and subsequently implement same into its unit. *Id.* at ¶ 11.

Finally, there can be no question that the Tecspec R&D – that Tecspec LLC paid for – was misappropriated by Defendants, as it is clearly the foundation for Defendants' creation of the Braya Unit. Indeed, Dr. Sheard, after reviewing several images of the Braya Unit, specifically identified the following ways in which the Braya Unit builds upon his findings:

> **<u>Coanda Back-Wall Integrations</u>**: The Braya Entities employed the Coanda effect to manage airflow form the plenum, creating an attached flow along the back-wall. This approach replicated the flow behavior observed in Tecspec LLC's research and development.

**Single Row of Plenum Holes**: By using a single row of holes in the plenum and integrating the Coanda back-wall, the Braya Entities enabled airflow jets attached to the back wall, allowing it to be positioned closer to the coil. The single row of holes in the plenum creates a less efficient nozzle effect, and the Braya Unit makes up for this reduced efficiency by relying on the Coanda wall effect. This is consistent with insights from Tecspec LLC's research and development.

**Convex-to-Concave Back-Wall Transition**: The transitions from a convex to a concave back-wall at a height similar to Tecspec LLC's early prototypes fitting with tall nozzles effectively maximized air entrainment. This design aligned with early Tecspec LLC research and development.

[*Id.* at ¶ 13.]

Accordingly, Plaintiffs have shown a likelihood of success on their claim that Defendants misappropriated Plaintiffs' trade secrets.

### v.    Plaintiffs Have Established a Likelihood of Success on Their Claim that M. Donnolo has Committed Corporate Waste and Mismanagement

To succeed on a claim for corporate waste, a "plaintiff must show that the corporate officer used corporate assets in a way so far opposed to the true interests of the corporation so as to lead to the clear inference that the officer possessed no honest desire to protect those interests." *Eichenblatt v. Kugel*, 2018 WL 3202079, at *6 (E.D.N.Y. May 15, 2018) (citing *Patrick v. Allen*, 355 F. Supp. 2d 704, 715 (S.D.N.Y. 2005)) (quotations omitted). "[T]he essence of waste is the diversion of corporate assets for improper or unnecessary purposes." *Patrick*, 355 F. Supp. 2d at 714 (quoting *Aronoff v. Albanese*, 85 A.D.2d 3, 5 (1982)). Here, the record shows that M. Donnolo has committed corporate waste. On that point, M. Donnolo has coordinated and participated in the misappropriation of Tecspec LLC's trade secret, *i.e.*, Dr. Sheard's research and development, a valuable corporate asset, for the improper purpose of using that research to develop the Braya Unit for a direct competitor. *See generally Sheard Dec.* In short, M. Donnolo drained Tecspec LLC of

one of its most valuable resources for his own benefit, and therefore, Plaintiffs have established a likelihood of success on their claim that M. Donnolo has committed corporate waste.

      **vi.**     **Plaintiffs Have Established a Likelihood of Success on Their Claim that M. Donnolo, J. Donnolo, and Mr. Long Have Breached the Faithless Servant Doctrine**

"Under New York law, an agent is obligated to be loyal to his employer and is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties." *Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184, 200 (2d Cir. 2003) (quoting *Western Elec. Co. v. Brenner*, 360 N.E.2d 1091 (N.Y. 1977)) (quotations omitted). "New York law with respect to disloyal or faithless performance of employment duties is grounded in the law of agency, and has developed for well over a century." *Id.* "Fundamental to [the employer-employee] relationship is the proposition that an employee is to be loyal to [his or her] employer and is prohibited from acting in any manner inconsistent with [his or her] agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of [his or her] duties." *Miller v. Levi & Korinsky, LLP*, 2021 WL 535599, at *4 (S.D.N.Y. Feb. 12, 2021) (quoting *W. Elec. Co.*, 360 N.E.2d at 1094).

Here, the record shows that J. Donnolo, Mr. Long, and M. Donnolo have reneged on their respective duties to remain loyal to Tecspec LLC as employees. On this point, Mr. Long, J. Donnolo, and M. Donnolo failed to show up at Tecspec LLC to perform the job they have been paid to do, only to form and work at a competing business. *See* Verified Complaint, ¶¶ 12, 68; Lopez Dec. ¶¶ 7-8. Further, in contravention of his duty to remain loyal to Tecspec LLC, the Individual Defendants misappropriated the research and development Dr. Sheard provided to Tecspec LLC. *See generally Sheard Dec.* Accordingly, Plaintiffs have shown a likelihood of

success on their claim that M. Donnolo, J. Donnolo, and Mr. Long have breached the faithless servant doctrine.

### vii.    Plaintiffs Have Established a Likelihood of Success on Their Claim that Defendants Have Been Unjustly Enriched

To succeed on an unjust enrichment claim, a plaintiff must show that "(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Ashland Inc. v. Morgan Stnaley & Co.*, 652 F.3d 333, 339 (2d Cir. 2011) (quoting *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 55 (2d Cir. 2011)). Here, the record shows that Defendants have undoubtedly been enriched at Plaintiffs' expense, as the Braya Entities have quite literally been built from the ground up using, and depending on, Tecspec LLC's trade secrets. *See generally* Sheard Dec. Indeed, as explained by Dr. Sheard, Defendants have incorporated his research and development to develop the Braya Unit. *Id.* However, it was Tecspec LLC that invested in and rightfully owns that research and development. *See* Verified Complaint, ¶ 44. That is an unjust benefit, *i.e.*, propping up the Braya Entities on stolen information without the need for Defendants to put up capital to conduct their own research and development.

### viii.    Plaintiffs Have Established a Likelihood of Success on Their Claim that M. Donnolo, J. Donnolo, and Mr. Long Have Converted Tecspec LLC's Trade Secrets

Under New York law, "[c]onversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owners' rights." *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 403-04 (2d Cir. 2006) (quoting *Vigilant Ins. Co. of Am. v. Hous. Auth.*, 600 N.E.2d 1121 (N.Y. 1995)). "This includes a denial or violation of the plaintiff's dominion, rights, or possession of [his or her] property." *Id.* "The two elements of conversion are

(1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." *St. John's Univ., New York v. Bolton*, 757 F. Supp. 2d 144, 178 (E.D.N.Y. 2010) (citing *Colavito v. New York Organ Donor Network, Inc.*, 8 N.Y.3d 43, 50 (2006)). As explained herein, the Individual Defendants have misappropriated Tecspec LLC's trade secrets, *i.e.*, the research and development conducted by Dr. Sheard, to develop the Braya Unit. *See generally* Sheard Dec. Tecspec LLC had a possessory interest in that research and development, which M. Donnolo, J. Donnolo, and Mr. Long took from Plaintiffs. *See* Verified Complaint, ¶ 44. Those indisputable facts show that Plaintiffs will prevail on their claim for conversion.

### ix.    Plaintiffs Have Established a Likelihood of Success on Their Claims Against Defendants for Tortious Interference and Unlawful Competition

Plaintiffs have established a likelihood of success on their claims for tortious interference with a prospective business relationship. To succeed on a claim for tortious interference with prospective economic advantage, a plaintiff must show that "(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." *Carvel Corp. v. Noonan*, 250 F.3d 6, 17 (2d Cir. 2003). "Importantly, a cause of action for interference with prospective (as opposed to existing) business relations, requires a plaintiff to show that the interference was accomplished by 'wrongful means.'" *Lader v. Delgado*, 941 F. Supp. 2d 267, 272 (E.D.N.Y. 2013) (citing *Waste Services*, 691 N.Y.S.3d 150, 151 (2d Dep't 1999) (holding a "cause of action for tortious interference with prospective contractual relations requires showing of 'malice or wrongful

30

conduct'"). "Wrongful means includes physical violence, fraud, misrepresentation, civil suits, criminal prosecutions and economic measures." *Id.*

Here, the record evidence established that Plaintiffs will prevail on their tortious interference claim. In this regard, M. Donnolo, J. Donnolo, and Mr. Long caused the Braya Entities to solicit two projects which they were aware Tecspec LLC was already working on, or were submitting bids on, specifically, the: (1) 730 Third Avenue Teachers' Insurance building; and (ii) the 200 Park Avenue Building. *See generally Anthes Dec.* By securing those two jobs, M. Donnolo, J. Donnolo, and Mr. Long have weakened Tecspec LLC's ability to compete in the marketplace.

Likewise, this conduct will lead to Plaintiffs succeeding on their unlawful competition claim. The "essence of an unfair competition claim under New York law is that the defendant misappropriate the fruit of plaintiff's labors and expenditures by obtaining access to plaintiff's business idea either through fraud or deception, or an abuse of a fiduciary or confidential relationship." *Pauwels v. Deloitte LLP*, 83 F.4th 171, 185 (2d Cir. 2023) (citation omitted). "In an action of this type there must be a showing of a confidential relationship between the parties, the disclosure of trade secrets and the use by the defendant of this secret information." *Speedry Chem. Prod., Inc. v. Carter's Ink Co.*, 306 F.2d 328, 331 (2d Cir. 1962) (citing Restatement of Torts, Section 757). Again, to reiterate, M. Donnolo, J. Donnolo, and Mr. Long misappropriated Plaintiffs' trade secrets to develop the Braya Unit. *See generally* Sheard Dec. That is the quintessential fact patter for unfair competition.

### x.    Plaintiffs Have Established a Likelihood of Success on Their Claim for Aiding and Abetting Breach of Fiduciary Duty

Finally, Plaintiffs have shown that they will likely prevail on their aiding and abetting breach of fiduciary duty claims against J. Donnolo and Mr. Long. "A claim for aiding and abetting a breach of fiduciary duty requires: (1) a breach by a fiduciary of obligations to another, (2) that

the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach." *Kaufman*, 307 A.D.2d at 125; *see also Wechsler v. Bowman*, 34 N.E.2d 322, 326 (N.Y. 1941) ("Any one who knowingly participates with a fiduciary in a breach of trust is liable for the full amount of the damage caused thereby to the cestuis que trust."). With respect to the second requirement, "[a]lthough a plaintiff is not required to allege that the aider and abettor had an intent to harm, there must be an allegation that such defendant had actual knowledge of the breach of duty." *Kaufman*, 307 A.D.2d at 125. And "[a] person knowingly participates in a breach of fiduciary duty only when he or she provides 'substantial assistance' to the primary violator." *Id.* at 126.

Here, the record shows, at a minimum, as employees of Plaintiff, J. Donnolo and Mr. Long were fully aware that M. Donnolo had a fiduciary duty to Tecspec LLC as a member thereof, and at worst (and most likely) intended to harm Tecspec LLC by aiding M. Donnolo in connection with the conduct raised herein. Verified Complaint, ¶ 68. Therefore, Plaintiffs have shown that they will succeed on their aiding and abetting breach of fiduciary duty claims.

### C.  Plaintiffs Have Established that the Balance of Hardships Weighs Strongly in Their Favor and an Injunction Favors the Public Interest

The record establishes that injunctive relief is warranted because Plaintiffs have shown that Tecspec LLC will suffer irreparable harm and that they are substantially likely to succeed on the merits of their claims. But even Plaintiffs had only raised sufficiently serious questions about the merits, injunctive relief is still necessary because a balance of the hardships tip heavily in favor of Plaintiffs. In this regard, without the requested injunctive relief, Plaintiffs will lose whatever confidentiality remains of Tecspec LLC's trade secrets and lose more clients.

On the other hand, Defendants will be brought to justice. The record is clear: Defendants have misappropriated trade secrets and solicited Tecspec LLC's actual and prospective customers.

The requested relief is righting a wrong, and Defendants should not be permitted to argue that they would be unjustly burdened if they cannot continue their improper conduct. In light of that reasoning, a preliminary injunction would strongly serve the public interest.

## <u>CONCLUSION</u>

For all the foregoing reasons, Plaintiffs respectfully submit that the Court enter the proposed injunctive relief reflected in the proposed order submitted contemporaneously herewith.

Respectfully submitted,

COLE SCHOTZ P.C.
*Attorneys for Plaintiffs*

By:___*/s/ Jason R. Melzer*_____
      Jason R. Melzer
      Arielle H. Wasserman
      1325 Avenue of the Americas
      Suite 1900
      New York, NY 10019

DATED: January 17, 2025