# EXHIBIT B

OPERATING AGREEMENT

OF

TECSPEC, LLC.
(a New York limited liability company)

COLE SCHOTZ PC
COURT PLAZA NORTH
25 MAIN STREET
P.O. BOX 800
HACKENSACK, NEW YORK 07602-0800
(201) 489-3000

## TABLE OF CONTENTS

**Page**

Section 1 - Formation and Name ................................................................................................1
Section 2 - Office ........................................................................................................................1
Section 3 - Definitions .................................................................................................................2
Section 4 - Purposes ....................................................................................................................4
Section 5 - Capital Contributions and Capital Accounts ............................................................4
Section 6 - Admission of Additional Members ...........................................................................7
Section 7 - Allocations and Distributions ...................................................................................8
Section 8 - Management .............................................................................................................10
Section 9 - Restrictions on the Transfer of a Member's Interest ..............................................14
Section 10 - Determination of Value .........................................................................................22
Section 11 - Escrow Arrangement for Collateral ......................................................................23
Section 12 – Insurance ...............................................................................................................25
Section 13 – Disposition of Insurance Policies After Sale of Interest ......................................26
Section 14 - The Trustee ............................................................................................................28
Section 15 - Term of the Company ............................................................................................31
Section 16 - Fiscal Year and Accounting Method .....................................................................32
Section 17 - Termination of a Member ......................................................................................32
Section 18 - Books and Records ................................................................................................32
Section 19 - Other Activities of Members .................................................................................33
Section 20 - Resignation of a Member .......................................................................................33
Section 21 - Tax Matters Member .............................................................................................33
Section 22 - Indemnification ......................................................................................................34
Section 23 - Limitation on Liability ..........................................................................................35
Section 24 - Amendment ............................................................................................................35
Section 25 - Covenant Not to Compete .....................................................................................35
Section 26 - Company Restrictions During Payout Period ........................................................36
Section 27 - Miscellaneous ........................................................................................................38

## OPERATING AGREEMENT

### OF

## TECSPEC, LLC.
### (a New York limited liability company)

THIS OPERATING AGREEMENT, made as of the 6th day of October, 2017, by and among Christina Senia ("Christina") and Michael Donnollo ("Michael") (Christina and Michael shall hereinafter, at times, be referred to collectively as the "Members" or individually as a "Member").

### WITNESSETH:

WHEREAS, the Company was formed on February 24, 2017 by the filing of its Articles of Organization with the Department of State of the State of New York, at which time Christina was the sole member of the Company;

WHEREAS, pursuant to THIS OPERATING AGREEMENT, Michael was admitted as a Member and Manager of the Company, effective as of October 6, 2017, such that the Percentage Interest of the Members is as follows:

| | |
|---|---|
| Christina Senia | 75% |
| Michael Donnolo | 25% |

WHEREAS, the Members desire to enter into this Operating Agreement to memorialize their agreements with respect to the ownership, management and operation of the Company, all as more specifically set forth hereinafter.

NOW, THEREFORE, in consideration of the mutual covenants herein expressed, and for other good and valuable consideration, the receipt of which is hereby acknowledged, it is hereby agreed as follows:

### Section 1 - Formation and Name

The Members hereby associate themselves into a limited liability company pursuant to the provisions of the New York Limited Liability Company Law, upon the terms and conditions hereinafter set forth. The limited liability company's name shall be TECSPEC, LLC.

### Section 2 - Office

The Company's address with the Department of State for service of process is Christina Senia, 20 Pine Street, Apt. 610, New York, New York. Such service of process

address may be changed, from time to time, as the Managers shall determine. The Company's initial principal place of business shall be 20 Pine Street, Apt. 610, New York, New York, and/or such other location or locations as, from time to time, the Managers shall select.

## Section 3 - Definitions

3.1    "Agreement" means this Operating Agreement, as originally executed and as amended from time to time, and the terms "hereof," "hereto," "hereby" and "hereunder," when used with reference to this Agreement, refer to this Agreement as a whole, unless the context otherwise requires.

3.2    "Assignee" means a Person (as hereinafter defined) which is a transferee of all or part of a Member's Interest in the Company which Person is not admitted as a Substitute Member (as hereinafter defined).

3.3    "Bankruptcy" means, and a Member shall be deemed a "Bankrupt Member" upon: (i) the entry of a decree or order for relief against the Member by a court of competent jurisdiction in any involuntary case brought against the Member under any bankruptcy, insolvency or other similar law (collectively, "Debtor Relief Laws") generally affecting the rights of creditors and relief of debtors now or hereafter in effect; (ii) the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator or other similar agent under applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property; (iii) the ordering of the winding up or liquidation of the Member; (iv) the filing of a petition in an involuntary bankruptcy case, which petition remains undismissed or suspended for a period of 180 days or which is not dismissed or suspended pursuant to Section 305 of the Federal Bankruptcy Code (or any corresponding provision of any future United States bankruptcy law); (v) the commencement by the Member of a voluntary case under any applicable Debtor Relief Law now or hereafter in effect; (vi) the consent by the Member to the entry of an order for relief in an involuntary case under any such law or to the appointment of or the taking of possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar agent under any applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property; or (vii) the making by a Member of any general assignment for the benefit of its creditors.

3.4    "Capital Account" means, with respect to any Member or Assignee, the Capital Account maintained in accordance with the provisions set forth in Section 5.3 hereof.

3.5    "Capital Contribution" means, with respect to any Member or Assignee, the amount of money and the fair market value of any property (other than money) contributed to the Company with respect to the Interest in the Company held by

2

such Member or Assignee. The initial Capital Contributions of the Members are set forth in Exhibit A.

3.6 "Code" means the Internal Revenue Code of 1986, as amended. All references herein to sections of the Code shall include any corresponding provision or provisions of succeeding law.

3.7 "Company" shall refer to TECSPEC, LLC.

3.8 "Deficit Capital Account" means with respect to any Member or Assignee, the deficit balance, if any, in such Member's or Assignee's Capital Account as of the end of the taxable year, after giving effect to the following adjustments:

(a) Credit to such Capital Account any amount which such Member or Assignee is obligated to restore under Regulation Section 1.704-1(b)(2)(ii)(c), as well as any addition thereto pursuant to the next to last sentence of Regulation Section 1.704-2(g)(1) and (i)(5), after taking into account thereunder any changes during such year in partnership minimum gain (as determined in accordance with Regulation Section 1.704-2(d)) and in the minimum gain attributable to any partner nonrecourse debt (as determined under Regulation Section 1.704-2(i)(3)); and

(b) Debit to such Capital Account the items described in Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

The definition of Deficit Capital Account is intended to comply with the provisions of Regulation Section 1.704-1(b)(2)(ii)(d) and 1.704-2, and will be interpreted consistently with those provisions.

3.9 "Interest" means a Member's entire interest in the Company including the Member's right to share in the Company's Profits, Losses and distributions of the Company's assets pursuant to this Agreement and the New York Act, and the right to participate in the management of the Company's business and affairs, including the right to vote on, consent to, or otherwise participate in any decision or action of or by the Members granted pursuant to this Agreement and the New York Act.

3.10 "Manager" or "Managers" means one or more Persons (individually and collectively) selected by the Members, to whom are delegated all or part of the management duties of the Company's business as provided in Section 8 hereof.

3.11 "New York Act" means the New York Limited Liability Company Law, as the same may be amended from time to time.

3.12 "Percentage Interest" of a Member means the percentage of such Member set forth opposite the name of such Member under the column "Percentage Interest" in Exhibit A hereto, as such percentage may be adjusted from time to time

3

pursuant to the terms hereof. Other than by application of Sections 6 and 7.1, the Percentage Interests of the Members may not be adjusted without the unanimous consent of the Members.

3.13    "Person" means an individual, association, corporation, general partnership, limited partnership, limited liability company, joint stock association, joint venture, firm, trust, business trust, cooperative, and foreign associations of like structure.

3.14    "Profits" and "Losses" means, for each fiscal year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, credit, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), adjusted in accordance with the Regulations.

3.15    "Regulations" means the Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

3.16    "Substitute Member" means any Person who or which is admitted into membership upon the written consent of the Members pursuant to Section 9.9 hereof.

## Section 4 - Purposes

The character and purposes for which the Company is formed, in general, is to manufacture and/or assemble HVAC equipment; to borrow money and issue evidences of indebtedness, secured or unsecured, in furtherance of any and all the objects of the Company's business; and to enter into any contracts or commitments, assume any obligations, execute any documents and do any and all other acts and things which may be necessary, incidental or convenient to carry on the Company's business as contemplated by this Agreement. The Company may also engage in such other business, activity or purpose permitted by law, as the Managers may determine.

## Section 5 - Capital Contributions and Capital Accounts

5.1    Members' Capital Contributions. Each Member shall contribute such amount as is set forth in Exhibit A as its share of the initial Capital Contributions. No interest shall be paid on any initial or subsequent Capital Contribution. If sixty (60%) percent or more of the Members entitled to vote deem it appropriate for the operations of the Company, the Members may require in writing that all Members make additional contributions to the Company in proportion to their Member Interest ("Call"). If a Member does not fully meet the Call ("Delinquent Member") within 30 days of the request by the Members, the other Member (the "Advancing Member") may make a loan to the Delinquent Member in the amount of all or part of such deficiency ("Deficiency

4

Advance") and, until the expiration of the Cure Period, the amount of such Deficiency Advance shall be treated as a capital contribution of the Delinquent Member.

The Delinquent Member shall have the right to repay the Deficiency Advance, plus interest thereon at **[five (5) percentage points]** above the prime rate in effect from time to time established by the Company's primary bank (the "Default Interest Rate"), until the expiration of the sixty (60) day period following the Call (the "Cure Period"); provided, however, that for purposes of Michael, the Cure Period shall be a period of one (1) year following the Call.  During the Cure Period, any distributions otherwise payable to the Delinquent Member pursuant to this Agreement shall be paid to the Advancing Member as repayment of the Deficiency Advance, with any amounts paid to the Advancing Member being applied first to accrued and unpaid interest and thereafter to the principal amount of the Deficiency Advance.  If at the expiration of the Cure Period, the Deficiency Advance and all accrued interest thereon have not been fully paid, the Deficiency Advance, at the option of the Advancing Member, will be deemed either (i) an additional Capital Contribution by the Advancing Member (in which event the amount of the Deficiency Advance shall no longer be treated as a Capital Contribution of the Delinquent Member), or (ii) a loan by the Advancing Member to the Delinquent Member, which loan shall accrue interest at the Default Loan Interest Rate.

In the event the Advancing Member elects to treat the Delinquency Advance as an additional capital contribution by the Advancing Member, an additional Capital Contribution in the amount of the unpaid Deficiency Amount, plus any accrued and unpaid interest, shall be credited to the Advancing Member's Capital Account.  The Delinquent Member's Interest in the Company will be diluted by recalculating the Percentage Interest of the Delinquent Member by either (i) dividing the Delinquent Member's Capital Account by the total balance in all of the Members' Capital Accounts or (ii) dividing the Delinquent Member's total Capital Contributions by the aggregate amount of all Members' Capital Contributions, whichever results in the lesser Percentage Interest (the lesser Percentage Interest resulting from (i) or (ii) shall be referred to as the "Dilution Amount").  The Interest of the Advancing Members shall be increased, such that the Percentage Interest of the Advancing Member shall be increased by the Dilution Amount.

In the event the Advancing Member elects to continue to treat the Delinquency Advance as a loan to the Delinquent Member, the Delinquency Advance shall continue to accrue interest at the Default Loan Interest rate until the Delinquency Advance, together with all accrued interest, is repaid to the Advancing Member in full. Until such time as the Delinquency Advance, together with all accrued interest, is repaid in full, any distributions otherwise payable to the Delinquent Member pursuant to this Agreement shall be paid to the Advancing Member as repayment of the Deficiency Advance, with any amounts paid to the Advancing Member being applied first to accrued and unpaid interest and thereafter to the principal amount of the Deficiency Advance.

Error! No property name supplied.Error! No property name supplied.Error! No property name supplied.34972/0001-11636270v2

5.2    Additional Contributions. Except as set forth in Section 5.1 above, no Member shall be required to make any Capital Contributions. In order to obtain additional funds or for other business purposes, additional capital may be contributed to the Company, but only upon the written consent of the Managers.

5.3    Capital Accounts. A separate Capital Account will be maintained for each Member.

(a)    Each Member's Capital Account will be increased by:

(i)    The amount of money contributed by the Member to the Company;

(ii)    The fair market value of property contributed by the Member to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Section 752 of the Code);

(iii)    Allocations to the Member of Profits; and

(iv)    Allocations to the Member of income or gain as provided in Section 7.2 hereof or otherwise by Regulation Section 1.704-1(b)(2)(iv).

(b)    Each Member's Capital Account will be decreased by:

(i)    The amount of money distributed to the Member by the Company;

(ii)    The fair market value of property distributed to the Member by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Section 752 of the Code);

(iii)    Allocations to the Member of Losses; and

(iv)    Allocations to the Member of deduction or expense as provided in Section 7.2 hereof or otherwise by Regulation Section 1.704-1(b)(2)(iv).

(c)    In the event of a permitted sale or exchange of an Interest in the Company, the Capital Account of the transferor shall become the Capital Account of the transferee to the extent it relates to the transferred Interest in accordance with Regulation Section 1.704-1(b)(2)(iv).

(d)    The manner in which Capital Accounts are to be maintained pursuant to this Section 5.3 is intended to comply with the requirements of Section 704(b) of the Code and the Regulations promulgated thereunder. If in the Managers' opinion, the manner in which Capital Accounts are to be maintained pursuant

6

to the preceding provisions of this Section 5.3 should be modified to comply with Section 704(b) of the Code and the Regulations thereunder, then notwithstanding anything to the contrary contained in the preceding provisions of this Section 5.3, the method in which Capital Accounts are maintained shall be so modified; provided, however, than any change in the manner of maintaining Capital Accounts shall not materially alter the economic agreement between or among the Members.

(e)    Except as otherwise required in the New York Act (and subject to Sections 5.1 and 5.2 above), no Member shall have any liability to restore all or any portion of a deficit balance in the Member's Capital Account.

5.4    Withdrawal or Reduction of Members' Contributions to Capital. A Member shall not receive any part of its Capital Contributions until all liabilities of the Company, except liabilities to Members on account of their Capital Contributions, have been paid or there remains Company property sufficient to pay them, as determined by the Managers in their sole discretion. A Member, irrespective of the nature of its Capital Contribution, has only the right to demand and receive cash in return for its Capital Contribution.

5.5    Advances by the Members. A Member may from time to time, with the consent of the Managers, advance additional monies to or for the Company's benefit, and each such advance shall be treated as a Capital Contribution to the Company or as a loan to the Company, as determined by the Managers. Any advance which is treated as a loan shall be evidenced by a promissory note executed and delivered by the Company to the Member.

5.6    Transactions Between Member or Manager and the Company. Except as otherwise provided in this Agreement, a Member or Manager may lend money to, borrow money from, act as a surety, guarantor or endorser for, guarantee or assume one or more specific obligations of, provide collateral for, and transact other business with the Company and, subject to other applicable law, has the same rights and obligations with respect to any such matter as a Person who is not a Member or Manager as set forth in the New York Act.

## Section 6 - Admission of Additional Members

Additional Members may be admitted to the Company and will participate in the Profits, Losses, distributions and ownership of the assets of the Company on such terms as are determined by the Managers. Admission of any such new Members shall require the consent of the Members owning a majority of the profits interests and capital interests in the Company. Such new Members shall be allocated Profit and Loss by such method as may be provided in this Agreement, and if no method is specified, then as may be permitted by Section 706(d) of the Code.

7

Section 7 - Allocations and Distributions

7.1     Allocations of Profits and Losses. Any Profits and Losses in any year shall be distributed to the Members in proportion to their Percentage Interests.

7.2     Special Allocations. Notwithstanding the provisions of Section 7.1:

(a)     Minimum Gain. Notwithstanding any other provision of this Section 7.2, if there is a net decrease in the Company's minimum gain as defined in Regulation Section 1.704-2(d) during a taxable year of the Company, the Capital Accounts of each Member shall be allocated items of income (including gross income) and gain for such year (and if necessary for subsequent years) equal to that Member's share of the net decrease in Company minimum gain. This Section 7.2(a) is intended to comply with the minimum gain chargeback requirement of Regulation Section 1.704-2 and shall be interpreted consistently therewith. If in any taxable year that the Company has a net decrease in the Company's minimum gain, if the minimum gain chargeback requirement would cause a distortion in the economic arrangement among the Members and it is not expected that the Company will have sufficient other income to correct that distortion, the Members may seek to have the Internal Revenue Service waive the minimum gain chargeback requirement in accordance with Regulation Section 1.704-2(f)(4).

(b)     Qualified Income Offset. If any Member unexpectedly receives any adjustments, allocations, or distributions described in Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), which create or increase a Deficit Capital Account of the Member, then items of Company income and gain (consisting of a pro rata portion of each item of Company income, including gross income, and gain for such year and, if necessary, for subsequent years) shall be specially credited to the Capital Account of the Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Deficit Capital Account so created as quickly as possible. It is the intent that this Section 7.2(b) be interpreted to comply with the alternate test for economic effect set forth in Regulation Section 1.704-1(b)(2)(ii)(d).

(c)     Deficit Balance. If any Member would have a Deficit Capital Account at the end of any Company taxable year which is in excess of the sum of any amount that the Member is obligated to restore to the Company under Regulation Section 1.704-1(b)(2)(ii)(c) and the Member's share of minimum gain as defined in Regulation Section 1.704-2(g)(1) (which is also treated as an obligation to restore in accordance with Regulation Section 1.704-1(b)(2)(ii)(d)), the Capital Account of the Member shall be specially credited with items of Company income (including gross income) and gain in the amount of the excess as quickly as possible.

(d)     Nonrecourse Deductions. Items of Losses, deduction, and expenditures described in Section 705(a)(2)(B) of the Code which are attributable to any

8

nonrecourse debt of the Company and are characterized as partner nonrecourse deductions under Regulation Section 1.704-2(i) shall be allocated to the Members' Capital Accounts in accordance with said Regulation Section 1.704-2(i). Beginning in the first taxable year in which there are allocations of "nonrecourse deductions" (as described in Regulation Section 1.704-2(b)) those deductions shall be allocated to the Members in accordance with, and as a part of, the allocations of Company Profit or Loss for that period.

(e)    Section 704(c). In accordance with Section 704(c)(1)(A) of the Code and Regulation Section 1.704-1(b)(2)(iv)(d)(3), if a Member contributes property with a fair market value that differs from its adjusted basis at the time of contribution, income, gain, loss, and deductions for the property shall, solely for Federal income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of the property to the Company and its fair market value at the time of contribution.

(f)    Curative Allocations. Any credit or charge to the Members' Capital Accounts pursuant to Sections 7.2(a) through 7.2(d) shall be taken into account in computing subsequent allocations of Profits and Losses pursuant to Section 7.1 above, so that the net amount of any items charged or credited to Capital Accounts pursuant to Sections 7.1 and 7.2 shall to the extent possible, be equal to the net amount that would have been allocated to the Capital Account of each Member pursuant to the provisions of this Section 7 if the special allocations required by Sections 7.2(a) through 7.2(d) had not occurred.

7.3    Distributions.

(a)    Except as otherwise provided herein, the Company shall make distributions to the Members (other than upon liquidation) according to their respective Percentage Interests in the Company at such times as the Managers shall determine. Liquidation proceeds of the Company will be paid within sixty (60) days of the end of the taxable year (or, if later, within one hundred twenty (120) days after the date of the liquidation). The Company may offset damages for breach of this Agreement by a Member whose interest is liquidated (either upon the withdrawal of a Member or the liquidation of the Company) against the amount otherwise distributable to the Member. Upon the Company's liquidation, the Company's assets shall be distributed in the following order of priority:

(i)    The claims of creditors, other than Members, first shall be satisfied and adequate reserves established (as determined by the Members);

(ii)    All outstanding loans from Members shall be repaid in the same proportion which the outstanding loans from any Member shall bear to the outstanding loans of all Members;

9

Error! No property name supplied.Error! No property name supplied.Error! No property name supplied.34972/0001-11636270v2

(iii)   The Members shall receive the balance in proportion to their relative Capital Accounts determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs.

(b)   The Company shall not make a distribution to a Member to the extent that at the time of the distribution, after giving effect to the distribution, all liabilities of the Company, other than liabilities to Members on account of their Interests and liabilities for which the recourse of creditors is limited to specified property of the Company, exceed the fair value of the Company's assets, except that the fair value of property that is subject to a liability for which the recourse of creditors is limited shall be included in the Company's assets only to the extent that the fair value of that property exceeds that liability.

(c)   Subject to the terms and conditions of Section 7.3(d), a Member who receives a distribution in violation of Section 7.3(b), and who knew at the time of the distribution that the distribution violated Section 7.3(b), shall be liable to the Company for the amount of the distribution. A Member who receives a distribution in violation of Section 7.3(b), and who did not know at the time of the distribution that the distribution violated Section 7.3(b), shall not be liable for the amount of the distribution.

(d)   Unless otherwise agreed upon by the Members, a Member who receives a distribution from the Company in violation of Section 7.3(b) shall have no liability under the New York Act or other applicable law for the amount of the distribution after the expiration of three (3) years from the date of the distribution unless an action to recover the distribution from the Member is commenced prior to the expiration of the three (3) year period and an adjudication of liability against the Member is made in the said action.

## Section 8 - Management

8.1   Management.

(a)   The Company's business and affairs shall be managed by the Managers. The Managers shall participate in the direction, management and control of the Company's business to the best of their ability.

(b)   Except as provided herein, if there is more than one (1) Manager designated to serve hereunder, the Managers shall in all cases act as a group, with the unanimous consent of the Managers required to take action with respect to any decisions of the Managers. Each Manager shall have one (1) vote.

(c)   The Company's Managers shall be Christina and Michael.

10

Error! No property name supplied.Error! No property name supplied.Error! No property name supplied.34972/0001-11636270v2

(d)    Except as expressly provided in this Agreement, no Member, acting alone, shall have any authority to act for, or to undertake or assume, any obligation, debt, duty or responsibility on behalf of, any other Member or the Company.

8.2    Number, Tenure and Qualifications. The number of Managers of the Company shall be fixed from time to time by the unanimous consent of Members, but in no instance shall there be less than one (1) Manager. Each Manager shall hold office until his or her successor shall have been elected and qualified. The Manager shall be elected by the unanimous consent of the Members. Managers need not be residents of the State of New York or Members of the Company.

8.3    Certain Powers of the Managers. Without limiting the generality of Section 8.1, the Managers shall have power and authority, on the Company's behalf:

(a)    To acquire property from any Person as the Managers may determine. The fact that a Member is directly or indirectly affiliated or connected with any such Person shall not prohibit the Managers from dealing with that Person;

(b)    To borrow money from any Person, including banks, other lending institutions, the Members, or affiliates of the Members on such terms as the Managers deem appropriate, and in connection therewith, to hypothecate, encumber, pledge and grant security interests in the Company's assets to secure repayment of the borrowed sums. Except as otherwise provided in the New York Act, no debt shall be contracted or liability incurred by or on the Company's behalf except by the Managers;

(c)    To purchase liability and other insurance to protect the Company property and the Company's business;

(d)    To hold and own any Company real and/or personal properties in the Company's name;

(e)    To invest any Company funds temporarily (by way of example but not limitation) in time deposits, short-term governmental obligations, commercial paper or other investments;

(f)    To sell or otherwise dispose of all or substantially all of the Company's assets as part of a single transaction or plan so long as such disposition is not in violation of or a cause of a default under any other agreement to which the Company may be bound;

(g)    To execute on the Company's behalf all instruments and documents, including, without limitation, checks, drafts, notes and other negotiable instruments, mortgages or deeds of trust, security agreements, financing statements, documents providing for the acquisition, mortgage or disposition of the Company property, assignments, bills of sale, leases, partnership agreements, and any other

11

instruments or documents necessary, in the Managers' opinion, to the Company's business;

        (h)    To employ accountants, legal counsel, managing agents or other experts to perform services for the Company and to compensate them from Company funds;

        (i)    To enter into any and all other agreements on the Company's behalf, with any other Person for any purpose, in such forms as the Managers may approve; and

        (j)    To do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business.

        8.4    <u>Liability for Certain Acts</u>.  The Managers shall exercise their business judgment in participating in the management of the Company's business, operations and affairs.  Unless fraud, deceit, gross negligence, willful misconduct or a wrongful taking shall be proved by a nonappealable court order, judgment, decree or decision, the Managers shall not be liable or obligated to the Members for any mistake of fact or judgment or for the doing of any act or the failure to do any act by the Managers in conducting the Company's business, operations and affairs, which may cause or result in any loss or damage to the Company or the Members.  The Managers do not, in any way, guarantee the return of the Members' Capital Contributions or a profit for the Members from the Company's operations.  The Managers shall not be responsible to any Members because of a loss of their investments or a loss in operations, unless the loss shall have been the result of fraud, deceit, gross negligence, willful misconduct or a wrongful taking by the Managers proved as set forth in this Section 8.4.  Unless fraud, deceit, gross negligence, willful misconduct or a wrongful taking shall be proved by a nonappealable court order, judgment, decree or decision, the Managers shall incur no liability to the Company or to any of the Members as a result of engaging in any other business or venture.

        8.5    <u>The Managers Have No Exclusive Duty to Company</u>.  The Managers shall not be required to manage the Company as their sole and exclusive function and they may have other business interests and, subject to the provisions of Section 25 hereof (to the extent a Manger is also a Member) may engage in other activities in addition to those relating to the Company.  Neither the Company nor any Member shall have any right, by virtue of this Agreement, to share or participate in such other investments or activities of the Managers or to the income or proceeds derived therefrom.

        8.6    <u>Bank Accounts</u>.  The Managers may open bank accounts in the Company's name.  The Company's funds shall be deposited in the Company's name in such bank account or accounts as shall be designated by the Managers.  The Managers

Error! No property name supplied.Error! No property name supplied.Error! No property name supplied.34972/0001-11636270v2

shall use such funds solely for the Company's business. Funds shall be withdrawn from the Company's bank accounts only upon a Manager's signature.

        8.7    Resignation. A Manager may resign at any time by giving written notice to the Members. A Manager's resignation shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

        8.8    Removal. Any Manager may be removed at any time, with or without cause, by the unanimous consent of the Members (other than a Member subject to removal as a Manager); provided, however, that each of Christina and Michael may not be removed as a Manager so long as he or she is a Member of the Company.

        8.9    Vacancies. Any vacancy occurring for any reason in the number of Managers of the Company may be filled by the unanimous consent of the remaining Managers then in office, provided that if there are no remaining Managers, the vacancy(ies) shall be filled by the unanimous consent of the Members. Any Manager's position to be filled by reason of an increase in the number of Managers shall be filled by the unanimous consent of a majority of the Managers then in office or by an election at a meeting of Members called for that purpose or by the Members' unanimous written consent. A Manager elected to fill a vacancy shall be elected for the unexpired term of its predecessor in office and shall hold office until the expiration of such term and until its successor shall be elected and shall qualify or until its earlier death, resignation or removal. A Manager chosen to fill a position resulting from an increase in the number of Managers shall hold office until the next meeting of Members and until its successor shall be elected and shall qualify, or until its earlier death, resignation or removal.

        8.10   Compensation. The guaranteed payments and other compensation of the Managers shall be fixed from time to time by the unanimous consent of Members and no Manager shall be prevented from receiving such compensation by reason of the fact that he or she is also a Member of the Company.

        8.11   Manager Representations. Every contract, deed, mortgage, lease and other instrument executed by any Manager shall be conclusive evidence in favor of every Person relying thereon or claiming thereunder that at the time of the delivery thereof: (i) the Company was in existence; (ii) neither this Agreement nor the Articles of Organization had been amended in any manner so as to restrict the delegation of authority to the Manager; and (iii) the execution and delivery of such instrument was duly authorized by the Manager. Any Person may always rely on a certificate addressed to him or her and signed by a Manager:

        (a)    as to who are the Members and the Manager hereunder;

13

(b)     as to the existence or non-existence of any fact which constitutes a condition precedent to acts by the Members or Manager or in any other manner germane to the Company's affairs;

(c)     as to who is authorized to execute and deliver any instrument or document of the Company;

(d)     as to the authenticity of any copy of the Articles of Organization, this Agreement, amendments thereto and any other document relating to the conduct of the Company's affairs; or

(e)     as to any act or failure to act by the Company or as to any other matter whatsoever involving the Company, the Managers or any Member in the capacity as a Member or Manager of the Company.

8.12    Limitations on Members.

(a)     Except as is expressly provided in this Section, no Member, acting alone, shall have any authority to act for, or to undertake or assume, any obligation, debt, duty or responsibility on behalf of, any other Member or the Company.

(b)     Unless authorized to do so by this Agreement or by the Managers, no Member, agent, or employee of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable pecuniarily for any purpose.

Section 9 - Restrictions on the Transfer of a Member's Interest

9.1     Lifetime Restrictions on Transfers. Except as otherwise provided herein, a Member shall not sell, transfer, pledge, encumber or otherwise dispose of all or any part of his Membership Interest to any Person unless the Member desiring to make the transfer or encumbrance (hereinafter referred to as the "Selling Member") shall have first made the offer to sell to the Company and thereafter to the other Members (the "Remaining Members") and such offer shall not have been accepted.

(a)     Notice of Offer. The offer which shall be given to the Company and the Remaining Members, shall consist of an offer to sell all of the Interest owned by the Selling Member, to which shall be attached a statement of intention to transfer or encumber, as the case may be, the name and address of the prospective purchaser or lienor, the Percentage Interest involved in any such proposed transfer or encumbrance, and the price and terms of any such transfer or encumbrance ("Bona Fide Offer"), in accordance with the provisions of Section 9.1(b) hereof.

(b)     Bona Fide Third Party Offer. If the Selling Member has received a bona fide written offer to purchase all of his Interest in the Company which he

14

wishes to accept, or a bona fide written offer to receive a loan or an advance of money, which loan or advance involves an encumbrance upon said Interest to secure the loan or advance as referred to in Section 9.1(a) above, the Selling Member shall submit to the Company and the Remaining Members, within fourteen (14) days after receipt of such Bona Fide Offer, a written notice including a copy of such Bona Fide Offer, as required under Section 9.1(a) above, together with the name and address of the principal or principals if the offer is made through an agent (hereinafter collectively referred to as the "Bona Fide Offerors"), and sufficient facts concerning the Bona Fide Offerors to enable the Company and the Remaining Members to arrive at an informed judgment as to the bona fides of such offer. The Selling Member shall then offer, or be deemed to have offered, in writing to sell to the Company, all of the Interest in the Company held by the Selling Member for an amount equal to the lesser of: (i) the Value of the Selling Member's Interest, which is determined under Section 10 hereof; or (ii) the purchase price set forth in the Bona Fide Offer, or, if an encumbrance, the lesser of the amount set forth in item (i) above and the amount of the debt involved in such encumbrance (the lesser of (i) and (ii) shall be referred to as the "Lifetime Purchase Price"), and upon the terms and conditions as hereinafter set forth; provided, however, that the Selling Member has complied with all of the procedural conditions hereof. Within thirty (30) days after receipt by the Company of the Bona Fide Offer, the Company may elect to purchase all of the Selling Member's Interest which is the subject of the Bona Fide Offer for the Lifetime Purchase Price. If such offer is not accepted by the Company, the Remaining Member may, within forty-five (45) days after the receipt by the Company of the Bona Fide Offer, elect to purchase all of the Selling Member's interest which is the subject of the Bona Fide Offer for the Lifetime Purchase Price, upon the terms and conditions as hereinafter set forth.

Each potential purchaser shall exercise his or its election to purchase by giving written notice thereof to the other potential purchaser and the Selling Member. Any such notice shall only be acceptable if it specifies a date for the closing of the purchase which shall not be more than thirty (30) days after the date of the giving of such notice of acceptance.

9.2    Terms of Payment. If the Company or the Remaining Members, whichever the case may be, exercises the right to purchase the Interest of a Selling Member in accordance with the terms of Section 9.1, then the Company or the Remaining Members, whichever the case may be (the "Purchaser"), shall have the option to pay the Lifetime Purchase Price, if a purchase, either: (i) in accordance with the terms and conditions of the Bona Fide Offer, whichever the case may be; or (ii) in successive equal monthly installments over a period of five (5) years, with interest being imposed at the annual rate equal to the lowest rate of interest which allows for the avoidance of any imputed or unstated interest for Federal income tax purposes existing at and fixed as of the date of closing (the "Installment Method"); provided, however, that if an encumbrance, then payment shall be made in accordance with the Installment Method.

15

The first monthly installment shall be due at the time of closing with fifty-nine (59) additional monthly payments being made thereafter on the same day of the month that the first payment was made until this obligation has been paid in full. The obligation to make such payments shall be evidenced by the promissory note of the Purchaser and shall provide for acceleration of any unpaid balance, together with all accrued interest, upon written notice to the purchaser of a default in the payment of any one (1) monthly installment, which default remains uncured for a period of thirty (30) days after receipt of such notice. The promissory note shall provide for the unrestricted right to prepay all or any part of the unpaid balance, without premium or penalty, and with interest only to the date of prepayment.

9.3    Release from Restriction. If the offer to sell as provided for in Section 9.1 is not accepted by the Company or the Remaining Members, the Selling Member may make a bona fide transfer or encumbrance to the prospective purchaser or lienor named in the statement attached to the Bona Fide Offer, with such sale or encumbrance to be made only in strict accordance with the terms therein stated. The Company and the Remaining Members shall be given full access to all closing documents relating to such sale or encumbrance to the Bona Fide Offerors so that adherence to the terms and conditions of the Bona Fide Offer can be demonstrated. However, if the Selling Member shall fail to make such transfer or encumbrance within thirty (30) days following the expiration of the time hereinabove provided for the election to purchase by the Company and the Remaining Members in accordance with Section 9.1, or if there is any modification in price or any of the terms and conditions of the Bona Fide Offer, such Interest shall again become subject to all of this Agreement's restrictions, and the Selling Member shall not have the right to complete the proposed sale or encumbrance without again offering the Interest, in writing, anew to the Company and the Remaining Members pursuant to the procedures set forth in Section 9.1.

Notwithstanding anything in this Agreement to the contrary, any Interest purchased by any Bona Fide Offerors from a Selling Member shall be acquired subject to the terms and conditions of this Agreement and the Bona Fide Offerors shall not sell, assign, pledge, encumber, hypothecate, mortgage, or in any other manner transfer the whole or any part of the Interest purchased, or any other Interest thereafter held or owned, without the prior written consent of the Company and the Remaining Members except as specifically provided in this Agreement. It shall be the Selling Member's affirmative obligation to notify the Bona Fide Offerors that the Interest proposed to be purchased by the Bona Fide Offerors will remain subject to the terms and provisions of this Agreement following the proposed sale and purchase.

9.4    Delivery to Escrow Agent. At the time of closing, the Selling Member shall deliver to the Escrow Agent, hereinafter designated in Section 11, an assignment representing the Selling Member's entire Membership Interest, free and clear of all liens, claims and encumbrances, in order to effectuate the sale and purchase.

16

9.5     Sale in Violation of Agreement.  In the event of any attempted sale, assignment, transfer, hypothecation, pledge, encumbrance or disposition ("Attempted Transfer") of the Interest of a Member, not in accordance with the terms of this Agreement, such Attempted Transfer shall be deemed to be an offer by such Member to sell his Interest pursuant to Section 9.1 hereof, to be deemed made as of the date of discovery of such Attempted Transfer, and at a price equal to the lesser of:  (i) the Value of the Member's Interest as determined under Section 10 hereof; or (ii) the purchase price paid to such Member pursuant to such Attempted Transfer.  The payment terms shall be in accordance with the Installment Method or such Attempted Transfer, whichever the purchaser chooses.

9.6     Involuntary Transfers.  In the event of any involuntary transfer ("Involuntary Transfer") or attempted involuntary transfer ("Attempted Involuntary Transfer") of an Interest owned by a Member due to certain events, including, but not limited to, a Member's bankruptcy or divorce, such Member shall be deemed to have made an offer to sell his Interest as of the date of discovery of such Involuntary Transfer or Attempted Involuntary Transfer, pursuant to Section 9.1 hereof, and at a price equal to the lesser of:  (i) the Value of the Member's Interest as determined under Section 10 hereof; or (ii) the purchase price paid to such Member pursuant to such Involuntary Transfer or Attempted Involuntary Transfer.  The payment terms shall be in accordance with the Installment Method, such Involuntary Transfer or Attempted Involuntary Transfer, whichever the purchaser chooses.

9.7     Further Restrictions on Transfer.  No Member shall assign, convey, sell, encumber or in any way alienate all or any part of its Interest in the Company if the Interest to be sold or exchanged, when added to the total of all other Interests sold or exchanged in the preceding twelve (12) consecutive months prior thereto, would result in the Company's termination under Section 708 of the Code.

9.8     Substitute Members.  An Assignee shall have the right to become a Substitute Member if:  (i) the requirements of Sections 9.8 are met; (ii) such Person executes an instrument satisfactory to the remaining Members accepting and adopting the terms and provisions of this Agreement; and (iii) such Person pays any reasonable expenses in connection with its admission as a Substitute Member.

9.9     Effect of Transfer.

(a)     Any permitted transfer of all or any portion of a Member's Interest in the Company shall take effect on the date of transfer.

(b)     Any Assignee of an Interest in the Company shall take subject to the restrictions on transfer imposed by this Agreement.

(c)    Upon any transfer of a Member's Interest in the Company, unless the Assignee is admitted as a Substituted Member pursuant to Section 9.9 herein, the Assignee shall have no right to participate in the management of the business and affairs of the Company or to become a Member, but shall only be entitled to share in the Company's Profits, Losses and distributions of the Company's assets pursuant to this Agreement and the New York Act, to which the transferor was entitled, and the extent transferred.

A Member ceases to be a Member and to have the power to exercise any rights or powers of a Member upon the assignment of all of his Interest.

9.10    Death of A Member.  Upon the death of a Member (the "Decedent"), the surviving Members must purchase all of the Decedent's Interest and the legal representatives of the estate of the Decedent shall be obligated to sell such Interest to the surviving Member, at a purchase price equal to the greater of (i) the insurance proceeds on the Decedent's life owned by the Trustee on behalf of the surviving Members, if any, or (ii) the Value of the Decedent's Interest, as determined pursuant to Section 10 of this Agreement (the greater of (i) and (ii) shall hereinafter be referred to as the "Death Purchase Price"), and upon the terms and conditions set forth herein.

(a)    Terms and Conditions of Sale Upon a Member's Death.  Upon the death of a Member, the Decedent's legal representatives shall furnish to the Trustee, on behalf of the surviving Members, such proof of death and other instruments, certificates and documents as may be necessary or required by the respective carriers issuing any insurance policies on the Decedent's life, if any.  Provided that the Trustee, on behalf of the surviving Members, is furnished with all required proof, instruments, certificates and documents, the Trustee shall make proper application for payment of the proceeds payable under any such policies, if any, for the use and payment thereof in accordance with the provisions of Sections 9.10(b), 9.10(c) and 9.10(d) below.  The Trustee, on behalf of the surviving Members, shall not be obligated to institute or proceed with any legal or other proceedings for the recovery of any insurance proceeds unless all expenses, including attorneys' fees, shall be advanced by the Decedent's legal representatives.  The Parties shall provide to the purchaser such assistance as may be reasonably required in order to cause the insurance carriers to make timely payment upon the insurance policies.

(b)    The Trustee, on behalf of the surviving Members, shall receive proceeds of any insurance policies on the Decedent's life listed on Exhibit C annexed hereto and made a part hereof, if any.  The proceeds shall be payable to and used by the purchaser(s) to fund the purchase price in whole or in part for the Decedent's Interest.  Payment for the Interest shall be deferred until the date of closing.

(c)    The closing of the purchase and sale of a Decedent's Interest to the purchaser(s) shall take place at the Company's principal office, or at such other

18

place as agreed to by the Parties, on a date mutually agreed to by the Parties which shall be within the applicable time period set forth herein; provided, however, that the insurance proceeds on the Decedent's life have been received by purchaser. If life insurance proceeds are received later than such applicable time period, the closing will take place no later than ten (10) days from receipt.

(d)     At the closing, the surviving Members shall pay all of the insurance proceeds received on the Decedent's life, if any, up to, but not exceeding, the Death Purchase Price for the Decedent's Interest directly to the Decedent's legal representatives. If, however, the proceeds on the Decedent's life are insufficient to fund the entire Death Purchase Price, or if there are no insurance policies on the Decedent's life, the surviving Members shall pay the unpaid balance of the Death Purchase Price, if any, after payment of all life insurance proceeds has been made, or, alternatively, the entire Death Purchase Price if there are no insurance policies on the Decedent's life, according to the Installment Method.

(e)     At the Closing, the legal representatives of the Deceased's estate, upon receipt of the life insurance proceeds, if any, and the promissory note, if any should be required, shall deliver to the Escrow Agent, as defined in Section 11 hereof, assignments representing all of the Deceased Member's Membership Interest in the Company, free and clear of all liens, claims and encumbrances and endorsed in blank, in order to effectuate the sale and purchase. The Escrow Agent shall hold such assignments in escrow in accordance with the provisions of Section 11. If the total Death Purchase Price is paid at the Closing and no promissory note is delivered to the legal representatives of the Deceased Member's estate, the assignments shall be delivered to the surviving Members, rather than the Escrow Agent.

9.11    Disability of a Member. For purposes of this Agreement, a Member shall be deemed to have become disabled when he is deemed disabled under the terms of any disability insurance policy(ies) covering him. In the absence of such a policy(ies) of disability insurance, or if there is a conflicting definition of "disability" in two or more policies of disability insurance wherein the Member (the "Disabled Member") is considered disabled under one policy but not considered disabled under the other, a Member's inability to regularly perform the ordinary duties of his occupation, determined or verified in accordance with the provisions of Section 9.12(f) hereof, shall be the basis for the determination of his disability.

(a)     Disability Buy-Out. Upon the expiration of one (1) year from the onset of a disability (the "One (1) Year Period"), the Company, at its option, may elect to purchase all of the Disabled Member's Interest, and the Disabled Member must sell such Interest to the Company, at a purchase price equal to the Value of the Disabled Member's Interest (the "Disability Purchase Price"), which is determined under Section 10 hereof, and upon the terms and conditions set forth herein. The Company shall notify, in writing, the Disabled Member and the other Members (the "Non-Disabled

19

Members") of its acceptance or rejection to purchase all of the Disabled Member's Interest within thirty (30) days after the expiration of the One (1) Year Period, provided that a failure to notify the Disabled Member and the Non-Disabled Members of its acceptance within said thirty (30) day period shall constitute an election not to purchase all of the Disabled Member's Interest. If the Company shall not elect to purchase the Disabled Member's Interest, the Non-Disabled Members shall then purchase the Disabled Member's Interest, and the Disabled Member must sell such interest to the Non-Disabled Members at a purchase price equal to the Disability Purchase Price, and upon the terms and conditions set forth herein. For two (2) months following the closing of the purchase of a Disabled Member's Interest pursuant to this Section, said disabled former Member shall receive the salary the Member had received in the two (2) months preceding his disability. Said payments shall be made in equal payments contemporaneously with the payroll paid to the remaining Members.

(b)    The closing for the sale of a Disabled Member's Interest under this Section 9.12 shall be scheduled to take place within a period of thirty (30) days after the Company provides notice of its election to purchase the Disabled Member's Interest or within thirty (30) days of the Company's rejection or deemed rejection of its right to purchase the Disabled Member's Interest, whichever the case may be.

(c)    At the closing and in accordance with the provisions set forth in Section 9.11 hereof, the Trustee shall pay, on behalf of the Non-Disabled Members, all of the disability buy-out insurance proceeds received as a result of the Disabled Member's disability from the policies insuring the Disabled Member listed on Exhibit D annexed hereto and made a part hereof, if any, up to, but not exceeding, the Disability Purchase Price for such Interest, directly to the Disabled Member. Any insurance proceeds from the disability buy-out insurance in excess of the Disability Purchase Price shall be paid by the Trustee to the Company or the Non-Disabled Members, whichever the case may be. If, however, the insurance proceeds from the disability buy-out insurance are insufficient to cover the Disability Purchase Price, or if there is no such disability buy-out insurance, the balance of the Disability Purchase Price or the entire Disability Purchase Price, whichever the case may be, shall be paid by the Company or the Non-Disabled Members, whichever the case may be, according to the Installment Method.

(d)    At the time of closing, the Disabled Member, or his legal representatives, shall deliver to the Escrow Agent, as defined in Section 11 hereof, certificates representing all of Interest owned by the Disabled Member free and clear of all liens, claims and encumbrances. If the total Disability Purchase Price is paid at closing and no promissory notes are delivered to the Disabled Member such membership interest assignment shall be delivered to the Non-Disabled Members, rather than the Escrow Agent.

Error! No property name supplied.Error! No property name supplied.Error! No property name supplied.34972/0001-11636270v2

(e)    The Disabled Member shall have the right to resume employment with the Company until such time as he is deemed to have offered his Interest for sale to the Company, as provided in Section 9.11(a) hereof. If, following a period of disability, the Disabled Member resumes employment for a continuous period of six (6) months or more, any subsequent disability shall be regarded as a new period of disability, and his rights under this Section 9.11 shall commence again. If said continuous period of employment and the actual performance thereof is less than six (6) months, any subsequent disability shall be deemed a continuation of the previous disability, and the entire period of disability shall be treated as a single period.

(f)    Whenever a Member claims to be disabled or the Company claims that a Member is disabled, and there is either no definition of "disability" applicable under any policy or policies of disability insurance covering the Member, or there is a conflict of the definitions of disability between two or more different policies, the Company shall have said Member examined by a licensed medical doctor designated by the Company, at the Company's sole expense, for the purpose of determining such disability within the terms of this Agreement. If the Member or the Member's duly appointed representative disputes the findings and conclusions of the doctor chosen by the Company, said Member shall be examined by a licensed medical doctor of his choice or the choice of his duly appointed representative, at his sole expense. If the findings and conclusions of both doctors do not agree on whether said Member is in fact disabled within the terms of this Agreement, said Member shall be examined by a third doctor, mutually agreed to by the two doctors who have already rendered different conclusions, the expense of which shall be equally borne by the Company and said disabled Member, whose determination as to the Member's disability shall be final and conclusive.

(g)    Control Over Disabled Member's Interest. Notwithstanding anything in this Section 9.11 to the contrary, a physically disabled Member shall have all of the power, control, rights, duties, liabilities and responsibilities with respect to his Interest as a non-disabled Member shall have with respect to his Interest, and said physically disabled Member shall fully participate in the actions and decisions of the Company. A mentally disabled Member with diminished capacity shall not be able to participate in the daily operation of the business, but shall be able to participate in any extraordinary action or decision of the Company as a Member, including but not limited to, decisions regarding the liquidation of the Company, the sale of substantially all of the Company's assets, the merger of the Company or the development of new lines of business by the Company, through a representative of said disabled Member, as designated herein on Exhibit E, attached hereto.

9.12    Termination of a Member's Employment. Upon the voluntary or involuntary termination of full-time employment by any Member (the "Terminated Member") with the Company for reasons other than his disability, the Terminated Member shall be deemed to have offered to sell his Interest pursuant to Section 9.1 of this

21

Agreement at a price equal to the Value of said Member's Interest, which is determined under Section 10 hereof. The Company shall have the option, but not the obligation, to purchase the Terminated Member's Interest within six (6) months of receipt by the Company of termination notice from the Terminated Member ("Termination Notice"). If such offer is not accepted by the Company, the other Members shall have the option, but not the obligation, to purchase within six (6) months of the expiration of the Company's six (6) month option period. The Company shall exercise its election to purchase by giving written notice thereof to the Terminated Member and the other Members. The other Members shall exercise their election to purchase by giving written notice thereof to the Terminated Member and the Company. The closing for a purchase under this Section 9.13 shall be in accordance with Section 9.1 hereof and the terms of payment shall be in accordance with the Installment Method.

      9.13    Retirement of a Member. Notwithstanding anything herein contained to the contrary, if a Member who has attained the age of fifty-five (55) years (the "Retiring Member") gives the Company and the other Members (the "Non-Retiring Members") one (1) years prior written notice of his intent to terminate employment with the Company, during said one (1) year period, the Company and the Non-Relating Members have the option to purchase the Retiring Member's Interest at a purchase price equal to the Value of the Interest, as determined pursuant to Section 10 hereof. The Company shall exercise its election to purchase by giving written notice thereof to the Retiring Member and the other Members. The Non-Retiring Members shall exercise their election to purchase by giving written notice thereof to the Retiring Member and the Company. In either event, the notice shall specify a date for the closing of the purchase which shall not be more than thirty (30) days after the date of the giving of such notice of acceptance. The purchase price shall be paid pursuant to the Installment Method. If neither the Non-Retiring Member nor the Company elects to purchase the Retiring Member's Interest within said one (1) year period, the Company shall be sold and/or liquidated within six (6) months of the expiration of the one (1) year period.

## Section 10 - Determination of Value

      Upon any sale of a Member's Interest pursuant to this Agreement, the total value of the Company ("Company Value") shall be the last dated amount set forth on the Certificate of Agreed Value, attached hereto as Exhibit B and made a part hereof, executed by the Members. The Members shall exercise best efforts to meet not less than once per year for the purpose of considering a new Value but their failure to meet or to determine a Company Value shall not invalidate the most recently executed Certificate of Agreed Value setting forth the Value then in effect. If the Members fail to agree on a revaluation as described above for more than two (2) years, the Value shall be determined by using the amount set forth on the most recent Certificate of Agreed Value, plus (or minus) an amount which reflects the increase (or decrease) in the net worth of the Company from the date of the most recent Certificate of Agreed Value to the end of the

Error! No property name supplied.Error! No property name supplied.Error! No property name supplied.34972/0001-11636270v2

fiscal year immediately preceding the date of the event triggering a sale of an Interest under this Agreement, as determined by the certified public accountant regularly employed by the Company applying generally accepted accounting principles.

The Value of a Member's Interest shall be an amount equal to the Company Value, multiplied by the Percentage Interest in the Company being purchased.

## Section 11 - Escrow Arrangement for Collateral

11.1    If a sale of a Member's Interest in the Company is effectuated among any of the parties to this Agreement under any of the provisions hereof, and if any portion of the purchase price is payable after the closing, the assignment for the Membership Interest being sold and the assignment of any purchasing Member's Interest in the Company shall be delivered, at the closing, to Samuel Weiner ("Samuel"), who shall hold such assignment pursuant to the terms and conditions provided in Section 11.2. If Samuel shall not be then surviving or shall fail to qualify, or having qualified shall die, resign or become incapacitated, Kenneth Sonzogni ("Kenneth") shall serve as Escrow Agent.  If Kenneth shall not be then surviving or shall fail to qualify, or having qualified shall die, resign or become incapacitated, the Escrow Agent shall be an individual who is mutually agreed upon by the Members, who shall then hold such assignment pursuant to the terms and conditions provided below.  If the Members do not agree on the Escrow Agent, the attorney then representing the Company shall be designated as the Escrow Agent.  Neither such attorney nor any member of the law firm of which he or she is a member, shall be precluded from representing any of the Members hereof by virtue of such escrow.

11.2    During the period that the assignment of a Member's Membership Interest shall be held in escrow pending payment of the note evidencing the purchase price, the Selling Member, Disabled Member or the legal representatives of the Deceased Member's estate, shall not be entitled to exercise any voting rights with respect such Membership Interest, other than in any circumstances where such vote is necessary to insure that the Company is classified as a partnership for Federal income tax purposes. Upon receipt of evidence satisfactory to the Escrow Agent of payment in full of said note, the Escrow Agent shall give the Selling Member, Disabled Member or the legal representatives of the Deceased Member's estate, written notice thereof and unless such evidence is contradicted by the Selling Member, Disabled Member or the legal representatives of the Deceased Member's estate, within ten (10) days after the receipt of such notice, the Escrow Agent shall turn over the assignment of the Membership Interest sold to the purchaser or purchasers and the Escrow Agent shall return the evidence of the purchaser's Interest in the Company, If any.  Upon receipt of evidence of default of more then thirty (30) days in the payment of any such note after the giving of written notice thereof by the Selling Member, Disabled Member or the legal representatives of the Deceased Member's estate, to the Escrow Agent and to the purchaser or purchasers, unless such evidence is contradicted by the purchaser within ten (10) days after the

Error! No property name supplied.Error! No property name supplied.Error! No property name supplied.34972/0001-11636270v2

receipt of such notice of default, the Escrow Agent shall be authorized to sell the Membership Interest that had been sold together with the Membership Interests of the purchaser, if any, and all other property then being held by him or her in escrow in a public or private sale, at which public sale the Selling Member, Disabled Member or the legal representatives of the Deceased Member's estate, shall have the right to bid and purchase the Interest being sold. The Escrow Agent shall apply all of the proceeds from such sale (i) to the payment of any and all expenses of such sale, including reasonable attorney's fees, (ii) to the payment of the balance owed by the purchaser or purchasers to the Selling Member, Disabled Member or the legal representatives of the Deceased Member's estate, and (iii) any excess thereof to be paid over to the purchaser or purchasers. The Selling Member, Disabled Member or the legal representatives of the Deceased Member's estate, shall also retain any and all rights and remedies available by law. If the Escrow Agent shall receive conflicting notices from the Selling Member, Disabled Member or the legal representatives of the Deceased Member's estate, and any purchaser, the Escrow Agent shall not act in respect of either of such notices, but shall thereafter act with respect to the assignment in accordance with any of the following:

(a) A new notice signed jointly by the Members or their representatives; or

(b) A certified copy of a judgment of a court of competent jurisdiction specifying the action to be taken by the Escrow Agent, as to which the Escrow Agent shall have received an opinion of counsel satisfactory to the Escrow Agent in his or her sole and absolute discretion that such judgment is final beyond appeal.

11.3   Upon performance of his or her duties in accordance with the provisions hereof, the Escrow Agent shall be relieved and discharged of any and all liabilities hereunder. The Escrow Agent shall in no event have any liability for any act or omission to act except those which constitute willful misconduct and shall be indemnified and held harmless from and against any loss, liability and expense incurred without willful misconduct on the part of the Escrow Agent arising out of or in connection with the acceptance by the Escrow Agent of the Escrow Agent's duties hereunder, including the cost and expense of defending himself or herself against any claim of liability hereunder.

11.4   During the period in which any assignment of a Member's Interest shall be held in escrow pursuant to the provisions hereof, the remaining Members shall not take any action to mortgage or pledge all or substantially all of the Company's assets or otherwise materially and adversely affect the rights, powers, privileges and equity interest represented by the assignment of Membership Interest held in escrow.

Error! No property name supplied.Error! No property name supplied.Error! No property name supplied.34972/0001-11636270v2

## Section 12 – Insurance

12.1    In order to provide ready funds to the parties to finance all or part of the purchase price contemplated in Section 9.11 of this Agreement, the Members may, but shall not be obligated to, either purchase individually or through the creation of a Trust and the appointment of a Trustee pursuant to Section 14 of this Agreement, policies of life insurance on the lives of the other Members (provided they are insurable), and may maintain any insurance on the lives of the Members, as set forth on **Exhibit C** annexed hereto and made a part hereof.

12.2    In order to provide ready funds to the parties to finance all or a part of the disability income contemplated in Section 9.12(a) of this Agreement, the Company and each Member may, but shall not be obligated to, obtain disability income insurance covering the other Members. All such policies will be set forth on **Exhibit D** annexed hereto and made a part hereof.

12.3    In order to provide ready funds to the parties to finance all or part of the purchase price contemplated in Section 9.12 of this Agreement, the Company and each Member may, but shall not be obligated to, either purchase individually or through the creation of a Trust and appointment of a Trustee pursuant to Section 14 of this Agreement, disability buy-out insurance covering the other Members. All such policies will be set forth on **Exhibit D** annexed hereto and made a part hereof.

12.4    A party, upon receiving the proceeds of the life insurance policy(ies), if any, or the proceeds of disability income or disability buy-out insurance, if any, subject to this Agreement shall hold the same in trust for the uses and purposes of this Agreement. The Decedent's estate or successor in interest, or the Disabled Stockholder or his successor in interest, as the case may be, shall have a lien on the proceeds of such life insurance policy(ies) or disability income or disability buy-out insurance policy(ies), as the case may be, until payment of the life insurance proceeds or disability income or disability buy-out insurance proceeds, as the case may be, are made pursuant to the terms of this Agreement.

12.5    An insurer's duties, liabilities and rights under such policies subject to this Agreement shall be as stated in such policy itself without regard whatsoever for the terms and provisions of this Agreement. Accordingly, it is contemplated that an insurer, and also the Trustee, may deal with any matter arising under a policy such, for instance, as matters relating to amendment of or change in policy form, change in beneficiary policy or premium loan, reinstatement, surrender, assignment, claim for benefit or the exercise of any other right, option or privilege provided by the policy in the same manner as though this Agreement has never been made.

## Section 13 – Disposition of Insurance Policies After Sale of Interest

13.1   At such time as Member ceases to be a Member of the Company (the "Former Member"), the Former Member shall have the option to purchase from the Company, the other Members or the Trustee, as the case may be, each insurance policy on such Former Member's life at a purchase price equal to the interpolated terminal reserve of such insurance policy plus that portion of the premium thereon paid before the date of purchase of such insurance policy covering the period the period of the policy extending beyond the date of purchase.  Such option shall be exercisable by written notice to the Company, the other Members and/or the Trustee, as the case may be, given not later than ninety (90) days after the date that the Former Member ceases to be a Member, and shall be accompanied by payment of the purchase price for the policy or an undertaking to pay the purchase price promptly upon notification of the amount due. Notwithstanding the foregoing, such option to purchase the insurance policies on the Former Member's life shall only be exercisable as to insurance policies in principal amount exceeding the unpaid portion of the purchase price payable to the Former Member for the Interest sold by him in accordance with this Agreement, and such option shall remain exercisable form time to time in its entirety for a period of ninety (90) days after payment in full of such purchase price.  In this event, the Company, the other Members and/or the Trustee, as the case may be, shall be obligated to maintain the policy of insurance on the Former Member's life until ninety (90) days have expired after the Company or the other Members, as the case may be, have paid the above-noted purchase price in full.  Upon receipt of payment of the purchase price for any insurance policy in accordance with the provisions of this Section 13, the policy owner shall deliver such insurance policy to the Former Member.

13.2   If a Member is a Selling Member pursuant to Section 9.1 of this Agreement, a Disabled Member pursuant to Section 9.12 of this Agreement or a Terminated Member pursuant to Section 9.13 of this Agreement, and the Company, the other Members and/or the Trustee, as the case may be, still maintain an insurance policy(ies) on the life of said Member pursuant to Section 12 of this Agreement, and such Member dies at a time when the purchase price for his Interest shall not have been fully paid, then the Company or the other Members, as the case may be, shall be obligated to purchase from the estate of said Member, the estate of said Member shall be obligated to sell to the Company or the other Members, the promissory note issued by the Company or the other Members, if any, to the Selling Member, the Disabled Member or the Terminated Member pursuant to Sections 9.2, 9.12(d) or 9.13 hereof.  The purchase price for such promissory note shall be equal to the unpaid balance of the face amount thereof, together with unpaid and accrued interest and shall be paid for from the proceeds of the life insurance from the policy(ies) that were still maintained by the Company, the other Members and/or the Trustee, as the case may be, with any excess life insurance proceeds being retained by the Company or the other Members, as the case may be.

Error! No property name supplied.Error! No property name supplied.Error! No property name supplied.34972/0001-11636270v2

13.3    The deceased Member's legal representative shall furnish to the Company, the other Members and/or the Trustee, as the case may be, such proof of death and other instruments, certificate and documents as may be required by the carriers issuing the insurance policies on such deceased Member's life. Provided that the Company, the other Members and/or the Trustee, as the case may be, shall make application for payment of the proceeds payable under such policies and shall hold such proceeds and make payment thereof in accordance with the provisions of Section 13.4 below. Neither the Company, the other Members nor the Trustee shall be obligated to institute or proceed with any legal action or other proceedings for the recovery of any insurance proceeds; provided, however, that if the Company, the other Members or the Trustee so proceed, they shall be solely responsible for all expenses, including attorneys fees. All of the parties hereto shall provide to the Company, the other Members and/or the Trustee, as the case may be, such assistance as they may reasonably require in order to cause the insurance carriers to make timely payment upon the insurance policies.

13.4    Payment for the promissory notes issued by the Company or the other Members, if any, in accordance with the provisions of this Section 13 shall be made in the following manner: The closing shall be held at the Company's offices on a date designated by the Company, but in no event later than (i) the expiration of ninety (90) days after the appointment of the deceased Member's legal representatives; or (ii) one hundred twenty (120) days after such deceased Member's death, whichever occurs first; provided, however, that in no event shall the closing be held earlier than ten (10) business days after the Company, the other Member or the Trustee, as the case may be, have collected the proceeds of insurance policies on the deceased Member's life. At the closing, the deceased Member's legal representatives shall deliver to the Company or the other Members the promissory notes being purchased, free and clear of all liens, claims and encumbrances, duly endorsed for transfer. Upon receipt of such promissory note, the Company, the other Members and/or the Trustee, as the case may be, shall pay the proceeds of the insurance policies on such deceased Member's life to the deceased Member's legal representatives to pay the purchase price for the note being purchased and the excess of such insurance proceeds, if any, shall be retained by the Company or the other Members, as the case may be. If the proceeds of the insurance policies are not sufficient to pay the full purchase price, the Company or the other Members, as the case may be, shall issue a new promissory note for the unpaid portion of the purchase price with terms identical to the promissory note that has already been sold according to this Section 13.

13.5    A Selling Member, a Disabled Member, a Terminated Member or a Decedent's estate shall be entitle to retain the life insurance policies he or it owns on the lives of the Members, if any (the "Insured Members") until such time as the purchase price of the Interest sold by the Selling Member, the Disabled Member, the Terminated Member or the Decedent's estate has been paid in full, with all payments having been made pursuant to any promissory notes. At that time, the Insured Members shall have the

option to purchase from the Selling Member, the Disabled Member, the Terminated Member or the Decedent's estate, as the case may be, the insurance policy on the lives of the Insured Members, at a purchase price equal to the interpolated terminal reserve of such insurance policies plus that portion of the premium thereof paid before the date of the purchase of such insurance policies covering the period of the policies extending beyond the date of purchase. Such option shall be exercisable by written notice by the Insured Members to the Selling Member, the Disabled Member, the Terminated Member or the Decedent's estate, given not later than ninety (90) days after the final payment for the Interest has been made, and shall be accompanied by payment of the purchase price for the policy or an undertaking to pay the purchase price promptly upon notification of the amount due.

## Section 14 - The Trustee

14.1 Creation of a Trust. The Members and the Company hereby create a trust (the "Trust") and appoint a Trustee, as hereinafter named, as their representative in order to effect the purpose of this Agreement and to secure the performance of the Members and the Company hereunder.

14.2 Purposes. The Members and the Company create this Trust as a means by which certain policies of insurance on the lives of the Members may be held for their mutual benefit, in accordance with the terms and conditions set forth in Sections 9.11 and 9.12 of this Agreement. In creating the Trust, the Members intend that:

(a) No transfers to this Trust shall be a gift from any Member to any other Member;

(b) The insurance proceeds received by the Trustee shall be used to implement the purchase of the Decedent's or the Disabled Member's Interest as more specifically set forth in Sections 9.11 and 9.12 hereof;

(c) No portion of the proceeds received by the Trustee shall be included in the estate of any deceased Member for federal estate tax purposes, except to the extent that such deceased Member may have, on the date of his death, a right to receive a distribution of such proceeds from the Trust; and

(d) All provision of the Trust shall be construed in such a manner as best to effect these intents.

14.3 Funding. Any and all existing life, disability buy-out and income insurance policies, or such monetary amounts necessary for the Trustee to obtain such policies, have been delivered to the Trustee concurrently herewith, and any additional life, disability buy-out and income insurance policies governed by this Agreement shall

28

be delivered to the Trustee forthwith upon the receipt thereof by the Company and the Members.

14.4    Irrevocability. This Trust and all interests in it are irrevocable and unamendable, except with the express written consent of all of the Members, and no Member shall have the unilateral power to alter, amend, revoke or terminate any Trust provision or interest, whether under this Trust or any statute or other rule of law.

14.5    Maintenance of Policies.

(a)    Maintain. As long as at least one (1) Member is alive, the Trustee shall own, possess all incidents of ownership over, maintain and be the beneficiary of life, disability income and disability buy-out insurance on the lives of each Member, including the policies listed on **Exhibits C** and **D** (the "Policy(ies)"). The Trustee will not cancel any of the Policy(ies) or allow them to lapse without the advance written consent of all of the Members.

(b)    Premiums. The Trustee will pay the premiums on the Policy(ies) first from the income of the Trust, if any, and to the extent the Trust does not have sufficient income to fund the premiums of the Policy(ies), from the payment of the Policy(ies) premiums by each Member. Each Member is obligated hereunder to pay his share of the premiums directly to the Trustee. A Member who fails to pay his share of a premium upon notice shall be a "Defaulting Member". Wherever there is a Defaulting Member, the Trustee shall notify the other Members, each of whom shall lend a pro rata portion of the required additional contribution to the Trustee. Each Member making such a loan is entitled to repayment from any and all compensation or distributions which would otherwise be made to the Defaulting Member hereunder or pursuant to any employment relationship with the Company.

14.6    Distribution of Proceeds.

(a)    Distribution. Upon the receipt of evidence of a Member's death or disability which evidence is satisfactory to the Trustee, the Trustee shall collect the proceeds of the life insurance, the disability income and/or the disability buy-out insurance, as applicable, on the deceased or disabled Member's life and, after satisfying any debts due hereunder, pay the remaining insurance proceeds in equal shares to the Decedent, the Disabled Member or his legal representatives or to the Company or the other Members, as the case may be, to effect the transactions specifically set forth in Sections 9.11 and 9.12 of this Agreement.

(b)    Termination of Trust.

(i)    Upon the death of the next-to-last Member to die, the Trustee shall collect the life insurance proceeds and after satisfying any debts due

29

hereunder, distribute any remaining Policy(ies) to the last surviving Member, and this Trust shall terminate.

(ii)     Upon the termination of the Agreement prior to the death of the next-to-last of the Members, this Trust shall terminate. On such termination and after first satisfying any debts due hereunder, the Trustee shall distribute to each then-living Member all remaining Policy(ies) of insurance on his life and a pro rata share of the other assets of the Trust unless such distribution contravenes any provision of this Agreement.

    14.7    The Trustee.

(a)     Samuel (the "Trustee"), shall serve as Trustee pursuant to the terms and conditions of this Agreement. The Trustee hereby accepts the Trust created by this Agreement and agrees to act as such Trustee in accordance with its terms and provisions. If said Trustee shall die, resign or become incapacitated or refuse to act as Trustee hereunder, then Kenneth shall serve as Trustee. If Kenneth shall die, resign, become incapacitated or refuse to act as Trustee hereunder, then the Members shall agree upon a substitute Trustee who they shall select to serve hereunder, with all the same duties and powers as are assumed and conferred under this Agreement upon the original Trustee.

(b)     No Trustee shall be required to file any accounting with any public official. The Trustee must, however, maintain accurate records concerning the Trust. Upon the request of all of the Members, the Trustee shall furnish an annual accounting of the Trust's condition, including receipts and disbursements, to each then-living Member.

    14.8    Trustee Powers. The Trustee is exclusively empowered to do the following, in the Trustee's fiduciary capacity:

(a)     To hold and retain all cash and other assets, including life insurance and disability income and disability buy-out insurance policies, without regard to diversification, risk or productivity;

(b)     To invest and reinvest the trust funds (or leave them temporarily uninvested), in any type of life insurance, disability income or disability buy-out insurance policy or in any federally-insured bank account or certificate;

(c)     To deposit Trust funds in any commercial savings or savings and loans accounts;

(d)     To pay and advance money for the Trust's protection and for all expenses, losses, and liabilities sustained in its administration;

30

    (e) To prosecute and defend any action for the protection of the Trust, the Trustee in the performance of his or its duties, or both, and to pay, contest, or settle any claim by or against the Trust or the Trustee in the performance of his or its duties;

    (f) To employ or engage persons, even if they are associated with the Trustee, to advise or assist the Trustee in the performance of the Trustee's duties;

    (g) To determine what is principal or income and what items shall be charged or credited to either; and

    (h) To execute and deliver any instruments necessary or useful in the exercise of any of these powers.

   14.9 Trustee Protections.

    (a) No Trustee shall be liable for any error of judgment, or for anything done or omitted by him or her in good faith, and each Trustee shall be answerable and accountable only for his or her own willful acts, neglects and defaults constituting a breach of trust knowingly committed by him or her in bad faith. No Trustee shall be required to give any bond or surety to secure his or her performance as Trustee hereunder. The Trustee will not be responsible for any loss resulting from the failure of any insurance company or the inability of any insurance company to pay its claims under any Policy held by the Trust.

    (b) The Company and the Members agree to indemnify the Trustee and hold him, her or its harmless from any personal liability, loss, claim, cost, expense or damage incurred or suffered by it, including, but not limited to, reasonable counsel fees and cost of litigation, incurred in the administration of the Trust, or in conducting any business or performing any act permitted by this Agreement and they shall execute a release or releases in favor of such Trustee with respect to his, her or its obligations hereunder.

   14.10 Spendthrift Clause. To the greatest extent permitted by law, no interest of any Member or beneficiary of the Trust created under this Agreement shall be subject to the Member's or beneficiary's liabilities or creditor claims or to assignment or anticipation.

## Section 15 - Term of the Company

   The Company shall commence as of the date its Articles of Organization was filed with the New York Department of State or such later date specified therein, and shall terminate upon the occurrence of any of the following events:

31

15.1   The mutual agreement in writing of all who shall be Members on the date of such agreement to terminate;

15.2   At such earlier time as may be provided by applicable law;

15.3   The sale, disposal, conveyance or distribution of all or substantially all of the assets in which the Company shall have an interest;

15.4   The entry of a decree of judicial dissolution in accordance with the New York Act

## Section 16 - Fiscal Year and Accounting Method

For income tax purposes, the Company's fiscal year shall be as determined by the Managers, and the Company's books shall be kept on the cash or accrual method of accounting as determined by the Managers. Such method when so adopted shall be consistently followed by the Company, subject, however to the Company's right to change its method of accounting for income tax purposes as allowed by law. The accounting for Company purposes shall be made in accordance with generally accepted accounting principles.

## Section 17 - Termination of a Member

The death, insanity, retirement, resignation, expulsion, bankruptcy or dissolution of a Member, or the occurrence of any other event which would terminate a Member's interest as a Member in the Company shall not dissolve the Company and shall not require the consent of the remaining Members to continue the Company.

## Section 18 - Books and Records

18.1   The Managers shall keep or cause to be kept complete and accurate books with respect to the Company's business. The Company's books at all times shall be maintained at the Company's principal office. Each Member or his duly authorized representative shall have the right to examine the Company's books and records at reasonable times upon reasonable prior notice to the Company.

18.2   The Company's books shall be closed at such intervals as the Managers shall determine but not less frequently than annually as of the end of each calendar year by the certified public accountants then regularly retained by the Company. Such certified public accountants for the Company may be changed at any time and from time to time by the Managers. Such accountants shall prepare the Federal income tax returns for the Company together with a report for each Member for Federal income tax purposes indicating the portion of each Member of the Company's profits and losses for such year. The Members shall each receive a copy of the appropriate report within a

Error! No property name supplied.Error! No property name supplied.Error! No property name supplied.34972/0001-11636270v2

reasonable period of time after the close of each fiscal year and promptly after its receipt by the Company and approval by the Managers.

18.3    A Member or Manager of the Company shall be fully protected in relying in good faith upon the Company's records and upon such information, opinions, reports or statements presented to the Company by any of its other Members, Managers, officers, employees, or committees of the Company, or by any other Person, as to matters the Member or Manager reasonably believes are within such other Person's professional or expert competence, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits or losses of the Company or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

## Section 19 - Other Activities of Members

Except as otherwise provided in Section 25 hereof, any Member may engage in other business ventures of every nature, including, without limitation by specification, the ownership of another business similar to that operated by this Company. Neither the Company nor any of the other Members shall have any right or interest in any such independent ventures or to the income and profits derived therefrom.

## Section 20 - Resignation of a Member

Pursuant to the New York Act, except as otherwise provided herein, a Member may not resign from the Company prior to the dissolution and winding up of the Company.

## Section 21 - Tax Matters Member

21.1    Notwithstanding any provision set forth in this Agreement to the contrary, for purposes of Section 6231(a)(7) of the Code or any corresponding provision of any future law of the same or similar import, the "Tax Matters Member" of the Company shall be Christina Senia, or such other Member selected by the Managers from time to time.

21.2    The Tax Matters Member shall be authorized to carry out, on the Company's behalf and at the Company's expense, all acts appropriate to such designation including but not limited to:

(a)    Receiving and responding to any and all notices and requests from any taxing authority;

(b)    Informing all other Members of any inquiry, examination or proceeding as required by law and, if not so required, as the Tax Matters Member shall deem appropriate;

33

(c)     Meeting and negotiating with representatives of any taxing authority;

(d)     Entering into a binding settlement agreement with any taxing authority on the Company's behalf regarding any tax deficiency, assessment, credit or refund, provided that all Members be given adequate prior notice so that any Member without prejudicing the validity of such a settlement agreement, may elect not to be bound by the settlement agreement where permitted under applicable law;

(e)     Entering into an agreement with any taxing authority to extend the limitations period on assessment(s) or collection of adjustments;

(f)     Commencing administrative or judicial proceedings regarding any tax deficiency, assessment, credit or refund;

(g)     Intervening in any judicial action or proceeding, the outcome of which could adversely affect a position taken by the Company;

(h)     Prosecuting an appeal from a decision or judgment of any court which is wholly or partially adverse to a position taken by the Company; and

(i)     Retaining tax advisors to whom the Tax Matters Member may delegate such of its rights and duties as the Tax Matters Member shall consider necessary and appropriate.

21.3    The Tax Matters Member shall be required to notify all Members (some of whom may not qualify as "notice partners" within the meaning of Section 6231(a)(8) of the Code) of the beginning and completion of an administrative proceeding at the Company level promptly upon such notice being received by the Tax Matters Member.

## Section 22 - Indemnification

22.1    The Members and Managers shall not be liable to the Company or any Member or Manager for any liability, loss, damage, cost or expense which may arise out of or in connection with any act or conduct on the part of the Members or Managers without fraud or willful misconduct, including, but not limited to, the failure to obtain and/or maintain any insurance policy or the insufficiency of any coverage thereunder, or the failure to insure against any particular risk, any unforeseen losses caused by strikes, labor troubles, riots, fires, power outages, tornadoes, floods, acts of a public enemy, insurrections, acts of God, breakdown or failure of plant or machinery, the failure to perform its obligations hereunder due to restrictions or prohibitions imposed by law, rule, regulation or demand of any governmental agency, or from any other cause beyond the control of the Members or Managers.

## Section 23 - Limitation on Liability

Except as otherwise provided by the New York Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company; and no Member, Manager, employee or agent of the Company shall be obligated personally for any such debt, obligation or liability of the Company, or for any debt, obligation or liability of any other Member, Manager, employee or agent of the Company, by reason of being a Member, Manager, or acting as an employee or agent of the Company. No Member shall be required to loan any funds to the Company. Except as may be expressly provided otherwise herein, no Member shall be required to make any contribution to the Company by reason of any negative balance in its Capital Account, nor shall any negative balance in a Member's Capital Account create any liability on the part of the Member to any third party.

## Section 24 - Amendment

24.1    This Agreement may be amended only by the unanimous consent of Members.

## Section 25 - Covenant Not to Compete

25.1    Except as otherwise provided herein, each Member covenants and agrees that while he is a Member of the Company, and for a four (4) year period after the Member transfers his entire Interest in the Company, he will not directly or indirectly, individually or in conjunction with any person or persons, firm, partnership, corporation, limited liability company, association or syndicate, as a principal, agent, member, partner, shareholder, employee, independent contractor, or in any other manner whatsoever, carry on or be engaged in, or connected with or interested in any business which competes, in whole or in part, with the Company, which is located in any county in which the Company is doing or has done business. In addition for a period of four (4) years after a Member is no longer either a Member or an employee of the Company, he shall not solicit business, accept business from, or deal with in any manner whatsoever, any customer or account of the Company. The provisions of this Section 25.1 apply only if the provisions of Section 25.3 are inapplicable.

25.2    If any Member's Interest in the Company is purchased by the Company or the remaining Members pursuant to the terms of this Agreement, the remaining Members shall not through any entity other than the Company, directly or indirectly, individually or in conjunction with any person or persons, firm, partnership, corporation, limited liability company, association, or syndicate, as a principal, agent, member, partner, shareholder, employee, independent contractor, or in any other manner whatsoever, conduct, solicit or be engaged in or connected with or interested in any business which competes, in whole or in part, with the Company within the 50 States of

35

America, and with which the Company has conducted business until all obligations have been fully paid to the Member or his personal representatives as payment for the purchase by the Company or the remaining Members of said Member's Interest pursuant to this Agreement. The parties agree that if there is a violation of this provision, then the purchaser of the interest, the remaining Members and the new entity involved pursuant to this Section 25.2 shall all be jointly and severally liable for the outstanding balance of the note including attorneys fees to enforce those obligations.

25.3    If any Member retires from the Company in accordance with the terms and conditions set forth in Section 9.14 hereof and pursuant to said section, the Company is liquidated and sold, the non-retiring Members shall not directly or indirectly, individually or in conjunction with any person or persons, firm, partnership, corporation, limited liability company, association or syndicate, as a principal, agent, member, partner, shareholder, employee, independent contractor, or in any other manner whatsoever, conduct, solicitor be engaged in any business activities with any manufacturer or fabricator of heating and ventilating equipment within the 50 States of America, and with which the Company has conducted business within the four (4) year period immediately following the date of the Company's liquidation or sale. The parties agree that if there is a violation of this provision, then the non-retiring Members shall be deemed to have purchased the retiring Member's Interest pursuant to the terms and conditions set forth in Section 9.14 and such non-retiring Members and the new entity involved pursuant to this Section 25.3 shall all be jointly and severally liable for the note deemed to have been issued as payment to the retiring Member and attorneys fees to enforce those obligations. The purchase price to be paid to the retiring Member pursuant to the terms of Section 9.14 shall be reduced by the amount received by the retiring Member as a result of the sale or liquidation of the Company.

25.4    If the scope of the foregoing restrictions is too broad to permit enforcement thereof to their full extent, then such restrictions shall be enforced to the maximum extent permitted by law, and each Member hereby consents and agrees that such scope may be modified accordingly in any judicial proceeding brought to enforce such restriction. In addition to any remedies at law, the Company shall be entitled to equitable relief to enforce the terms and conditions of this provision and to obtain reasonable professional fees incurred or paid by the Company to enforce this provision.

## Section 26 - Company Restrictions During Payout Period

26.1    So long as any part of the purchase price of an Interest sold to the Company, if applicable, in accordance with this Agreement remains unpaid, the Company shall not declare or pay and distributions to the Members, and the Selling Member, Decedent's legal representative, the Disabled Member, the Terminated Member or the Retiring Member, whichever the case may be, shall have the right to examine the Company's books and records from time to time and receive copies of all accounting reports and tax returns prepared on the Company's behalf. If the Company breaches any

Error! No property name supplied.Error! No property name supplied.Error! No property name supplied.34972/0001-11636270v2

of its obligations under this Section 26.1, the Selling Member, Decedent's legal representatives, the Disabled Member, the Terminated Member or the Retiring Member, whichever the case may be, in addition to any other remedies available, may elect to declare the entire unpaid purchase price due and payable forthwith.

26.2   If a Member's Interest is sold pursuant to the terms of this Agreement, and in connection with such sale, any portion of the purchase price is paid by delivery by the purchaser(s) of one (1) or more promissory notes pursuant to the Installment Method (the "Promissory Notes"), then so long as any amount remains due and payable to the departing Member or his estate pursuant to such Promissory Notes, the salaries of the remaining Members, if any, shall not be increased, except in the ordinary course of business consistent with the past practice of the Company.

26.3   (i)   If a Member's Interest is sold pursuant to the terms of this Agreement, and in connection with such sale, any portion of the purchase price is paid by delivery by the purchaser(s) of one (1) or more Promissory Notes, then so long as any amount remains due and payable to the departing Member or his estate pursuant to such Promissory Notes, the aggregate Net Book Value (as defined herein) of the Company shall equal or exceed the outstanding principal balance of the Promissory Notes (the "Aggregate Outstanding Principal Balance Amount"). For purposes of this Agreement, "Net Book Value" with respect to the Company shall mean an amount equal to the aggregate value of the Company's assets, less the aggregate amount of the Company's liabilities, as reflected in the Balance Sheet of the Company prepared by the certified public accountant then employed by the Company (the "CPA"). The Net Book Value of the Company shall be calculated by the CPA on a monthly basis.

(ii)   If in any month the aggregate Net Book Value of the Company is less than the Aggregate Outstanding Principal Balance, then the departing Member or his estate shall have the right, upon written notice to the Company and the remaining Members, to require that the Company refrain from paying any bonuses to Members or incurring, or reimbursing the Members for, any expenses other than ordinary and necessary expenses incurred in the ordinary course of the Company's business until such time as the aggregate Net Book Value of the Company equals or exceeds the then Aggregate Outstanding Principal Balance Amount.

(iii)   Attached hereto as Exhibit F is an example of the calculation of the aggregate Net Book Value of the Company. The CPA shall deliver the monthly calculation of the aggregate Net Book Value of the Company, together with the supporting financial statements for the Company, to the Company, the remaining Members and departing Member or his estate.

37

## Section 27 - Miscellaneous

27.1   Organizational Fees.  The Company shall pay all expenses incurred in the organization of the Company.

27.2   Company Property.  Title or interest to any or all Company property may be acquired and/or held for the Company purposes set forth in this Agreement in the Company name and/or in the name of any nominee as the Managers may designate. The Managers shall have the right to enter into nominee agreements with any such nominee on the Company's behalf and such agreements may provide for indemnifying such nominee from all claims, damages, costs, expenses or liabilities arising therefrom other than as may be due to or result from the wilful misconduct of such nominee.

27.3   Notices.  All notices or writings required to be given hereunder or deemed necessary or desirable by any party hereto shall be given in writing addressed to the Company at its principal business office and to each Member and Manager at the address set forth on the books and records of the Company which address may be changed by notice forwarded to the Company, in accordance herewith, and shall be delivered either: personally; by deposit in the United States Post Office Box, postage pre-paid, by certified or registered mail, return receipt requested; by a postal or private form of expedited delivery service; or by facsimile transmission.

27.4   Failure of Member to Comply with Terms of this Agreement.  If any Member fails to perform in accordance with, or to comply with the terms and conditions of this Agreement, then the Members acknowledge that all other Members bound by this Agreement will have no adequate remedy at law and shall be entitled to such equitable and injunctive relief as may be available to restrain a violation or threatened violation of the provisions of this Agreement or to specifically enforce the provisions hereof.

27.5   Failure of a Manager to Comply with Terms of this Agreement.  A Manager shall not be personally liable for failure to perform in accordance with, or to comply with the terms and conditions of this Agreement or for any other reason unless such failure to perform or comply or such other reason constitutes gross negligence or willful misconduct by the Managers.

27.6   Applicable Law.  This Agreement shall be interpreted in accordance with, and the rights of the parties hereunder shall be determined by, the substantive laws of the State of New York (without regard to its conflicts of laws provisions). Any proceedings brought by any Member or Manager relating to this Agreement shall be held exclusively in Federal or State courts sitting in New York.

27.7   Severability.  If any provision of this Agreement shall be declared invalid, cause the Company not to be treated for income tax purposes as a partnership, then and in any of such events, such provision(s) shall be deemed to be invalid, and

38

notwithstanding any such invalidity, the remaining provisions of this Agreement shall remain in full force and effect as if such invalid provisions(s) had not been a part hereof.

27.8  Benefit. This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto, and to their respective heirs, executors, administrators and assigns; provided however, that none of the provisions of this Agreement shall be for the benefit of nor shall they be enforceable by any creditor of the Company or of any Member.

27.9  Construction. As used in this Agreement, the masculine gender shall include the feminine or neuter gender and the neuter gender shall include the masculine or feminine gender, the singular shall include the plural and the plural shall include the singular, wherever appropriate to the context.

27.10  Execution. This Agreement may be executed in any number of counterparts, each of which shall be considered an original. The signature by any Member on any one of the counterparts shall bind such Member at such time as each of the Members has signed and delivered to the Company at least one (1) counterpart.

27.11  Headings. The headings in this Agreement are solely for convenience of reference and shall not affect its interpretation.

27.12  Partnership. It is the intent of the Members that the Company be treated as a partnership for all tax purposes.

Error! No property name supplied.Error! No property name supplied.Error! No property name supplied.34972/0001-11636270v2

IN WITNESS WHEREOF, the Members and Managers have hereunto set their hands and seals or caused these presents to be signed and sealed by duly authorized persons as of the day and year first above written.

WITNESS:

MEMBERS:

CHRISTINA SENIA

MICHAEL DONNOLO

WITNESS:

MANAGERS:

CHRISTINA SENIA

MICHAEL DONNOLO

40

## Exhibit A

### Capital Contributions and Percentage Interests

| Members | Initial Capital Contributions | Percentage Interests |
|---|---|---|
| 1. CHRISTINA SENIA | | 75% |
| 2. MICHAEL DONNOLO | | 25% |
| | | —— |
| 3. TOTAL | | 100% |

Error! No property name supplied.Error! No property name supplied.Error! No property name supplied.34972/0001-11636270v2

## Exhibit B

### Certificate Of Agreed Value

Pursuant to the provisions of Section 10 of the Operating Agreement to which this Certificate of Agreed Value is annexed as Exhibit B, the value of the Company is the last dated amount set forth below under the column "Value of Company" in respect of which the signatures of Christina Senia and Michael Donnolo are also set forth.

Date                                   Value of Company

                                       $ _____

WITNESS:                               MEMBERS:

                                       CHRISTINA SENIA

                                       MICHAEL DONNOLO

Error! No property name supplied.Error! No property name supplied.Error! No property name supplied.34972/0001-11636270v2

## Exhibit C

## Life Insurance

| Insured | Name of Policy | Policy No. | Amount |
|---------|----------------|------------|--------|

Error! No property name supplied.Error! No property name supplied.Error! No property name supplied.34972/0001-11636270v2

## Exhibit D

## Disability Buy-Out Insurance

Insured          Name of Policy          Policy No.          Amount

Error! No property name supplied.Error! No property name supplied.Error! No property name supplied.34972/0001-11636270v2

## EXHIBIT E

### Appointment of Representative for
### Disabled Member

If Christina Senia shall be determined to be disabled pursuant to Section 9.11, she appoints her father, Robert Senia, to serve as her representative for purposes of making extraordinary decisions and participating in such actions of the Company, as set forth in Section 9.11(g) of this Agreement. If Robert Senia shall not be then surviving or shall fail to qualify, or having qualified shall die, resign or become incapacitated while serving as his representative hereunder, Christina appoints her sister, Gina Senia, to serve as her representative for purposes of making decisions and participating in the actions of the Company.

If Michael Donnolo shall be determined to be disabled pursuant to Article 9.11 hereunder, he appoints his wife, Amy Uong, to serve as his representative for purposes of making extraordinary LLC. decisions and participating in such actions of the Company, as set forth in Section 9.11(g) of this Agreement. If Amy Uong shall not be then surviving or shall fail to qualify, or having qualified shall die, resign or become incapacitated while serving as his representative hereunder, Michael appoints his brother, Joshua Donnolo, to serve as his representative for purposes of making decisions and participating in the actions of the Company.

2

Error! No property name supplied.Error! No property name supplied.Error! No property name supplied.34972/0001-11636270v2

Witness:

_____                    _____ (L.S.)
                                                    CHRISTINA SENIA, Stockholder

_____                    _____ (L.S.)
                                                    MICHAEL DONNOLO, Stockholder

3

## EXHIBIT F – NET BOOK VALUE

1. <u>Facts</u>: The departing Member sells his Interest on October 6, 2017. The purchase price for his Interest in the Company is $20,000, which is paid pursuant to the Installment Method. The departing Member holds a promissory note(s) in the amount of $20,000, representing the Aggregate Principal Balance Amount as of October 6, 2017. The CPA submits the monthly financial statements, which are attached hereto and reflect a Net Book Value of the Company as follows (see "Total Equity" line of the attached October 31, 2017 Balance Sheets):

    Net Book Value of Tecspec LLC.                $25,000.00

    The departing Member is deemed secured since the Net Book Value of the Company is greater than the Aggregate Outstanding Principal Balance Amount.

2. <u>Facts</u>: On March 31, 2018, the Aggregate Outstanding Principal Balance Amount is $17,000.00 after five (5) monthly payments are made to the departing Member. The CPA submits the monthly financial statements, which are attached and reflect an Net Book Value of the Company as follows:

    Net Book Value of Tecspec LLC.                $15,000.00

Since the Aggregate Outstanding Principal Balance Amount is now greater than the Net Book Value of the Company, the departing Member is deemed insecure and has the right to exercise his right to restrict the payment of bonuses by the Company and the incurrence or reimbursement of expenses by the Company, other than ordinary and necessary expenses incurred in the ordinary course of business, pursuant to Section 26.3 of the Operating Agreement.