P4H4TECC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    TECSPEC LLC, *et al.*,

4                    Plaintiffs,

5             v.                          24 Civ. 8077 (JHR)

6    JOSHUA DONNOLO, *et al.*,
                                          Telephone Conference
7
                    Defendants.
8    ------------------------------x
9                                         New York, N.Y.
                                          April 17, 2025
10                                        3:45 p.m.

11   Before:

12                   HON. JENNIFER H. REARDEN,

13                                        District Judge

14                        APPEARANCES

15   COLE SCHOTZ
          Attorneys for Plaintiffs
16   BY:  ARIELLE WASSERMAN

17

18   ROSENBERG & ESTIS, P.C.
          Attorneys for Defendants
19   BY:  MATTHEW S. BLUM

20

21

22

23

24

25

P4H4TECC

1           (Case called)

2           THE COURT:  Good afternoon counsel, who do we have?

3           MS. WASSERMAN:  Good afternoon, your Honor.  This is

4     Arielle Wasserman of Cole Schotz on behalf of plaintiff.

5           MR. BLUM:  Good afternoon, your Honor.  This is

6     Matthew Blum with Rosenberg & Estis, for the defendants,

7     counterclaim plaintiffs.

8           THE COURT:  We're here on the counterclaim plaintiffs

9     applications for a TRO at ECF No. 120, and specifically for a

10    TRO stating that counterclaim plaintiffs are not "currently

11    restrained or enjoined from entering into any new contracts

12    with businesses desiring to conduct business with any of the

13    counterclaim plaintiffs," and restraining counterclaim

14    defendants from "interfering with counterclaim plaintiffs'

15    fulfillment of counterclaim plaintiffs' new and existing

16    contracts and unreasonably interfering with counterclaim

17    plaintiffs' business opportunities which include dissemination

18    of false or defamatory statements concerning the disposition of

19    this case, false statements concerning the status or nature of

20    counterclaim plaintiffs' ability to perform or fulfill

21    contracts, threats against counterclaim plaintiffs' business

22    prospects and any other defamatory information designed to

23    interfere with counterclaim plaintiffs' business prospects."

24    That's ECF No. 120, order to show cause at 3.

25          Mr. Blum, you're on right?  I think I heard you

P4H4TECC

1    introduce yourself.

2            MR. BLUM:  Yes, your Honor.

3            THE COURT:  All right.  I want to clarify one point

4    with you before I allow both sides to make their arguments.

5    The requested TRO relates to your client's claim for tortious

6    interference with business relationships; is that correct?

7            MR. BLUM:  It certainly lends to that prospect, your

8    Honor.  The order to show cause seeks to prevent the

9    interference with these business opportunities, yes.

10           THE COURT:  Okay.  So I'm not talking now about the TI

11   but strictly about the TRO.

12           MR. BLUM:  Yes.

13           THE COURT:  But that rests on the tortious

14   interference claim.  So there isn't any other claim for which I

15   need to determine whether your clients are likely to succeed

16   right now; is that correct?

17           MR. BLUM:  Your Honor, this actually lends to an

18   interesting timing issue.  Where there are actively projects

19   and contracts to which the counterclaim plaintiffs are seeking

20   to secure and it is an active process that the

21   plaintiff/counterclaim defendants are attempting to interfere

22   with the acquisition of those projects.  And so I would say

23   that to claim a tortious interference with that prospective

24   business opportunity, that may not be ripe, because we have not

25   been formally denied yet which is the basis for the TRO which

P4H4TECC

1    is why we want the behavior to stop.

2            THE COURT:  Right.  It's ongoing, is what you are

3    alleging?

4            MR. BLUM:  Correct, your Honor.  Right.  And it stems

5    from essentially what is defamatory *per se* statements that are

6    being made in the market.

7            If your Honor may recall, the plaintiff initially

8    commenced this action with a temporary restraining order, which

9    was denied.  So the plaintiffs' not obtaining that temporary

10   restraining order can't then go into the market and say,

11   actually, they are restrained.  It's a categorically false

12   statement among other similarly false statements to, in effect,

13   exact *a de facto* temporary restraining order by preventing our

14   clients from entering the market, when they were denied that

15   temporary relief that was sought initially.  And so --

16           MS. WASSERMAN:  Your Honor, may I interrupt, please?

17           THE COURT:  What I want to do is I want to hear both

18   sides out.  And I started with a question to Mr. Blum, who is

19   representing the counterclaim plaintiffs, and it's their

20   application.

21           So Mr. Blum, why don't you tell me, more broadly,

22   anything you want me to hear about your application now.  And

23   then I'm going to turn to Ms. Wasserman and let her argue.

24           MS. WASSERMAN:  Thank you, your Honor.

25           MR. BLUM:  Yes, your honor.  Thank you.

P4H4TECC

1              Your Honor, this application seeking specifically the

2      temporary restraining order deferring arguments and

3      presentation on the preliminary injunction to the return date

4      on, I believe, May 15.  On the temporary restraining order, the

5      movants are seeking to restrain the plaintiff/counterclaim

6      defendants from interfering with ongoing prospective business

7      opportunities by way of unlawful conduct.

8              And so if I could draw the Court's attention to the

9      specified three requested orders of relief, which your Honor

10      had read previously, as Judge Hurley may characterize it "this

11      is ice in the wintertime."  It's not anything that the movants

12      aren't already essentially entitled to.  The clarification that

13      there is no issued restraint on the counterclaim plaintiffs to

14      conduct business or to fulfill orders or anything else that the

15      plaintiff counterclaim defendants may have disseminated within

16      market.  So the clarifying order seeks to undo any of these

17      false attestations that are made within the market.

18              And in that vein, your Honor, I would draw the Court's

19      attention to our brief, and in particular the areas and the

20      sections that deal with defamation with respect to companies.

21      And so your Honor, we cite in our brief, *IDG USA, LLC v. Schupp*

22      416 F. App'x 86 (2d Cir 2011) which makes very clear that

23      threat dissemination trade secrets and loss of good will is a

24      basis for irreparable harm.  This is further supported with

25      *Medicrea USA, Inc. v K2M Spine, Inc*.  It's an unpublished

P4H4TECC

1    decision, WL 3407702 (SDNY 2018) which relies on a Second

2    Circuit case *Doherty Associates v. Saban Entertainment*, 60 F.3d

3    27 (2d Cir. 1995).  In that Second Circuit controlling opinion,

4    the Second Circuit is very clear that in instances where you

5    have reputational injuries to a person's business or to a

6    company that consists of statements that imputes some form of

7    fraud or misconduct or general unfitness or incapacity or

8    inability to perform, that constitutes defamation *per se*.

9            So when we're talking about irreparable harm, your

10   Honor, we have a very clear and well-settled law that a finding

11   of irreparable harm exists when there's evidence to show a

12   threatened loss of good will or customers -- of potential or

13   actual customers that can't be rectified by monetary damages.

14   Again, that's *Doherty v. Saban*, 60 F.3d 27 at 37 (2d Cir.

15   1995).

16           Then I would draw the Court's attention to the

17   declaration that was submitted with the application.  There are

18   actually two declarations that are submitted with the

19   application, and that's the declaration of Michael Donnolo

20   entitled -- with a subtitle, Sensitive Business Information.

21           THE COURT:  Yes.

22           MR. BLUM:  And the sensitive business information

23   declaration is distinct from the declaration of Michael Donnolo

24   that was also submitted as the preceding document because there

25   is reference to the potential client.  This is really what

P4H4TECC

1     underscores the importance of a temporary restraining order.

2             And if you look at Paragraph 5 of the declaration of

3     Michael Donnolo, you have the items and statements that the

4     plaintiff/counterclaim defendants are telling people within the

5     market that we, the counterclaim plaintiffs, are attempting to

6     do business.  And so they are making claims that if anyone does

7     business with us, they are going to sue them for doing business

8     with us or that the products that we sell are going to be

9     reclaimed because the model that we are selling actually

10    doesn't belong to us, it belongs to Tecspec, which there is no

11    finding of that, and that's just not true.

12            There's other fundamentally false statements being

13    disseminated in the market saying we are incapable of

14    fulfilling order, incapable of entering into new contracts.

15    And this is exactly what the Second Circuit is talking about,

16    it's the incapacity or inability to perform one's duties and

17    the unfitness to perform under a contract in one's trade.  This

18    is defamation *per se*, is actionable.

19            THE COURT:  Mr. Blum, you say it's actionable, but you

20    didn't actually -- you seem to be suggesting that irreparable

21    harm is all you need to show.  You didn't actually bring a

22    defamation claim here.

23            MR. BLUM:  Correct, your Honor.  And so --

24            THE COURT:  What about the likelihood of success on

25    the merits?

P4H4TECC

1          MR. BLUM:  Your Honor, in the bringing of this

2     application, I would say that if the Court can issue the

3     temporary restraining order, this may eliminate the need to

4     make a defamation claim.  So what we are talking about is

5     damages.  To support the claim you need the liability and you

6     need the Court to find damages.  So if we can abrogate the

7     damages that may be incurred as a result of the false

8     statements, then this may be something that could be obviated

9     altogether.

10          It's well settled, your Honor, that a movant not

11     seeking something that is of the ultimate merits of the case or

12     the ultimate fact or issue of a case actually bears a lower

13     threshold to demonstrate entitlement of success on the merits.

14     Here, what we're asking the Court to do is to prevent the

15     counterclaim defendant from doing what they shouldn't be doing

16     anyway.

17          And so, your Honor you're absolutely right, we didn't

18     counterclaim a defamation case, but that doesn't foreclose our

19     ability to do that once we ascertain damages that are resulting

20     from that defamatory conduct.  And so this underscores the

21     importance of coming to the Court and say, this is happening in

22     real time.  We don't want to lose out on this ability to

23     perform these contracts in the market.  And if we do lose that

24     opportunity, yes, absolutely, your Honor, we would make a claim

25     for monetary damages relating to the defamation.  We don't know

P4H4TECC

1    that we have that damages component to make that claim at this

2    moment, and we are trying to avoid that entirely.

3              As the affirmation of Michael Donnolo, the business

4    information will say, at Paragraph 17, that this is a

5    make-or-break moment.  This is a make-or-break moment for the

6    counterclaim plaintiffs.  And now that I'm looking at it, I

7    don't know if that is specifically the paragraph, your Honor.

8    It's Paragraph 11.  It says this is a make-or-break moment on a

9    business that's just starting up.  So to have the opportunity

10   for a contract or business prospect like this may result in the

11   success of the business.  And failure to get this particular

12   contract, as a result of the things that are being stated in

13   the market by plaintiffs-counterclaim defendant, that could

14   make the business fail, which is ultimately the purpose of the

15   statement.  And so the Second Circuit is very clear that this

16   constitutes irreparable harm.  The fact that we have an

17   unquantifiable potential harm here if the Court doesn't

18   interfere with judicial intervention and prevent the

19   counterclaim defendants from doing what they're doing, we could

20   essentially be out of business.

21             Conversely, in obtaining the temporary relief that we

22   are seeking there's no -- and this is going to the balance of

23   the equities, your Honor -- there is no prospect for prejudice

24   because if the counterclaim defendants are doing any of these

25   things, they shouldn't be doing these as a matter of law.

P4H4TECC

1          And so the application is ripe, and it has an

2    immediate need because we need to stop this activity in its

3    tracks.  And your Honor is absolutely right, we didn't bring a

4    claim for defamation.  We are not opposed to doing that and

5    hopefully we can avoid that by preventing this behavior.

6          I think I made that -- I think I made my point, your

7    Honor.

8          THE COURT:  All right.  Well, I heard that.  I hear

9    what you're saying, but I want to be clear on this one point.

10   Because likelihood of success on the merits needs to be shown

11   for a TRO.  So what legal claims am I reviewing right now in

12   this posture?

13         MR. BLUM:  Your Honor, the likelihood of success on

14   the merits for plaintiffs' claim -- or rather, the counterclaim

15   plaintiffs' counterclaims against the counterclaim defendant,

16   for one, is a violation of the non-compete.  If your Honor may

17   recall, part of the plaintiffs' initial application sought a

18   temporary restraining order against the defendants for

19   violating a non-compete, and the non-compete is very clear.

20   The non-compete prevents competition within the county in

21   which -- or rather the competing business cannot be located

22   within the county in which the plaintiff Tecspec has done

23   business.  The --

24         THE COURT:  How does the violation of the non-compete

25   relate to the restraints that you're requesting, the temporary

P4H4TECC

1    restraints?

2              MR. BLUM:  The violation of the non-compete, your

3    Honor, is related to the restraints we're seeking.  The

4    plaintiff is simultaneously seeking these bids.  This is an

5    open-bidding process.  We are submitting bids, and they are

6    submitting bids.  At least we are advised they are submitting

7    bids.  We have certainly not foreclosed them from submitting

8    bids.  That's how we know this prospective project is talking

9    to both sides.  And their side is saying, in competition with

10   us, saying that we are not actually able to submit bids because

11   we can't compete, we can't fulfill orders, we are foreclosed

12   because of legal process, all of these things that aren't true.

13             Your Honor, the counterclaim defendants are attempting

14   to compete in violation of the non-compete with a business,

15   Braya, for which they are able to compete with Braya.  Braya is

16   able to compete with Tecspec, pursuant to the non-compete.  But

17   they are attempting to interfere with Braya's ability to

18   compete for these bids.  This ties directly to the counterclaim

19   defendant's ability to compete or not compete with Braya.

20             THE COURT:  Thank you, Mr. Blum.

21             Ms. Wasserman, I'll hear from you now.

22             MS. WASSERMAN:  Good afternoon, your Honor.

23             I'd like to start out with just a couple of threshold

24   issues.  Number one, your Honor, as you mentioned, the relief

25   that's being sought is threefold and limited.  It's to confirm

P4H4TECC

1    that counterclaim plaintiffs are not enjoined from entering

2    into new business.  It's to confirm that counterclaim

3    defendants are enjoined from interfering because of existing

4    contracts.  And it's to ensure that counterclaim defendants are

5    enjoined from unreasonably interfering with business

6    opportunities.  There is no claim for defamation.  So anything

7    to say about defamation is neither here nor there.  Because as

8    your Honor also mentioned, the test for preliminary injunction

9    is threefold.  You need irreparable injury.  But also need

10   likelihood of success on the merits, and you also need balance

11   of the equities, neither of which have been discussed here,

12   that's number one.

13        Number two, my friend conceded that the TRO is

14   actually a restatement of law.  Our clients are never allowed

15   to tortiously interfere with contracts or to engage in

16   defamation because they uphold the New York law, and that's not

17   the purpose of a TRO.  The purpose of a TRO is to try and

18   enjoin specific harm that is happening and or that is about to

19   happen, and that is not reflected in the language of the TRO.

20        The third preliminary issue that I would like to point

21   out here -- sorry, I apologize.  The third preliminary issue

22   that I want to point out here is that there is no irreparable

23   injury because what has been represented to you as to what our

24   clients are saying in the marketplace is incorrect.  And the

25   reason that I'm able to say that with such confidence as I'm

P4H4TECC

1    saying here is that we have instructed our clients, and our

2    clients continued to do so, that when they are asked about what

3    is ongoing in this action or anything at all about Braya, they

4    direct those inquiries to us at counsel.

5           And I will just say, I think there are two things that

6    are being conflated.  There is a specific client that is the

7    subject of Donnolo's affidavit.  And then today Mr. Blum seemed

8    to mention other potential clients without naming them or

9    identifying them.  That's a separate issue that I'll get to

10   later.

11          To the extent they are talking about a specific client

12   referenced in the sensitive business affidavit, we ensured that

13   plaintiffs do not speak to the separate client themselves in

14   order to avoid this exact situation.  And instead, they

15   directed this client to Jason Melzer, my colleague, to answer

16   the questions.  And I'm happy to tell you about that.  In early

17   in March, Jason Melzer spoke with Jeremy Bloom he's an internal

18   counsel of a separate client.  And again, on March 5th with

19   John Weissman, who was external counsel for that client.  And

20   Jason was specifically asked both by internal counsel and

21   external counsel, one, whether there was anything preventing

22   Roth [ph.] Group from accepting bids from either Braya or

23   Tecspec to which Jason informed us, no.

24          And two, specifically, if there is a threat that if

25   Roth Group picks one over the other, the subject client will be

P4H4TECC

1    sued.  And Jason responded very clearly that there was no

2    threat on our end of suing clients, obviously, excepting any

3    separate misfeasance that might occur.  We are reserving that

4    right.  But we were very, very clear about what would or would

5    not happen on our end, should this go in either direction.

6         When external counsel asked for more information,

7    Jason directed him to the public docket in order to ensure he

8    did not say anything improper.  And very carefully he never

9    spoke about any of the allegations.  He only said, "there is no

10   injunction currently in place."  That is what he said.  And we

11   are happy to put that in a declaration if that is something

12   your Honor is looking for.

13        And I want to point out, your Honor, that I think it's

14   noteworthy that I'm coming to you here with names, dates, and

15   times.  And that Donnolo sensitive business declaration, on the

16   other hand, is vague and unspecified.  And that's not a

17   coincidence.  To the extent that the claim is confidential, we

18   can't get into that, that's not accurate.  We can give dates,

19   times, places without providing those specific identifying

20   details like a name.  And that alone is reason for your Honor

21   to deny this TRO, as there is just no basis for irreparable

22   harm.

23        Furthermore, I'd like to point out that what my friend

24   said earlier that the standard of proof is lower than the

25   ultimate resolution of the merits, that's incorrect.  I would

P4H4TECC

1   like to direct your Honor to *Vanlines. Com LLC v. Net-Marketing*

2   *Group Inc.*, 486 F. Supp. 2d 292 (S.D.N.Y. 2007).  Where the

3   Court said, and I quote, "a preliminary injunction is an

4   extraordinary and drastic remedy, one that should not be

5   granted unless the movant, by clear showing, carries the burden

6   of persuasion."  And I would posit, your Honor, that no clear

7   showing exists here because my friend isn't able to point to

8   what causes of action are premising this TRO.  And when asked

9   about that, the one that he mentioned specifically is the

10  breach of non-compete.  As your Honor referenced, it's not

11  clear to me, and, indeed, I would argue that it's not at all

12  connected to the relief being sought.  The breach of a

13  non-compete has nothing to do with whether or not the

14  counterclaim defendants are allegedly interfering with

15  contract, which, again, I'm comfortable noting they are not.

16        And to the extent that a tortious interference claim

17  is underpinning this TRO, they've demonstrated no likelihood of

18  success, let alone success by a clear showing.  Because state

19  law is clear that in order to successfully assert tortious

20  interference claims you need to provide details as to who those

21  contracts are with.  And outside of the subject client, which I

22  reference the earlier, there are no allegations as to what

23  those contracts are, who they were.  Same with business

24  opportunities, you can't -- just making vague accusations of

25  hostile business opportunities in the marketplace, it is not

P4H4TECC

1    sufficient, as a matter of law, from a pleading standard, let

2    alone a clear showing of evidence.

3         And if your Honor would like, I'm happy to go through

4    the other five claims that are listed in counterclaim

5    plaintiff's papers and go through why those also do not have a

6    likelihood of success on the merits, if that would be of help

7    to, your Honor.

8         THE COURT:  Thank you.  Well, I think that we've

9    established at the outset here and that those are not coming

10   into play right now, as we talk about the TRO and I decide that

11   today.  I think that that's -- those claims are for another

12   day.  I think I heard what I need from you.

13        Mr. Blum, it's your application.  I'll let you reply

14   if you wish.

15        MR. BLUM:  Thank you, your Honor.

16        I would just like to touch on something that's in our

17   brief, starting at page 3.  We have actually walked through all

18   of our counterclaims against the counterclaim defendant.  And

19   so I picked that one because it is key and material to the

20   issue that we're here about.  But when we're talking about

21   likelihood of success on the merits, your Honor, you have on

22   page 5 success on the merits for counterclaim plaintiffs'

23   Defend Trade Secrets Act violation.  So your Honor may recall

24   or it was laid out in papers that the counterclaim defendants

25   broke in, broke and entered into the Braya space.  The police

P4H4TECC

1    were called.  And the individually-named plaintiffs, Robert

2    Senia, Richard Rose, and Ralph Schlenker took pictures of all

3    of the products, the set up, and the trade secrets of Braya.  I

4    mean, this is not -- this is not in dispute.  Maybe they're

5    going to argue that these are not trade secrets.  But it's not

6    disputed that these individuals broke the law, broke in, took

7    pictures.  So we have, your Honor, an action and claim against

8    the counterclaim defendants for violations of Defend Trade

9    Secrets act for trespass.  I mean, this is indefensible.  We

10   have videos of that that we provided to the Court.

11          We also have the tortious interference claim, and also

12   the good faith and fair dealing claim which underlies the

13   relationship between the plaintiff and the defendants.  So in

14   the counterclaims against the counterclaim defendant, the

15   counterclaim plaintiffs make some troubling allegations against

16   the counterclaim defendant, which includes misappropriation of

17   assets to the tune of millions or even tens of millions of

18   dollars and violation of federal RICO statutes, fraud.  There

19   is a lot of allegations, and it's pleaded with particularity.

20   The counterclaim -- the allegations in the answered

21   counterclaims are robust.  And we believe that this is

22   absolutely going to sustain, at the very least, this motion, I

23   mean, a likelihood of success on the merits.

24          We have -- we have a position, we take a position that

25   all of these allegations will be proven at trial.  And to the

P4H4TECC

1   extent that we need to demonstrate that today, your Honor, I

2   would suggest that with a temporary restraining order, we don't

3   need to prove the entitlements and ultimate form of relief in

4   the matter at this stage.  But we need to show that we have a

5   likelihood of success on at least one of these claims.  So,

6   your Honor, with respect to the motion or rather the claim for

7   breach of non-compete at page 3 in the memorandum of law, we're

8   very clear that the non-compete clause requires in Section 25

9   of the operating agreement, that Tecspec is located -- or

10  rather, the competing business cannot be located in a county in

11  which Tecspec is doing or has done business.  And so Braya is

12  located in Richmond County.  Tecspec has never done, ever,

13  business in Richmond County.  That's the reason Braya is there.

14          And so I presume that's the reasoning that the Court

15  came to in the plain language of this non-compete that that's

16  not competition.  It's not a violation of the non-compete.  So

17  likewise, we have SRS and the counterclaim defendants that are

18  conducting business and are located in locations where Tecspec

19  is doing business.  The non-compete provision, specifically

20  restricting business in the areas where Tecspec hasn't done

21  business, that being Brooklyn, and the counterclaim defendants

22  being located in Brooklyn is an obvious and clear violation of

23  the non-compete provision.

24          So in this vein, your Honor, I think we do need, I do

25  believe we meet the likelihood of success on the merits.  With

P4H4TECC

1    respect, again, to the irreparable harm and balancing the

2    equities, the irreparable harm is very clear.  The Second

3    Circuit is very clear on what constitutes irreparable harm and

4    that false statements being made in the market to dissuade

5    people or entities from doing business with Braya constitutes

6    defamation *per se*, which the Second Circuit clearly says is

7    irreparable harm.

8          And if we are looking at balancing the equities, I

9    would like to draw the Court's attention to what Ms. Wasserman

10   stated in arguing in opposition.  And I believe that the

11   counterclaim defendant will give an affirmation or affidavit or

12   declaration saying that they haven't done any of these things.

13   Well, your Honor, we wouldn't be here if that were the case.

14   We wouldn't need to have an order that clarifies the things

15   that have been disseminated aren't true, and we wouldn't need

16   an order restraining activity that they're not doing.  We

17   wouldn't need that.  And so the reason that we're here is

18   because it's at the behest of the entities and individuals that

19   want to do business with Braya but are scared to do so based on

20   these allegations.  That is exactly we're here.

21         So I would go back to the balancing of the equities.

22   If what we are saying is accurate, and I believe that it is,

23   then there is absolutely no harm that could possibly come to

24   the counterclaim defendant and the Court issuing this order,

25   not any harm whatsoever.  And likewise, in the absence, the

P4H4TECC

1    counterclaim plaintiffs would be irreparably harmed in the

2    event that the defendants are doing this.  And we do have

3    attestations by Michael Donnolo in firsthand accounts that this

4    is what the counterclaim defendants are doing.  And so we are

5    looking at this --

6         THE COURT:  All right.  I think I have enough now.

7    What I would like to do is take a few minutes to think about

8    what I've heard this afternoon and then come back and give you

9    my ruling.

10        MR. BLUM:  Yes, your Honor.

11        MS. WASSERMAN:  Thank you, your Honor.

12        THE COURT:  I'm going to do that now.  It won't be

13   very long.  I'm going to try to keep this to a few minutes.  So

14   if you would try to bear with me, I will be back as soon as I

15   can, and I will give you my ruling.

16        MS. WASSERMAN:  Thank you, your Honor.

17        THE COURT:  All right.  Thank you.

18        (Recess)

19        THE COURT:  I'm prepared to rule on the counterclaim

20   plaintiffs' motion for a TRO.

21        The Court assumes the parties' familiarity with the

22   facts of this matter.

23        In terms of the applicable legal standards, in the

24   Second Circuit the standard for obtaining a temporary

25   restraining order is the same as the standard for obtaining a

P4H4TECC

preliminary injunction.  See, for example, *Basank v. Decker,*

449 F.Supp. 3d 205, 210 (S.D.N.Y. 2020)  ("It is well

established in this circuit the standard for entry of a TRO is

the same as for a preliminary injunction."  See also *Empire*

*Trust, LLC v. Cellura*, No. 24 Civ. 859 (KMK), 2024 WL 1216729,

at *2 (S.D.N.Y. Mar. 21 2024); *Free Country Limited v. Drennen*,

235 F. Supp 3d 559, 565 (S.D.N.Y. 2016).

          In general, a party seeking a TRO or a preliminary

injunction must establish a likelihood of success on the merits

that the movant is likely to suffer irreparable injury in the

absence of preliminary relief, that the balance of hardships

tips in its favor, and that an injunction is in the public

interest.

          For that proposition I'm quoting *Pharaohs GC, Inc. v.*

*United States Small Business Administration*, 990 F.3d 217, 225,

(2d Cir. 2021) (quoting *Winter v. National Resources Defense*

*Council Inc*., 555 U.S. 7, 20, (2008)).

          Like a preliminary injunction, a temporary restraining

order is an extraordinary remedy never awarded as of right.

*Bragg v. Jordan,* 669 F. Supp. 3d 257, 267 (S.D.N.Y. 2023).

(Quoting *Winter*, 555 U.S. at 24); see also *Anwar v. Fairfield*

*Greenwich Limited,* 728 F. Supp 2d 462, 472 (S.D.N.Y. 2010).

("Temporary restraining orders and preliminary injunctions are

among the most drastic tools in the arsenal of judicial

remedies, and must be used with great care.")

P4H4TECC

1            From a review of the counterclaim plaintiffs' brief

2      and what I've heard during argument today, tortious

3      interference with business relationships, which is also called

4      tortious interference with prospective economic advantage, is

5      the only legal claim brought by counterclaim plaintiffs that

6      could justify the restraint requested in a proposed TRO.  The

7      requested restraints aim to prevent counterclaim defendants

8      from "interfering" with counterclaim plaintiffs "fulfillment of

9      new and existing contracts and business opportunities.  ECF No.

10     120 at 3.

11           These restraints would not prevent counterclaim

12     defendants from competing with Tecspec or disclosing trade

13     secrets.  So counterclaim plaintiffs' claims for breach of the

14     non-compete agreement and misappropriation of trade secrets are

15     not at issue here.  I will therefore review whether

16     counterclaim plaintiffs are likely to succeed on the tortious

17     interference claim.

18           A plaintiff suing for tortious interference with

19     business relationships must prove that "there is a business

20     relationship between the plaintiff and a third party; the

21     defendant, knowing of that relationship intentionally

22     interferes with it; a defendant acts with the sole purpose of

23     harming the plaintiff or failing that level of malice, uses

24     dishonest, unfair, or improper means; and the relationship is

25     injured" *Catskill Development LLC v. Park Place Entertainment*

P4H4TECC

*Corporation*, 547 F.3d 115, 132 (2d Cir. 2008).

"A claim for interference with prospective contractual relations is very difficult to sustain." *Kramer v. Pollock-Krasner Foundation*, 890 F. Supp. 250, 258 (S.D.N.Y. 1995).

First, an allegation of tortious interference with business relationships must include a "sufficiently particular allegation of interference with a specific contract or business relationship" of the counterclaim plaintiffs. *Kolchinsky v. Moody's Corporation*, No. 10 Civ. 6840 (PAC) 2012 WL 639162, at *6 (S.D.N.Y. Feb. 28, 2012).

With one exception counterclaim plaintiffs have failed to show that counterclaim defendant "interfered with a specific business relationship," *id.* at 7.  Counterclaim plaintiffs' assertion that counterclaim defendants have made "false statements and threats to potential and current Braya customers" ECF No. 120-1, that's the Donnolo declaration, is too "broad" and of an allegation to "state a claim for tortious interference with business relationships" citing *Kolchinsky* 2012 WL 639162 at *6 (dismissing tortious interference claims for false statements the defendant allegedly made to "potential employers in the financial industry" for failing to identify a specific business relationship); See *Nourieli v. Lemonis*, No. 20 Civ. 2021 WL 3475624 at *6. (S.D.N.Y. Aug. 6, 2021) (dismissing the plaintiff's claim for tortious relations with

P4H4TECC

1    its "customers" because "these types of generalized allegations

2    about hypothetical business relations are not enough." *Keswani*

3    *v. Sovereign Jewelry Inc.*, No. 20 Civ. 8934 (KPF), 2021 WL

4    4461332, at *14 (S.D.N.Y. Sept. 29, 2021) (concluding that

5    "Plaintiff's barebones allegations regarding Defendants'

6    sabotage of his relationships with 'vendors' and 'suppliers'

7    were insufficient to set forth a cause of action for tortious

8    interference").

9            Counterclaim plaintiffs do, however, identify one

10   business relationship with specificity.  For this I rely on

11   Michael Donnolo's declaration titled "Sensitive Business

12   Information"  ECF No. 120-2.  Despite this title I will discuss

13   the declaration openly because counterclaim plaintiffs have

14   filed it on the public docket.

15           The declaration states that the counterclaim defendant

16   made "patently false" statements to a specific potential

17   client, ECF No. 120-2, Paragraph 6.  While Mr. Donnolo does not

18   identify that client by name, he notes that "the name of the

19   potential client is known to all parties" and can be "disclosed

20   to the Court *in camera* or under seal at the Court's request."

21   *id.* at 1 Note 1.

22           I will therefore turn to counterclaim plaintiffs'

23   likelihood of success on the merits of their tortious

24   interference claim only as they relate to the potential client

25   identified in the Donnolo declaration.

P4H4TECC

1          "Unlike the claim for tortious interference with

2    contract, which requires a plaintiff to show no more than that

3    the defendant intentionally, and without justification,

4    procured a breach of a valid contract for which he was aware, a

5    claim for tortious interference with prospective economic

6    advantage requires the plaintiff to show that the defendant was

7    motivated solely by a desire to harm and not with a permissible

8    purpose, such as normal economic self-interests." *Cartiga, LLC*

9    *v. Aquino.*  No. 24 Civ. 1014 (PAE), 2025 WL  388804 at *10

10   (S.D.N.Y. Feb. 4, 2025).

11         "Therefore when a plaintiff is alleging interference

12   with a nonbinding or future relationship, he or she must show

13   that the defendant's conduct amounted to a crime or an

14   independent tort, or the defendant must have engaged in the

15   conduct for the sole purpose of inflicting intentional harm on

16   plaintiff." *RBG Management Corporation v. Village Super Market*

17   *Inc*., 692 F. Supp 3d 135, 149 (S.D.N.Y. 2023).

18         Counterclaim plaintiffs suggest that counterclaim

19   defendants' statements violated the independent tort of

20   defamation, albeit as part of their irreparable harm argument,

21   not the merits.  ECF No. 120-9 at 15-16.  To state a claim for

22   defamation under New York law, a plaintiff must allege "that a

23   defamatory statement of fact was made concerning the plaintiff;

24   that the defendant published that statement to a third party;

25   that the statement was false; that there exists some degree of

P4H4TECC

fault; and that there are special damages or that the statement is defamatory *per se*, i.e. it disparaged the plaintiff in the way of his or her office, profession, or trade." *Kolchinsky*, 2012 WL 639162 at *4.

A defamation claim must "identify the purported communication and indicate who made the communication when it was made and to whom it was communicated." *Elcan Industries Inc. v. Cuccolini* S.R.L., No. 13 Civ. 4058 (GBD) 2014 WL 1173343 at *9. (S.D.N.Y. Mar. 21, 2014) (cleaned up). Here, Mr. Donnolo's declaration "fails to identify who made the allegedly defamatory statement, when they were made or where" *id*. "These allegations lack the specificity required to set forth a defamation claim." *id*; see also *Cruz v. Marchetto*, 2012 WL 4513484 at *4 (S.D.N.Y. Oct. 1, 2012) (failure to specifically plead "when, where, or in what manner the statements were made" necessitates dismissal of defamation claim).

Moreover, the New York Court of Appeals has never held that *any* misrepresentation to a third party is sufficient to sustain a claim for tortious interference with prospective economic relations. *Friedman v. Coldwater Creek Inc.*, 321 F. App'x 58, 60 (2d Cir. 2009).

Thus, counterclaim plaintiffs have not shown that counterclaim defendants' "conduct amounted to an independent tort." *RBG Management*, 692 F. Supp 3d at 149.

P4H4TECC

1          I will turn to whether counterclaim plaintiffs has

2     shown that counterclaim defendant "engaged in the conduct for

3     the sole purpose of inflicting intentional harm on plaintiff."

4     *Id.*

5          As the New York Court of Appeals has explained,

6     competition "provides an obvious motive" for a defendant's

7     "interference other than as a desire to injure" the plaintiff.

8     *Carvel Corporation v. Noonan*, 3 N.Y. 3d 182, 191 (2004);  See

9     *RBG Management*, 692 F.Supp. 3d at 150 (holding that an

10    allegation that the defendant "was trying to compete with the

11    plaintiff does not permit the Court to infer it acted solely to

12    inflict intentional harm on the plaintiff.")

13         Here, Mr. Donnolo's declaration strongly suggests that

14    is counterclaim defendants were competing with counterclaim

15    plaintiffs for the HVAC contract with the potential client.

16    Mr. Donnolo "has several meetings with potential client,

17    including a presentation of the Braya unit."  And he "also

18    knows that potential client has been in touch with plaintiff

19    and Tecspec which resulted in a review of the product

20    manufactured by Tecspec." ECF No. 120-2, Paragraph 3.

21    Mr. Donnolo further states that the potential client met with

22    "both Braya and Tecspec.  *Id.*, Paragraph 4.

23         The most "plausible inference to be drawn from these"

24    statements is that counterclaim defendants were "motivated at

25    least in part by their own economic interest."  *RBG Management*

P4H4TECC

1    692 F. Supp 3d at 149, *see Carvel* 3 N.Y. 3d at 362 (dismissing

2    tortious interference with prospective economic advantage

3    claims, where "it is undisputed that Carvel's motive in

4    interfering with the franchisees' relationships with their

5    customers was normal economic self-interest"); *Cartiga*, 2025 WL

6    388804 at *11.  (Dismissing tortious interference with business

7    relationship claims where the plaintiff's allegations that the

8    defendant "reached out to business contacts of the plaintiff

9    for the purpose of seeking to obtain the business for herself

10   and/or a direct competitor, supported that the defendant was

11   motivated, at least in part, by her own economic interest").

12           Counterclaim plaintiffs, therefore, have not shown

13   that counterclaim defendants' conduct toward the potential

14   client "amounted to a crime or an independent tort" or was "for

15   the sole purpose of inflicting intentional harm on"

16   counterclaim plaintiffs.  *RBG Management*, 692 F. Supp. 3d at

17   149.  Without such a showing, they are not likely to succeed on

18   the merits of their claim for tortious interference with

19   business relationships.

20           Accordingly, the motion for a TRO is denied.

21           As a final note, I will say that at the time of this

22   hearing, Braya Concepts LLC, Braya Machine Company LLC, Braya

23   Systems LLC, Braya Ventures LLC, John Michael Long, Joshua

24   Donnolo, and Michael Donnolo are not currently restrained or

25   enjoined from entering into any new contracts.  But a ruling on

P4H4TECC

1    plaintiffs' preliminary injunction motion, including whether

2    one or more of those named defendants is enjoined from entering

3    into certain contracts is forthcoming.

4              Is there anything else either side wishes to be heard

5    on now?

6              MS. WASSERMAN:  No, thank you, your Honor.  Thank you

7    for your time today.

8              MR. BLUM:  No, your Honor.  Thank you.

9              THE COURT:  All right.  So that we can have a record

10   of what happened today, counterclaim plaintiffs, could you

11   please order the transcript, and we are adjourned for now.

12   Thank you all.

13             (Adjourned)

14

15

16

17

18

19

20

21

22

23

24

25