**ROSENBERG & ESTIS, P.C.**
Matthew S Blum, Esq. – MBlum@RosenbergEstis.com
~~Jay H. Min~~Jake W. Bedor, Esq. -
~~Jmin~~JBedor@RosenbergEstis.com
Daniel C. Gibbons, Esq. -
DGibbons@RosenbergEstis.com 733 Third Avenue, Floor 14
New York, New York 10017
*Attorneys for Michael Donnolo, individually and derivatively on behalf of Tecspec LLC, Joshua Donnolo, John Michael Long, Braya Concepts LLC, Braya Machine Company LLC, Braya Systems LLC, Braya Ventures LLC*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TECSPEC LLC, RICHARD ROSE, ROBERT SENIA, and RALPH SCHLENKER,~~,~~ <br><br> Plaintiffs, <br><br> -against- <br><br> MICHAEL DONNOLO, JOSHUA DONNOLO, JOHN MICHAEL LONG, BRAYA CONCEPTS LLC, BRAYA MACHINE COMPANY LLC, BRAYA SYSTEMS LLC, BRAYA VENTURES LLC, and <br><br> ABC CORPORATIONS ~~1-10~~1- 10, <br><br> Defendants, | Case No. 24-cv-08077 |
| BRAYA CONCEPTS LLC, BRAYA MACHINE COMPANY LLC, BRAYA SYSTEMS LLC, BRAYA VENTURES LLC, JOHN MICHAEL LONG, JOSHUA DONNOLO, and MICHAEL DONNOLO, individually and derivatively on behalf of Tecspec LLC, <br><br> Counterclaim Plaintiffs, <br><br> ~~-~~ -against - <br><br> RALPH SCHLENKER, ROBERT SENIA, RICHARD ROSE, CHRISTINA SENIA, NUMA PRODUCTS, LLC, SRS ENTERPRISES INC., SRS ENTERPRISES NJ LLC, HVAC SERVICE ASSOCIATES INC., and SRS RESEARCH LLC, <br><br> ~~Counterclaim Defendants,~~ <br><br> ~~-~~ -against - <br><br><br> TECSPEC LLC, <br><br> Nominal Counterclaim Defendant. | **AMENDED ANSWER WITH AFFIRMATIVE DEFENSES AND COUNTERCLAIMS** |

Defendants/Counterclaim Plaintiffs Braya Concepts LLC, Braya Machine Company LLC, Braya Systems LLC, Braya Ventures LLC, Michael Donnolo, John Michael Long, and Joshua Donnolo (collectively referred to in this Amended Answer with Affirmative Defenses and Counterclaims, "Defendants"), by and through their attorneys, Rosenberg & Estis, P.C., respond to Plaintiffs' Complaint (ECF No. 1) as follows:

**<u>INTRODUCTION</u>**

1.      As and for Plaintiffs' Complaint, Paragraph 1, Defendants deny each and every ~~1.~~ allegation as drafted.

2.      As and for Plaintiffs' Complaint, Paragraph 2, Defendants deny each and every ~~2.~~ allegation as drafted.

3.      As and for Plaintiffs' Complaint, Paragraph 3, Defendants deny each and every ~~3.~~ allegation as drafted.

4.      As and for Plaintiffs' Complaint, Paragraph 4, Defendants deny each and every ~~4.~~ allegation as drafted.

5.      As and for Plaintiffs' Complaint, Paragraph 5, Defendants deny each and every ~~5.~~ allegation as drafted.

6.      As and for Plaintiffs' Complaint, Paragraph 6, Defendants deny each and every ~~6.~~ allegation as drafted.

7.      As and for Plaintiffs' Complaint, Paragraph 7, Defendants deny each and every ~~7.~~ allegation as drafted.

8.      As and for Plaintiffs' Complaint, Paragraph 8, Defendants deny each and every ~~8.~~ allegation as drafted.

9.      As and for Plaintiffs' Complaint, Paragraph 9, Defendants deny each and every
~~9.~~ allegation as drafted.

10.     As and for Plaintiffs' Complaint, Paragraph 10, Defendants deny each and every
~~10.~~ allegation as drafted.

11.     As and for Plaintiffs' Complaint, Paragraph 11, Defendants deny each and every
~~11.~~ allegation as drafted.

12.     As and for Plaintiffs' Complaint, Paragraph 12, Defendants deny each and every
~~12.~~ allegation as drafted.

13.     As and for Plaintiffs' Complaint, Paragraph 13, Defendants deny each and every
~~13.~~ allegation as drafted.

14.     As and for Plaintiffs' Complaint, Paragraph 14, Defendants deny each and every
~~14.~~ allegation as drafted.

15.     As and for Plaintiffs' Complaint, Paragraph 15, Defendants deny each and every
allegation as drafted.

16.     As and for Plaintiffs' Complaint, Paragraph 16, Defendants deny each and every
~~16.~~ allegation as drafted.

17.     As and for Plaintiffs' Complaint, Paragraph 17, Defendants deny each and every
~~17.~~ allegation as drafted.

18.     As and for Plaintiffs' Complaint, Paragraph 18, Defendants deny each and every
~~18.~~ allegation as drafted.

**THE PARTIES**

19.     As and for Plaintiffs' Complaint, Paragraph 19, Defendants admit the allegations
~~19.~~ contained therein.

20.     As and for Plaintiffs' Complaint, Paragraph 20, Defendants admit the allegations contained therein.

21.     As and for Plaintiffs' Complaint, Paragraph 21, Defendants admit the allegations contained therein.

22.     As and for Plaintiffs' Complaint, Paragraph 22, Defendants admit the allegations contained therein.

23.     As and for Plaintiffs' Complaint, Paragraph 23, Defendants admit the allegations contained therein.

24.     As and for Plaintiffs' Complaint, Paragraph 24, Defendants admit the allegations contained therein.

25.     As and for Plaintiffs' Complaint, Paragraph 25, Defendants admit the allegations contained therein.

26.     As and for Plaintiffs' Complaint, Paragraph 26, Defendants admit the allegations contained therein.

27.     As and for Plaintiffs' Complaint, Paragraph 27, Defendants admit the allegations contained therein.

28.     As and for Plaintiffs' Complaint, Paragraph 28, Defendants deny each and every allegation contained therein except admit that Joshua Donnolo was an employee of Tecspec.

29.     As and for Plaintiffs' Complaint, Paragraph 29, Defendants deny each and every allegation contained therein except admit that John Michael Long was an employee of Tecspec.

## JURISDICTION AND VENUE

30.     As and for Plaintiffs' Complaint, Paragraph 30, Defendants lack sufficient information to admit or deny the allegations as written.

31.     As and for Plaintiffs' Complaint, Paragraph 31, Defendants admit the allegations contained therein.

32.     As and for Plaintiffs; Complaint, Paragraph 32, Defendants admit the allegations contained therein.

33.     As and for Plaintiffs' Complaint, Paragraph 33, Defendants admit the allegations contained therein.

## FACTUAL ALLEGATIONS

34.     As and for Plaintiffs' Complaint, Paragraph 34, Defendants deny each and every allegation as drafted.

35.     As and for Plaintiffs' Complaint, Paragraph 35, Defendants deny each and every allegation as drafted.

36.     As and for Plaintiffs' Complaint, Paragraph 36, Defendants deny each and every allegation as drafted.

37.     As and for Plaintiffs' Complaint, Paragraph 37, Defendants deny each and every allegation as drafted.

38.     As and for Plaintiffs' Complaint, Paragraph 38, Defendants deny each and every allegation as drafted.

39.     As and for Plaintiffs' Complaint, Paragraph 39, Defendants deny each and every allegation as drafted.

40.     As and for Plaintiffs' Complaint, Paragraph 40, Defendants deny each and every allegation as drafted.

41.     As and for Plaintiffs' Complaint, Paragraph 41, Defendants lack sufficient information to admit or deny the allegations as written.

42.     As and for Plaintiffs' Complaint, Paragraph 42, Defendants deny each and every
42. allegation as drafted.

43.     As and for Plaintiffs' Complaint, Paragraph 43, Defendants deny each and every
43. allegation as drafted.

44.     As and for Plaintiffs' Complaint, Paragraph 44, Defendants deny each and every
44. allegation as drafted.

45.     As and for Plaintiffs' Complaint, Paragraph 45, Defendants deny each and every
45. allegation as drafted.

46.     As and for Plaintiffs' Complaint, Paragraph 46, Defendants deny each and every
46. allegation as drafted.

47.     As and for Plaintiffs' Complaint, Paragraph 47, Defendants deny each and every
47. allegation as drafted.

48.     As and for Plaintiffs' Complaint, Paragraph 48, Defendants deny each and every
48. allegation as drafted.

49.     As and for Plaintiffs' Complaint, Paragraph 49, Defendants deny each and every
49. allegation as drafted.

50.     As and for Plaintiffs' Complaint, Paragraph 50, Defendants lack sufficient
50. information to admit or deny the allegations as written.

51.     As and for Plaintiffs' Complaint, Paragraph 51, Defendants deny each and every
51. allegation as drafted.

52.     As and for Plaintiffs' Complaint, Paragraph 52, Defendants deny each and every
52. allegation as drafted.

53.      As and for Plaintiffs' Complaint, Paragraph 53, Defendants lack sufficient 53. information to admit or deny the allegations as written.

54.      As and for Plaintiffs' Complaint, Paragraph 54, Defendants deny each and every 54. allegation as drafted.

55.      As and for Plaintiffs' Complaint, Paragraph 55, Defendants deny each and every 55. allegation as drafted.

56.      As and for Plaintiffs' Complaint, Paragraph 56, Defendants deny each and every allegation contained therein except admit that Joshua Donnolo and John Michael Long were employees of Tecspec.

57.      As and for Plaintiffs' Complaint, Paragraph 57, Defendants deny each and every 57. allegation as drafted.

58.      As and for Plaintiffs' Complaint, Paragraph 58, Defendants deny each and every 58. allegation as drafted.

59.      As and for Plaintiffs' Complaint, Paragraph 59, Defendants deny each and every 59. allegation as drafted.

60.      As and for Plaintiffs' Complaint, Paragraph 60, Defendants lack sufficient 60. information to admit or deny the allegations as written.

61.      As and for Plaintiffs' Complaint, Paragraph 61, Defendants deny each and every 61. allegation as drafted.

62.      As and for Plaintiffs' Complaint, Paragraph 62, Defendants deny each and every 62. allegation as drafted.

63.      As and for Plaintiffs' Complaint, Paragraph 63, Defendants deny each and every 63. allegation as drafted.

64.    As and for Plaintiffs' Complaint, Paragraph 64, Defendants deny each and every
64. allegation as drafted.

65.    As and for Plaintiffs' Complaint, Paragraph 65, Defendants deny each and every
65. allegation as drafted.

66.    As and for Plaintiffs' Complaint, Paragraph 66, Defendants deny each and every
66. allegation as drafted.

67.    As and for Plaintiffs' Complaint, Paragraph 67, Defendants deny each and every
67. allegation as drafted.

68.    As and for Plaintiffs' Complaint, Paragraph 68, Defendants deny each and every
68. allegation as drafted.

69.    As and for Plaintiffs' Complaint, Paragraph 69, Defendants deny each and every
69. allegation as drafted.

70.    As and for Plaintiffs' Complaint, Paragraph 70, Defendants deny each and every
70. allegation as drafted.

71.    As and for Plaintiffs' Complaint, Paragraph 71, Defendants deny each and every
71. allegation as drafted.

72.    As and for Plaintiffs' Complaint, Paragraph 72, Defendants deny each and every
72. allegation as drafted.

73.    As and for Plaintiffs' Complaint, Paragraph 73, Defendants deny each and every
73. allegation as drafted.

74.    As and for Plaintiffs' Complaint, Paragraph 74, Defendants deny each and every
74. allegation as drafted.

75.     As and for Plaintiffs' Complaint, Paragraph 75, Defendants deny each and every allegation as drafted.

76.     As and for Plaintiffs' Complaint, Paragraph 76, Defendants deny each and every ~~76.~~ allegation as drafted.

77.     As and for Plaintiffs' Complaint, Paragraph 77, Defendants deny each and every ~~77.~~ allegation as drafted.

78.     As and for Plaintiffs' Complaint, Paragraph 78, Defendants deny each and every ~~78.~~ allegation as drafted.

79.     As and for Plaintiffs' Complaint, Paragraph 79, Defendants deny each and every ~~79.~~ allegation as drafted.

80.     As and for Plaintiffs' Complaint, Paragraph 80, Defendants deny each and every ~~80.~~ allegation as drafted.

81.     As and for Plaintiffs' Complaint, Paragraph 81, Defendants deny each and every ~~81.~~ allegation as drafted.

82.     As and for Plaintiffs' Complaint, Paragraph 82, Defendants lack sufficient ~~82.~~ information to admit or deny the allegations as written.

83.     As and for Plaintiffs' Complaint, Paragraph 83, Defendants deny each and every ~~83.~~ allegation as drafted.

84.     As and for Plaintiffs' Complaint, Paragraph 84, Defendants deny each and every ~~84.~~ allegation as drafted.

85.     As and for Plaintiffs' Complaint, Paragraph 85, Defendants deny each and every ~~85.~~ allegation as drafted.

86.     As and for Plaintiffs' Complaint, Paragraph 86, Defendants deny each and every

~~86.~~ allegation as drafted.

87.     As and for Plaintiffs' Complaint, Paragraph 87, Defendants deny each and every

~~87.~~ allegation as drafted.

88.     As and for Plaintiffs' Complaint, Paragraph 88, Defendants deny each and every

~~88.~~ allegation as drafted.

89.     As and for Plaintiffs' Complaint, Paragraph 89, Defendants deny each and every

~~89.~~ allegation as drafted.

90.     As and for Plaintiffs' Complaint, Paragraph 90, Defendants deny each and every

~~90.~~ allegation as drafted.

91.     As and for Plaintiffs' Complaint, Paragraph 91, Defendants deny each and every

~~91.~~ allegation as drafted.

92.     As and for Plaintiffs' Complaint, Paragraph 92, Defendants deny each and every

~~92.~~ allegation as drafted.

## COUNT I

93.     Defendants repeat and reallege the foregoing responses as if set forth more fully

hereunder.

94.     As and for Plaintiffs' Complaint, Paragraph 94, Defendants deny each and every

~~94.~~ allegation as drafted.

95.     As and for Plaintiffs' Complaint, Paragraph 95, Defendants deny each and every

allegation as drafted.

96.     As and for Plaintiffs' Complaint, Paragraph 96, Defendants deny each and every

~~96.~~ allegation as drafted.

## COUNT II

97.    Defendants repeat and reallege the foregoing responses as if set forth more fully hereunder.

98.    As and for Plaintiffs' Complaint, Paragraph 98, Defendants deny each and every allegation contained therein except refer all matters of law to this Honorable Court and/or documents which language speaks for itself.

99.    As and for Plaintiffs' Complaint, Paragraph 99, Defendants deny each and every allegation contained therein except refer all matters of law to this Honorable Court and/or documents which language speaks for itself.

100.    As and for Plaintiffs' Complaint, Paragraph 100, Defendants deny each and every 100. allegation as drafted.

101.    As and for Plaintiffs' Complaint, Paragraph 101, Defendants deny each and every 101. allegation as drafted.

102.    As and for Plaintiffs' Complaint, Paragraph 102, Defendants deny each and every 102. allegation as drafted.

103.    As and for Plaintiffs' Complaint, Paragraph 103, Defendants deny each and every 103. allegation as drafted.

104.    As and for Plaintiffs' Complaint, Paragraph 104, Defendants deny each and every 104. allegation as drafted.

## COUNT III

105.    Defendants repeat and reallege the foregoing responses as if set forth more fully hereunder.

106.    As and for Plaintiffs' Complaint, Paragraph 106, Defendants deny each and every 106. allegation as drafted.

107.    As and for Plaintiffs' Complaint, Paragraph 107, Defendants deny each and every ~~107.~~ allegation as drafted.

108.    As and for Plaintiffs' Complaint, Paragraph 108, Defendants deny each and every ~~108.~~ allegation as drafted.

109.    As and for Plaintiffs' Complaint, Paragraph 109, Defendants deny each and every ~~109.~~ allegation as drafted.

110.    As and for Plaintiffs' Complaint, Paragraph 110, Defendants deny each and every ~~110.~~ allegation as drafted.

111.    As and for Plaintiffs' Complaint, Paragraph 111, Defendants deny each and every ~~111.~~ allegation as drafted.

112.    As and for Plaintiffs' Complaint, Paragraph 112, Defendants deny each and every allegation as drafted.

113.    As and for Plaintiffs' Complaint, Paragraph 113, Defendants deny each and every ~~113.~~ allegation as drafted.

114.    As and for Plaintiffs' Complaint, Paragraph 114, Defendants deny each and every ~~114.~~ allegation as drafted.

115.    As and for Plaintiffs' Complaint, Paragraph 115, Defendants deny each and every ~~115.~~ allegation as drafted.

116.    As and for Plaintiffs' Complaint, Paragraph 116, Defendants deny each and every ~~116.~~ allegation as drafted.

117.    As and for Plaintiffs' Complaint, Paragraph 117, Defendants deny each and every ~~117.~~ allegation as drafted.

## COUNT IV

118.     Defendants repeat and reallege the foregoing responses as if set forth more fully hereunder.

119.     As and for Plaintiffs' Complaint, Paragraph 119, Defendants deny each and every 119. allegation as drafted.

120.     As and for Plaintiffs' Complaint, Paragraph 120, Defendants deny each and every allegation as drafted.

121.     As and for Plaintiffs' Complaint, Paragraph 121, Defendants deny each and every 121. allegation as drafted.

122.     As and for Plaintiffs' Complaint, Paragraph 122, Defendants deny each and every 122. allegation as drafted.

123.     As and for Plaintiffs' Complaint, Paragraph 123, Defendants deny each and every 123. allegation as drafted.

124.     As and for Plaintiffs' Complaint, Paragraph 124, Defendants deny each and every 124. allegation as drafted.

125.     As and for Plaintiffs' Complaint, Paragraph 125, Defendants deny each and every 125. allegation as drafted.

126.     As and for Plaintiffs' Complaint, Paragraph 126, Defendants deny each and every 126. allegation as drafted.

127.     As and for Plaintiffs' Complaint, Paragraph 127, Defendants deny each and every 127. allegation as drafted.

## COUNT V

128.     Defendants repeat and reallege the foregoing responses as if set forth more fully hereunder.

129.     As and for Plaintiffs' Complaint, Paragraph 129, Defendants deny each and every ~~129.~~ allegation as drafted.

130.     As and for Plaintiffs' Complaint, Paragraph 130, Defendants deny each and every ~~130.~~ allegation as drafted.

131.     As and for Plaintiffs' Complaint, Paragraph 131, Defendants deny each and every ~~131.~~ allegation as drafted.

132.     As and for Plaintiffs' Complaint, Paragraph 132, Defendants deny each and every ~~132.~~ allegation as drafted.

133.     As and for Plaintiffs' Complaint, Paragraph 133, Defendants deny each and every ~~133.~~ allegation as drafted.

## COUNT ~~IV~~ VI

134.     Defendants repeat and reallege the foregoing responses as if set forth more fully hereunder.

135.     As and for Plaintiffs' Complaint, Paragraph 135, Defendants deny each and every allegation contained therein except refer all matters of law to this Honorable Court and/or documents which language speaks for itself.

136.     As and for Plaintiffs' Complaint, Paragraph 136, Defendants deny each and every allegation contained therein except refer all matters of law to this Honorable Court and/or documents which language speaks for itself.

137.     As and for Plaintiffs' Complaint, Paragraph 137, Defendants deny each and every allegation contained therein except refer all matters of law to this Honorable Court and/or documents which language speaks for itself.

138.    As and for Plaintiffs' Complaint, Paragraph 138, Defendants deny each and every allegation contained therein except refer all matters of law to this Honorable Court and/or documents which language speaks for itself.

139.    As and for Plaintiffs' Complaint, Paragraph 139, Defendants deny each and every 139. allegation as drafted.

140.    As and for Plaintiffs' Complaint, Paragraph 140, Defendants deny each and every 140. allegation as drafted.

141.    As and for Plaintiffs' Complaint, Paragraph 141, Defendants deny each and every 141. allegation as drafted.

142.    As and for Plaintiffs' Complaint, Paragraph 142, Defendants deny each and every 142. allegation as drafted.

143.    As and for Plaintiffs' Complaint, Paragraph 143, Defendants deny each and every 143. allegation as drafted.

144.    As and for Plaintiffs' Complaint, Paragraph 144, Defendants deny each and every 144. allegation as drafted.

145.    As and for Plaintiffs' Complaint, Paragraph 145, Defendants deny each and every 145. allegation as drafted.

146.    As and for Plaintiffs' Complaint, Paragraph 146, Defendants deny each and every allegation as drafted.

147.    As and for Plaintiffs' Complaint, Paragraph 147, Defendants deny each and every 147. allegation as drafted.

## COUNT VII

148.    Defendants repeat and reallege the foregoing responses as if set forth more fully hereunder.

149.   As and for Plaintiffs' Complaint, Paragraph 149, Defendants lack sufficient ~~149.~~ information to admit or deny the allegations as written.

150.   As and for Plaintiffs' Complaint, Paragraph 150, Defendants lack sufficient ~~150.~~ information to admit or deny the allegations as written.

151.   As and for Plaintiffs' Complaint, Paragraph 151, Defendants deny each and every allegation contained therein except refer all matters of law to this Honorable Court and/or documents which language speaks for itself.

152.   As and for Plaintiffs' Complaint, Paragraph 152, Defendants deny each and every ~~152.~~ allegation as drafted.

153.   As and for Plaintiffs' Complaint, Paragraph 153, Defendants deny each and every ~~153.~~ allegation as drafted.

## COUNT VIII

154.   Defendants repeat and reallege the foregoing responses as if set forth more fully hereunder.

155.   As and for Plaintiffs' Complaint, Paragraph 155, Defendants deny each and every ~~155.~~ allegation as drafted.

156.   As and for Plaintiffs' Complaint, Paragraph 156, Defendants admit the allegations ~~156.~~ contained therein.

157.   As and for Plaintiffs' Complaint, Paragraph 157, Defendants deny each and every ~~157.~~ allegation as drafted.

158.   As and for Plaintiffs' Complaint, Paragraph 158, Defendants deny each and every ~~158.~~ allegation as drafted.

159.   As and for Plaintiffs' Complaint, Paragraph 159, Defendants deny each and every ~~159.~~ allegation as drafted.

## COUNT IX

160.     Defendants repeat and reallege the foregoing responses as if set forth more fully hereunder.

161.     As and for Plaintiffs' Complaint, Paragraph 161, Defendants deny each and every ~~161.~~ allegation as drafted.

162.     As and for Plaintiffs' Complaint, Paragraph 162, Defendants deny each and every ~~162.~~ allegation as drafted.

163.     As and for Plaintiffs' Complaint, Paragraph 163, Defendants deny each and every ~~163.~~ allegation as drafted.

## COUNT X

164.     Defendants repeat and reallege the foregoing responses as if set forth more fully hereunder.

165.     As and for Plaintiffs' Complaint, Paragraph 165, Defendants deny each and every ~~165.~~ allegation as drafted.

166.     As and for Plaintiffs' Complaint, Paragraph 166, Defendants deny each and every ~~166.~~ allegation as drafted.

167.     As and for Plaintiffs' Complaint, Paragraph 167, Defendants deny each and every ~~167.~~ allegation as drafted.

168.     As and for Plaintiffs' Complaint, Paragraph 168, Defendants deny each and every ~~168.~~ allegation as drafted.

169.     As and for Plaintiffs' Complaint, Paragraph 169, Defendants deny each and every ~~169.~~ allegation as drafted.

170.     As and for Plaintiffs' Complaint, Paragraph 170, Defendants deny each and every ~~170.~~ allegation as drafted.

## COUNT XI

171.    Defendants repeat and reallege the foregoing responses as if set forth more fully hereunder.

172.    As and for Plaintiffs' Complaint, Paragraph 172, Defendants deny each and every ~~172.~~ allegation as drafted.

173.    As and for Plaintiffs' Complaint, Paragraph 173, Defendants deny each and every ~~173.~~ allegation as drafted.

174.    As and for Plaintiffs' Complaint, Paragraph 174, Defendants deny each and every ~~174.~~ allegation as drafted.

175.    As and for Plaintiffs' Complaint, Paragraph 175, Defendants deny each and every ~~175.~~ allegation as drafted.

176.    As and for Plaintiffs' Complaint, Paragraph 176, Defendants deny each and every ~~176.~~ allegation as drafted.

177.    As and for Plaintiffs' Complaint, Paragraph 177, Defendants deny each and every ~~177.~~ allegation as drafted.

## COUNT XII

178.    Defendants repeat and reallege the foregoing responses as if set forth more fully hereunder.

179.    As and for Plaintiffs' Complaint, Paragraph 179, Defendants deny each and every ~~179.~~ allegation as drafted.

180.    As and for Plaintiffs' Complaint, Paragraph 180, Defendants deny each and every ~~180.~~ allegation as drafted.

181.    As and for Plaintiffs' Complaint, Paragraph 181, Defendants deny each and every ~~181.~~ allegation as drafted.

182.   As and for Plaintiffs' Complaint, Paragraph 182, Defendants deny each and every ~~182.~~ allegation as drafted.

## PRAYER FOR RELIEF

183.   Defendants deny that Plaintiffs are entitled to any enumerated prayer for relief.

## AFFIRMATIVE DEFENSES

184.   As and for a First Affirmative Defense, Plaintiffs fail to state a claim upon which relief may be granted.

185.   As and for a Second Affirmative Defense, Plaintiffs failed to mitigate their damages.

186.   As and for a Third Affirmative Defense, Plaintiffs are at fault for any damages ~~186.~~ arising from Plaintiffs' alleged claims.

187.   As and for a Fourth Affirmative Defense, Plaintiffs have unclean hands.

188.   As and for a Fifth Affirmative Defense, Plaintiffs' claims are barred by the ~~188.~~ doctrines of waiver, estoppel, and consent.

189.   As and for a Sixth Affirmative Defense, Plaintiffs' claims are barred by the statute ~~189.~~ of limitations.

190.   As and for a Seventh Affirmative Defense, Plaintiffs' claims are barred by the ~~190.~~ doctrine of laches.

191.   As and for an Eighth Affirmative Defense, Plaintiffs' claims are barred as a result ~~191.~~ of Defendants exercising reasonable care.

192.   As and for a Ninth Affirmative Defense, Plaintiffs' damages are speculative.

193.   As and for a Tenth Affirmative Defense, Plaintiffs have no damages or injury.

194.   As and for a Eleventh Affirmative Defense, Plaintiffs ratified Defendants' conduct.

195.    As and for a Twelfth Affirmative Defense, Defendants' actions were justified under 195. the circumstances.

196.    As and for a Thirteenth Affirmative Defense, Plaintiffs' allegations against 196. Defendants lack causation to their damages.

197.    As and for a Fourteenth Affirmative Defense, Plaintiffs materially breached their obligations of good faith and fair dealing.

198.    As and for a Fifteenth Affirmative Defense, Defendants are indemnified and held harmless for any and all claims alleged.

199.    As and for a Sixteenth Affirmative Defense, Plaintiffs would be unjustly enriched by recovery.

## COUNTERCLAIMS

200.    The counterclaims asserted by Counterclaim Plaintiffs Braya Concepts LLC, Braya Machine Company LLC, Braya Systems LLC, Braya Ventures LLC, John Michael Long, Joshua Donnolo, and Michael Donnolo, individually and derivatively on behalf of Tecspec LLC (hereafter "Counterclaim Plaintiffs") arise primarily from the scheme of Counterclaim Defendants Ralph Schlenker, Robert Senia, Richard Rose, SRS Enterprises Inc., SRS Enterprises NJ LLC, HVAC Service Associates Inc., Numa Products, LLC, and SRS Research LLC's, (hereaftercollectively, with Counterclaim Defendant Christina Senia "Counterclaim Defendants"), cognizable under the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. §§ 1961-1968 ("RICO"), to corrupt Tecspec LLC and SRS (each defined hereunder) in pursuit of Counterclaim Defendants' intention to launder money.

## PARTIES

201.    Braya Concepts LLC is a limited liability company organized under the laws of New York, owned by Michael Donnolo, located in Richmond County New York.

202.    Braya Machine Company LLC is a limited liability company organized under the laws of New York, owned by Michael Donnolo, located in Richmond County, New York.

203.    Braya Systems LLC is a limited liability company organized under the laws of New York, owned by Michael Donnolo, located in Richmond County, New York.

204.    Braya Ventures LLC is a limited liability company organized under the laws of New York, owned by Michael Donnolo, located in Richmond County New York.

205.    Michael Donnolo is an individual residing in New York, New York, and owner of the Braya entities.

206.    John Michael Long is an individual residing in New York, New York, and was an employee of Tecspec LLC.

207.    Joshua Donnolo is an individual residing in New York, New York, and was an employee of Tecspec LLC.

208.    Upon information and belief, Ralph Schlenker is a resident of New York, who maintains ownership and control over Tecspec LLC, and SRS.

209.    Upon information and belief, Robert Senia is a resident of New Jersey, who maintains ownership and control over Tecspec LLC, and SRS.

210.    Upon information and belief, Christina Senia is a resident of New York, who is employed by or works with SRS.

211.    Numa Products, LLC ("Numa"), upon information and belief, is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in New York, New York.

212. ~~210.~~ Upon information and belief, Richard Rose is a resident of New Jersey, who maintains ownership and control over Tecspec LLC, and SRS. (Rose, Senia, and Schlenker, collectively, "Individual Counterclaim Defendants").

213. ~~211.~~ Upon information and belief, SRS Enterprises Inc. is a New York corporation owned and operated by the Individual Counterclaim Defendants, and which is located in Brooklyn, New York.

214. ~~212.~~ Upon information and belief, SRS Enterprises NJ LLC is a New Jersey corporation owned and operated by the Individual Counterclaim Defendants, and which is located in Middletown, New Jersey.

215. ~~213.~~ Upon information and belief, HVAC Service Associates, Inc. is a New Jersey corporation owned and operated by the Individual Counterclaim Defendants, and which is located in Middletown, New Jersey.

216. ~~214.~~ Upon information and belief, SRS Research LLC is a New York corporation owned and operated by the Individual Counterclaim Defendants, and which is located in Middletown, New Jersey. (SRS Enterprises Inc., SRS Enterprises NJ LLC, HVAC Service Associates, Inc., and SRS Research LLC, collectively, "SRS").

217. ~~215.~~ Tecspec LLC ("Tecspec") is a limited liability company organized under the laws

of the State of New York, with its place of business in Newark, New Jersey.

## JURISDICTION AND VENUE

218. ~~216.~~ This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as it arises under federal law, specifically the Defend Trade Secrets Act (18 U.S.C. § 1836 et seq.) and RICO statutes (18 U.S.C. §§ 1961-1968).

219. ~~217.~~ The Court has supplemental jurisdiction under 28 U.S.C. § 1367 for the state law claims that are part of the same case or controversy as the federal claims.

220. 218. Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this district, and Counterclaim Defendants reside in or conduct business within this jurisdiction.

## STATEMENT OF FACTS

A.    **Tecspec LLC.**

221. 219. Tecspec, LLC was formed over seven years ago, specifically around February 24, 2017, under the laws of the State of New York, as a limited liability company focused on the development and innovation of heating, ventilation, and air conditioning (HVAC) technologies. Robert Senia, without disclosing it to Richard Rose or Ralph Schlenker, set up Tecspec with his daughter Christina Senia as a surrogate owner to gain advantage on WBE contracts.

222. 220. Since its inception, Michael Donnolo has been the owner and manager of Tecspec, utilizing his extensive experience in both technical and design aspects of HVAC systems to influence the direction and success of the company.

223. 221. Through his engineering expertise, Michael Donnolo has developed numerous key products and innovative processes that have established Tecspec's standing in the HVAC marketplace.

224. 222. Tecspec's Operating Agreement, executed on October 6, 2017, outlines the governance and operational structure of Tecspec. Initially, Tecspec comprised two members: Christina Senia, who held a 75% ownership interest, and Michael Donnolo, holding a 25% ownership interest.

225. 223. The Operating Agreement explicitly includes provisions that permit Tecspec members to engage in other business interests without the obligation to prioritize Tecspec's operations. For instance, the Operating Agreement states that members are not required to manage

Tecspec solely and that neither Tecspec nor any member has rights to the income or profits from these other ventures unless otherwise noted.

226. 224. Importantly, Section 25 of the Operating Agreement includes a non-compete clause indicating that members will not engage in any competing business within counties where Tecspec operates, but it also recognizes that members may pursue independent business ventures, provided the business is not located in any county in which Tecspec has operated (the "Non-Compete").

227. Operating Agreement Section 25 prohibits any Tecspec member from being "directly or indirectly, …engaged in, or connected with or interested in any business which competes, in whole or in part,with [Tecspec]." In addition for a period of four (4) years after a Member is no longer either a Member or an employee of the Company, he shall not solicit business, accept business from, or deal with in any manner whatsoever, any customer or account of the Company.

228. Despite Christina Senia being an owner through 2019, Christina Senia went to work at SRS, in direct violation of the Non-Compete.

229. 225. On January 1, 2018, under pressure from Robert Senia because Richard Rose and Ralph Schlenker found out about Tecspec and that Robert Senia was using SRS funds to operate Tecspec without their knowledge, Christina Senia, assigned her 75% interest in Tecspec to three individuals: Robert Senia, Richard Rose, and Ralph Schlenker, each receiving an equal 25% share. This change was formalized but did not alter the original Operating Agreement's critical provisions.During the four-year period following her transfer of interest in Tecspec, Christina Senia worked for SRS Enterprises Inc., which was a customer and account of the company, and a company directly competing with Tecspec.At all relevant times, SRS Enterprises Inc. engaged in

selling, and continues to sell, non-Tecspec HVAC induction units, HVAC fans, and other related equipment and inventory, collectively which Tecspec has manufactured and sold.

230. 226. Since the formation of Tecspec, Michael Donnolo remains the only member with a significant technical background and expertise in HVAC.

231. 227. The Counterclaim Defendants, Ralph Schlenker, Robert Senia, and Richard Rose ("Individual Counterclaim Defendants") collectively operate entities under SRS Enterprises Inc., SRS Enterprises NJ LLC, HVAC Service Associates, Inc., and SRS Research LLC, separate from but competing with Tecspec, ultimately leveraging Tecspec resources for Individual Counterclaim Defendants' profit.

232. 228. Counterclaim Defendants have engaged in business activities that not only directly compete with Tecspec in violation of the Non-Compete but have used SRS to divert and misappropriate millions of dollars from Tecspec and Michael Donnolo.

233. Specifically, Counterclaim Defendants purchase Tecspec products at a steep discount—buying Tecspec products through the SRS Entities in order to sell the Tecspec products as the SRS Entities' products at full price to the end-user.

234. Often, these products are "sold" from Tecspec to the SRS Entities at a loss; meaning at a price significantly less than the manufacturing cost.

235. 229. Tecspec's business centered on research, development, and manufacturing for

HVAC-related technology ("HVAC Units"), included, among other things:

      i.     HVAC induction units. An HVAC induction unit is a device used in commercial and industrial spaces to distribute air efficiently. It leverages a central air handling unit to supply conditioned primary air through ductwork, which passes through narrow nozzles in the unit, creating low pressure that induces room air into the unit. This secondary air mixes with the primary air, facilitating temperature regulation before being discharged back into the room. The unit's unit's coils can be connected to chilled or hot water systems for further temperature adjustments. For Tecspec, these induction

i.  units took 3,000-4,000 hours to develop through the efforts of Michael Donnolo, John Michael Long, and Joshua Donnolo (collectively, "Individual Counterclaim Plaintiffs").

ii.  Machine-metal grilles, which attach to an HVAC encasing. Such grilles took up to 2,000 research and development hours for Tecspec to develop. These materials were researched at the direction of Robert Senia, who only sold 2 such orders before no longer promoting the manufacture of such materials.

iii.  Heating and cooling pump skids, which are trailer-sized packaged equipment which combine specialty heating and cooling components and appurtenances. These HVAC Units took 200 hours to engineer and, once plans were developed, Robert Senia absconded with the plans and gave the manufacturing plans to another company to produce.

iv.  Personal air diffusers, which are ceiling versions of an HVAC air vent, which were researched and developed at the direction of Robert Senia. The personal air diffuser took up to 750 research and development hours for Tecspec to develop. However, once the design & plans for manufacturing were developed by Tecspec, Robert Senia took the plans and gave the plans to SRS Research LLC, which then gave the plans to Numa as a buy-in for 33% of the Numa business – an HVAC manufacturer.

v.  Packaged pump systems, which are smaller versions of heating and cooling pump skids, took approximately 500 research and development hours for Tecspec to create, which Robert Senia also gave away to a different company once developed.

vi.  Extruded grilles, which are a different type of metal grating that is situated in an induction housing, which took 3,000 research and development hours, which Robert Senia also gave to a different company after Tecspec developed the designs and plans for manufacturing.

vii.  Fan coils, which is a completely different type of HVAC system, taking more than 3,000 research and development hours, that the Counterclaim Defendants made available to other companies and that Tecspec thereafter never manufactured.

(collectively, "HVAC Units")

**B.    Counterclaim Defendants' Fraudulent Scheme of "Price Manipulation"**
        ~~B.~~ **(as part of the RICO Scheme, defined hereunder).**

236.    ~~230.~~ The Individual Counterclaim Defendants, Ralph Schlenker, Robert Senia, and Richard Rose, devised a scheme to manipulate pricing for Tecspec products, effectively diverting money away from Tecspec and to themselves ("Price Manipulation").

237.    ~~231.~~ Under this scheme, Ralph Schlenker, Robert Senia, and Richard Rose unilaterally controlled the pricing structure of Tecspec's products by computing Tecspec product pricing by way of the ultimate price paid by the customer, less profits Ralph Schlenker, Robert Senia, and Richard Rose desired to keep for themselves. Ralph Schlenker, Robert Senia, and Richard Rose did not price Tecspec products based on any criteria other than what the customer was willing to pay. This computed price would correlate to the customer's price less a profit margin for SRS.

238.    ~~232.~~ For instance, in transactions involving Tecspec induction units, the Counterclaim Defendants would set a sale price (hypothetically $1,000.00 per unit) that did not reflect Tecspec's production costs, which were significantly higher (e.g., $2,500.00 per unit).

239.    ~~233.~~ Once Counterclaim Defendants secured a price from the customer, Counterclaim Defendants would then compute the price Tecspec would charge SRS for the HVAC Units. Counterclaim Defendants would build in a 30% buffer for SRS profit and then charge the remaining amount as the "purchase price" between SRS and Tecspec. For example:

240.    ~~234.~~ Hypothetical sale 1:

Individual Counterclaim Defendants, holding themselves out as owners of SRS, establish a purchase price with a customer for $1,000 per Tecspec induction unit. Counterclaim Defendants compute a 30% profit for SRS, at $300 per unit, resulting in Counterclaim Defendants having "Tecspec sell to SRS" induction units for that project at $700.

241. ~~235.~~ Contemporaneous hypothetical sale 2:

Individual Counterclaim Defendants, holding themselves out as owners of SRS, establish a purchase price with a customer for $800 per Tecspec induction unit. Counterclaim Defendants compute a 30% profit for SRS, at $240 per unit, resulting in Counterclaim Defendants having "Tecspec sell to SRS" induction units for that project at $560.

242. ~~236.~~ Despite the fact that the Tecspec induction units cost $2,500 to Tecspec to produce, Counterclaim Defendants, through SRS, always make a profit on every sale, and sell the Tecspec HVAC Units at prices without correlation to the actual cost of production. In fact, Tecspec never had a set price for selling induction units to SRS because of the scheme in which Counterclaim Defendants engaged.

243. ~~237.~~ This manipulation effectively ensured that SRS could competitively sell Tecspec products to end-users at a price that appeared advantageous but was still reflective of significant profits to the Counterclaim Defendants, while Tecspec never recovered from the cost of producing the units Counterclaim Defendants would sell.

244. ~~238.~~ This cyclical pricing strategy allowed the Counterclaim Defendants to consistently profit from each HVAC Unit sold under the SRS name, ultimately depriving Tecspec of its rightful earnings and exacerbating its ongoing financial losses.

245. ~~239.~~ Through this misrepresentation and manipulation of the market, the Counterclaim Defendants not only affected the profitability of Tecspec but also severely compromised its operational sustainability by creating unprofitability for Tecspec.

246. ~~240.~~ The actions of the Counterclaim Defendants amounted to a systematic diversion of corporate opportunities and resources from Tecspec to SRS, effectively constituting a breach of fiduciary duty and resulting in significant financial harm to Tecspec.

247. ~~241.~~ Through the foregoing scheme, Counterclaim Defendants have engaged in approximately $15 million in Tecspec sales to themselves, which translates to an extraordinary amount of funds that the Counterclaim Defendants and SRS have kept for themselves, money which belongs to Tecspec and Michael Donnolo.

**C.    The Counterclaim Defendants broke into the Braya facility
and stole proprietary information from the Braya facility.**

248.    Braya is a company created independently by Michael Donnolo. Braya engages in the sale of uniquely designed and uniquely manufactured HVAC Units.

249.    Braya maintains its competitive advantage through engineering ingenuity, use and design of certain products and materials, and the ability to actually service its products of which Senia, Rose, and Schlenker are incapable.

250.    Braya maintains certain proprietary technology, which has nothing to do with Tecspec.

251.    Notwithstanding, Senia, Rose, and Schlenker have actively maligned, defamed, and interfered with Braya's business opportunities, spreading false statements to prospective customers about the nature of Braya's technology, false statements concerning Michael Donnolo, and false statements concerning the status of litigation.

252.    Senia, Rose, and Schlenker knew the foregoing statements were false at the time they were made, designed to thwart business opportunities and prospects of Braya.

253. 242. On October 17, 2024, at approximately 12:34 PM, Richard Rose dropped off Robert Senia near the entrance of the Braya facility located at 2589 Richmond Terrace, Staten Island, New York ("Premises") with the apparent intent to "case the property."

254. 243. Shortly thereafter, at 12:45 PM, a Chevy Colorado (New York license plate number KPU5916) entered the Premises, carrying Senia and an unidentified individual.

255. 244. At the same time, Richard Rose walked onto the property, followed by two other individuals.

256. 245. Once on-site, Senia began taking pictures of everything.

257. 246. At approximately 12:47 PM, Michael Donnolo encountered Senia, Rose, and the unidentified third person while in his Smart Car.

258. 247. Michael Donnolo instructed them to leave the Premises, as captured in video footage.

259. 248. In response, Senia defiantly stated, "I'm not doing that."

260. 249. Following this confrontation, Michael Donnolo called 911 at around 12:47 PM and waited at the front of the Premises for officers to respond.

261. 250. Concurrently, at approximately 12:47 PM, Senia, Rose, and the unidentified individual opened a previously closed door at the back of the Braya Premises, thereby trespassing onto the Premises.

262. 251. While inside, Senia and Rose systematically took pictures of equipment, machinery, and other non-public information within the facility, actions documented in video footage.

263. 252. Around the same time, Joshua Donnolo also called 911 to report the ongoing incident at the Braya facility.

264. 253. Despite being told multiple times to leave the Premises, the Counterclaim Defendants continued to trespass inside the Braya facility, capturing images without consent.

Cellphone camera footage from Joshua Donnolo and John Michael Long during this period is preserved.

265. 254. The first officers arrived on the scene at 1:03 PM, as referenced in video footage.

266. 255. After the officers arrived, Senia, Rose, and the unidentified third person exited the Premises.

267. 256. Ultimately, Senia, Rose, and the third person left the property at 1:14 PM, concluding the unauthorized entry and actions within the Braya facility, taking with them photographs of Braya operations and proprietary information that they had provided to Tecspec employees, agents, and vendors.

D. The Counterclaim Defendants broke into the Braya facility and stole proprietary information from the Braya facility.

257. Braya is a company created independently by Michael Donnolo. Braya engages in the sale of uniquely designed and uniquely manufactured HVAC Units.

258. Braya maintains its competitive advantage through engineering ingenuity, use and design of certain products and materials, and the ability to actually service its products of which Senia, Rose, and Schlenker are incapable.

259. Braya maintains certain proprietary technology, which has nothing to do with Tecspec.

260. Notwithstanding, Senia, Rose, and Schlenker have actively maligned, defamed, and interfered with Braya's business opportunities, spreading false statements to prospective customers about the nature of Braya's technology, false statements concerning Michael Donnolo, and false statements concerning the status of litigation.

261. Senia, Rose, and Schlenker knew the foregoing statements were false at the time they were made, designed to thwart business opportunities and prospects of Braya.

**D. E. Racketeer Influenced and Corrupt Organizations Act (RICO); 18 U.S.C. §§ 1961- 1968 1961-1968.**

### i.    Purpose and Structure of Counterclaim Defendants' RICO enterprise;  Distinction between the RICO Persons and the <u>Association-in-Fact Enterprise.</u>

268. ~~262.~~ Counterclaim Plaintiffs allege that Counterclaim Defendants Ralph Schlenker, Robert Senia, and Richard Rose have agreed to engage in, have engaged in, and have benefited from actively participating in an association-in-fact enterprise within the meaning of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968.

269. ~~263.~~ This association-in-fact enterprise comprises RICO persons Ralph Schlenker, Robert Senia, and Richard Rose, each who have associated with each other in an association-in-fact enterprise (the "AIFE").

270. 264. Rose, Senia, and Schlenker have agreed to collaborate, and collaborated in a coordinated effort to execute a fraudulent scheme that corrupts Tecspec and SRS for the purposes of money laundering ("RICO Scheme", as further defined hereunder).

271. 265. "Money Laundering" ""is the criminal practice of processing ill-gotten gains, or "dirty" money, through a series of transactions; in this way the funds are "cleaned" so that they appear to be proceeds from legal activities.""[1]

272. 266. The Individual Counterclaim Defendants, via the AIFE, employed a variety of illegal acts to effectuate their money laundering scheme, including Mail Fraud in violation of 18

U.S.C. § 1341, Wire Fraud in violation of 18 U.S.C. § 1343, Tax Fraud in violation of 26 U.S.C. § 7201, Bank Fraud in violation of 18 U.S.C. § 1344, Commercial Bribing in the Second Degree in violation of NY-PEN § 180.00, Threats and Intimidation in violation of 18 U.S.C. § 1951, Falsifying Business Records in the First Degree in violation of NY-PEN § 170.10, and Embezzlement in the First Degree in violation of NY-PEN § 155.42.

273. 267. Robert Senia, Ralph Schlenker, and Richard Rose, each RICO persons, comprise the AIFE as defined under applicable RICO statutes, engaging in an illegal and fraudulent scheme

[1] Federal Financial Institutions Examination Council, *Bank Secrecy Act – Anti-Money Laundering Examination Manual,"* 2006, p. 7. Black's Law Dictionary, 8thed., defines the term as "[t]he act of transferring illegally obtained money through legitimate people or accounts so that its original source cannot be traced."

to launder money through their corruption of SRS and Tecspec, distributing to themselves 'clean' cash after acquiring monies through fraud and other false pretenses, obfuscating the source of such funds to, among other things, thwart recovery of ill-gotten funds and to evade taxes.

274. 268. Robert Senia, Ralph Schlenker, and Richard Rose, each, actively participate in the AIFE, and each respectively controls aspects various of the AIFE.

---

[1]    Federal Financial Institutions Examination Council, Bank Secrecy Act – Anti-Money Laundering Examination Manual," 2006, p. 7. Black's Law Dictionary, 8thed., defines the term as "[t]he act of transferring illegally obtained money through legitimate people or accounts so that its original source cannot be traced."

275. 269. Robert Senia serves as the leader of the AIFE. Senia is the primary decision maker, orchestrating the efforts of the others, Rose and Schlenker. In the scope of the money laundering RICO Scheme, Senia keeps the organizational structure and troubleshoots problems for the AIFE to continue its money laundering operations.

276. 270. Richard Rose engages in deal negotiations with potential customers, negotiating sales of HVAC Units, which serves as the foundation for the AIFE to operate. In the scope of the money laundering RICO Scheme, Rose controls and coordinates illicit money transfers between, Tecspec, SRS, and the Individual Counterclaim Defendants, predicated on fraudulent and false- appearing business documents and deliberately misleading bookkeeping practices to falsely and in all other ways materially mischaracterize the financial health of Tecspec and SRS to elicit additional income of funds under false pretenses via loan proceeds.

277. 271. Ralph Schlenker engages in sales under the auspice of acting as a "sales engineer," pitching purchase opportunities and bringing in potential customers for the various entities. Schlenker controls and coordinates false appearing "services" which are later imputed to Tecspec by SRS and the Individual Counterclaim Defendants. In the scope of the RICO Scheme, Schlenker's coordination of alleged "services" -- that have never been offered or performed by Tecspec but for which Tecspec was back-billed, as well as the alleged business generated for SRS but using assets of Tecspec -- provides the foundation upon which the illicit activities of the AIFE are conducted, including perpetual self-dealing transactions which embezzle Tecspec products, money, and value.

278. 272. Separate and apart of the foregoing, each of Senia, Schlenker, and Rose have agreed to participate, and continue to participate, in gross financial misappropriation via other illicit

activities, including Mail Fraud in violation of 18 U.S.C. § 1341, Wire Fraud in violation of 18

U.S.C. § 1343, Tax Fraud in violation of 26 U.S.C. § 7201, Bank Fraud in violation of 18 U.S.C.

§ 1344, Commercial Bribing in the Second Degree in violation of NY-PEN § 180.00, Threats and

Intimidation in violation of 18 U.S.C. § 1951, Falsifying Business Records in the First Degree in

violation of NY-PEN § 170.10, and Embezzlement in the First Degree in violation of NY-PEN §

155.42. (RICO Scheme).

279. 273. Through this RICO Scheme, each of the RICO persons have engaged in a

pattern of racketeering activity that encompasses fraud, tax evasion, and threats of violence and

intimidation, all of which are illegal and constitute predicate acts under 18 U.S.C. § 1961.

### ii.        The AIFE's Corruption of Tecspec and SRS.

280. 274. One objective of the AIFE was to siphon profits away from Tecspec and

isolate losses so that none of the AIFE would incur reductions of funds that the AIFE would

otherwise collect, irrespective of such reductions being valid and necessary business expenses.

See Price Manipulation scheme, above.

281. 275. The Price Manipulation Scheme was designed to maximize funds flowing to

the AIFE, at the severe and fatal detriment to Tecspec. By executing the RICO Scheme, the

AIFE aimed to enrich each of the RICO persons at the direct expense of Tecspec and Michael

Donnolo, undermining Tecspec's operational stability and financial integrity. This AIFE

organization was not a mere coincidence; rather, it involved a deliberate and systematic approach

using embezzlement and fraud.

282. 276. Under the RICO Scheme, the Individual Counterclaim Defendants

established fraudulent accounting and bookkeeping practices, as well as pricing structures, that

allowed them to create misleading profitability projections that were not reflective of

Tecspec'sTecspec's or SRS's true financial health. They engaged in the Price Manipulation

scheme to ensure SRS always secured a

profit despite selling products (owned by Tecspec) at below production cost, diverting away from Tecspec millions of dollars in value, product, and cash.

283. 277. The AIFE manufactured and provided to Bank of America, and other financial institutions, false corporate records, or "cooked books," for the purposes of inducing Bank of America and others to issue to Tecspec and the AIFE millions of dollars in loans, including lines of credit and other financing. Each of the RICO persons participated in manufacturing of the false business records, which each of Senia, Schlenker, and Rose conferred and decided to use in the course of committing bank fraud, submitting those false records for the purposes of securing bank financing based on false financial documents.

284. 278. Once loan proceeds were issued, those proceeds were immediately recharacterized and reflected in further "cooked books" not as loan proceeds, but rather as "profits" or "business revenue" or "loans" between SRS and Tecspec, which the AIFE used to falsely recast bank loans as assets of SRS. The system was designed to falsely prove that SRS was generating millions of dollars in income when it was not, using Tecspec as the special purpose vehicle to dump any and all expenses, costs, or liabilities. Specific examples are below.

### iii. 18 U.S.C. § 1961; Predicate Acts

285. 279. The Individual Counterclaim Defendants' unlawful activities included a series of

predicate acts of racketeering under 18 U.S.C. § 1961.

#### (1) Predicate acts concerning the AIFE's bank fraud; instances of Falsifying Business Records In The First Degree under NY-PEN § 175.10.

286. 280. Starting in the fourth quarter of 2018, Senia, Rose, and Schlenker engaged in a practice of creating fraudulent business records for SRS and Tecspec. Specifically:

287. 281. In or about October 2018, SRS started to receive pre-payments for HVAC Units (which it never manufactured but would routinely embezzle from Tecspec). As a pre-

payment

delivered to SRS for a product that SRS did not own or manufacture, this pre-payment could not legally be classified as, either "income" or an "asset" for SRS. Instead, pre-payment for products is considered a liability against cash on-hand. Upon information and belief, in the last quarter of 2018, SRS received approximately $500,000 in pre-payments. That belief is informed by Michael Donnolo's review of, among other things, business records of Tecspec reflecting loans from SRS to Tecspec.

288. ~~282.~~ Such pre-payments were specifically earmarked for purchasing materials in connection with the manufacturing needs of various orders made to SRS for HVAC Units.

289. ~~283.~~ However, wanting to give the false appearance that such pre-payments were purely 'profit' instead of funds earmarked to cover manufacturing expense, Senia, Rose, and Schlenker falsely mischaracterized such funds as "loan" funds issued to Tecspec.

290. ~~284.~~ By the foregoing mischaracterization, Senia, Rose, and Schlenker claimed the foregoing pre-payments as "assets" of SRS (as accounts receivables) instead of liabilities for SRS.

291. ~~285.~~ After diverting the pre-payments from SRS to Tecspec under the false pretense of being "loans", Senia, Rose, and Schlenker used Tecspec to purchase materials for use in manufacturing the ordered HVAC Units. This way, SRS could and did falsely report the pre-payments as "income," falsely report the "loan to Tecspec" (in the amount of the pre-payments to SRS) as SRS "assets" by way of accounts receivable and scuttle any expenses to Tecspec. In this method, Senia, Rose, and Schlenker actively and fraudulently concealed business expenses so Senia, Rose, and Schlenker could omit same on loan applications.

292. ~~286.~~ The foregoing paradigm was the normal course of business for Senia, Rose, and Schlenker, who corrupted the purpose of Tecspec; instead of using Tecspec as a viable business,

Senia, Rose, and Schlenker used Tecspec as a dumping ground for operational expense, guaranteeing Tecspec would never make money.

293. ~~287.~~ And after the product was manufactured by Tecspec, Senia, Rose, and Schlenker diverted the products back to themselves/SRS at a "price" below even the cost to manufacture the products, which allowed SRS to continuously report profits when, in fact, the operation as a whole was losing massive amounts of money.

294. ~~288.~~ Senia, Rose, and Schlenker further used the false-appearing corporate records of SRS to induce Bank of America to issue Senia, Rose, and Schlenker business loans in the amount of millions of dollars.

295. ~~289.~~ The aforementioned business loans were secured under false pretenses, on false business records that Senia, Rose, and Schlenker collectively created, agreed to submit, and then submitted to Bank of America from January 2019 through to March 2019.

296. ~~290.~~ And after the business loans were issued upon false business records, Senia, Rose, and Schlenker then diverted the loan proceeds to themselves.

297. ~~291.~~ The foregoing is part of the RICO Scheme in that Senia, Rose, and Schlenker, through the AIFE, corrupted Tecspec, using Tecspec to "sanitize" and falsify SRS's business records for the purpose of submitting those false records to induce the issuance of business loans. Once the money was received by AIFE, the AIFE then engaged in money laundering, transferring the loan proceeds through their various business entities, which ultimately ended with Senia, Rose, and Schlenker receiving the loan proceeds themselves.

298. ~~292.~~ Moreover, the profits that Tecspec should have realized, which were associated with the manufacturing expense that Senia, Rose, and Schlenker shifted to Tecspec, were further diverted back to SRS, which Senia, Rose, and Schlenker further laundered, such funds ultimately

being funneled through SRS and the AIFE to conceal the source of such funds, allowing Senia, Rose, and Schlenker to take possession of such funds themselves.

299. ~~293.~~ Each of Senia, Rose, and Schlenker actively participated in this part of the RICO Scheme, each certifying false business records in violation of NY-PEN § 175.10, and then sending those fraudulent records through the mail and/or over the wires to Bank of America at multiple times from January 2019 through March 2019, in violation of 18 U.S.C. §§ 1341, 1343.

300. ~~294.~~ The foregoing is pleaded on information and belief, such belief formed by phone calls in January 2020, whereby Michael Donnolo conferenced with the then-Chief Operations Officer of SRS who provided the foregoing explanations to Michael Donnolo's questions as to why Tecspec was reporting numerous "loans" received by SRS. Michael Donnolo had a follow up phone call several weeks later with Counterclaim Defendant Rose, who further confirmed the foregoing, addressing Michael Donnolo's question as to how SRS could possibly charge Tecspec "interest" on "loans" that SRS never genuinely gave Tecspec and that Tecspec never solicited,

needed, or received. Mr. Rose's response to Michael Donnolo's inquiry was to reassure Mr. Donnolo that the "interest" was only for appearances and that Tecspec could "invoice back" the interest to SRS. Of course, Mr. Donnolo was unaware at that time that Senia, Rose, and Schlenker were using the false corporate documents they generated to commit bank fraud in securing loans in the names of SRS and Tecspec, proceeds from which Senia, Rose, and Schlenker were diverting to themselves.

> **(2)     Predicate acts concerning AIFE's bank fraud; Fifteen instances  of bank fraud (18 U.S.C. § 1344), committed upon Falsified Business Records In The First Degree (NY-PEN § 175.10) sent over through the mail and/or over wire (18 U.S.C. §§ 1341, 1343).**

301. ~~295.~~ Senia, Rose, and Schlenker each communicated about, authorized the use of, and caused  to submit financial documents to Bank of America and other financial institutions

containing materially false representations by deliberately mischaracterizing the nature of reported funds, the status of Tecspec contracts, and the disposition of Tecspec liabilities. Such statements were materially false, submitted to Bank of America and other financial institutions for the express purpose of inducing same to loan money.

302. 296. Specifically, on or about May 2019, the RICO persons of the AIFE induced Tecspec and Michael Donnolo to agree to open a line of credit on behalf of, among others, Tecspec, with a credit limit of $7 million ($7,000,000.00) dollars ("Credit Line").

303. 297. Senia, as the ringleader of the AIFE, in or about April 2019, contacted Michael Donnolo by phone and advised that Senia, Rose, and Schlenker sought to requisition a secured revolving line of credit from Bank of America, which Senia falsely stated would be used to purchase machines, materials, marketing space, and to cover expenses for Tecspec.

304. 298. Unbeknownst to Michael Donnolo at the time, Senia, Rose, and Schlenker had engaged in bank fraud leading up to the application for and issuance of the Credit Line in 2018- 2019 as outlined above.

305. 299. Upon Senia's representation, Michael Donnolo, on behalf of Tecspec, signed loan

documents to secure a $7 million dollar Credit Line, secured by all the assets in Tecspec.

306. 300. As a condition for this Credit Line, Rose, Senia, and Schlenker, as well as Tecspec, were required to submit quarterly reports to Bank of America, explaining sales numbers and the use of funds distributed from the Credit Line.

307. 301. Upon information and belief, each of Rose, Senia, and Schlenker used the Credit Line to line their pockets instead of using the Credit Line for any legitimate business expenses, which included Senia, Schlenker, and Rose, each, purchasing high end sports cars and other luxury items unrelated to the Tecspec business despite the Credit Line being taken out after pledging

Tecspec as collateral for the Credit Line. That information is based on Michael Donnolo's review of Tecspec financials as well as the coinciding purchases by the AIFE members with the issuance of the Credit Line.

308. ~~302.~~ Much like they did in committing bank fraud leading up to the issuance of the Credit Line (section (iii)[1] above), Senia, Schlenker, and Rose took pre-payments made to SRS and falsely mischaracterized those pre-payments as "loans" to Tecspec, which then-purchased the materials needed to fulfill the orders of HVAC Units. This way, Senia, Schlenker, and Rose created false business records, which each of them signed and agreed to submit to Bank of America, upon which they intended Bank of America to rely to satisfy the covenants in the Credit Line agreement which pertained to showing certain benchmarks for conducting business, such reports submitted quarterly (singly "Fraudulent Financial Report", collectively, "Fraudulent Financial Reports").

309. ~~303.~~ Upon submitting the Fraudulent Financial Reports to Bank of America, Senia, Schlenker, and Rose each knew that the thresholds for conducting business required by Bank of America were not met, yet each falsely represented to Bank of America that such thresholds were met. They knew the statements in the Fraudulent Financial Reports were false at the time they made such statements, intending Bank of America to rely on such false statements to leave open the revolving Credit Line.

310. ~~304.~~ Each of Senia, Rose, and Schlenker abused the Credit Line for their own personal gain, making personal purchases and diverting to themselves the proceeds from the Credit Line

despite representing to Michael Donnolo that any such use of the Credit Line would be solely dedicated to Tecspec for business use only. This information is informed by Michael Donnolo's review of Tecspec financials and conversations with the AIFE members, as well as the accountant for Tecspec.

311. 305. Upon information and belief, Rose, Senia, and Schlenker used the Fraudulent Financial Reports to falsely report that SRS and Tecspec were doing millions of dollars in business, with millions being earned in profit. Except, no such business was actually conducted; rather, Rose, Senia, and Schlenker committed bank fraud by submitting false Fraudulent Financial Reports, giving the appearance of such business by the AIFE members to Bank of America by shifting money around between entities.

312. 306. Upon information and belief, Senia, Rose, and Schlenker further contributed to the Fraudulent Financial Reports by invoicing or crediting back Tecspec for various services that Tecspec never actually provided, or for products that Tecspec never actually purchased. For example, Senia, Rose, and Schlenker would 'credit back' SRS installation service charges to Tecspec when in fact Tecspec never offered installation service. The effect was an improper diversion of cash or balance sheet value from Tecspec to SRS so that Senia, Rose, and Schlenker could further prop up the SRS balance sheet by claiming credits for services that did not exist and products that were never purchased. The foregoing contributed to the false statements in the submitted Fraudulent Financial Reports. This belief is formed by Michael Donnolo witnessing the purported back charges for installation services never performed or offered by Tecspec, as well as his witnessing Senia, Schlenker, and Rose's requests for reimbursement on invoices for products that Tecspec never purchased or used.

313. 307. Moreover, Rose, Schlenker, and Senia manipulated prices on "sales" by Tecspec to SRS and other AIFE entities, where in fact there were no actual sales or transfers of assets. For example, Rose, Schlenker, and Senia embezzled massive amounts of product from Tecspec by booking $1 million in sales by Tecspec to SRS but transferring, for e.g., over $2 million worth of

product to SRS. In such an instance, the books showed $1 million in sales revenues when the book entry was actually embezzlement of over $1 million in products from Tecspec to SRS by the AIFE.

314. ~~308.~~ The AIFE then sold the $1 million in products it embezzled from Tecspec under the SRS banner, diverting to themselves the cash value sold for the $1 million in Tecspec product.

315. ~~309.~~ This further allowed SRS to report additional "profit" for having sold Tecspec products under the SRS banner that, neither SRS nor the AIFE ever paid for.

316. ~~310.~~ The AIFE then used the numbers sold from the embezzled Tecspec products to manufacture false Fraudulent Financial Reports to secure additional loan proceeds from Bank of America, for which Tecspec was pledged as security/collateral. And yet, they used the loan proceeds, and Credit Line, as their own personal bank account.

317. ~~311.~~ Rose, Schlenker, and Senia created false Fraudulent Financial Reports of Tecspec which they knew were false, and which took planning by Rose, Schlenker, and Senia to appear legitimate despite containing materially false information that inaccurately and deliberately misled the readers of such documents of the financial health of Tecspec.

318. ~~312.~~ Upon information and belief, Rose, Schlenker, and Senia agreed to create, then created, and then signed the Fraudulent Financial Reports. This belief is informed by Michael Donnolo's review of the loan documents which required quarterly reporting on the Credit Line, as well as review of Tecspec financials which revealed bank balances deliberately mischaracterized as "business revenue" that Michael Donnolo understood to be pre-payments to SRS that Rose, Senia, and Schlenker improperly diverted to Tecspec so to avoid reporting use of such pre-payments by SRS for materials purchases. The foregoing belief is further formed based on the conversations Michael Donnolo had with the Chief Operating Officer of SRS in January 2020,

where the foregoing paradigm was confirmed, and three weeks later confirmed by Rose in a phone call with Michael Donnolo.

319. 313. Further, Michael Donnolo had seen and questioned the Fraudulent Financial Reports to Bank of America in which all three of Senia, Rose, and Schlenker signed (at no time did Michael Donnolo sign), each of member of the AIFE certifying the accuracy and correctness of the Fraudulent Financial Reports, which each of Senia, Rose, and Schlenker knew were false,

inaccurate, and whom had taken steps to actively deceive Bank of America of the true financial condition of Tecspec and SRS.

320. 314. As a predicate act of bank fraud (18 U.S.C. § 1344), mail fraud (18 U.S.C. § 1341) and/or wire fraud (18 U.S.C. § 1343), and falsifying business documents in the first degree (NY- PEN § 170.10), in July 2019 each of Senia, Rose, and Schlenker agreed to submit, and knowingly submitted, a Fraudulent Financial Report to Bank of America covering the 2nd Quarter of 2019. Upon information and belief, such belief formed by the facts stated above, Senia, Rose, and Schlenker made knowingly false statements about the reported profits of SRS, knowingly false statements inflating business revenues and assets of SRS and Tecspec, falsely underrepresenting liabilities and expenses, and overall misrepresenting the financial health and business activity of SRS and Tecspec. The foregoing was certified by Rose, Schlenker, and Senia as being true. The false statements therein were presented to Bank of America to show that SRS revenues were positive, trending upward, and/or that SRS and/or Tecspec were making a profit when in fact SRS was reporting profits by selling embezzled Tecspec products and Tecspec was operating at a deep net loss far in excess of any profits diverted to SRS. These statements were calculated to induce Bank of America to continue lending under the Credit Line, which was abused by Senia, Rose, and Schlenker and who each signed the Fraudulent Financial Report as being accurate. Senia,

Rose, and Schlenker knew such statements to be false at the time the Fraudulent Financial Report was submitted. Tecspec was actively injured by this in that Schlenker, Rose, and Senia each continued to benefit from using and abusing the Credit Line for which the assets of Tecspec were pledged as collateral with an increasing amount of debt that Tecspec would need to pay back.

321. 315. As a predicate act of bank fraud (18 U.S.C. § 1344), mail fraud (18 U.S.C. § 1341) and/or wire fraud (18 U.S.C. § 1343), and falsifying business documents in the first degree (NY- PEN § 170.10), in October 2019 each of Senia, Rose, and Schlenker agreed to submit, and knowingly submitted, a Fraudulent Financial Report to Bank of America covering the 3rd Quarter of 2019. Upon information and belief, such belief formed by the facts stated above, Senia, Rose, and Schlenker made knowingly false statements about the reported profits of SRS, knowingly false

statements inflating business revenues and assets of SRS and Tecspec, falsely underrepresenting liabilities and expenses, and overall misrepresenting the financial health and business activity of SRS and Tecspec. The foregoing was certified by Rose, Schlenker, and Senia as being true. The false statements therein were presented to Bank of America to show that SRS revenues were positive, trending upward, and/or that SRS and/or Tecspec were making a profit when in fact SRS was reporting profits by selling embezzled Tecspec products and Tecspec was operating at a deep net loss far in excess of any profits diverted to SRS. These statements were calculated to induce Bank of America to continue lending under the Credit Line, which was abused by Senia, Rose, and Schlenker and who each signed the Fraudulent Financial Report as being accurate. Senia, Rose, and Schlenker knew such statements to be false at the time the Fraudulent Financial Report was submitted. Tecspec was actively injured by this in that Schlenker, Rose, and Senia each continued to benefit from using and abusing the Credit Line for which the assets of Tecspec were pledged as collateral with an increasing amount of debt that Tecspec would need to pay back.

322. 316. As a predicate act of bank fraud (18 U.S.C. § 1344), mail fraud (18 U.S.C. § 1341) and/or wire fraud (18 U.S.C. § 1343), and falsifying business documents in the first degree (NY- PEN § 170.10), in January 2020 each of Senia, Rose, and Schlenker agreed to submit, and knowingly submitted, a Fraudulent Financial Report to Bank of America covering the 4th Quarter of 2019. Upon information and belief, such belief formed by the facts stated above, Senia, Rose, and Schlenker made knowingly false statements about the reported profits of SRS, knowingly false statements inflating business revenues and assets of SRS and Tecspec, falsely underrepresenting liabilities and expenses, and overall misrepresenting the financial health and business activity of SRS and Tecspec. The foregoing was certified by Rose, Schlenker, and Senia as being true. The false statements therein were presented to Bank of America to show that SRS revenues were positive, trending upward, and/or that SRS and/or Tecspec were making a profit when in fact SRS was reporting profits by selling embezzled Tecspec products and Tecspec was operating at a deep net loss far in excess of any profits diverted to SRS. These statements were calculated to induce Bank of America to continue lending under the Credit Line, which was abused by Senia, Rose,

and Schlenker and who each signed the Fraudulent Financial Report as being accurate. Senia, Rose, and Schlenker knew such statements to be false at the time the Fraudulent Financial Report was submitted. Tecspec was actively injured by this in that Schlenker, Rose, and Senia each continued to benefit from using and abusing the Credit Line for which the assets of Tecspec were pledged as collateral with an increasing amount of debt that Tecspec would need to pay back.

323. 317. As a predicate act of bank fraud (18 U.S.C. § 1344), mail fraud (18 U.S.C. § 1341) and/or wire fraud (18 U.S.C. § 1343), and falsifying business documents in the first degree (NY- PEN § 170.10), in April 2020 each of Senia, Rose, and Schlenker agreed to submit, and knowingly submitted, a Fraudulent Financial Report to Bank of America covering the 1st Quarter of 2020.

Upon information and belief, such belief formed by the facts stated above, Senia, Rose, and Schlenker made knowingly false statements about the reported profits of SRS, knowingly false statements inflating business revenues and assets of SRS and Tecspec, falsely underrepresenting liabilities and expenses, and overall misrepresenting the financial health and business activity of SRS and Tecspec. The foregoing was certified by Rose, Schlenker, and Senia as being true. The false statements therein were presented to Bank of America to show that SRS revenues were positive, trending upward, and/or that SRS and/or Tecspec were making a profit when in fact SRS was reporting profits by selling embezzled Tecspec products and Tecspec was operating at a deep net loss far in excess of any profits diverted to SRS. These statements were calculated to induce Bank of America to continue lending under the Credit Line, which was abused by Senia, Rose, and Schlenker and who each signed the Fraudulent Financial Report as being accurate. Senia, Rose, and Schlenker knew such statements to be false at the time the Fraudulent Financial Report was submitted. Tecspec was actively injured by this in that Schlenker, Rose, and Senia each continued to benefit from using and abusing the Credit Line for which the assets of Tecspec were pledged as collateral with an increasing amount of debt that Tecspec would need to pay back.

324.    318. As a predicate act of bank fraud (18 U.S.C. § 1344), mail fraud (18 U.S.C. § 1341) and/or wire fraud (18 U.S.C. § 1343), and falsifying business documents in the first degree (NY- PEN § 170.10), in July 2020 each of Senia, Rose, and Schlenker agreed to submit, and knowingly

submitted, a Fraudulent Financial Report to Bank of America covering the 2nd Quarter of 2020. Upon information and belief, such belief formed by the facts stated above, Senia, Rose, and Schlenker made knowingly false statements about the reported profits of SRS, knowingly false statements inflating business revenues and assets of SRS and Tecspec, falsely underrepresenting liabilities and expenses, and overall misrepresenting the financial health and business activity of

SRS and Tecspec. The foregoing was certified by Rose, Schlenker, and Senia as being true. The false statements therein were presented to Bank of America to show that SRS revenues were positive, trending upward, and/or that SRS and/or Tecspec was making a profit when in fact SRS was reporting profits by selling embezzled Tecspec products and Tecspec was operating at a deep net loss far in excess of any profits diverted to SRS. These statements were calculated to induce Bank of America to continue lending under the Credit Line, which was abused by Senia, Rose, and Schlenker and who each signed the Fraudulent Financial Report as being accurate. Senia, Rose, and Schlenker knew such statements to be false at the time the Fraudulent Financial Report was submitted. Tecspec was actively injured by this in that Schlenker, Rose, and Senia each continued to benefit from using and abusing the Credit Line for which the assets of Tecspec were pledged as collateral with an increasing amount of debt that Tecspec would need to pay back.

325. 319. As a predicate act of bank fraud (18 U.S.C. § 1344), mail fraud (18 U.S.C. § 1341) and/or wire fraud (18 U.S.C. § 1343), and falsifying business documents in the first degree (NY- PEN § 170.10), in October 2020 each of Senia, Rose, and Schlenker agreed to submit, and knowingly submitted, a Fraudulent Financial Report to Bank of America covering the 3rd Quarter of 2020. Upon information and belief, such belief formed by the facts stated above, Senia, Rose, and Schlenker made knowingly false statements about the reported profits of SRS, knowingly false statements inflating business revenues and assets of SRS and Tecspec, falsely underrepresenting liabilities and expenses, and overall misrepresenting the financial health and business activity of SRS and Tecspec. The foregoing was certified by Rose, Schlenker, and Senia as being true. The false statements therein were presented to Bank of America to show that SRS revenues were positive, trending upward, and/or that SRS and/or Tecspec was making a profit when in fact SRS

was reporting profits by selling embezzled Tecspec products and Tecspec was operating at a deep

net loss far in excess of any profits diverted to SRS. These statements were calculated to induce Bank of America to continue lending under the Credit Line, which was abused by Senia, Rose, and Schlenker and who each signed the Fraudulent Financial Report as being accurate. Senia, Rose, and Schlenker knew such statements to be false at the time the Fraudulent Financial Report was submitted. Tecspec was actively injured by this in that Schlenker, Rose, and Senia each continued to benefit from using and abusing the Credit Line for which the assets of Tecspec were pledged as collateral with an increasing amount of debt that Tecspec would need to pay back.

326.   320.  As a predicate act of bank fraud (18 U.S.C. § 1344), mail fraud (18 U.S.C. § 1341) and/or wire fraud (18 U.S.C. § 1343), and falsifying business documents in the first degree (NY- PEN § 170.10), in January 2021 each of Senia, Rose, and Schlenker agreed to submit, and knowingly submitted, a Fraudulent Financial Report to Bank of America covering the 4th Quarter of 2020. Upon information and belief, such belief formed by the facts stated above, Senia, Rose, and Schlenker made knowingly false statements about the reported profits of SRS, knowingly false statements inflating business revenues and assets of SRS and Tecspec, falsely underrepresenting liabilities and expenses, and overall misrepresenting the financial health and business activity of SRS and Tecspec. The foregoing was certified by Rose, Schlenker, and Senia as being true. The false statements therein were presented to Bank of America to show that SRS revenues were positive, trending upward, and/or that SRS and/or Tecspec was making a profit when in fact SRS was reporting profits by selling embezzled Tecspec products and Tecspec was operating at a deep net loss far in excess of any profits diverted to SRS. These statements were calculated to induce Bank of America to continue lending under the Credit Line, which was abused by Senia, Rose, and Schlenker and who each signed the Fraudulent Financial Report as being accurate. Senia, Rose, and Schlenker knew such statements to be false at the time the Fraudulent Financial Report

was submitted. Tecspec was actively injured by this in that Schlenker, Rose, and Senia each continued to benefit from using and abusing the Credit Line for which the assets of Tecspec were pledged as collateral with an increasing amount of debt that Tecspec would need to pay back.

327. 321. As a predicate act of bank fraud (18 U.S.C. § 1344), mail fraud (18 U.S.C. § 1341) and/or wire fraud (18 U.S.C. § 1343), and falsifying business documents in the first degree (NY- PEN § 170.10), in April 2021 each of Senia, Rose, and Schlenker agreed to submit, and knowingly submitted, a Fraudulent Financial Report to Bank of America covering the 1st Quarter of 2021. Upon information and belief, such belief formed by the facts stated above, Senia, Rose, and Schlenker made knowingly false statements about the reported profits of SRS, knowingly false statements inflating business revenues and assets of SRS and Tecspec, falsely underrepresenting liabilities and expenses, and overall misrepresenting the financial health and business activity of SRS and Tecspec. The foregoing was certified by Rose, Schlenker, and Senia as being true. The false statements therein were presented to Bank of America to show that SRS revenues were positive, trending upward, and/or that SRS and/or Tecspec was making a profit when in fact SRS was reporting profits by selling embezzled Tecspec products and Tecspec was operating at a deep net loss far in excess of any profits diverted to SRS. These statements were calculated to induce Bank of America to continue lending under the Credit Line, which was abused by Senia, Rose, and Schlenker and who each signed the Fraudulent Financial Report as being accurate. Senia, Rose, and Schlenker knew such statements to be false at the time the Fraudulent Financial Report was submitted. Tecspec was actively injured by this in that Schlenker, Rose, and Senia each continued to benefit from using and abusing the Credit Line for which the assets of Tecspec were pledged as collateral with an increasing amount of debt that Tecspec would need to pay back.

328.    322. On May 24, 2021, Bank of America reduced the Credit Line from $7 million to $4 million. Upon information and belief, the basis for this decision by Bank of America was based on the questionable Fraudulent Financial Reports submitted by Senia, Rose, and Schlenker.

329.    323. As a predicate act of bank fraud (18 U.S.C. § 1344), mail fraud (18 U.S.C. § 1341) and/or wire fraud (18 U.S.C. § 1343), and falsifying business documents in the first degree (NY- PEN § 170.10), in July 2021 each of Senia, Rose, and Schlenker agreed to submit, and knowingly submitted, a Fraudulent Financial Report to Bank of America covering the 2nd Quarter of 2021. Upon information and belief, such belief formed by the facts stated above, Senia, Rose, and

Schlenker made knowingly false statements about the reported profits of SRS, knowingly false statements inflating business revenues and assets of SRS and Tecspec, falsely underrepresenting liabilities and expenses, and overall misrepresenting the financial health and business activity of SRS and Tecspec. The foregoing was certified by Rose, Schlenker, and Senia as being true. The false statements therein were presented to Bank of America to show that SRS revenues were positive, trending upward, and/or that SRS and/or Tecspec were making a profit when in fact SRS was reporting profits by selling embezzled Tecspec products and Tecspec was operating at a deep net loss far in excess of any profits diverted to SRS. These statements were calculated to induce Bank of America to continue lending under the Credit Line, which was abused by Senia, Rose, and Schlenker and who each signed the Fraudulent Financial Report as being accurate. Senia, Rose, and Schlenker knew such statements to be false at the time the Fraudulent Financial Report was submitted. Tecspec was actively injured by this in that Schlenker, Rose, and Senia each continued to benefit from using and abusing the Credit Line for which the assets of Tecspec were pledged as collateral with an increasing amount of debt that Tecspec would need to pay back.

330. 324. As a predicate act of bank fraud (18 U.S.C. § 1344), mail fraud (18 U.S.C. § 1341) and/or wire fraud (18 U.S.C. § 1343), and falsifying business documents in the first degree (NY- PEN § 170.10), in October 2021 each of Senia, Rose, and Schlenker agreed to submit, and knowingly submitted, a Fraudulent Financial Report to Bank of America covering the 3rd Quarter of 2021. Upon information and belief, such belief formed by the facts stated above, Senia, Rose, and Schlenker made knowingly false statements about the reported profits of SRS, knowingly false statements inflating business revenues and assets of SRS and Tecspec, falsely underrepresenting liabilities and expenses, and overall misrepresenting the financial health and business activity of SRS and Tecspec. The foregoing was certified by Rose, Schlenker, and Senia as being true. The false statements therein were presented to Bank of America to show that SRS revenues were positive, trending upward, and/or that SRS and/or Tecspec were making a profit when in fact SRS was reporting profits by selling embezzled Tecspec products and Tecspec was operating at a deep net loss far in excess of any profits diverted to SRS. These statements were calculated to induce

Bank of America to continue lending under the Credit Line, which was abused by Senia, Rose, and Schlenker and who each signed the Fraudulent Financial Report as being accurate. Senia, Rose, and Schlenker knew such statements to be false at the time the Fraudulent Financial Report was submitted. Tecspec was actively injured by this in that Schlenker, Rose, and Senia each continued to benefit from using and abusing the Credit Line for which the assets of Tecspec were pledged as collateral with an increasing amount of debt that Tecspec would need to pay back.

331. 325. As a predicate act of bank fraud (18 U.S.C. § 1344), mail fraud (18 U.S.C. § 1341) and/or wire fraud (18 U.S.C. § 1343), and falsifying business documents in the first degree (NY- PEN § 170.10), on or about January 13, 2022, upon information and belief, Senia, Schlenker, and Rose directed Kevin Finley, Controller for SRS, to inaccurately reflect inventory thereby

increasing ~~Tecspec's~~ Tecspec's profit on documents provided to Bank of America for the renewal of a line of credit which, upon information and belief, contained false statements specifically to induce Bank of America to continue issuing a line of credit. Upon information and belief, Rose, Senia, and Schlenker caused to be submitted financial documents which falsely reported the health of SRS and Tecspec to induce Bank of America to continue lending. This is believed to be true based on the explanation by Kevin Finley that he would not accurately reflect the inventory Tecspec had on hand as of December 31, 2021. Finley explained that they intended not to show another year of Tecspec losses to Bank of America. The foregoing false statements were communicated through telephone and e-mail, and were materially relied upon by Bank of America to continue issuance of a line of credit, uses and advances against which inured solely to the AIFE, not Tecspec.

332. ~~326.~~ As a predicate act of bank fraud (18 U.S.C. § 1344), mail fraud (18 U.S.C. § 1341) and/or wire fraud (18 U.S.C. § 1343), and falsifying business documents in the first degree (NY- PEN § 170.10), in January 2022 each of Senia, Rose, and Schlenker agreed to submit, and knowingly submitted, a Fraudulent Financial Report to Bank of America covering the 4th Quarter of 2021. Upon information and belief, such belief formed by the facts stated above, Senia, Rose, and Schlenker made knowingly false statements about the reported profits of SRS, knowingly false

statements inflating business revenues and assets of SRS and Tecspec, falsely underrepresenting liabilities and expenses, and overall misrepresenting the financial health and business activity of SRS and Tecspec. The foregoing was certified by Rose, Schlenker, and Senia as being true. The false statements therein were presented to Bank of America to show that SRS revenues were positive, trending upward, and/or that SRS and/or Tecspec were making a profit when in fact SRS was reporting profits by selling embezzled Tecspec products and Tecspec was operating at a deep net loss far in excess of any profits diverted to SRS. These statements were calculated to induce

Bank of America to continue lending under the Credit Line, which was abused by Senia, Rose, and Schlenker and who each signed the Fraudulent Financial Report as being accurate. Senia, Rose, and Schlenker knew such statements to be false at the time the Fraudulent Financial Report was submitted. Tecspec was actively injured by this in that Schlenker, Rose, and Senia each continued to benefit from using and abusing the Credit Line for which the assets of Tecspec were pledged as collateral with an increasing amount of debt that Tecspec would need to pay back.

333. 327. As a predicate act of bank fraud (18 U.S.C. § 1344), mail fraud (18 U.S.C. § 1341) and/or wire fraud (18 U.S.C. § 1343), and falsifying business documents in the first degree (NY- PEN § 170.10), in April 2022 each of Senia, Rose, and Schlenker agreed to submit, and knowingly submitted, a Fraudulent Financial Report to Bank of America covering the 1st Quarter of 2022. Upon information and belief, such belief formed by the facts stated above, Senia, Rose, and Schlenker made knowingly false statements about the reported profits of SRS, knowingly false statements inflating business revenues and assets of SRS and Tecspec, falsely underrepresenting liabilities and expenses, and overall misrepresenting the financial health and business activity of SRS and Tecspec. The foregoing was certified by Rose, Schlenker, and Senia as being true. The false statements therein were presented to Bank of America to show that SRS revenues were positive, trending upward, and/or that SRS and/or Tecspec were making a profit when in fact SRS was reporting profits by selling embezzled Tecspec products and Tecspec was operating at a deep net loss far in excess of any profits diverted to SRS. These statements were calculated to induce Bank of America to continue lending under the Credit Line, which was abused by Senia, Rose,

and Schlenker and who each signed the Fraudulent Financial Report as being accurate. Senia, Rose, and Schlenker knew such statements to be false at the time the Fraudulent Financial Report was submitted. Tecspec was actively injured by this in that Schlenker, Rose, and Senia each continued

to benefit from using and abusing the Credit Line for which the assets of Tecspec were pledged as collateral with an increasing amount of debt that Tecspec would need to pay back.

334. 328. As a predicate act of bank fraud (18 U.S.C. § 1344), mail fraud (18 U.S.C. § 1341) and/or wire fraud (18 U.S.C. § 1343), and falsifying business documents in the first degree (NY- PEN § 170.10), in July 2022 each of Senia, Rose, and Schlenker agreed to submit, and knowingly submitted, a Fraudulent Financial Report to Bank of America covering the 2nd Quarter of 2022. Upon information and belief, such belief formed by the facts stated above, Senia, Rose, and Schlenker made knowingly false statements about the reported profits of SRS, knowingly false statements inflating business revenues and assets of SRS and Tecspec, falsely underrepresenting liabilities and expenses, and overall misrepresenting the financial health and business activity of SRS and Tecspec. The foregoing was certified by Rose, Schlenker, and Senia as being true. The false statements therein were presented to Bank of America to show that SRS revenues were positive, trending upward, and/or that SRS and/or Tecspec was making a profit when in fact SRS was reporting profits by selling embezzled Tecspec products and Tecspec was operating at a deep net loss far in excess of any profits diverted to SRS. These statements were calculated to induce Bank of America to continue lending under the Credit Line, which was abused by Senia, Rose, and Schlenker and who each signed the Fraudulent Financial Report as being accurate. Senia, Rose, and Schlenker knew such statements to be false at the time the Fraudulent Financial Report was submitted. Tecspec was actively injured by this in that Schlenker, Rose, and Senia each continued to benefit from using and abusing the Credit Line for which the assets of Tecspec were pledged as collateral with an increasing amount of debt that Tecspec would need to pay back.

335. 329. As a predicate act of bank fraud (18 U.S.C. § 1344), mail fraud (18 U.S.C. § 1341) and/or wire fraud (18 U.S.C. § 1343), and falsifying business documents in the first degree (NY-

PEN § 170.10), in October 2022 each of Senia, Rose, and Schlenker agreed to submit, and knowingly submitted, a Fraudulent Financial Report to Bank of America covering the 3rd Quarter of 2022. Upon information and belief, such belief formed by the facts stated above, Senia, Rose, and Schlenker made knowingly false statements about the reported profits of SRS, knowingly false statements inflating business revenues and assets of SRS and Tecspec, falsely underrepresenting liabilities and expenses, and overall misrepresenting the financial health and business activity of SRS and Tecspec. The foregoing was certified by Rose, Schlenker, and Senia as being true. The false statements therein were presented to Bank of America to show that SRS revenues were positive, trending upward, and/or that SRS and/or Tecspec was making a profit when in fact SRS was reporting profits by selling embezzled Tecspec products and Tecspec was operating at a deep net loss far in excess of any profits diverted to SRS. These statements were calculated to induce Bank of America to continue lending under the Credit Line, which was abused by Senia, Rose, and Schlenker and who each signed the Fraudulent Financial Report as being accurate. Senia, Rose, and Schlenker knew such statements to be false at the time the Fraudulent Financial Report was submitted. Tecspec was actively injured by this in that Schlenker, Rose, and Senia each continued to benefit from using and abusing the Credit Line for which the assets of Tecspec were pledged as collateral with an increasing amount of debt that Tecspec would need to pay back.

336. ~~330.~~ As a predicate act of bank fraud (18 U.S.C. § 1344), mail fraud (18 U.S.C. § 1341) and/or wire fraud (18 U.S.C. § 1343), and falsifying business documents in the first degree (NY- PEN § 170.10), in January 2023 each of Senia, Rose, and Schlenker agreed to submit, and knowingly submitted, a Fraudulent Financial Report to Bank of America covering the 4th Quarter of 2022. Upon information and belief, such belief formed by the facts stated above, Senia, Rose, and Schlenker made knowingly false statements about the reported profits of SRS, knowingly false

statements inflating business revenues and assets of SRS and Tecspec, falsely underrepresenting liabilities and expenses, and overall misrepresenting the financial health and business activity of SRS and Tecspec. The foregoing was certified by Rose, Schlenker, and Senia as being true. The false statements therein were presented to Bank of America to show that SRS revenues were positive, trending upward, and/or that SRS and/or Tecspec were making a profit when in fact SRS was reporting profits by selling embezzled Tecspec products and Tecspec was operating at a deep net loss far in excess of any profits diverted to SRS. These statements were calculated to induce Bank of America to continue lending under the Credit Line, which was abused by Senia, Rose, and Schlenker and who each signed the Fraudulent Financial Report as being accurate. Senia, Rose, and Schlenker knew such statements to be false at the time the Fraudulent Financial Report was submitted. Tecspec was actively injured by this in that Schlenker, Rose, and Senia each continued to benefit from using and abusing the Credit Line for which the assets of Tecspec were pledged as collateral with an increasing amount of debt that Tecspec would need to pay back.

337. ~~331.~~ The foregoing Credit Line has at all times pledged all assets of Tecspec as collateral for repayment, proceeds from which Senia, Rose, and Schlenker have put into their pockets that did not end up going to Tecspec.

338. ~~332.~~ The foregoing That Senia, Rose, and Schlenker fraudulently induced Michael Donnolo and Tecspec to initially sign onto the Credit Line, over which Senia, Rose, and Schlenker exerted complete control, was definitively to the injury and detriment of Tecspec and Michael Donnolo, having been pledged as collateral for a Credit Line that Senia, Rose, and Schlenker were using to fund their lavish lifestyles having nothing to do with the Tecspec business.

### (3)    Commercial Bribing in the Second Degree and Embezzlement of Tecspec Assets: JPR Mechanical

339.    ~~333.~~ Upon information and belief, starting in and around the 3rd Quarter of 2018, Rose approached several authorized representatives of JPR Mechanical with the offer of paying hundreds of thousands of dollars in kickbacks in exchange for entering into an agreement to purchase certain HVAC products, entering into an illegal bribery scheme with JPR Mechanical.

340.    ~~334.~~ In short, through the end of July 2019, Rose paid JPR Mechanical board members to induce JPR Mechanical to enter into agreements with SRS and Tecspec for equipment at highly inflated prices (almost double the actual cost of the equipment). However, Tecspec never received the benefit of those highly inflated prices. Instead, Rose coordinated those double-priced products to be purchased between SRS and JPR Mechanical, Rose transferring equipment to JPR

Mechanical from Tecspec to fulfill those orders, Tecspec receiving compensation at less-than manufacturing cost resulting in Tecspec receiving a net-loss despite the units being sold at twice the market price. Counterclaim Defendants embezzled the difference between the actual sale price and "price" at which Senia, Rose, and Schlenker directed Tecspec products to SRS/themselves.

341.    ~~335.~~ The double-priced products were then sold by SRS to JPR Mechanical, with Rose, Schlenker, and Senia taking the overpayment to use on sports car modifications, further bribes, and splitting the balance with JPR Mechanical to incentivize continued purchases at inflated prices, which eventually resulted in JPR Mechanical having to file bankruptcy in 2019.

342.    ~~336.~~ Rose, Schlenker, and Senia further coordinated "sales" of equipment that JPR Mechanical would "manufacture" for Tecspec. Rose, Schlenker, and Senia placed "orders" for JPR Mechanical to manufacture equipment at an inflated price, which Senia, Rose, and Schlenker would then divert to SRS for a "price" that was below the manufacturing cost. Again, Senia, Rose, and Schlenker corrupted Tecspec, using Tecspec as a dumping ground for

operational and other

expense, as well as using relationships with JPR Mechanical to divert to SRS and themselves valuable and paid-for equipment which the AIFE "ordered" for Tecspec.

343. ~~337.~~ In fact, at the bankruptcy auction on November 19, 2019, equipment that Tecspec

"purchased" was still at the JPR Mechanical facility and was auctioned off.

### (4)    Commercial Bribing in the Second Degree: VRF Kickbacks

344. ~~338.~~ In January 2022, SRS allegedly purchased equipment from Samsung.

345. ~~339.~~ Senia, Rose, and Schlenker agreed to ship Samsung equipment, HVAC units commonly used in residential applications, to ~~Tecspec's~~ Tecspec's facility for the purpose of further delivering to an SRS customer. In this, Senia, Rose, and Schlenker promised a kickback by committing Tecspec resources to incentivize an SRS customer so that SRS could continue to do business at Tecspec's expense.

346. ~~340.~~ Upon information and belief, Senia, Rose, and Schlenker kicked back the Samsung VRF equipment to the SRS customer. This belief is formed based on the SRS customer's

   expectations and preparation of the VRF equipment leading up to and at pick up.

347. ~~341.~~ Tecspec received no benefit from this exchange, which used time and resources of

Tecspec to incentivize a deal being made between Senia, Rose, Schlenker and SRS's customer.

### (5)    Embezzlement in the First Degree: Misappropriation of Tecspec property in an amount exceeding $4.5 million.

348. ~~342.~~ Rose, Schlenker, and Senia, for the most part, unilaterally set sale prices of Tecspec products. However, Rose, Schlenker, and Senia routinely transferred to themselves Tecspec product at well below cost only for them to sell the very same product through their own company SRS.

349. 343. On November 22, 2022, the AIFE misappropriated, embezzled, and stole $2,160.00 of Tecspec's Tecspec's property by transferring products to themselves which they later sold, products valued at $9,360.00 which SRS and the AIFE exchanged for only $7,200.00, invoice no. 2208-0061-1-C.

350. 344. On November 22, 2022, the AIFE misappropriated, embezzled, and stole $3,706.50 of Tecspec's Tecspec's property by transferring products to themselves which they later sold, products valued at $16,061.50 which SRS and the AIFE exchanged for only $12,355.00, invoice no. 1705-0349-3 1705-0349- 3¬A

351. 345. On September 16, 2020, the AIFE misappropriated, embezzled, and stole

$32,065.84 of Tecspec's Tecspec's property by transferring products to themselves which they later sold, products valued at $138,951.97 which SRS and the AIFE exchanged for only $106,886.13, invoice no. 1705-0349-2-A.

352. 346. On September 27, 2018, the AIFE misappropriated, embezzled, and stole $1,402.50 of Tecspec's Tecspec's property by transferring products to themselves which they later sold, products valued at $6,077.50 which SRS and the AIFE exchanged for only $4,675.00, invoice no. 1705-0349-1-B.

353. 347. On September 27, 2018, the AIFE misappropriated, embezzled, and stole $5,085.20 of Tecspec's Tecspec's property by transferring products to themselves which they later sold, products valued at $22,035.88 which SRS and the AIFE exchanged for only $16,950.68, invoice no. 1705-0349-1 1705-0349- 1¬B-37.

354. 348. On May 18, 2022, the AIFE misappropriated, embezzled, and stole $2,977.20 of Tecspec's Tecspec's property by transferring products to themselves which they later sold, products valued at $12,901.20 which SRS and the AIFE exchanged for only $9,924.00, invoice no. 1904-0262-9- B.

355. 349. On April 26, 2022, the AIFE misappropriated, embezzled, and stole $357.30 of Tecspec's Tecspec's property by transferring products to themselves which they later sold, products valued at $1,548.30 which SRS and the AIFE exchanged for only $1,191.00, invoice no. 1904-0262-9-A.

356. 350. On June 14, 2022, the AIFE misappropriated, embezzled, and stole $140.25 of Tecspec's Tecspec's property by transferring products to themselves which they later sold, products valued at $607.75 which SRS and the AIFE exchanged for only $467.50, invoice no. 2206-0222-1-A.

357. 351. On April 08, 2022, the AIFE misappropriated, embezzled, and stole $1,410.00 of Tecspec's Tecspec's property by transferring products to themselves which they later sold, products valued at $6,110.00 which SRS and the AIFE exchanged for only $4,700.00, invoice no. 2109-0092-2-A.

358. 352. On January 12, 2022, the AIFE misappropriated, embezzled, and stole $27,617.79 of Tecspec's Tecspec's property by transferring products to themselves which they later sold, products valued at $119,677.09 which SRS and the AIFE exchanged for only $92,059.30, invoice no. 2003-0012 2003- 0012¬4-B.

359. 353. On November 04, 2021, the AIFE misappropriated, embezzled, and stole $5,484.78 of Tecspec's Tecspec's property by transferring products to themselves which they later sold, products valued at $23,767.38 which SRS and the AIFE exchanged for only $18,282.60, invoice no. 2006-0411-1 2006-0411- 1¬T.

360. 354. On January 13, 2022, the AIFE misappropriated, embezzled, and stole $2,711.34 of Tecspec's Tecspec's property by transferring products to themselves which they later sold, products valued at $11,749.14 which SRS and the AIFE exchanged for only $9,037.80, invoice no. 2108-0065-1 2108-0065- 1¬B.

361. 355. On October 01, 2020, the AIFE misappropriated, embezzled, and stole

$690,000.00

of ~~Tecspec's~~ <u>Tecspec's</u> property by transferring products to themselves which they later sold, products valued

at $2,990,000.00 which SRS and the AIFE exchanged for only $2,300,000.00, invoice no. 1807-00291B05.

362. 356. On August 20, 2021, the AIFE misappropriated, embezzled, and stole $1,791,044.78 of Tecspec's Tecspec's property by transferring products to themselves which they later sold, products valued at $7,761,194.03 which SRS and the AIFE exchanged for only $5,970,149.25, invoice no. 2106-0295-1-A.

363. 357. In 2020 the AIFE misappropriated, embezzled, and stole $962,500.00 of Tecspec's Tecspec's property by transferring products to themselves which they later sold, products valued at $4,170,833.33 which SRS and the AIFE exchanged for only $3,208,333.33, invoice no. 1807-00291A04.

364. 358. In 2020 the AIFE misappropriated, embezzled, and stole $172,500.00 of Tecspec's Tecspec's property by transferring products to themselves which they later sold, products valued at $747,500.00 which SRS and the AIFE exchanged for only $575,000.00, invoice no. 1807-00291B05.

365. 359. In 2019 the AIFE misappropriated, embezzled, and stole $300,000.00 of Tecspec's Tecspec's property by transferring products to themselves which they later sold, products valued at $1,300,000.00 which SRS and the AIFE exchanged for only $1,000,000.00, invoice no. 1705-0349-1.

366. 360. In 2018 the AIFE misappropriated, embezzled, and stole $150,000.00 of Tecspec's Tecspec's property by transferring products to themselves which they later sold, products valued at $650,000.00 which SRS and the AIFE exchanged for only $500,000.00.

367.    ~~361.~~ In 2019 the AIFE misappropriated, embezzled, and stole $150,000.00 of ~~Tecspec's~~ Tecspec's

property by transferring products to themselves which they later sold, products valued at

$650,000.00 which SRS and the AIFE exchanged for only $500,000.00.

368.    ~~362.~~ In 2018 the AIFE misappropriated, embezzled, and stole $90,000.00 of ~~Tecspec's~~ Tecspec's

property by transferring products to themselves which they later sold, products valued at

$390,000.00 which SRS and the AIFE exchanged for only $300,000.00.

369.    ~~363.~~ In 2019 the AIFE misappropriated, embezzled, and stole $90,000.00 of ~~Tecspec's~~ Tecspec's

property by transferring products to themselves which they later sold, products valued at

$390,000.00 which SRS and the AIFE exchanged for only $300,000.00.

370.    ~~364.~~ In total, Counterclaim Defendants misappropriated, embezzled, and stole

millions of dollars from Tecspec from 2018 through to 2022, and which continues to date.

371.    ~~365.~~ Senia, Rose, and Schlenker controlled both Tecspec and SRS, engaging in the

Price Manipulation scheme that resulted in paying SRS and themselves millions of dollars at the

expense of Tecspec. Each of Senia, Rose, and Schlenker participated in the Price Manipulation

scheme, which allowed the AIFE to give the appearance of generating Tecspec contracts, giving

the AIFE additional grounds to seek more and more financing by way of committing bank fraud

under Count II § (a).

### (6)    Tax Fraud, in violation of 26 U.S.C. § 7201.

372.    ~~366.~~ Despite the foregoing 'Tecspec contracts' being secured through Senia,

Rose, and Schlenker's Price Manipulation scheme, each concealed the fact that the Tecspec

contracts were for the sale of Tecspec products at a fraction of the cost that it took Tecspec to create

such products, putting Tecspec deeper and deeper into debt with every purchase order.

373.    ~~367.~~ And with each of the foregoing purchase orders, the AIFE would buffer

"profits"

to SRS, which ultimately were paid to the Individual Counterclaim Defendants, leaving Tecspec

with a contract to fulfill at a deep deficit to Tecspec, which the Individual Counterclaim Defendants would then use to secure additional financing from Bank of America and other financial institutions.

374. 368. Furthermore, each Individual Counterclaim Defendant engaged in tax fraud by illegally omitting profits obtained through the manipulation of Tecspec's sales, which affected both federal and state tax liabilities of Tecspec.

375. 369. Upon information and belief, Senia, Rose, and Schlenker committed tax fraud under 26 U.S.C. § 7201 by falsely reporting profits and losses for Tecspec for the annual tax filings

for 2019. This belief is formed upon the facts that the Individual Counterclaim Defendants had engaged in a Price Manipulation scheme and RICO Scheme specifically to manipulate the losses of Tecspec despite millions of dollars in sales which Senia, Rose, and Schlenker made on embezzled Tecspec products.

376. 370. Upon information and belief, Senia, Rose, and Schlenker committed tax fraud under 26 U.S.C. § 7201 by falsely reporting profits and losses for Tecspec for the annual tax filings for 2020. This belief is formed upon the facts that the Individual Counterclaim Defendants had engaged in a Price Manipulation scheme and RICO Scheme specifically to manipulate the losses of Tecspec despite millions of dollars in sales which Senia, Rose, and Schlenker made on embezzled Tecspec products.

377. 371. Upon information and belief, Senia, Rose, and Schlenker committed tax fraud under 26 U.S.C. § 7201 by falsely reporting profits and losses for Tecspec for the annual tax filings for 2021. This belief is formed upon the facts that the Individual Counterclaim Defendants had engaged in a Price Manipulation scheme and RICO Scheme specifically to manipulate the losses

of Tecspec despite millions of dollars in sales which Senia, Rose, and Schlenker made on embezzled Tecspec products.

378. 372. Upon information and belief, Senia, Rose, and Schlenker committed tax fraud under 26 U.S.C. § 7201 by falsely reporting profits and losses for Tecspec for the annual tax filings for 2022. This belief is formed upon the facts that the Individual Counterclaim Defendants had engaged in a Price Manipulation scheme and RICO Scheme specifically to manipulate the losses of Tecspec despite millions of dollars in sales which Senia, Rose, and Schlenker made on embezzled Tecspec products.

379. 373. Upon information and belief, Senia, Rose, and Schlenker committed tax fraud under 26 U.S.C. § 7201 by falsely reporting profits and losses for Tecspec for the annual tax filings for 2023. This belief is formed upon the facts that the Individual Counterclaim Defendants had engaged in a Price Manipulation scheme and RICO Scheme specifically to manipulate the losses of Tecspec despite millions of dollars in sales which Senia, Rose, and Schlenker made on

 embezzled Tecspec products.

380. 374. The foregoing gives Tecspec considerable liability for payment of taxes based on a fraudulent manipulation of Tecspec sales and liabilities.

381. 375. This is part of the AIFE RICO Scheme in that Tecspec is used to artificially and illegally insulate SRS from such liabilities and losses.

### (7)    Threats and Intimidation in violation of NY-PEN § 180.00.

382. 376. Senia utilized intimidation tactics or supported intimidation to suppress dissent and maintain control over Tecspec, which benefited the AIFE. Key stakeholders were frequently threatened, including Michael Donnolo, John Michael Long, and Joshua Donnolo, with extreme violence, including explicit threats of death and physical harm, such as threats to bash their heads

in or shoot them with a firearm owned by Robert Senia. Several examples are on video and already of record with the Court.

383. ~~377.~~ These threats were designed not only to intimidate but also to ensure that no challenges to the AIFE's illegal activities would arise, further consolidating their power over Tecspec and creating a culture of fear and control.

384. ~~378.~~ The threats and intimidation tactics employed by the Counterclaim Defendants, in violation of 18 U.S.C. § 1951, were intended to suppress any dissent and maintain an unquestioned environment around their activities. By instilling fear among key stakeholders and employees, the Counterclaim Defendants ensured that their scheme could operate without challenge, thereby protecting their ability to siphon profits without scrutiny. This atmosphere of control was crucial for their continued extraction of profits from Tecspec into their own pockets. The examples are numerous, some of which are caught on video and are part of this Court's record in filed papers.

### (8) Embezzlement in the First Degree: Stealing Research and Development Specifications and Tecspec Resources.

385. ~~379.~~ In the fourth quarter of 2019, Rose, Senia, and Schlenker directed employee John Michael Long to commit hundreds of hours to research and develop designs for a personal air

diffuser device.

386. ~~380.~~ After months of work, Mr. Long turned over the design specifications of that work to Mr. Senia, together with prototype samples.

387. ~~381.~~ Shortly thereafter, Senia, Rose, and Schlenker "gifted" the design specifications and samples to ~~a company called~~ Numa – a company that sells, among other things, HVAC units.

388. ~~382.~~ It was later discovered that SRS is a minority owner of Numa~~.~~ and, in much the same way as it does the other SRS Entities, uses Numa to conceal

389. ~~383.~~ Despite hundreds of hours, and tens of thousands of dollars in research and development of new technology, the cost of which completely borne by Tecspec, the Individual Counterclaim Defendants stole the results of that technological development and gave it to themselves to market and sell through Numa.

390. ~~384.~~ None of either SRS, Numa, Senia, Rose, or Schlenker had anything to do with the development of the technology developed by John Michael Long at Tecspec, which Senia, Rose, and Schlenker gave to Numa to sell at market.

391. ~~385.~~ The foregoing was done for the benefit of SRS, to the detriment of Tecspec.

### iv. Counterclaim Defendants' RICO Scheme predicate acts are related, continuous, and open-ended, continuing to date. Each of the Predicate Acts impact interstate commerce.

392. ~~386.~~ The illegal activities engaged by the Counterclaim Defendants demonstrate continuity, as their actions constituted ongoing and systemic efforts to defraud Tecspec, Bank of America, Michael Donnolo, and others, and maintain a firm grip over its operations. This systematic approach further underscores their collective intent to profit unlawfully at the expense of the business.

393. ~~387.~~ Rose, Senia, and Schlenker's illegal predicate acts are related in that their bank fraud furthers the RICO Scheme of money laundering by infusing the AIFE with cash.

394. ~~388.~~ The AIFE's mail and wire fraud were necessary to commit the AIFE's bank fraud, which promoted the issuance of the Credit Line and other loans issued upon the false documents submitted by Rose, Senia, and Schlenker.

395. ~~389.~~ The AIFE's falsifying business records in the first degree was necessary for their RICO Scheme in that the AIFE used the falsified records to commit bank fraud, which were further subject to mail/wire fraud as the fraudulent documents were sent through the mail and/or wire to Bank of America.

396. ~~390.~~ The AIFE's embezzlement of Tecspec products was also in furtherance of generating cash and value which Senia, Rose, and Schlenker diverted to themselves, which also propped up SRS for the purposes of securing financing and to induce lending against such assets.

397. ~~391.~~ The corruption of Tecspec by the Individual Counterclaim Defendants was key to their RICO Scheme in that Tecspec was used to insulate and strip away costs and expenses incurred in the normal course of business by SRS, which allowed Senia, Rose, and Schlenker to embezzle Tecspec profits, cash, products, and divert to themselves business opportunities.

398. ~~392.~~ Senia, Rose, and Schlenker's use of Tecspec to report business losses for the

purpose of committing tax fraud furthered the preservation of cash and value in Tecspec and SRS.

399. ~~393.~~ Commercial bribing in the second degree achieved the same goal, securing additional cash capital and value, which Senia, Rose, and Schlenker embezzled from Tecspec.

400. ~~394.~~ The foregoing acts continue to date, related, and will persist until the AIFE is stopped.

401. ~~395.~~ Moreover, the foregoing, each, impact interstate commerce in that SRS operates, among other places, in New Jersey and New York, with all of the mailings, wires, false documents, phone calls made in connection with the foregoing, and general operations relating to the RICO Scheme traversing State lines.

402. ~~396.~~ Upon information and belief, Senia, Rose, and Schlenker, each, would communicate with representatives from Bank of America (in New York, from New Jersey), over the phone and through the mails, concerning the covenant reports containing materially false statements, such falsities Senia, Rose, and Schlenker would further explain and support using additional lies to justify the original lies. This belief is formed by Michael Donnolo's knowledge

of how Counterclaim Defendants conduct business over the phone and their perpetuation of false and misleading statements to Bank of America and others.

## CAUSES OF ACTION

### ~~Count~~ COUNT I

*Violation of 18 U.S.C. § 1836 (Defend Trade Secrets Act)*
*for Stealing Braya Trade Secrets*

403.   ~~397.~~ Counterclaim Plaintiffs repeat and reallege all of the pleadings set forth above as if set forth fully hereunder.

404.   ~~398.~~ Under the meaning given by the Defend Trade Secrets Act and New York law, Braya has undertaken extraordinary efforts and expense to develop certain designs and other intellectual property relating to Braya's competitive advantage that, together, comprise Braya's trade secrets ("Trade Secrets").

405.   ~~399.~~ Such Trade Secrets include engineering feats with respect to the manufacturing process of Braya units, involving the customization, modification, re-construction, and programming of industrial machines so that they operate in unique ways, resulting in a more precise and efficient manufacturing method that yields superior products at a fraction of the cost. Further, Braya's components are specially designed in a way that renders them completely differentiable and distinct from any unit that has ever been engineered by Tecspec.[2]

406.   ~~400.~~ Braya's Trade Secrets were protected in a facility accessible only to Michael Donnolo and specific authorized employees, agents, or vendors. No other individual from the public was permitted to enter the Braya facility without authorization. The Premises is gated, with locking doors and security cameras.

---

[2]   As the foregoing alludes to Trade Secrets, Counterclaim Plaintiffs cannot divulge the extent and scope of such secrets without compromising same. To the extent such secrets are at issue, Counterclaim Plaintiffs seek in-camera review of same.

407. 401. These measures are necessary because, once in the Braya facility (Premises), Braya's Trade Secrets are being used in the course of operating its business, which requires such Trade Secrets to be viewable from authorized visitors into the Premises. For e.g., the materials

² As the foregoing alludes to Trade Secrets, Counterclaim Plaintiffs cannot divulge the extent and scope of such secrets without compromising same. To the extent such secrets are at issue, Counterclaim Plaintiffs seek in camera review of same.

Braya uses cannot be 'concealed' as they are being used in the course of Braya's production of materials.

408. 402. Knowing the foregoing, the Counterclaim Defendants broke into the Braya

Premises with the express purpose and intent of ascertaining Braya's Trade Secrets.

409. 403. Not only were Counterclaim Defendants' actions improper, but they were also

illegal and punishable under New York Penal Law.

410. 404. Counterclaim Defendants have disseminated such Trade Secrets to their employees, agents, and vendors specifically to inform Counterclaim Defendants of Braya's technological advancements, forming its competitive advantage.

411. 405. The foregoing was acquired without the consent of any of the Counterclaim Plaintiffs. Moreover, Counterclaim Plaintiffs called the police to thwart Counterclaim Defendants from continuing their illegal trespass onto the Premises.

412. 406. Upon information and belief, Counterclaim Defendants intend to use Braya's Trade

Secrets for their own competitive advantage.

413. 407. Upon information and belief, if no such advantage can be obtained through stealing Braya's Trade Secrets, Defendants will use and disseminate Braya's Trade Secrets solely to eliminate Braya's competitive advantage despite Defendants' ability to wield Braya's technological advances for themselves.

414. 408. Consequently, Counterclaim Defendants have violated 18 U.S.C. § 1836, damaging Counterclaim Plaintiffs in an amount to be determined at trial but in no amount less than $5 million.

## ~~Count~~COUNT II

*Violations of the Racketeer Influenced and Corrupt Organizations Act*
*18 U.S.C. §§ 1962(a), 1962(b), 1962(c), and 1962(d).*

415. ~~409.~~ Counterclaim Plaintiffs repeat and reallege all of the pleadings set forth above as if set forth fully hereunder.

416. ~~410.~~ Senia, Rose, and Schlenker comprise an association-in-fact enterprise as defined under RICO statute (the AIFE) and as set forth more fully in ¶¶ 58-69 above.

417. ~~411.~~ Senia, Rose, and Schlenker have associated in such a manner for thirty years, having engaged in fraudulent conduct for at least the last seven years, as more particularized at ¶¶ 58-191 above.

418. ~~412.~~ Senia, Rose, and Schlenker usurped control and corrupted Tecspec and SRS, which the AIFE used to launder money. See ¶¶ 58-74.

419. ~~413.~~ Senia, Rose, and Schlenker, individually, are each RICO persons, each committing felonious predicate acts, acting together, for the benefit of the AIFE and to the detriment of Michael Donnolo and Tecspec.

420. ~~414.~~ Senia, Rose, and Schlenker committed crimes in connection with perpetrating the

AIFE:

a.  Mail Fraud and Wire Fraud: In violation of 18 U.S.C. §§ 1341, 1343, Rose, Senia, and Schlenker transmitted fabricated financial documents containing false statements through the mail and over the wires. These Fraudulent Financial Reports contained false statements inflating profitability statements for SRS, false sales projections, and reduced liabilities, which were used to secure loans and the Credit Line under false pretenses, enabling the Counterclaim Defendants to enhance cash flow directed to SRS rather than benefiting Tecspec. At ¶¶ 76-90, 91-128, Senia, Rose, and Schlenker are identified as having engaged in, agreed to, and participated in mail and wire fraud by knowingly sending false statements through the mail and over the wire to Bank of America at least 18 different times, each, in a seven year period.

b. **Tax Fraud: In violation of 26 U.S.C. § 7201, the**

Counterclaim Defendants willfully omitted significant portions of income generated from the manipulation of Tecspec's sales. This recurring fraudulent underreporting allowed them to evade tax liabilities and retain profits that should have benefited Tecspec, contributing to its financial decline. Senia, Rose, and Schlenker are identified at ¶¶ 162-171 to have engaged in tax fraud at least 6 different times within the last 7 years.

c. Bank Fraud: In violation of 18 U.S.C. § 1344, the Counterclaim Defendants presented false information to banks to secure loans based on fabricated claims of ~~Tecspec's~~Tecspec's profitability. This fraudulent activity occurred repeatedly over the past five years, diverting financial resources intended for Tecspec to SRS without any intention of sharing the benefits. At ¶¶ ~~76-90~~76- 90, 91-128, Senia, Rose, and Schlenker are identified as having engaged in, agreed to, and participated in bank fraud on Bank of America at least 18 different times, each, in a ~~seven-year~~seven-year period.

d. Commercial Bribing in the Second Degree: New York Penal Law § 180.00 and 18 U.S.C. § 1961 et seq., Senia and Rose engaged in a pattern of racketeering activity through acts of commercial bribery that affected interstate commerce. At ¶¶ 129-137, Counterclaim Defendants are identified as having benefited from commercial bribing numerous times from 2018 to the middle of 2019.

e.  Threats and Intimidation: In violation of 18 U.S.C. § 1951, the Counterclaim Defendants directed explicit threats of physical violence toward key stakeholders, including Michael Donnolo, John Michael Long, and Joshua Donnolo, to maintain control over the company and suppress dissent against their unlawful actions.

f.  Falsifying Business Records in the First Degree: NY-PEN § 170.10 states that Senia, Rose, and Schlenker, each committed a Class E Felony punishable by up to four (4) years in prison (a qualifying criteria under 18 U.S.C. §1961) for making false entries in documents maintained by a business enterprise in connection with intent to commit another crime. In this instance, the further crime was the larcenous misappropriation of loan proceeds under NY-PEN §

155.05. At ¶¶ 76-128, Counterclaim Defendants are identified as having falsified business records over 18 times, each, in the last 7 years.

g.  Embezzlement in the First Degree: NY-PEN § 155.42 sets out that Grand Larceny in an amount exceeding $1 million in cash or property carries a sentence of up to 25 years in prison. Set forth below, Counterclaim Defendants engaged in over $15 million dollars' worth of property transfers from Tecspec to SRS, controlled by Rose, Senia, and Schlenker, which resulted in the misappropriation of value from Tecspec to Rose, Senia, Schlenker, and SRS of at least $4.5 million dollars. At ¶¶ 13-161, 175-181,

g. Counterclaim Defendants are identified as having engaged in Embezzlement in the First Degree at least 23 distinct different times, in amounts exceeding $4.5 million.

421. 415. The foregoing predicate acts are all part of the RICO Scheme, related for the purpose of infusing SRS and the AIFE with cash and value so the AIFE can launder money through otherwise legitimate-seeming entities to obscure the source of such funds so such funds may be diverted to the Individual Counterclaim Defendants. The RICO Scheme is a continuous, open-ended scheme, each of the activities related to the purpose of generating funds under any means necessary, which are recharacterized and then diverted to SRS, ultimately then paid to the AIFE members as 'clean' cash or reimbursement for expenses.

422. 416. The foregoing conduct was acted upon knowingly by each of the RICO persons, participating in the collective scheme to generate money, launder that money, and then misappropriate that money for themselves.

417. Each RICO person's activities were knowingly in furtherance of the common RICO Scheme, in which Senia, Rose, and Schlenker, each, knowingly agreed to participate, and whom, each, actively controlled multiple aspects of the RICO Scheme and AIFE. This is pleaded on information and belief, which is informed by the facts that Senia, Rose, and Schlenker all certified false statements to secure financing, including Credit Lines, each participating in the proceeds from the commercial bribery scheme with JPR Mechanical, each receiving and misappropriating Credit Line loan proceeds to the detriment of Tecspec, each controlled various aspects of the AIFE, and each owning SRS which was the vehicle through which Senia, Rose, and Schlenker used to divert millions of dollars in value and product from Tecspec to themselves.

423. 418. Each RICO person engaged in their own predicate acts, dozens of such acts conducted over a single year and which extended over the course of the last 7 years -- acts pleaded with requisite specificity above.

424. 419. Further as pleaded the RICO persons Senia, Rose, and Schlenker are distinct from the AIFE, each acting in furtherance of the RICO Scheme for a common and collective purpose.

425. The AIFE is distinct from the RICO Scheme in that it serves as the organizational structure through which these schemes are executed.

426. 420. Each of Senia, Rose, and Schlenker, had their respective roles, participated, and controlled aspects of the AIFE, allowing and promoting the AIFE to operate, with each materially benefiting from the AIFE through the embezzlement, diversion, and misappropriation of funds that ultimately were paid to each AIFE member.

427. The SRS Entities are involved in the RICO Scheme by acting as intermediaries in transactions where Tecspec products are sold at manipulated prices, ensuring profits for the Counterclaim Defendants while depriving Tecspec of its rightful earnings.

428. Additionally, the SRS Entities are used to create false business records and secure fraudulent loans, which are part of the broader RICO Scheme.

429. 421. As a result of the foregoing, Tecspec and Michael Donnolo were injured as a direct result of the RICO Scheme in an amount to be determined at trial.

430. 422. Moreover, Tecspec has been and continues to be damaged from pledging Tecspec as collateral on lines of credit and loans, proceeds from which Tecspec must repay but which were diverted to the AIFE.

431. 423. Each of the RICO persons' predicate acts impact interstate commerce, as the activities concerning the predicate acts occurred by transmitting fraudulent documents and information between New York and New Jersey. Further, funds acquired in New York, including through bank fraud committed at a New York Bank of America branch, were and continue to be diverted to the AIFE, each member located in New Jersey.

432.   424. The Counterclaim Defendants collectively conspired to engage in the RICO Scheme, consorting and agreeing to participate in the corruption of Tecspec, benefiting from the corruption of Tecspec, which resulted in injury to Counterclaim Plaintiffs.

433.   425. Each of the RICO persons and Counterclaim Defendants received income derived directly from a pattern of racketeering activity in violation of 18 U.S.C. § 1962(a), which impacts interstate commerce.

434.   426. Each of the RICO persons Senia, Rose, and Schlenker maintain an interest and control in the AIFE, which is an enterprise engaged in a pattern of racketeering activity which impacts interstate commerce, in violation of 18 U.S.C. § 1962(b).

435.   427. Each of the RICO persons Senia, Rose, and Schlenker and Counterclaim Defendants are employed by and associated with the AIFE in the conduct of the AIFE's affairs, which impacts interstate commerce, in violation of 18 U.S.C. § 1962(c).

436.   428. Each Counterclaim Defendant conspired with each other to engage in a pattern of racketeering activity in violation of 18 U.S.C. §§ 1962(a)-(c), in violation of 18 U.S.C. § 1962(d).

437.   A series of predicate acts, including bank fraud, mail fraud, wire fraud, and falsifying business records, that have occurred over several years and continue to date.

438.   429. Lastly, as a result of the RICO Scheme, Tecspec is no longer a viable business and, instead, serves as a special purpose vehicle to house the AIFE's cost of engaging in their RICO Scheme, Tecspec completely unable to recover any semblance of profitability as a result of the AIFE's activities.

439.   430. By the foregoing, Counterclaim Defendants are liable to Tecspec and Michael Donnolo for damages arising from the violations of 18 U.S.C. §§ 1962(a)-(d).

## ~~Count~~COUNT III

*Aiding and Abetting and Direct Violation of Tecspec LLC's Non-Compete Agreement*
*As against the Counterclaim Defendants*

440. ~~431.~~Counterclaim Plaintiffs repeat and reallege all of the pleadings set forth above as if set forth fully hereunder.

441. ~~432.~~The Operating Agreement for Tecspec includes an enforceable non-compete provision that restricts competition between Tecspec Members, as well as former member Christina Senia, in having interests in businesses located in the counties where Tecspec has operated.

442. ~~433. Counterclaim Defendants~~Ralph Schlenker, Richard Rose, Robert Senia, and Christina Senia have maintained ownership interests in and control of SRS, SRS Enterprises Inc., SRS Enterprises NJ LLC, and HVAC Service Associates, Inc. located in

Middletown, New Jersey ~~and,~~ SRS Research LLC located in New York, New York, and Numa Products LLC located in New York, New York. Tecspec has done business in both of those locations, which the Non-Compete strictly prohibits.

443. ~~434.~~ By themselves and through each other and their alter egos, Counterclaim Defendants have knowingly engaged in business activities that compete with Tecspec.

444. ~~435.~~For example, opportunities for selling HVAC Units may be filled by SRS through a completely different and other manufacturer, that not being Tecspec, which actively competes with Tecspec's ability to compete with leads generated through SRS.

445. For further example, Christina Senia has been and continues to work for SRS, securing purchase orders for HVAC units for SRS that are not filled by Tecspec but, rather, filled by Tecspec competitors.

446. ~~436.~~Tecspec sells HVAC Units and SRS sells HVAC Units.

447. 437. SRS does not always 'acquire' its HVAC Units from Tecspec. In such

circumstances, SRS would be competing with Tecspec.

448. 438. Where the Counterclaim Defendants hold ownership interest in, are engaged

in or connected with the SRS entities, they have violated the Non-Compete.

449. The Counterclaim Defendants diverted business opportunities from Tecspec to the

SRS Entities, including contracts and sales that Tecspec could have fulfilled.

450. The Counterclaim Defendants secured purchasers for Tecspec products but

funneled these sales through SRS, depriving Tecspec of its rightful profits.

451. The SRS Entities utilized Tecspec's resources, including research and

development, to enhance their competitive position in the market. This included using Tecspec's

designs and products to fulfill orders for SRS, further violating the non-compete clause.

452. 439. For violating the Non-Compete, the Counterclaim Defendants are liable to

Tecspec and Michael Donnolo to the extent SRS conducted business that resulted in sales of

HVAC Units that did not come from Tecspec.

453. 440. Consequently, the Counterclaim Defendants are liable for an amount to be

determined at trial.

**Count COUNT IV**

*Declaratory Judgment*
*By Michael Donnolo as Against SRS*

454. 441. Counterclaim Plaintiffs reincorporate by reference all preceding allegations

as if fully set forth herein.

455. 442. Counterclaim Plaintiffs assert that SRS Enterprises Inc. is an alter ego of

Tecspec, LLC, as both entities are owned and controlled by the same individuals—Ralph

Schlenker, Robert

Senia, and Richard Rose—who utilize SRS as a conduit to divert business opportunities and profits that rightfully belong to Tecspec.

456. 443. Upon information and belief, the Counterclaim Defendants conduct business for the sale of HVAC Units by holding themselves out as owners and operators of SRS while conducting business on behalf of Tecspec and, further, hold themselves out as owners and operators of Tecspec while conducting business on behalf of SRS.

457. 444. There exists a unity of interest and ownership between SRS Enterprises Inc. and Tecspec, LLC, as both companies operate with overlapping management and have engaged in mutual business transactions that blur the lines of their separate identities through Counterclaim Defendants' activities.

458. 445. The Counterclaim Defendants have used SRS Enterprises to circumvent the restrictions and obligations placed upon them as members of Tecspec, including fiduciary duties which the Counterclaim Defendants breached and the misuse of Tecspec's resources for Counterclaim Defendants' benefit.

459. 446. The intermingling of assets and operations between the two entities demonstrates that the separate personalities of SRS Enterprises Inc. and Tecspec LLC are not maintained, as SRS has utilized Tecspec's Tecspec's resources and diverted key business opportunities to benefit itself.

460. 447. The actions of the Counterclaim Defendants in operating SRS Enterprises Inc. as an alter ego of Tecspec, LLC have resulted in inequitable consequences, including the misappropriation of funds, erosion of Tecspec's Tecspec's market position, and inability to receive rightful returns on its investments.

461. 448. The foregoing constitutes a justiciable controversy for which Counterclaim Plaintiffs have no other adequate remedy at law.

462. ~~449.~~ Therefore, a declaration from this Court is necessary to confirm that SRS Enterprises Inc. is the alter ego of Tecspec, LLC, and to prevent the Counterclaim Defendants from continuing to evade their obligations to Tecspec through the misuse of the corporate form.

463. The Counterclaim Defendants' actions have caused significant financial harm to Michael Donnolo, as an owner of Tecpsec, including, without limited to, the loss of profits and business opportunities that were diverted from Tecpsec to SRS.

464. By using SRS to misappropriate Tecspec's resources and opportunities, the Counterclaim Defendants breached their fiduciary duties to Michael Donnolo, further exacerbating the financial harm suffered by him.

465. ~~450.~~ Plaintiff Michael Donnolo seeks judgment in his favor, finding that Tecspec and SRS are alter egos, and that Mr. Donnolo's 25% ownership extends to 25% ownership in SRS.

### ~~Count~~ COUNT V

#### ~~Battery~~ Assault
*By the Individual Counterclaim Plaintiffs as Against Defendants Senia and Rose*

466. ~~451.~~ Counterclaim Plaintiffs reincorporate by reference all preceding allegations as if fully set forth herein.

467. ~~452.~~ Counterclaim Defendants Robert Senia made specific verbal threats against the personal safety of Counterclaim Plaintiffs Michael Donnolo, Joshua Donnolo, and John Michael Long.

468. ~~453.~~ Specifically, those threats were to cause injury and/or to murder the Individual Counterclaim Plaintiffs using blunt force to the skull and/or shooting the Counterclaim Plaintiffs in the head using a firearm owned and kept by Robert Senia.

469. On or about April 1, 2022, bodily contact was made with Joshua Donnolo, further escalating the threat level.

470.     On or about October 14, 2024, Robert Senia was recorded on video making threats about former employees of SRS, now working at a competitor, thereby maintaining the hostile work environment he initiated in 2022.

471.     454. These threats created a reasonable apprehension of imminent harmful or offensive contact, resulting in psychological distress and fear for the safety of the Counterclaim Plaintiffs.

472.     455. This conduct constitutes ~~battery~~assault, as it involved intentional acts leading to harmful and offensive contact, whether perceived or actual.

473.     456. By the foregoing, Senia and Rose are liable to the Individual Counterclaim Plaintiffs in an amount to be determined at trial.

### ~~Count~~COUNT VI

*Corporate Waste and Misappropriation of Tecspec LLC Opportunities*
*By Tecspec LLC as against Ralph Schlenker, Richard Rose, Robert Senia, and Christina Senia*

*Aiding and Abetting of Corporate Waste and Misappropriation of Tecspec LLC Opportunities*
*By Tecspec LLC as against all Counterclaim Defendants*

474.     457. Counterclaim Plaintiffs reincorporate by reference all preceding allegations as if fully set forth herein.

475.     458. Over the last seven years, Tecspec has operated a manufacturing business designed to supply HVAC Units, among other things.

476.     Tecspec's business centered on the research, development, and manufacturing of HVAC-related technology, including HVAC induction units, machine-metal grilles, heating and cooling pump skids, personal air diffusers, packaged pump systems, extruded grilles, and fan coils. These products were developed through significant investment in research and development by Tecspec and its employees, indicating a clear business interest in these opportunities.

477.     The Counterclaim Defendants engaged in business activities that directly competed with Tecspec, violating the non-compete clause in Tecspec's Operating Agreement.

478. ~~459.~~ The Counterclaim Defendants, purportedly holding themselves out on behalf of Tecspec as owners of Tecspec, secured purchases of Tecspec products by SRS and the SRS Entities.

~~Entities.~~

479. Ralph Schlenker, Richard Rose, Robert Senia, and Christina Senia actively diverted and misappropriated business opportunities to SRS Entities, including to Numa, while each had an obligation of loyalty to Tecspec LLC.

480. Ralph Schlenker, Richard Rose, Robert Senia, and Christina Senia actively diverted and misappropriated business opportunities to SRS Entities, including to Numa, while each had a restraint and were subject to the Non-Compete.

481. Each of the Counterclaim Defendants knowingly and substantially assisted in the diversion and misappropriation by Ralph Schlenker, Richard Rose, Robert Senia, and Christina Senia, each benefitting from said misappropriation.

482. ~~460.~~ When securing purchasers of HVAC Units via SRS, Counterclaim Defendants did not each time use Tecspec despite holding themselves out as being affiliated, owning, and/or operating Tecspec.

483. ~~461.~~ Upon information and belief, SRS conducted business using other HVAC Units that could have been purchased through Tecspec but, instead, were purchased through a different manufacturer.

~~462.~~ Counterclaim Defendants have used SRS Enterprises Inc. and SRS Enterprises NJ LLC, acting by themselves and through such entities, to divert Tecspec opportunities by fulfilling purchase orders using Tecspec resources and products for SRS, selling them for the benefit of SRS and to Tecspec's detriment. Specifically, Counterclaim Defendants diverted to themselves Tecspec products, for which they failed to pay, and thereafter sold such products for the benefit and profit of SRS Enterprises Inc. and SRS Enterprises NJ LLC.

484. 463. Similarly, Counterclaim Defendants directed Defendants to commit thousands of hours of research and development paid by Tecspec to generate engineering designs, specifications, and products that Counterclaim Defendants turned over to SRS Research LLC, which SRS Research LLC used as a 'buy-in' to purchase an interest in another business. Specifically, Counterclaim Defendants each benefited from

485. 464. As controllers and owners of, and through, HVAC Service Associates, Inc., Counterclaim Defendants divert to themselves business opportunities that could and should benefit Tecspec, including fulfillment of purchase orders for HVAC Units.

486. 465. Moreover, for all corporate Counterclaim Defendants, in securing purchasers, the Counterclaim Defendants could have secured said purchaser of Tecspec products directly with Tecspec, but instead, chose to only funnel such purchases through SRS Enterprises Inc., SRS Enterprises NJ LLC, SRS Research LLC, and HVAC Service Associates, Inc., so that Counterclaim Defendants could disproportionately profit from Tecspec business and, further, serve as the mechanism through which Counterclaim Defendants Rose, Senia, and Schlenker unlawfully compete with Tecspec.

487. The Counterclaim Defendants owed fiduciary duties to Tecspec and its members, including Michael Donnolo.

488. By engaging in the diversion of corporate opportunities and assets, they breached these fiduciary duties.

489. The misappropriation of business opportunities constitutes a breach of fiduciary duty and corporate waste, as the Counterclaim Defendants used their control over Tecspec to benefit themselves and their entities at the expense of Tecspec.

490. 466. As a direct result, Tecspec suffered, and continue to suffer, significant financial losses, including the loss of contracts and diminished market presence.

## Count COUNT VII

*Tortious Interference with Braya Business Activities*
*By Counterclaim Plaintiffs against Counterclaim Defendants*

491. 467. Counterclaim Plaintiffs reincorporate by reference all preceding allegations as if fully set forth herein.

492. 468. Braya had established business relationships within the HVAC industry.

493. 469. Counterclaim Defendants became aware of these relationships and intentionally interfered by attempting to sabotage those relationships.

494. On or about January 26, 2024, Michael Donnolo met with representatives from Vendor No. 1[3], a controls vendor, at their office and was informed that Robert Senia made disparaging remarks, cautioning Vendor No. 1 not to do business with Michael Donnolo and/or Braya.

495. On or about May 29, 2024, Michael Donnolo received a call from representatives of Customer No. 1[4], stating they would not do business with Braya because of disparaging information they had been told by Richard Rose and/or Robert Senia.

496. On or about August 8, 2024, Michael Donnolo met with representatives from Customer No. 2[5], who expressed concerns about working with Braya in the future because Robert Senia told them that he was going to sue Michael Donnolo.

---

[3] Vendor No. 1 is identified as such to maintain confidentiality and prevent retaliation by the Plaintiffs/Counterclaim Defendants.
[4] Customer No. 1 is identified as such to maintain confidentiality and prevent retaliation by the Plaintiffs/Counterclaim Defendants.
[5] Customer No. 2 is identified as such to maintain confidentiality and prevent retaliation by the Plaintiffs/Counterclaim Defendants.

497.    On or about February 6, 2025, representatives from Customer No. 2 visited the Braya facility and inquired if Braya's counsel could speak to Customer No. 2's counsel regarding Braya's ability to do business based on disparaging information they had been told by Robert Senia.

498.    On or about March 13, 2025, Michael Donnolo met again with representatives from Customer No. 2, where they reiterated their concerns about working with Braya due to recent discussions with Senia.

499.    In or around April and May 2025, Counterclaim Plaintiffs' counsel spoke multiple times with counsel for Customer No. 2 regarding Braya's ability to complete a pending contract.

500.    470. Counterclaim Defendants have engaged in a campaign to unjustifiably and unreasonably interfere with Braya's business opportunities, making false statements against Braya and Michael Donnolo designed to intimidate and harass potential Braya customers, thereby sabotaging Braya's business relationships.

501.    471.  Counterclaim Defendants have baselessly threatened potential Braya customers with litigation and potential legal ramifications for considering doing business with Braya, tortiously interfering with Braya's business opportunities.

502.    This conduct was intended to deter customers from engaging with Braya, thereby interfering with Braya's business opportunities

503.    472. Such interference was done by the Counterclaim Defendants knowingly and without basis other than animus against the Counterclaim Plaintiffs.

504.    473.  By the foregoing, Counterclaim Defendants are liable to Braya for tortious

interference with Braya's business opportunities in an amount to be determined at trial.

## ~~Count~~COUNT VIII

*Breach of Good Faith and Fair Dealing*
*By Michael Donnolo against the Individual Counterclaim Defendants*

505. ~~474.~~ Counterclaim Plaintiffs reincorporate by reference all preceding allegations as if fully set forth herein.

506. ~~475.~~ The Operating Agreement between Tecspec and its members outlines specific duties and obligations, including restrictions on competitive conduct.

507. ~~476.~~ The Individual Counterclaim Defendants and Michael Donnolo agreed to the provisions therein, making it a binding contract.

508. ~~477.~~ That Operating Agreement contained an implied covenant of good faith and fair dealing.

509. ~~478.~~ The Individual Counterclaim Defendants breached that implied covenant of good faith and fair dealing by way of engaging in fraud and committing the RICO Scheme and Price Manipulation scheme.

510. The Individual Counterclaim Defendants have manipulated pricing structures to benefit SRS at the expense of Tecspec, ensuring that SRS profits from sales while Tecspec incurs losses, thereby undermining Tecspec's financial stability and operational sustainability.

511. The Individual Counterclaim Defendants have engaged in a fraudulent scheme to misappropriate Tecspec's resources and intellectual property, transferring valuable designs and products to other entities for their own benefit, without compensating Tecspec.

512. Individual Counterclaim Defendants have also engaged in a pattern of racketeering activity, including mail and wire fraud, tax fraud, and embezzlement, further exacerbating the financial harm to Tecspec and Michael Donnolo.

513.     The actions of the Individual Counterclaim Defendants have impaired Michael Donnolo's contractual rights and reasonable expectations under the Operating Agreement by depriving him of the financial benefits and profits that should have accrued to Tecspec, thereby diminishing the value of his ownership interest.

514.     The actions of the Individual Counterclaim Defendants have further impaired Michael Donnolo's contractual rights and reasonable expectations under the Operating Agreement by undermining the operational integrity and market position of Tecspec, which Michael Donnolo has worked to establish and maintain.

515.     The actions of the Individual Counterclaim Defendants have further impaired Michael Donnolo's contractual rights and reasonable expectations under the Operating Agreement by creating an environment of mistrust and instability within Tecspec, contrary to the cooperative and mutually beneficial relationship envisioned by the Operating Agreement.

516.     479. As a result of these breaches, Michael Donnolo was damaged, which damages are

proximately caused by the Individual Counterclaim Defendants' breaches.

517.     Michael Donnolo has suffered damages, including but not limited to: (a) loss of profits and business opportunities that were wrongfully diverted to SRS and other entities controlled by the Individual Counterclaim Defendants; (b) diminished value of his ownership interest in Tecspec due to the financial and operational harm inflicted by the Individual Counterclaim Defendants; and (c) legal and other costs incurred in addressing and remedying the breaches and misconduct of the Individual Counterclaim Defendants.

518.     480. By the foregoing, the Individual Counterclaim Defendants are liable to Michael Donnolo in an amount to be determined at trial.

## ~~Count~~**COUNT** IX

*Trespass*
*By Braya as against the Individual Counterclaim Defendants*

519.   ~~481.~~ Counterclaim Plaintiffs reincorporate by reference all preceding allegations as if fully set forth herein.

520.   Braya's facility, located at 2589 Richmond Terrace, Staten Island, New York, is a secured premises accessible only to Michael Donnolo and specific authorized employees, agents, or vendors.

521.   The facility is gated, with locking doors and security cameras, ensuring that no unauthorized individual from the public is permitted to enter without authorization.

522.   ~~482.~~ On October 17, 2024, Senia, Rose, and an unknown third person unlawfully entered the Braya facility without consent, intending to misappropriate proprietary technology and information.

523.   ~~483.~~ Their entry was intentional, as they were fully aware they had no right to access the premises. In fact, Senia and Rose were directed not to enter, to immediately leave the premises, and when they refused, the police were called.

524.   During their unauthorized entry, Senia and Rose systematically took pictures of equipment, machinery, and other non-public information within the facility, actions documented in video footage.

525.   ~~484.~~ As a result of this trespass, Counterclaim Plaintiffs suffered damages, including loss of proprietary information and operational disruption.

526.   ~~485.~~ By the foregoing, Senia and Rose are liable to Braya in an amount to be determined

at trial.

## Count X

*Failure to Pay Wages*

## COUNT X

*Failure to Pay Wages*
*By the Individual Counterclaim Plaintiffs against Tecspec LLC*

527. ~~486.~~ Counterclaim Plaintiffs reincorporate by reference all preceding allegations as if fully set forth herein.

528. ~~487.~~ Michael Donnolo, John Michael Long, and Joshua Donnolo were all employed by

Tecspec, providing services critical to the ~~company's~~company's operations.

529. ~~488.~~ Despite their performances of work, Counterclaim Defendants failed to compensate them appropriately for their labor, violating both state and federal labor laws.

530. Counterclaim Plaintiffs' final paychecks were delayed, and payments were not made until their attorneys intervened, incurring additional attorneys' fees.

531. Joshua Donnolo's final payment was not made until January 2025, resulting in additional costs for filing a New Jersey state tax return.

532. ~~489.~~ This failure to pay wages has resulted in economic harm and loss for each of these Counterclaim Plaintiffs, including the owed interest.

533. ~~490.~~ As a result, the Individual Counterclaim Plaintiffs were damaged in an amount which compensation was withheld, plus interest, penalties, and related costs.

## ~~Count~~COUNT XI

*Breach of Fiduciary Duty*
*By Michael Donnolo against Senia, Rose, and Schlenker*

534. ~~491.~~ Counterclaim Plaintiffs reincorporate by reference all preceding allegations as if fully set forth herein.

535. ~~492.~~ Michael Donnolo, Senia, Rose, and Schlenker are members of Tecspec, owing to each other fiduciary duties of loyalty and care.

536.   493.  By engaging in fraud, the RICO Scheme, Price Manipulation scheme, and diversion of corporate opportunities and assets, Senia, Rose, and Schlenker, each breached their fiduciary duties to Michael Donnolo.

537.   The Individual Counterclaim Defendants systematically misappropriated Tecspec's assets by transferring products to themselves at below-cost prices and selling them through SRS, thereby depriving Tecspec of its rightful profits and causing financial harm to Michael Donnolo.

538.   The Individual Counterclaim Defendants diverted business opportunities from Tecspec to SRS and other affiliated entities, in direct violation of the non-compete provisions in Tecspec's Operating Agreement.

539.   This diversion resulted in lost profits and diminished market presence for Tecspec, further harming Michael Donnolo's financial interests.

540.   The Individual Counterclaim Defendants submitted fraudulent financial reports to financial institutions, falsely inflating the profitability of SRS and Tecspec to secure loans and credit lines. These actions increased Tecspec's liabilities and financial burdens, adversely affecting Michael Donnolo's financial position.

541.   494.  As a result of the Individual Counterclaim Defendants' breach of fiduciary duties, Michael Donnolo was injured in the amount of millions of dollars in damages.

542.   The diversion of corporate opportunities and misappropriation of Tecspec's assets resulted in substantial lost profits that would have otherwise benefited Michael Donnolo as a member of Tecspec.

543.   The fraudulent financial reporting and manipulation of Tecspec's financial statements have increased the company's liabilities, placing an undue financial burden on Michael

~~495.~~ Donnolo. By the foregoing, the Individual Counterclaim Defendants are liable to Michael Donnolo in an amount to be determined at trial.

## COUNT XII

### *Defamation Per Se*

### *By Braya as against the Individual Counterclaim Defendants*

544.    Counterclaim Plaintiffs reincorporate by reference all preceding allegations as if fully set forth herein.

545.    Braya had established business relationships within the HVAC industry.

546.    Counterclaim Defendants became aware of these relationships and intentionally interfered by attempting to sabotage those relationships.

547.    Counterclaim Defendants have engaged in a campaign to unjustifiably and unreasonably interfere with Braya's business opportunities, making false and defamatory statements against Braya and Michael Donnolo concerning the disposition of this case, or false and unfounded statements concerning the ability of Counterclaim Plaintiffs to meet certain contract requirements.

548.    The false statements were made by the Counterclaim Defendants knowingly and without basis other than with the intent to harm the reputation of the Counterclaim Plaintiffs and to interfere with Counterclaim Plaintiffs' business relationships.

549.    The false statements were published to third parties, including potential business partners and clients of the Counterclaim Plaintiffs, thereby causing harm to the Counterclaim Plaintiffs' business reputation and standing in the HVAC industry.

550.    The statements made by the Counterclaim Defendants are defamatory per se as they impugn the Counterclaim Plaintiffs' business integrity and competence, which are essential to their business operations and reputation in the HVAC industry.

551.    By the foregoing, Counterclaim Defendants are liable to Braya for defamation per se in an amount to be determined at trial.

## INJUNCTION

552.    496. Counterclaim Plaintiffs allege an on-going breach of the Non-Compete, by the Counterclaim Defendants and, specifically, SRS.

553.    497. Senia, Rose, and Schlenker continue to corrupt and pervert the business of Tecspec for the benefit of SRS, using SRS to compete and subsume corporate opportunities for Tecspec in direct violation of the Operating Agreement containing a covenant not-to-compete.

554.    498. Plainly, SRS is located and does business in Middletown, New Jersey and Manhattan, New York, both locations in which Tecspec has done business.

555.    499. Tecspec lacks an adequate remedy at law to prevent SRS from misappropriating business opportunities from Tecspec.

556.    500. Tecspec, Michael Donnolo, and Braya are entitled to an injunction as against SRS, and the Individual Counterclaim Defendants, for unlawful competition, the AIFE's RICO Scheme, and misappropriation of Braya technology.

## PRAYER FOR RELIEF

**WHEREFORE**, Counterclaim Plaintiffs respectfully request that this Court enter judgment in their favor and against Counterclaim Defendants as follows:

a)    An injunction permanently prohibiting Counterclaim Defendants from using or disclosing Counterclaim Plaintiffs' proprietary information, trade secrets, and further trespassing upon Counterclaim Plaintiffs' premises.

b)    An order enjoining Counterclaim Defendants from unlawfully competing with Counterclaim Plaintiffs using wrongfully obtained information and taking actions that undermine the business relationships of Braya and Tecspec.

c)    An award of actual damages for lost profits, lost opportunities, and compensation for unpaid wages.

d)      An award of punitive damages due to the willful and malicious nature of ~~d)~~ Counterclaim Defendants' conduct.

e)      A declaration from this Court establishing the proprietary nature of the misappropriated information as belonging to Braya and Tecspec, along with an order directing SRS to cease any further use or profit from such information.

f)      An order requiring Counterclaim Defendants to return all proprietary materials and documents belonging to Counterclaim Plaintiffs.

g)      An award of Counterclaim Plaintiffs' attorney's fees, costs, and expenses ~~g)~~ incurred in connection with this action.

h)      Treble damages, punitive damages, and compensatory damages for Counterclaim Defendants' various breaches of 18 U.S.C. §§ 1961-1968, which includes attorneys' fees, costs, and expenses,

i)      Such other and further relief as this Court may deem just and proper.

Dated:    New York, New York
        July 7, 2025

                 **ROSENBERG & ESTIS, P.C.**
                 *Attorneys for Defendants/Counterclaim Plaintiffs*

~~Dated:     New York, New York~~
~~March 25, 2025~~

                 ~~**ROSENBERG & ESTIS, P.C.**~~
                 ~~*Attorneys for Defendants/Counterclaim Plaintiffs*~~

                 ~~Matthew S. Blum, Esq.~~
                 ~~733 Third Avenue~~
                 ~~New York, New York 10017~~
                 ~~(212) 551-8409~~
                 ~~MBlum@RosenbergEstis.com~~

                 Matthew S. Blum, Esq.
                 733 Third Avenue
                 New York, New York 10017
                 (212) 551-8409
                 MBlum@RosenbergEstis.com